Marc J. Randazza, NV Bar No. 12265
Ronald D. Green, NV Bar No. 7360
Alex J. Shepard, NV Bar No. 13582
Randazza Legal Group, PLLC
8991 W. Flamingo Rd., Ste. B
Las Vegas, NV 89147
Telephone: 702-420-2001
ecf@randazza.com

Attorneys for Defendants
Keith Hodge, Kevin Hodge, and Hodgetwins, LLC

RANDAZZA | LEGAL GROUP

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

PASTOR STEVE SMOTHERMON,

Plaintiff,

v.

KEITH HODGE, an individual; KEVIN HODGE, an individual; HODGETWINS, LLC, a limited liability company,

Defendants.

Case No. 2:25-cv-01858-APG-BNW

**DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF PLAINTIFF'S PROPOSED EXPERT ROBERT J. FISHER**

Defendants Keith Hodge, Kevin Hodge, and Hodgetwins, LLC ("Defendants") move to exclude the report and testimony of Plaintiff's designated expert, Robert J. Fisher, in their entirety or, in the alternative, to exclude the opinions identified in Section 4.2.

As detailed in the Declaration of Ronald Green ("Green Dec."), attached, defense counsel made numerous attempts to meet and confer prior to the filing of this Motion. Mr. Green called both Nicole Westbrook and Mike Jackson, Plaintiff's counsel of record. He additionally sent each of them several emails and text messages. They declined to speak with him, forcing Defendants to file this Motion without a meet-and-confer conference.

//

//

RANDAZZA | LEGAL GROUP

**TABLE OF CONENTS**


1.0 INTRODUCTION .......... 1
2.0 RELEVANT BACKGROUND .......... 2
2.1 The Facebook post .......... 2
2.2 Mr. Fisher's report .......... 3
2.3 Mr. Fisher's prior exclusions .......... 3
2.4 Mr. Fisher's deposition .......... 4
3.0 LEGAL STANDARD .......... 6
4.0 ARGUMENT .......... 7
4.1 Plaintiff cannot carry his burden under Rule 702 .......... 7
4.1.1 Rule 702(a): Fisher has no specialized knowledge that helps the jury .......... 7
4.1.2 Rule 702(b): Fisher did not rely upon sufficient facts or data .......... 9
4.1.2.1 He collected no facts and took no measurements .......... 9
4.1.2.2 He never established a baseline .......... 10
4.1.2.3 He ignored contrary evidence .......... 11
4.1.3 Rule 702(c): Fisher applied no reliable principles or methods .......... 12
4.1.4 Rule 702(d): Fisher did not reliably apply any method to the facts .......... 14
4.1.4.1 He adopted counsel's positions as findings .......... 14
4.1.4.2 He did not know the facts .......... 16
4.1.4.3 He filled gaps with conjecture .......... 17
4.1.4.4 His method is a filter keyed to his client .......... 18
4.2 In the alternative, specific opinions should be struck, and his rate should be reduced .......... 18
4.2.1 Opinions resting on undisclosed sources .......... 19
4.2.2 Fault, state-of-mind, legal, and personal opinions .......... 20
4.2.3 Psychological and cost opinions beyond his expertise .......... 21
4.2.4 Inflammatory language under Rule 403 .......... 22

4.2.5 Mr. Fisher's rate should be reduced ... 22

5.0 CONCLUSION ... 24

RANDAZZA | LEGAL GROUP

RANDAZZA | LEGAL GROUP

# TABLE OF AUTHORITIES

**Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002)........ 13

*Borel v. Chevron U.S.A. Inc.*,
265 F.R.D. 275 (E.D. La. 2010)........ 23

*Bowen v. Monahan*,
163 F.R.D. 571 (D. Neb. 1995)........ 22

*Carroll v. Trump,*
No. 20-cv-07311-LAK, 2023 U.S. Dist. LEXIS 179828 (S.D.N.Y. Oct. 5, 2023) ........ passim

*Carroll v. Trump*,
No. 22-cv-10016, 2023 U.S. Dist. LEXIS 52011 (S.D.N.Y. Mar. 27, 2023)........ 2, 3, 4, 13

*Claar v. Burlington N. R.R. Co.*,
29 F.3d 499 (9th Cir. 1994) ........ 7, 12

*Daubert v. Merrell Dow Pharms., Inc.*,
43 F.3d 1311 (9th Cir. 1995) ........ 6

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993)........ 6, 7

*De Blanc v. Aloha Airport Express, LLC*,
416 F. Supp. 3d 1056 (D. Nev. 2019)........ 7, 9, 14

*Edin v. Paul Revere Life Ins. Co.*,
188 F.R.D. 543 (D. Ariz. 1999) ........ 23

*EEOC v. Johnson & Higgins, Inc.*,
No. 93 Civ. 5481 (LBS) (AJP), 1999 U.S. Dist. LEXIS 478 (S.D.N.Y. Jan. 21, 1999) ........ 23

*Engilis v. Monsanto Co.*,
151 F.4th 1040 (9th Cir. 2025) ........ 6, 7, 12

*Garity v. APWU-AFL-CIO*,
No. 2:11-cv-01109-APG-CWH, 2017 U.S. Dist. LEXIS 131875 (D. Nev. Aug. 15, 2017)........ 7

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997)........ 7, 14, 18

*Hangarter v. Provident Life & Accident Ins. Co.*,
373 F.3d 998 (9th Cir. 2004) .......... 7, 21

*Joachims v. Isuzu Motors, Ltd.*,
141 F.R.D. 493 (S.D. Iowa 1992) .......... 23

*Key v. Qualcomm Inc.*,
129 F.4th 1129 (9th Cir. 2025) .......... 7

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) .......... 6, 7

*Magee v. Paul Revere Life Ins. Co.*,
172 F.R.D. 627 (E.D.N.Y. 1997) .......... 23

*Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*,
523 F.3d 1051 (9th Cir. 2008) .......... 7, 21

*Perez v. State Farm Mut. Auto. Ins. Co.*,
No. C 06-01962 JW, 2012 U.S. Dist. LEXIS 106908 (N.D. Cal. July 31, 2012) .......... 6

*Reed v. Binder*,
165 F.R.D. 424 (D.N.J. 1996) .......... 22

*Reit v. Post Props., Inc.*,
No. 09 Civ. 5455, 2010 WL 4537044 (S.D.N.Y. Nov. 4, 2010) .......... 22

*U.S. Energy Corp. v. NUKEM, Inc.*,
163 F.R.D. 344 (D. Colo. 1995) .......... 22

*United States v. Valencia-Lopez*,
971 F.3d 891 (9th Cir. 2020) .......... 6

*Walker v. Spike's Tactical, LLC*,
No. 2:13-cv-01923-RFB-PAL, 2015 U.S. Dist. LEXIS 1125 (D. Nev. Jan. 2, 2015) .......... 23

**Other Authorities**

Fed. R. Evid. 702 advisory committee's notes to 2000 amendment .......... 7

Fed. R. Evid. 702 advisory committee's notes to 2023 amendment .......... 6

**Rules**

Fed. R. Civ. P. 26 .......... 7

Fed. R. Civ. P. 37 .......... 7, 20



RANDAZZA | LEGAL GROUP

Fed. R. Evid. 104 .......... 6

Fed. R. Evid. 403 .......... 21, 22

Fed. R. Evid. 702 .......... passim

Fed. R. Evid. 703 .......... 16

RANDAZZA | LEGAL GROUP

RANDAZZA | LEGAL GROUP

## MEMORANDUM OF POINTS AND AUTHORITIES

## 1.0 INTRODUCTION

Defendants posted Plaintiff's photograph by mistake on a Facebook post about a different man with a nearly identical name. Plaintiff's staff flagged the error and asked that it be taken down. The post came down within hours. Plaintiff now asks a jury for $2.65 million to $5.589 million, plus an additional $325,000 to $350,000 for "reputation repair."

To support that request, Plaintiff hired expert Robert J. Fisher ("Mr. Fisher" or "Fisher"), a retired public relations practitioner. He did not interview anyone or measure anything, never looked at the photograph at the crux of the Complaint, cannot identify one person who saw Defendants' allegedly defamatory Facebook post, and cannot identify one person whose opinion of Plaintiff changed because of it. Fisher's 45-page report rests on four proverbs: (1) it takes years to build a reputation and seconds to destroy it; (2) you cannot un-ring a bell; (3) you can never wipe the slate clean; and (4) perception is more important than reality. (Expert Report of Robert J. Fisher ("Fisher Rep.") at 27, ECF No. 73-2, attached to the Green Dec. as **Exhibit 1**.) He calls these sayings "the basis of many of my conclusions and opinions in this report." (*Id.*) Defendants' rebuttal expert, Eric Rose, says of them: "They are not evidence, and standing alone they are not a methodology." (Rebuttal Expert Report of Eric Rose ("Rose Rep.") at 6, attached to the Green Dec. as **Exhibit 2**.) Mr. Fisher dismisses peer review as "BS." (Dep. of Robert J. Fisher ("Fisher Dep.") 84:20–22, attached to the Green Dec. as **Exhibit 3**.)

Where the report claims to rest on evidence, the evidence came from Plaintiff's lawyers. Its passages on metadata, reverse image searching, and "incognito mode" repeat, word for word, Plaintiff's own unverified interrogatory answers, and cite a "study" that turned out to be a four-page internal memorandum from one of Plaintiff's lawyers to another, marked "CONFIDENTIAL ATTORNEY-CLIENT WORK PRODUCT." (PASTORSTEVE 000056–59, attached as **Exhibit 4**.) Plaintiff produced it only after Defendants moved to compel. (ECF Nos. 73, 83.) While Fisher relied upon it, he never saw it. Asked whether Fisher had "adopted a study designed by the lawyers who hired [him], whose author [he] can't name, using a method [he] can't describe,"

RANDAZZA | LEGAL GROUP

Fisher answered: "Yeah, that's fair." (Fisher Dep. 141:21–25.) On the metadata passage, Mr. Fisher agreed he was "just writing what they told [him] to write." (*Id.* 267:3–7.) The damages range is "not [his] number" but the number requested by Plaintiff's counsel. (*Id.* 365:5–9.)

Mr. Fisher previously served as an expert witness for President Donald Trump in both *Carroll v. Trump* cases. Judge Kaplan excluded his testimony for the same failings described in this Motion. *Carroll v. Trump*, No. 22-cv-10016, 2023 U.S. Dist. LEXIS 52011, at *9-12 (S.D.N.Y. Mar. 27, 2023) ("*Carroll II*"); *Carroll v. Trump,* No. 20-cv-07311-LAK, 2023 U.S. Dist. LEXIS 179828, at *4 (S.D.N.Y. Oct. 5, 2023) ("*Carroll I*") (report "lack[ed] the kind of foundation in facts, evidence, and/or experience that is demanded of expert witnesses"). His report here does not mention either exclusion. Instead, he boasts that his methodology "has been accepted and validated by both federal and state courts." (Fisher Rep. at 22.)

Plaintiff bears the burden of showing that each of Mr. Fisher's opinions rests on sufficient facts, reliable methods, and a reliable application of those methods to this case. He cannot do so because Mr. Fisher did not do the job an expert is supposed to do. Mr. Fisher should be excluded.

## 2.0 RELEVANT BACKGROUND

### 2.1 The Facebook post

On August 22, 2025, Defendants published a Facebook post criticizing Steve Smotherman, a former Cracker Barrel executive. Beneath the text they placed a photograph found through a Google search for Smotherman. It was a photograph of Plaintiff Steve Smothermon. A Google image search for "Steve Smotherman" returns mostly images of Steve Smothermon; even the first result of Mr. Fisher's own search for Steve Smotherman was of Plaintiff. (Fisher Rep. at 30.) Plaintiff's employees spotted the error the same day and informed Defendants' customer service team, who took the post down after being informed of the error. (*Id.* at 12–15; Defs.' Resp. to Pl.'s Third Set of Interrogs. No. 17, ECF No. 77-2 at 29.) YouTube made the same mistake, identifying Plaintiff as Cracker Barrel's Steve Smotherman. (ECF No. 43-23; *see* ECF No. 51 at 5.) Defendants' post was only up for three to four hours. (*Id.*) Fisher's report recites that defense. (Fisher Rep. at 18.)

Mr. Fisher does not believe Defendants acted deliberately: "I don't believe they did it on purpose at all." (Fisher Dep. 170:21–22.) "I can see how somebody might like to make a mistake and they are common names." (*Id.* 237:21–22.) His report says Defendants "had every right" to post about the Cracker Barrel executive and removed the photograph "[t]o their credit." (Fisher Rep. at 29, 43.) When Mr. Fisher was walked through the post line by line, he agreed that apart from the photograph it is "totally on target." (Fisher Dep. 252:18–253:11.)

### 2.2 Mr. Fisher's report

Mr. Fisher billed Plaintiff $900 an hour for his report and wishes to charge Defendants $975 an hour (with a four-hour minimum) for his deposition testimony. (Fisher Rep. at 3.) His report has no footnotes, bibliography, cited studies, data, or reference to any published standard. (Fisher Dep. 94:22–95:4.) Mr. Fisher claims he has "background as . . . a journalist" for the New York Times (Fisher Rep. at 3), but has testified that he worked there less than a year and that his reporting "was based on pirating" material and was "basically plagiarism." (Deposition of Fisher from *Carroll I* (Dec. 14, 2022) ("*Carroll I* Dep.") at 16:2–17:21, attached to the Green Dec. as **Exhibit 5**.) Much of the report is "boilerplate" from earlier reports, used because original drafting would have taken 25 percent more billable time.[1] (Fisher Dep. 123:19–22, 126:5–9.) It also contains text copied from Plaintiff's pleadings, letters, and interrogatory answers, as shown below.

### 2.3 Mr. Fisher's prior exclusions

In *Carroll*, Judge Kaplan held that "Mr. Fisher [did] not explain how his experience informed his [proposed testimony] . . . indeed his entire analysis of [Plaintiff's proposal for reputation repair] contains no citation other than to [Plaintiff's expert's] report," and that his report "contains a mixture of legal opinions . . . as well as arguments about the evidence . . . and sundry other things. . . None of which is a proper subject of expert testimony." *Carroll II*, 2023 U.S. Dist. LEXIS 52011, at *13-14; *see also Carroll I*, 2023 U.S. Dist. LEXIS 179828, at *4.

[1] The report gives inconsistent counts of his prior cases and reuses language from his past reports, *compare* Fisher Rep. at 3, 4, 5, *with id.* at 24, refers to "Plaintiffs" throughout (*id.* at 37–42), and contains the phrase "Facebook 19 Post," a stray from a prior report. (Fisher Dep. 122:8–123:18, 126:10–128:6.)



RANDAZZA | LEGAL GROUP

RANDAZZA | LEGAL GROUP

In this case, the only judicial comment the report quotes, without naming the case, is that his work "lays out the bare minimum in terms of support." (Fisher Rep. at 37.) The report discloses neither *Carroll* ruling. Nor does it disclose that "a couple of months ago" a Massachusetts judge "ruled that he didn't think a reputation damage expert witness had anything to offer the jury," or that a plaintiff who had retained him for three years let him go after learning of the *Carroll* exclusions. (Fisher Dep. 99:1–4, 100:3–24.)

Mr. Fisher's use of his own proverbs depends on who hired him. In *Carroll I*, retained by the defendant, Mr. Fisher left out his first proverb, "It takes years to build a reputation and seconds to destroy it," because "in this case I'm representing the defendant, so I didn't. . ." (*Carroll I* Dep. at 394:5–6, 399:5–11.) Mr. Rose compared the two reports and concluded that Mr. Fisher's "conclusions track the position of whichever party retained him, rather than a fixed, reliable methodology." (Rose Rep. at 18.) His habits are the same too: in *Carroll I* he did not read significant parts of the report he was rebutting, declined to learn how many people engaged with the statements at issue, and said, "Well, I don't particularly get into data." (*Carroll I* Dep. at 105:2–109:17, 316:4–22, 310:25.) His research in *Carroll I* was about an hour of "simply 'Googl[ing]'" the plaintiff. *Carroll II*, 2023 U.S. Dist. LEXIS 52011, at *10.

**2.4 Mr. Fisher's deposition**

Mr. Fisher was deposed on August 6, 2026. He claims to have prepared with a one-hour call to counsel and by rereading his report. (Fisher Dep. 7:22–8:10.) He testified:

- He spoke to no one but Plaintiff's counsel. (*Id.* 129:24–130:4, 133:22–134:24.)
- He does not know how many people saw, liked, commented on, or shared the post, and it does not matter "whether it was up two years or two months." (*Id.* 135:6–14, 325:17–18.)
- He does not know if anyone recognized the photograph as Plaintiff, if any Legacy Church congregants left the church, if any media outlet became more critical of Smothermon, and does not even know if any documents show that anyone discussed the post. (*Id.* 135:15–19, 312:14–313:9, 314:1–20.)

RANDAZZA | LEGAL GROUP

- When asked for "every bit of evidence" behind his word-of-mouth theory: "Well, I don't have any evidence." (*Id.* 259:6–15.)
- His report says he researched academic studies from Harvard, Duke, and Cornell. Asked to name one such study, he said, "there isn't any." (*Id.* 94:11–16.)
- He has never run a reverse image search; does not know what EXIF, metadata, or incognito mode is; had never run a Google image search; learned to take a screenshot a week before the deposition; and has never heard of the Wayback Machine or any media-monitoring platform. (*Id.* 75:3–9, 175:4–6, 181:17, 212:14–214:14, 266:15-16, 299:4–13, 364:9–19.)
- His only original research was a Google search that anyone could have done. It was undated, undocumented, run while logged in, and (by his own testimony) "can't be replicated." (Fisher Rep. at 30; Fisher Dep. 218:17–219:3, 280:11–12.)
- He never measured Plaintiff's reputation before the post and testified there was no way to do so. (Fisher Dep. 298:6–7.)
- When handed a compilation of Plaintiff's earlier press coverage, he declined to read it. (*Id.* 275:3–5.)
- In 133 engagements, whenever he has worked for a plaintiff, he has always found they suffered reputational harm. (*Id.* 101:11–102:17, 301:14–19.)
- His report block-quotes a letter from Plaintiff's counsel to Plaintiff, marked "PRIVILEGED AND CONFIDENTIAL," and describes it as a letter to defense counsel, even though his own materials list identifies it as an email "to Pastor Steve Smothermon." (Fisher Rep. at 16, 22; **Exhibit 4**, PASTORSTEVE 000053–55.) He insisted "[t]here's no attorney-client in it," then conceded "obviously there's an error there of some sort." (Fisher Dep. 145:15–17, 147:6–7.)
- He has faced "about 30 or 40 exclusion motions" and observed that "most people don't go over my report . . . that thoroughly." (*Id.* 98:6–7, 375:2–6.)

//

//

RANDAZZA | LEGAL GROUP

## 3.0 LEGAL STANDARD

An expert may testify only "if the proponent demonstrates to the court that it is more likely than not that" the expert's specialized knowledge will "help the trier of fact"; the testimony is "based on sufficient facts or data"; the opinion is the "product of reliable principles and methods"; and the opinion reflects a reliable application of those "methods to the facts of the case." Fed. R. Evid. 702. The 2023 amendment was adopted because "many courts have held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility. These rulings are an incorrect application of Federal Rules 702 and 104(a)." Fed. R. Evid. 702 advisory committee's notes to 2023 amendment. "[T]here is no presumption in favor of admission." *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1049 (9th Cir. 2025).

Reliability turns on whether the method can be tested, if it has been tested, if it has been subjected to peer review, has a known error rate and controlling standards, and is generally accepted. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593–94 (1993). Also significant is "whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) ("*Daubert II*"). An expert who relies mainly on material selected and sent by retaining counsel uses a method that tilts toward a predetermined conclusion. *Perez v. State Farm Mut. Auto. Ins. Co.*, No. C 06-01962 JW, 2012 U.S. Dist. LEXIS 106908, at *21-22 (N.D. Cal. July 31, 2012) (*citing Daubert II*, 43 F.3d at 1317).

The gatekeeping duty applies to experience-based testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). The Ninth Circuit rejected a default rule that objections to experience-based testimony go only to weight, and has explained that reliability matters more, not less, when an opinion rests on experience rather than on testable methods. *United States v. Valencia-Lopez*, 971 F.3d 891, 900 (9th Cir. 2020). The expert must "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how

that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's notes to 2000 amendment. The test is whether he "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152; *Garity v. APWU-AFL-CIO*, No. 2:11-cv-01109-APG-CWH, 2017 U.S. Dist. LEXIS 131875, at *4 (D. Nev. Aug. 15, 2017) (Gordon, J.).

"[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). This Court has excluded an expert whose opinions "do not assist the jury and are not the product of reliable principles and methods." *De Blanc v. Aloha Airport Express, LLC*, 416 F. Supp. 3d 1056, 1063 (D. Nev. 2019) (Gordon, J.). An expert who fails to account for obvious alternative explanations is excluded. *Claar v. Burlington N. R.R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994); Fed. R. Evid. 702 advisory committee's notes to 2000 amendment (citing *Claar*); *Engilis*, 151 F.4th at 1054. And an expert must disclose "the facts or data considered" in forming his opinions or lose the use of them. Fed. R. Civ. P. 26(a)(2)(B)(ii), 37(c)(1); *Key v. Qualcomm Inc.*, 129 F.4th 1129, 1143 (9th Cir. 2025).

Opinions on matters within jurors' ordinary understanding do not help them. *De Blanc*, 416 F. Supp. 3d at 1063. An expert may not instruct the jury on the law, offer legal conclusions, or testify to a party's state of mind. *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004); *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008).

## 4.0 ARGUMENT

### 4.1 Plaintiff cannot carry his burden under Rule 702

#### 4.1.1 Rule 702(a): Fisher has no specialized knowledge that helps the jury

Mr. Fisher's stated methodology has three steps: gather information, analyze it, reach conclusions. (Fisher Rep. at 23–24.) That describes any exercise of judgment by anyone on any subject. He agreed his field is more art than science. (Fisher Dep. 301:25–302:3.) His method has no known error rate, no written standards, and has never been reviewed by anyone. (*Id.* 91:25–



RANDAZZA | LEGAL GROUP

RANDAZZA | LEGAL GROUP

92:11, 300:14–25.) Pressed on what exactly his method was, he said: "You can't replicate that. . . That's my expertise. No one else would have that expertise. . . Nobody else can do it. She can't do it. She can't do it. And you can't do it." (*Id.* 281:22–282:4.) Rule 702 requires reasoning another professional can test. Mr. Fisher's position is that his conclusions cannot be tested because they come from him. That is, by definition, an un-scientific methodology.

Mr. Fisher has no expertise in how readers perceive a post: "I don't know that I have any expertise in visual, but reading comprehension -- I mean, I have a college education." (*Id.* 217:7–13.) The "extensive research of treatises and academic studies" from Harvard, Duke, and Cornell claimed at page 22 of the report does not exist: "there isn't any." (*Id.* 94:16–95:5.) Fisher's one investigative act was a Google search. "Specialized knowledge has nothing to do with doing a Google search. You're right. The gal out there could have done the same thing as I do." (*Id.* 280:9–14.) The report agrees: "As an average person, I sought to replicate the process used to do a search on the internet." (Fisher Rep. at 30.) Reviewing Mr. Fisher's self-reported independent research, Mr. Rose noted that Fisher's report was "internally inconsistent" in reporting the number of responsive search results. (Rose Rep. at 15.) While Fisher claimed that of the "first 10 listings . . . four of the six listings were about the Plaintiff, two of the listings were about the Cracker Barrel executive . . . and four were about neither." (*Id.*) Mr. Rose double checked Mr. Fisher's math, and concluded: "Four plus two plus four is ten, not six." (*Id.*) Mr. Fisher himself estimates that "probably 80 percent of the report" could be produced by anyone handed the same documents. (Fisher Dep. 290:3–11.) He did not say which 80 percent.

The remainder rests on religious doctrine he is not qualified to interpret. Mr. Fisher's theory of harm is that the post made Plaintiff "look like a charlatan" because support for DEI and LGBTQ causes is "totally opposed to biblical teachings" and "diametrically opposed" to what a pastor preaches. (Fisher Dep. 111:4–16, 112:10–18, 115:2–6, 341:6–25.) Mr. Fisher has no theological training, is not clergy, and has never administered a church. (*Id.* 37:2–15.) Fisher does not "claim to be an expert on the Bible," has never heard Plaintiff preach, is "not familiar specifically with him," and does not know whether there were homosexuals "back in those days."

(*Id.* 114:2–3, 115:18–20, 250:25–251:1, 342:3–10.) What Plaintiff's congregation believes, and whether a position on DEI contradicts it, is not a subject on which a retired publicist has specialized knowledge.

Fisher's report says it is "not plausible that anyone could have conducted a basic research on Google . . . [and] confused" Smothermon and Smotherman. (Fisher Rep. at 33.) At deposition, he abandoned this position: "I can see how somebody might like to make a mistake and they are common names, you know? I mean, how many Steve Smothermons are there? I mean, I'm human." (Fisher Dep. 237:21–25.) "I believe they thought that that was the . . . executive." (*Id.* 308:20–24.) "[I]t's easy not to see an, A-N, instead of an, O-N. I'll give that." (*Id.* 177:12–14.) Spoken, the two names "can be washed together"; it is "not an easy name to pronounce, whether there's an M-O-N or an M-A-N on the end of it." (*Id.* 261:10–15.) YouTube itself made the error he calls implausible. (ECF No. 43-23.) Whatever remains is within the jury's own competence. Jurors can decide for themselves whether Plaintiff resembles the Cracker Barrel executive and how easily "Smothermon" becomes "Smotherman." *De Blanc*, 416 F. Supp. 3d at 1062-63.

#### 4.1.2 Rule 702(b): Fisher did not rely upon sufficient facts or data

##### 4.1.2.1 He collected no facts and took no measurements

In preparing his report, Mr. Fisher did not interview anyone. He did not review church attendance, membership, or financial records beyond an annual report, medical or income records, correspondence from any congregant, or social media: "I never saw any social posts about anybody, including the defendants."[2] (Fisher Dep. 129:24–130:3, 136:1–137:4, 327:18–21.) He never saw the photograph. (*Id.* 187:4–8.) His report asserts that "the news media . . . have become more suspect and critical" (Fisher Rep. at 35), but his materials list does not contain any news articles. (Fisher Dep. 315:16–18.) He has never heard any of Plaintiff's sermons and is not familiar with his teachings, yet opines that the post destroyed his credibility. (*Id.* 250:25–251:1, 342:3–9.)

[2] This entire case is about a social media post, and Defendants' primary audience is on social media. Mr. Fisher opined on a social media case without ever reviewing any social media.



RANDAZZA | LEGAL GROUP

RANDAZZA | LEGAL GROUP

Reach, engagement, and persistence can be measured. Fisher measured none of these. He did not measure media monitoring, sentiment analysis, search-visibility review, survey, or focus groups, and Fisher had never even heard of platforms that do such work. (*Id.* 135:6–14, 299:4–13.)[3] He knows how to get data when he wants it. In *Coomer v. Donald J. Trump for President, Inc.*, a subcontractor gathered it: "If something is in my area of expertise, I do it. If not, I hire somebody to do it." (*Id.* 74:3–8, 76:10–17, 82:11–12.) He did not hire anyone here. (*Id.* 76:15.) He even identified the right metric, "How many people saw the post? That would be -- seem to me to be the obvious," and did not obtain it. (*Id.* 78:17–25.)

**4.1.2.2 He never established a baseline**

Every damages figure in the report assumes a before-and-after comparison, and here there is no "before." Asked how he measured Plaintiff's reputation before the post, Fisher said, "I didn't because I wasn't on the case before then and there's no way of postdating." (*Id.* 298:6–7.) Internet archives exist for that purpose. (Rose Rep. at 14.) He cannot name one. (Fisher Dep. 211:11–212:8.) He had never heard of the Wayback Machine or archive.org. (*Id.* 214:6–14.) He agreed his 2026 search "wouldn't say anything about '25." (*Id.* 214:15–20.) Instead of measuring Plaintiff's reputation, Fisher merely ran a Google search on his own browser, without clearing cookies or disabling personalization, and inferred that "the absence of negativity generally means the person has a fairly clean slate." (*Id.* 201:14–15, 204:10–21, 206:14–20, 209:3–10.) This simple search was done without Fisher, the so-called expert, knowing that Google personalizes results if a user does not clear cookies or disable personalization, and he did not preserve this search at all. (*Id.*) The absence on which his opinion rests is the result of a cursory search, not an attempt to determine Smothermon's reputation.

//

//

[3] Plaintiff may say a communications consultant cannot quantify exposure. In *Coomer*, Fisher was retained by the campaign, and ran a "digital survey" which collected about 38,700 viewer comments and analyzed how many of those comments had mentioned the plaintiff. (Fisher Dep. 71:20–74:19.) Fisher performed actual research when a defendant was paying.

RANDAZZA | LEGAL GROUP

#### 4.1.2.3 He ignored contrary evidence

The post was live for a few hours. However, this lawsuit continues to generate searchable coverage, and even Plaintiff has acknowledged to the Court that a current search of his name may be shaped by "the litigation's own public footprint." (Rose Rep. at 11–12; ECF No. 56 at 11.) The report never mentions it, though Mr. Fisher knew the lawsuit had been covered and that a case page existed on defense counsel's website. (Fisher Dep. 209:18–210:12.) Plaintiff has also argued that a search run months after the post "cannot establish what Kevin Hodge's August 22, 2025 search returned." (ECF No. 56 at 11.) Mr. Fisher's search was undated, and the lawyers' "study" he adopted ran its searches on June 17, 2026. By Plaintiff's own reasoning, neither says anything about August 2025.

The report states: "I did not see any information of a negative nature about him either personally or professionally." (Fisher Rep. at 29.) Mr. Rose: "That representation is not accurate." (Rose Rep. at 9.) Mr. Fisher knew of Plaintiff's "little controversies here or there . . . a political thing." (Fisher Dep. 198:22–199:2.) He initially denied writing it, then read it aloud. (*Id.* 333:15–17, 334:16–17.) When shown coverage of protests outside Legacy Church, he recognized it from his own research and volunteered that it was "directly related" to this case. (*Id.* 343:5–19.) The fourth result of his own Google search was a thread titled "Legacy Church, the unchristian church"; he never opened it. (*Id.* 327:22–328:12.) He saw the negative material, understood its relevance, yet reported that he found none. His materials list says he reviewed Defendants' Amended Answer. (Fisher Rep. at 20; Fisher Dep. 226:9–15.) When handed its exhibits, which include the YouTube and KOAT misspellings and press coverage of Plaintiff, he said, "I didn't see any of this stuff." (Fisher Dep. 217:15–218:2, 233:13–17.) He did not know YouTube had made the same mistake, and guessed that KOAT, an Albuquerque television station, is "probably . . . an internet station." (*Id.* 232:8–10, 237:5–8.) When shown this Court's May 5, 2026, order, which records Plaintiff's own claim that those exhibits were "curated . . . to smear him" (ECF No. 51 at 6), he first testified he "never saw that document," then, when told it was on his list, "[i]f it's on my list, I looked at it," then "I didn't review it." (Fisher Dep. 149:7–150:10, 330:6–15, 334:19–25.) He also never

RANDAZZA | LEGAL GROUP

asked whether Plaintiff's own church amplified the exposure, though the report states that Legacy Church's official page responded to the post. (*Id.* 325:24–326:15.)

He never considered that Defendants might be right. The report recites Defendants' points that Plaintiff did not lose any book sales, interviews, or speaking engagements; that he did not receive any negative comments from parishioners; and that church income rose in 2025. (Fisher Rep. at 19–20.) He has no evidence contradicting any of those points. (Fisher Dep. 316:9–318:8.) The report nonetheless asserts that congregants have been "moving on to other churches" and "ceasing to attend church altogether" (Fisher Rep. at 35); asked for his evidence that any congregant stopped attending, he answered, "I have no evidence." (Fisher Dep. 312:14–16.) Asked where his report addresses them, he said, "I don't think I addressed them." (*Id.* 318:19.) His description of his role is "it's my job to factor in what they're saying, but not to -- to investigate that they're saying what they're saying." (*Id.* 324:9–13.) When offered time to read the press coverage he had ignored, he declined, saying "I don't think it would change -- change my opinions on it." (*Id.* 275:3–5.) An expert who dismisses an alternative explanation without a reasoned basis has not grounded the opinion in sufficient facts or data. *Engilis*, 151 F.4th at 1054; *Claar*, 29 F.3d at 502.

**4.1.3 Rule 702(c): Fisher applied no reliable principles or methods**

Mr. Fisher starts with four adages and material from Plaintiff's counsel and works back to a fixed conclusion. He never explains why a post that was live for only a few hours, was flagged by Plaintiff's staff, and was removed the same day is somehow an "unrecoverable" reputational event. When asked about whether his first adage is a study or merely a saying, Fisher gave three different answers within a minute: "It's not a study"; "Well, it is a study . . . from . . . practical experience"; "No, it's not a formal study." (Fisher Dep. 294:17–295:6.) He agreed that children know these sayings. (*Id.* 295:18–22.) A witness whose principles are known to children is not offering any new insights to a jury.

//

//

RANDAZZA | LEGAL GROUP

The field has tools. Mr. Rose lists them: media and social monitoring, audience analytics, publicity valuation, sentiment assessment, search-visibility review, content analysis, and stakeholder assessment, which are reflected in AMEC's Barcelona Principles and the Institute for Public Relations measurement guidance. (Rose Rep. at 6–7 & nn.11–12.) Mr. Fisher used none of these tools and had not even heard of most of them. His work is "not merely incomplete but irreproducible at every point that matters to his conclusions." (*Id.* at 22.)

Fisher's method cannot be tested. His standards are "[n]ot written standard. . . I don't know if anyone has written them down"; they are "up here from -- from 50 years of doing them." (Fisher Dep. 286:20–287:14.) "The only published protocols I've ever seen are in expert witness reports, like in mine." (*Id.* 287:15–19.) It cannot be falsified: the report says its principles apply "regardless of whether it is true or not." (Fisher Rep. at 27.) A model that finds the same harm whether the statement is true or false measures publicity, not defamation. And it is indifferent to the facts: asked how much more harm two years of exposure would have caused than a few hours, he said, "I don't know that it matters whether it was up two years or two months," which he called "a supposition, obviously." (Fisher Dep. 325:15–18.) A method whose output does not change with the facts cannot reliably be applied to any facts. Asked at the end of the day what the net effect of the post on Plaintiff will be: "I don't think anyone has an actual clue." (*Id.* 368:14–25.)

What methodology he does use, he does not apply consistently. Describing his method, he said the application of his principles "depends on whether I'm representing the plaintiff or the defendant," and "[i]f I'm representing the plaintiff, I apply them to see what . . . is appropriate to them." (Fisher Dep. 270:13–22.) Asked whether he used the same method here as in *Carroll*: "No, not necessarily. . .[M]ethodology evolves." (*Id.* 196:6–15.) In *Carroll I*, he admitted that whether he invoked his first adage depended on who retained him. (*Carroll I* Dep. at 399:2–12.) Shown his own *Carroll* opinion that a polarizing speaker's audience discounts him, he did not recognize it: "I don't understand. What -- what's the context?" (Fisher Dep. 366:13–367:3.) An expert who does not apply his own stated method reliably may be excluded on that ground alone. *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 268-69 (2d Cir. 2002).

The "Bond of Trust" section illustrates his failure to reliably apply his own method. It lists professions held to a higher standard, including clergy, and concludes that harm to Plaintiff "would be particularly and significantly more damaging." (Fisher Rep. at 26.) No survey, interview, or attendance figure supports it, and in *Carroll* he opined the opposite: that a plaintiff's "long standing positive image would possibly offset most of [the] derogatory remarks." *Carroll I*, 2023 U.S. Dist. LEXIS 179828, at *4*;* Rose Rep. at 17–18. That is *ipse dixit. Joiner,* 522 U.S. at 146; *De Blanc*, 416 F. Supp. 3d at 1063.

There is no peer review or general acceptance. His "peer-reviewed" publications are expert-referral services that reposted his LinkedIn articles. (Fisher Dep. 83:4–84:16.) He had heard of none of seven leading journals in his field. (*Id.* 88:12–89:15.) Peer review is "a red herring," an "opposing counsel's witch hunt," and "useless" in "expert witnessing." (*Id.* 85:5–8, 91:5–23.) The report claims other experts gave "confirmation and validation" of his method. (Fisher Rep. at 22–23.) The only one he could name was Eric Rose, who discounts Mr. Fisher's opinion and says: "I did not provide him with the methodology he applies in this case . . . That is not peer review. It is a claim about peer review, offered on faith." (Fisher Dep. 91:3–4; Rose Rep. at 5.) Plaintiff's only evidence of acceptance is a witness who disclaims it.

#### 4.1.4 Rule 702(d): Fisher did not reliably apply any method to the facts

##### 4.1.4.1 He adopted counsel's positions as findings

The report's most specific factual claims, that incognito mode "bypasses standard internet browsers," "deliberately leaves no record of the search," and "destroys the verification history," and that "the most basic, industry-standard check of the photograph's System Metadata" would have revealed a Legacy Church source, are Plaintiff's lawyers' words. These phrases appear, nearly verbatim, in Plaintiff's June 12, 2026, response to Defendants' Interrogatory No. 8, an answer which Plaintiff has never verified despite being asked to multiple times. (*Compare* Fisher Rep. at 30, *with* ECF No. 72-5 at 8–9; *see* ECF No. 72-1 ¶ 3; ECF No. 78 at 6.) The report quotes that interrogatory answer as its source. (Fisher Rep. at 30.) The rest it attributes to "a study conducted by Plaintiff's law firm." (*Id.* at 24.) That study is a lawyer's memorandum dated June



RANDAZZA | LEGAL GROUP

18, 2026, titled "Plaintiff's Image Analysis Brief." (**Exhibit 4** at 000056-59.) The searches in the memorandum were run June 17, 2026, ten months after Defendants' Facebook post. (*Id.* at 000056, 000058.) These searches say nothing about August 2025, nor the search in this case. (*Id.*) The report itself even concedes it "is not absolute proof on its own." (*Id.*) The rest is argument about actual malice.

Mr. Fisher never saw this study, cannot name its author, does not know its methodology, did not verify any of it, and agreed counsel "could have just made it up." (Fisher Dep. 138:23–24, 139:14–22, 140:8, 141:1–25.) He does not know whether incognito mode destroys a verification history. (*Id.* 269:1–6.) Plaintiff's own counsel has since told Defendants it does not: incognito mode "governs only local browser artifacts; it does not suppress server-side logging," and Google records a signed-in user's searches "regardless of incognito mode." (ECF No. 76-1 at 3.) The report asserts, in Plaintiff's counsel's earlier words, the opposite of what Plaintiff's counsel now says. He cannot say which industry's "standard check" the report references, because that sentence came from the law firm. (Fisher Dep. at 264:21–265:18.) He has never seen a professional standard requiring a reverse image search before publishing a photograph. (*Id.* 267:14–17, 268:4–6.) Mr. Rose calls this "functioning as a conduit for someone else's advocacy." (Rose Rep. at 6.)

This copying of counsel's argument runs through the report. When shown a side-by-side of the Complaint and his report, he said, "I'll take your word for it. . . [A]gain, don't reinvent the wheel." (Fisher Dep. 161:8–21.) The description of the post at pages 12 and 13 was lifted from the Complaint, because he never saw the post. (*Id.* 156:18–157:7, 169:16–25.) The "$145 million loss in brand value" at page 13 is Paragraph 44 of the Complaint and appears nowhere in the post. (*Id.* 152:11–157:25, 264:1–2.) The block quotation at page 34 is Paragraphs 50 through 52. (*Id.* 158:8–160:11.) "Rage bait" came from the Complaint; he had never heard the phrase. (*Id.* 58:11–12, 58:18–19, 162:2–12.) The incognito mode passage tracks the proposed First Amended Complaint: "So I attributed it to the plaintiff." (*Id.* 163:10–164:20.) Then he disclaimed what he copied. Asked whether the post says Plaintiff was "opposed to 'old fashioned' values, anti-family and anti-American," as page 34 of his report states, he said "No." (*Id.* 241:16–19.) The "woke, anti-



RANDAZZA | LEGAL GROUP

American, and anti-family values" label at page 9 is "probably what I picked up from the -- the plaintiff's allegation." (*Id.* 239:11–240:12.) Asked whether he was "basing [his] opinion on inferences given to [him] by the plaintiff," he said, "Well, yeah." (*Id.* 241:1–3.) Plaintiff's counsel "provided comments" on the draft, suggesting what to "bring up"; Mr. Fisher did not keep any drafts, so no one can see what changed. (*Id.* 120:25–122:7.) By the end of the day, he testified that Ms. Westbrook "has never told me anything." (*Id.* 369:2–16.)

The damages figure is borrowed too. The report says, "they have determined" the $2.65 million to $5.589 million range; "they" are Plaintiff and his counsel, he does not know how it was derived, and "it's not my number." (Fisher Rep. at 42; Fisher Dep. 103:25–104:10, 365:5–9.)[4] Yet asked whether $2.65 million to $5.589 million is fair compensation, he called it "a reasonable range" for the jury, before admitting he has not heard Plaintiff's testimony and "neither you or I have walked the walk." (Fisher Dep. 104:17–106:18.) He vouches for a number he disclaims. "The number simply appears." (Rose Rep. at 20.) Rule 703 permits reliance on inadmissible material only where experts in the field reasonably rely on it. No reputation professional is supposed to adopt the retaining party's unattributed advocacy as a finding.

**4.1.4.2 He did not know the facts**

Asked what the case is about, Mr. Fisher testified:

> Q. What happened in this case? . . . Yeah. What is the --
> A. Very -- very simple. The -- you want me to go back to Crate & Barrel (sic)? How far back do you want me to go?
> Q. I don't know what Crate & Barrel means. You mean the store?
> A. No. This case is about Crate & Barrel. Part -- part of it is.

(Fisher Dep. 108:17–109:1.) Offered the correction, he rejected it: "We sell furniture, Crate & Barrel." (*Id.* 109:22–24.) He used the wrong company twelve times, narrating the rebranding, the

[4] He could not offer the figure as his own in any event: "that's one of the things the Court struck me down on. They said, you're not a financial expert. You can't author the . . . damages claim." (Fisher Dep. 102:23–103:7.)



RANDAZZA | LEGAL GROUP

logo, and Defendants' motive around a retailer with no connection to this case. (*Id.* at 108, 109, 110, 111, 172, 240, 244, 245, 254, 308.) His report names the right one. (Fisher Rep. at 10.) Either he forgot what it says or he did not write that part.

Fisher also could not account for the rest of the document. He did not know that the block quotation at page 34 and the "$145 million" figure came from the Complaint. (Fisher Dep. 152:11–160:11.) He described a privileged letter from Plaintiff's counsel to Plaintiff as a letter to defense counsel, then conceded "obviously there's an error there." (*Id.* 145:15–147:7.) When shown the screenshot on his materials list captioned "I'm a Right-Wing Extremist and Here's Why," he could not say who "I" is. (*Id.* 346:7–347:9.) He does not know which Defendant ran the search he says was reckless. (*Id.* 174:14–23.) Shown the italicized "conscious avoidance of truth" passage: "if it's in italics, it's not me." (*Id.* 307:6–11.) He never saw the photograph: "I've never seen the picture." (*Id.* 187:2–4.) When asked about himself, Mr. Fisher knew what he was talking about. When asked about the case, he did not. His opinions are "final unless I see something that changes them," and having not read the exhibits, "I could do a 180 flip." (*Id.* 371:17–20, 372:20–22.) An expert who has offered a report and deposition testimony should not be speculating that his view of the case could change completely if and when he reviews the materials the case is about.

**4.1.4.3 He filled gaps with conjecture**

The report says there is "no facial resemblance" between Plaintiff and the executive. (Fisher Rep. at 33.) Mr. Fisher agreed that if a stranger were shown the photograph, they would not know whom it depicted. (Fisher Dep. 253:12–257:5.) Fisher agreed that only someone who already knew the Plaintiff could recognize it, and that he is not aware of any person who saw the photograph and recognized the subject as the Plaintiff. (Fisher Dep. 253:12–257:5.) He then described a chain of hearsay by "word of mouth," "the buzz," "the gossip going around," and, asked for evidence of any of it: "Well, I don't have any evidence. It was very -- very logical." (*Id.* 257:18–259:15.) He cannot identify one republication. (*Id.* 326:16–327:5.)

//

//



RANDAZZA | LEGAL GROUP

RANDAZZA | LEGAL GROUP

As Mr. Rose noted, Fisher's theory "is asserted, not demonstrated," and Mr. Fisher "never identifies a single third party who received, forwarded, discussed, or acted on the post." (Rose Rep. at 3.) The idea that "a large percentage" of Defendants' followers are "future congregants" or book buyers (Fisher Rep. at 34) does not consider where those followers live nor whether they may be non-Christians who subscribe or buy a megachurch pastor's book for comedy. Fisher's stacking of inference upon inference, supported by no document or witness, is the *ipse dixit* that *Joiner* forbids. 522 U.S. at 146.

**4.1.4.4 His method is a filter keyed to his client**

The report calls its conclusions "objective and not based on any biases." (Fisher Rep. at 28.) About 70 percent of his roughly 130 engagements are for plaintiffs, and he has never told one that a repair program was unnecessary. (Fisher Dep. 59:3–5, 101:7–20, 102:5–17, 301:14–19.) He "usually [] think[s] they're too low" and has never documented a plaintiff exaggerating. (*Id.* 69:13–19, 103:4–5.) When a plaintiff's claim is unsupportable, he may "just skip it." (*Id.* 70:15–71:4.) An expert who answers unfavorable facts by leaving them out is not applying a method.

**4.2 In the alternative, specific opinions should be struck, and his rate should be reduced**

If any part of Mr. Fisher's testimony survives, Defendants ask the Court to reduce Mr. Fisher's rate and exclude these specific opinions, each identified by report page:

- That the misidentification "unquestionably resulted in reputation harm" and that Plaintiff suffered "irreparable reputation harm." (Fisher Rep. at 43, 44.)
- That Defendants "exhibited extreme carelessness," "maliciously double-downed," or "engaged in a conscious avoidance of truth and a flagrant disregard," and that it is "not plausible that anyone" could have confused the two men. (*Id.* at 30, 33, 43.)
- The passages at pages 29 through 33 reciting Plaintiff's interrogatory answers and the lawyers' memorandum on incognito mode, metadata, and reverse image searches, and the Google search at pages 30 through 33.

- The $2.65 million to $5.589 million damages range and the $325,000 to $350,000 repair budget. (*Id.* at 36–42.)
- The opinions on Plaintiff's mental trauma, physical symptoms, family, and church operations. (*Id.* at 35–36.)
- The audience figures at pages 10 and 11, the "Bond of Trust" opinion at page 26, the discussion of defense counsel's website at pages 28 through 29 and 33 through 34, the recitation and application of the elements of defamation at pages 25 through 26, and every passage labeled "Personal Opinion."
- The words "demonic," "malicious," and "rage bait." (*Id.* at 14, 17, 33-34, 43).

#### 4.2.1 Opinions resting on undisclosed sources

The audience figures at pages 10 and 11 came from internet research; Mr. Fisher is "not sure if [he] got that off of Wikipedia," Wikipedia appears nowhere on his materials list, and Mr. Fisher "didn't do anything to verify" the figures. (Fisher Dep. 345:3–20.) Mr. Fisher does not know whether the 28 million figure refers to the Plaintiff or the church. (*Id.* 137:4–8.)

The $325,000 to $350,000 repair budget was withheld. The report says he "projected costs for each of the activities and program elements" but "will not delineate them." (Fisher Rep. at 41.) "I didn't choose to put it in there." (Fisher Dep. 353:7.) He said it had been produced; Plaintiff's counsel, asked on the record, gave no audible answer, then asked, "Did you really not get it?" (*Id.* 354:5–7, 355:12–23.) It arrived the day of the deposition. (*Id.* 358:19.) Even then, nothing rests on a quote: a $5,000 audit at $250 an hour, a $10,500 plan, "about" $25,000 for a website, SEO at "about 2,000 a month" from a general conversation with a vendor he did not retain, and a video component from an unnamed "video guy." (*Id.* 356:9–363:10.) "I've done 35, 40 of them. I know what people charge out in the field." (*Id.* 358:23–359:3.) The report concedes the SEO component is "unlikely" to work. (Fisher Rep. at 40.) He defines search engine optimization as "scrubbing off all the negative." (Fisher Dep. 361:18–362:12.) And the program is not to start until "the trial is over, assuming that the plaintiff prevails," because a verdict "gives him hell of a launching board." (*Id.* 356:17–357:19.) A budget whose premise is winning this case is litigation strategy, not



RANDAZZA | LEGAL GROUP

damages. "A single blended number with no components behind it is not a budget. It is a guess dressed up as one." (Rose Rep. at 21.) Opinions resting on undisclosed or late-disclosed sources should be struck. Fed. R. Civ. P. 37(c)(1).

#### 4.2.2 Fault, state-of-mind, legal, and personal opinions

Mr. Fisher knows the rule: "as an expert witness, I'm not allowed to get into liability"; "I can't tie that in terms of malice or anything else." (Fisher Dep. 46:22–24, 191:1–2.) His report does it anyway. Defendants "exhibited extreme carelessness," "maliciously double-downed," engaged in a "conscious avoidance of truth and a flagrant disregard"; it is "not plausible that anyone" could have confused the two men; the post "unquestionably resulted in reputation harm"; Plaintiff suffered "irreparable reputation harm." (Fisher Rep. at 30, 33, 43, 44.) Those are negligence, malice, state of mind, causation, and the injunction standard. Confronted with each, he disclaimed it: "I'm not allowed to . . . get into causation"; "It's a personal opinion. It's not expert opinion"; "if it's in italics, it's not me." (Fisher Dep. 303:15–22, 304:11–12, 307:6–11, 310:10–12.) The "maliciously double-downed" finding rests on defense counsel's website, which he saw only when the report was nearly done, and on an assumption: "I think I'm right to make the assumption that your clients are aware that this exists." (*Id.* 53:10–13, 210:7–12, 320:19–22.) He never asked. On the state of mind that matters, his testimony helps Defendants: "I don't think that the defendants were going after the pastor in the post"; "no one is claiming them doing a hatchet job . . . deliberately or wantonly or purposely"; he offers no opinion that either Defendant doubted the photograph; the post itself is "opinion" with which he has "no problem" and is "totally on target." (*Id.* 119:4–20, 170:7–8, 171:1–4, 253:10–11, 308:17–24.)

//

//

//

//

//



RANDAZZA | LEGAL GROUP

The report is not shy about its legal purpose: Mr. Fisher "will opine on" the "Claim of Relief" of "Defamation," recites the Nevada elements he found by searching the internet, and applies them himself. (Fisher Rep. at 3, 25–26; Fisher Dep. 60:22–61:1, 307:16–21.) Fisher believes the definition of defamation is "exactly the same" in every state, and that actual malice means "negligence or reckless disregard." (Fisher Dep. 60:10–13, 304:21–24.) He last studied libel in an undergraduate course in 1966. (*Id.* 33:6–34:9.) *Hangarter* and *Nationwide* foreclose all of it. 373 F.3d at 1016; 523 F.3d at 1058.

He labeled parts of his report "Personal Opinion," including its ultimate conclusion: "This is my personal opinion based on my experience and expertise as a communication expert." (Fisher Rep. at 33–34, 44.) The label was deliberate. Asked whether those passages could be struck: "Well, if you want to, feel free to." (Fisher Dep. 309:10–20.)

#### 4.2.3 Psychological and cost opinions beyond his expertise

Mr. Fisher is not a clinician. (Fisher Dep. 63:20–64:4.) He nonetheless reports that Plaintiff suffered "anguish, fear, depression, anxiety, [and] apprehension." (Fisher Rep. at 36.) He never spoke with Plaintiff, did not review any records, and relied on a sworn account that does not exist: Plaintiff has not been deposed and has not verified a single interrogatory answer. (Fisher Dep. 64:14–65:7, 66:20–23, 131:13–132:13, 137:19–21; ECF No. 72-1 ¶ 3; ECF No. 78 at 6–7.) Plaintiff's own unverified answer states that he "has not sought or received medical treatment as a result of the Facebook Post." (ECF No. 72-5 at 7.) Fisher's reasoning: "Well, duh. . . Is he the weird duck that didn't have any when everyone else has?" (Fisher Dep. 282:8–12.) The report adds an "ongoing back problem" it concedes is "not attributable to the Facebook post," and speculation about "divorce" and children "physically attacked," with no evidence of either. (Fisher Rep. at 36; Fisher Dep. 315:19–316:8.) This fails Rule 702(a) and invites a verdict on an improper basis under Rule 403.

//

//

//



RANDAZZA | LEGAL GROUP

He is also unqualified to price a reputation repair program. The last one he ran was "[p]robably around 2000," and he cannot identify it. (Fisher Dep. 17:20–18:5.) His last audit assessment was in the 1980s or 1990s, done by staff. (*Id.* 359:13–360:2.) All of his current work is testifying. (*Id.* 13:11.) He "will have nothing to do with this program." (*Id.* 359:5–7.)

#### 4.2.4 Inflammatory language under Rule 403

"Demonic," "malicious," and "rage bait" should be excluded. "Rage bait" is not a term of art; he copied it from the Complaint. (Fisher Dep. 58:9–12, 58:18–19, 162:2–12.) He has never used "demonic" in a report before, and neither word appears in any report he wrote for a defendant. (*Id.* 59:8–21.) He says his background sections are "scrupulously neutral" and faulted the opposing expert in *Carroll* for one-sided language. (*Id.* 47:18–22, 367:4–9.) At deposition, he described whoever ran the search as "a blithering idiot," Defendants as "blathering idiots," and the standard as what "any halfways-intelligent person" would do. (*Id.* 181:7–8, 189:6–13, 224:18–23.) The words add nothing but prejudice.

#### 4.2.5 Mr. Fisher's rate should be reduced

If the Court permits Mr. Fisher to testify as an expert (which it should not), it should reduce his rate. Plaintiff agreed to pay Mr. Fisher $900 per hour, but Defendants did not and should not be subject to Plaintiff's bad bargain. "[W]hile plaintiff may contract with any expert of plaintiff's choice and, by agreement, that expert may charge unusually high rates for services, the discovery process will not automatically tax such unreasonable fees upon the defendant." *Bowen v. Monahan*, 163 F.R.D. 571, 574 (D. Neb. 1995); *see also Reit v. Post Props., Inc.*, No. 09 Civ. 5455, 2010 WL 4537044, at *2 (S.D. N.Y. Nov. 4, 2010); *U.S. Energy Corp. v. NUKEM, Inc.*, 163 F.R.D. 344, 347 (D. Colo. 1995) ("[U]nless the courts patrol the battlefield to ensure fairness, the circumstances invite extortionate fee setting."). If this Court sets a reasonable fee below the rate contracted by Plaintiff, Plaintiff, as the retaining party, may be responsible for the balance. *See Reed v. Binder*, 165 F.R.D. 424, 428 n.3 (D. N.J. 1996) ("Where the expert charges more than what a court determines is a 'reasonable' fee, the party retaining that expert must pay the amount over and above the 'reasonable' rate.").

RANDAZZA | LEGAL GROUP

When courts consider whether an expert's rate is fair, they examine the witness's expertise, the training required, prevailing rates for comparable experts, the quality of the discovery responses, the fee charged to the retaining party, and the fees the expert traditionally charges. *See Edin v. Paul Revere Life Ins. Co.*, 188 F.R.D. 543, 546 (D. Ariz. 1999); *Joachims v. Isuzu Motors, Ltd.*, 141 F.R.D. 493, 495-97 (S.D. Iowa 1992). "[C]ourts most often reduce expert fee requests when the expert seeks to charge the opposing party a higher rate than the expert charges the retaining party." *EEOC v. Johnson & Higgins, Inc.*, No. 93 Civ. 5481 (LBS) (AJP), 1999 U.S. Dist. LEXIS 478, at *3-4 (S.D.N.Y. Jan. 21, 1999) (collecting cases); *see also Magee v. Paul Revere Life Ins. Co.*, 172 F.R.D. 627, 646 (E.D.N.Y. 1997); *Borel v. Chevron U.S.A. Inc.*, 265 F.R.D. 275, 277 (E.D. La. 2010); *Walker v. Spike's Tactical, LLC*, No. 2:13-cv-01923-RFB-PAL, 2015 U.S. Dist. LEXIS 1125 (D. Nev. Jan. 2, 2015).

Fisher's report cites two rates: $900 per hour for the work he performed for Plaintiff Smothermon, and $975 per hour, with a four-hour minimum for deposition testimony. (Fisher Rep. at 3.) Mr. Fisher is charging Defendants more than he charged Plaintiff, even though Plaintiff was able to negotiate his rate and Defendants were not. His report was sloppy and incomplete by any metric, especially for an expert charging $900 per hour for his services. Fisher already charged Plaintiff too much for his work; Defendants should not have to pay a premium for shoddy product.

Mr. Rose has testified in more than forty reputation matters, has never been excluded from testifying as an expert, and is only compensated at $700 per hour. (Rose Rep. at 2.) Mr. Fisher should not be permitted to charge as much as Mr. Rose. The difference in the quality of their reports is striking.

Fisher testified at deposition that the audit assessment in his proposed repair program would be priced at $250 per hour. (Fisher Dep. at 356:9-10.) This is a reasonable rate for Mr. Fisher. He testified that it was what people "charge out in the field" during his deposition. (*Id.* at 359:2-3.) If he is permitted to testify, his rate should be reduced to what someone that actually does his job is able to charge for that work.



RANDAZZA | LEGAL GROUP

RANDAZZA | LEGAL GROUP

## 5.0 CONCLUSION

The witness offered to prove that Defendants failed at internet research has never run an image search, cannot name an archive, and does not know what EXIF means. The witness offered to prove reputational harm never measured Plaintiff's reputation, never found a single person who saw the post at issue, and refused to even read the evidence when it was handed to him. The witness offered to prove the mistake Defendants made was impossible could not himself keep Cracker Barrel and Crate & Barrel straight. He went so far as to concede the mistake is one a reasonable person could make. The witness offered to prove damages disclaimed the number cited in his report, withheld the reputation management budget until the day of his deposition, and testified that the length of publication makes no difference. Defendants respectfully request that the Court exclude the report and testimony of the witness, Robert J. Fisher, or, in the alternative, the opinions identified in Section 4.2.

Dated: October 16, 2026.

Respectfully submitted,

RANDAZZA LEGAL GROUP, PLLC
/s/ Ronald D. Green
Marc J. Randazza, NV Bar No. 12265
Ronald D. Green, NV Bar No. 7360
8991 W. Flamingo Rd., Ste. B
Las Vegas, NV 89147

*Attorneys for Defendants*
*Keith Hodge, Kevin Hodge, and Hodgetwins, LLC*

Case No. 2:25-cv-01858-APG-BNW

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on October 16, 2026, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I further certify that a true and correct copy of the foregoing document is being served via transmission of Notices of Electronic Filing generated by CM/ECF.

Respectfully submitted,

/s/ Ronald D. Green
Ronald D. Green

RANDAZZA | LEGAL GROUP