# EXHIBIT 1

Expert Report of Robert J. Fisher

(July 16, 2026)

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

**PASTOR STEVE SMOTHERMON**
**V**
**KEITH HODGE, KEVIN HODGE AND HODGETWINS, LLC.**

**(Case No. 2:25-cv-01858)**

# EXPERT REPORT OF ROBERT J. FISHER PREPARED FOR PASTOR STEVE SMOTHERMON

**July 16, 2026**

# TABLE OF CONTENTS

Assignment…………………………………………………………………….. 3

Compensation………………………………………………………………….. 3

Background and Qualifications……………………………………………………… 4 - 6

Record of Testimony…………………………………………………………………… 7 - 9

Case Background……………………………………………………………………. 9 - 16

Lawsuit Information…………………………………………………………………. 16 - 20

Information/Input Reviewed to Form Opinions…………………………………….. 20 - 22

Methodology…………………………………………………………………… 22 - 25

Preface to Findings…………………………………………………………………….. 25 - 28

Analysis and Opinions………………………………………………………………….. 28 - 29

Anatomy of Reputation Harm………………………………………………………….. 29 - 34

Analysis of Negative Impact Resulting From Reputation Harm……………………. 34 - 36

Reputation Damage Repair Program……………………………………………….. 36 - 42

Reputation Damage Compensation……………………………………………………. 42

Summary of Conclusions and Opinions………………………………………………. 42 - 44

Report Disclaimer…………………………………………………………………… 45

## ASSIGNMENT

I am a veteran communications professional, executive and counselor with a background as both a journalist (reporter for the New York Times) and a half-century career in the communications fields of public relations, advertising, and marketing, including 42 years operating my own communications firm, Fisher & Associates, Inc., located in the Los Angeles, California area. During my professional career, I have provided counsel and services to clients in a broad range of businesses, professions, and industries as well as to nonprofit organizations and government entities on a local, national, and international basis. The firm's areas of specialization included law (represented over 125 law firms), litigation (handled communications for hundreds of lawsuits and trials), crisis communications and reputation management and damage repair.

In addition to the legal profession, I have been acknowledged nationally by the news media for my background, experience, and expertise in the fields of crisis communications and reputation management and damage repair and have served for more than 40 years as an expert media information source, analyst, and commentator. Additionally, I am an experienced expert witness who has been involved in 133 cases in 32 states, 124 of which were for defamation or reputational harm, during the past 20 years.

I have amassed a significant amount of experience and expertise in aiding and counseling individuals, businesses, and entities that were in trouble, conflict, crisis situations and/or had been harmed by communications that damaged their name, goodwill, image, reputation, brand, etc.

Due to that experience and expertise, I have been retained by the Plaintiff, Pastor Steve Smothermon, to serve as an expert witness in his lawsuit against Keith Hodge, Kevin Hodge and Hodgetwins, LLC. I have been asked to assess, analyze, and offer my insights, comments, conclusions, and opinions relating to the claims of relief, including defamation and cited in the Plaintiff's complaint. I have also been requested to evaluate and assess whatever reputation damage, that the Plaintiff may have suffered from the alleged words and actions of the Defendants as well as to address what measures can be taken to restore the Plaintiff's reputation.

(Note: In this report I may use legal terminology and cite some legal standards, concepts, or principles. These are not to be interpreted as my offering legal conclusions or arguments because I am not an attorney. Any I may offer will be for the purpose of providing insight, context, or perspective to issues I am discussing or conclusions and opinions I am offering.)

## COMPENSATION

For consultations, information gathering, research and the preparation of this report, my compensation was $900 per hour. For testimony in a deposition, my rate will be $975 per hour with a four-hour minimum and trial testimony would be $5,000 for a half day and $8,000 for a full day. Travel fees are $250 per hour, and travel expenses would be required to be reimbursed as well.

(Note: My compensation is not contingent on the conclusions and opinions I will generate in this case either in this report or through my testimony nor is payment of my services dependent on the outcome of this litigation or any receipt of funds that would be awarded from it.)

**BACKGROUND AND QUALIFICATIONS**

General Summary

I am a communications generalist through the breadth of my professional background and experience (e.g., journalism, public relations, marketing, advertising) and I am also a nationally-recognized expert in crisis communications, reputation management and image repair and counseling. My firm was a (and possibly the) national pioneer in creating and developing public relations and marketing/communications programs for the legal profession. My firm provided litigation support in hundreds of civil and criminal cases (including trials) throughout the United States. Additionally, for the past 20 years I have served as an expert witness, working on behalf of both Plaintiffs and Defendants in 133 cases in 32 states and the District of Columbia. For decades I have functioned as an expert information source and analyst for the mass media on issues relating to crisis communications, damaged image, and reputation.

Litigation Experience

I have a 42-year background in representing law firms and being involved in litigation and trials by handling communications and the "Court of Public Opinion." In this capacity, I have assisted in formulating communication strategies in preparation for and during litigation. I have amassed a significant amount of background and experience in the judicial process and all aspects of litigation. This has led to me periodically receiving calls from law firms, individuals, and businesses throughout the U.S. from those who needed aid and counsel. A brief list of some of the major litigation and/or legal actions in which I was called to provide counsel or services, include:

- Iranian Hostages before the U.S. Supreme Court (Washington, D.C.)
- Dennis Wilson (Beach Boys) Estate Dispute (Los Angeles)
- Maxicare Bankruptcy (Los Angeles)
- United Airlines Crash in Iowa Cornfield (Chicago)
- International Organization Branded Cult (Scottsdale, Arizona)
- Legislature Threat to Ban Brothels in Nevada
- High School Students Killed (Paducah, Kentucky)
- Rodney King Beating (Los Angeles)
- IRS Indictment of CPA Firm for Tax Fraud (San Francisco)
- Homeowners Facing Loss of Homes (Los Angeles)
- BKK/BFI Landfill Fraud (Southern California)
- Firestone Tire Class Action Lawsuit re Defective Tires (Los Angeles/Washington, D.C.)

In providing litigation support to law firms in scores of cases, I assisted in the "Court of Public Opinion" by providing information and exposure through various channels of communications during the period from the filing of the civil or criminal action through to its conclusion. I also provided counsel and strategies relating to communications.

Media Expert/Analysis

As a direct result of my involvement in many litigious situations (many high profile), over the past few decades, I have often been sought out by the media as an expert information source and analyst to provide background, information, interpretation and analysis, commentary and opinions on news, issues and matters relating to those people, businesses, institutions, governments, etc. who were controversial, in conflict or in trouble. Generally, this is related to what the public perception

of the situation was, how it could be changed by those involved and what damage has or was it causing to their image, reputation, or brand in the short and/or long term. As an example, with both of the O.J. Simpson civil and criminal trials, and between the two, I was regularly interviewed by local, national, and international print and electronic media as an expert media source/analyst.

## Expert Witness

In 2006, on account of my extensive career in journalism, public relations, marketing, and advertising, I began providing services to litigants as an expert witness. Since then I have served as an expert witness in 133 cases on behalf of both Defendants and Plaintiffs in 32 states throughout the United States (California, New York, Florida, West Virginia, Georgia, North Carolina, Mississippi, Virginia, Utah, Tennessee, New Mexico, Nevada, Hawaii, Washington, Colorado, Minnesota, Maryland, Indiana, Delaware, Massachusetts, Michigan, Wisconsin, Ohio, Louisiana, Kentucky, Arizona, Texas and Alabama) plus the District of Columbia. I am a court-qualified expert witness, and I have represented both Plaintiffs and Defendants and provided sworn testimony in depositions, hearings, arbitration hearings and trials, both bench and jury, in state and federal courts. The bulk of the cases have been in the areas of journalism, defamation (libel and slander), and public opinion/perception. I have also been involved in cases relating to professional malpractice, overbilling, inappropriate billing, loss of image and reputation, professional business operation, and damage to a future professional career.

## Education

San Jose State College Bachelor of Arts degree Public Relations (1966)
University of California at Los Angeles (UCLA) Periodic courses taken to upgrade knowledge.
Numerous seminars, workshops, and other education forums to enhance knowledge.

## Professional Experience

| | | |
|---|---|---|
| • New York Times | Newspaper | Reporter |
| • Los Angeles Beautiful, Inc. | Public Relations Director | Non-profit organization |
| • Harshe, Rotman & Druck | National PR Firm | Asst. Account Executive |
| • Burson-Marsteller, Inc. | National PR Firm | Account Executive |
| • Atlantic Richfield Plaza | Shopping Center | Promotion Director |
| • Doremus & Company | National PR Firm | Account Supervisor |
| • Fisher & Associates, Inc. | PR Firm (Founded 1978) | President |

## Related Experience

While in the United States Army (1966-68), I served as a Public Information Officer in West Germany. I provided traditional public relations counsel and services for the Army, and I also interacted with the German media/community.

## Awards and Honors

I have received numerous awards from local and national public relations and marketing organizations for my counsel and service to clients during the past four-plus decades.

Professional Memberships

- Public Relations Society of America (former Executive Committee Member of Counselor's Academy)
- Public Communicators of Los Angeles (officer for five years)
- Institute of Management Consultants (board member)
- Public Interest Radio and Television Education Society
- American Heart Association (Vice Chairman, Communications Committee)

Lectures and Publications

Throughout my professional career, I have spoken and written on a wide variety of subjects related to public relations, marketing, and communications for business as well as for specialty areas (e.g., crisis communications, legal marketing/litigation support).

- Lectures/Presentations – I have lectured at universities (e.g., UCLA), to national conventions (e.g., American Bar Association) and at a variety of speaking forums (e.g., weekly/monthly meetings, seminars, symposiums) held by a diverse range of professional and business organizations.

- Publications – I have written a large number of articles for a variety of local, regional, and national general, business, professional (e.g., legal) and trade publications, online and offline, including newspapers, magazines, newsletters, and websites. (I have also been interviewed for, quoted in, and had articles written about me in local, regional, and national legal publications.)

- Defamation/Reputation Harm Articles – The articles I have written specifically addressing reputation damage and defamation include the following:

    - American Bar Association TYL Magazine (Summer 2020): *"Image/Reputation/Brand Damage: Does Litigation Solve the Problem?"*
    - *"Defamation: The Stain That Can Never Be Removed."*
    - *"Negative Communications: The Process of Absorption and Transmission."*
    - *"Harmful Media Exposure: Beware of the Hidden Sources of Damage."*
    - *"Defamation: Guiding Principles of Negative Communications That Result in Image and Reputation Damage."*
    - *"Defamation Defense: Is there a Third Bite of the Apple."*
    - *"Image/Reputation Damage From Media News Reports: Is it Legally Actionable."*
    - *"Reputation Damage Can Emanate From Actions/In-Actions…As well as Words."*
    - *"Defamation Cases: Why an Expert Witness is Vital."*

**RECORD OF TESTIMONY**

Following is a list of cases for which I have provided testimony over the past four years.

During this period, I have had my deposition taken 17 times:

- September 30, 2022 – *Linda Fairstein v Netflix, Inc., Ava DuVernay and Attica Locke*, United States District Court, Southern District of New York.

- October 31, 2022 – *Cumberland Family Medical Centers, Inc., d/b/a Health Kids Clinics v James A. Miller, M.D. and Blue Grass Clinics, PLLC.*, Commonwealth of Kentucky, Casey Circuit Court.

- November 29, 2022 – *San Juan Products, Inc. and American Environmental Corporation v River Pools & Spas, Inc.; River Pools Franchising, Inc.; and Thursday Pools, LLC.*, The United States District Court for the Middle District of Florida, Tampa Division.

- December 14 and 20, 2022 - *E. Jean Carroll v Donald J. Trump*, Supreme Court of the State of New York, County of New York.

- February 6, 2023 - *E. Jean Carroll v Donald J. Trump*, Supreme Court of the State of New York, County of New York.

- February 24, 2033 – *Michael Coleman v City of Delray Beach*. In the Circuit Court of the 15th Judicial District in and for Palm Beach County, Florida.

- April 3, 2023 – *John Cooksey v Roosevelt Benford.* Superior Court of New Jersey, Law Division, Camden County.

- June 19, 2023 - *Rexidence Residential Services, LLC v The Regents of the University of California.* Superior Court of the State of California, County of Orange – Central Justice Center.

- August 24, 2023 - *Pacific Coast Family Entertainment, LLC v Indoor Golf Design, LLC*, Superior Court of the State of California for the County of Monterey.

- October 4, 2023 - *Kaitlyn Kuchar v Western Reserve Academy, Thomas Siegenthaler v Western Reserve Academy and Suzanne Walker Buck*, In the Court of Common Pleas, Summit County, Ohio

- May 30, 2023 – *Karla K. Allsberry v Judge Patrick S. Flynn, Kathy Hall and Circuit Court of Lincoln County, Missouri*, In the Circuit Court of Lincoln County, State of Missouri.

- June 21 and July 16, 2024 - *Theodore Topolewski, DMH v Madison Parish Police Jury, Madison Parish Service District Hospital Board of Commissioners, and Madison Parish Service District Hospital d/b/a Madison Parish Hospital*, United States District Court for the Western District of Louisiana, Monroe Division.

- July 19, 2024 - *Alexander Belya v Hilarion Kapral a/k/a Metropolitan Hilarion; Nicholas Olkhovskiy, Victor Potao, Serge Lukianov, David Straut, Alexandre Antchoutine, Mark Mancuso, George Temidis, Serafim Gan, Pavel Loukianoff, Boris Dmitrieff, Eastern Diocese of the Russian Orthodox Church Outside of Russia and The Synod of Bishops of The Russian Orthodox Church Outside of Russia on August 1, 2020 in the United States District Court, Southern District of New York,* United States District Court, Southern District of New York.

- December 9, 2024 – *Philip Tadros and Doejo, LLC v Crain Communications, Inc.,* In the Circuit Court of Cook County, Illinois, County Department, Law Division.

- March 20, 2025 – *JW Holdings, LLC, The Chicago Center for Plastic and Reconstructive Surgery, LLC, d/b/a JW Plastic Surgery and Ashley Kalus v MJS Design+Build, Inc.*, In the Circuit Court of Cook County, Illinois County Department, Law Division.

- August 14, 2025 – *Michael David Sills and Mary Sills v Southern Baptist Convention, Dr. Ed Litton, Lifeway Christian Resources of The Southern Baptist Convention, Jennifer Lyell, Executive Committee of the Southern Baptist Convention, Bart Barber, Willie McClaurin, Rolland Slade, The Southern Baptist Theological Seminary, Dr. R. Albert Mohler, Guidepost Solutions, and Guidepost Solutions, LLC.,* United States District Court, Middle District, Nashville Division.

- May 7, 2026 - *Eric Coomer, PH.D. v Donald J. Trump for President, Inc., Rudolph Giuliani, Joseph Oltmann, FEC United, Shuffling Madness Media, Inc., dba Conservative Daily, James Hoft, TGP Communications LLC dba The Gateway Pundit, and Michelle Malkin*, Denver District Court, Denver, County, Colorado.

During this period, I have testified in five jury trials:

- May 4, 2023 - *Party Animal, Inc. v Evanger's Dog and Cat Food Co, Inc. and Nutripack, LLC,* United States District Court, Central District of California.

- On September 27, 2023 - *Pacific Family Entertainment Group, LLC d.b.a. Links Club v Interior Golf Design, LLC*, Superior Court of the State of California, County of Monterey.

- On August 13, 2024 - *Jason Moorehead v School District of the City of Allentown; Board of School Directors of the School District of the City of Allentown; Thomas Parker; Nancy Wilt; Nicholas Miller; Lisa A. Conover; Phoebe D. Harris; Audrey Mathison; Charles F. Thiel; Anthony Pidgeon; Marilyn Martinez; Jennifer Ramos; John D. Stanford; Patrick Palmer; LaTarsha Brown; Jennifer Lynn Ortiz,* United States District Court, Eastern District of Pennsylvania.

- March 6, 2025 – *Lance Weinstein v Andrew Dale and Mad Partners, LLC*, Supreme Court of the State of New York, County of Rockland.

- June 12, 2026 – *Tsvika Golan and MG Property One Urban Renewal, LLC v Scott Goldman and Adam Goldman*, Superior Court of New Jersey, Law Division: Essex County.

During this period, I have testified in three bench trials:

- December 11, 2024 – *Karla K. Allsberry v Judge Patrick S. Flynn, Kathy Hall and Circuit Court of Lincoln County, Missouri*, In the Circuit Court of Lincoln County, State of Missouri.

- January 15, 2025 – *Mary Burnette v Laura Anson*, Supreme Court of the State of New York, County of Dutchess.

- December 23, 2025 – *Taharka Aboke Bey aka Toronto Antonio Johnson v Tariq A. Nasheed aka Marcus Vincent Thomas, King Flex Entertainment, Inc. and Medanoid Nation Foundation*, Superior Court of California, County of Los Angeles.

**CASE BACKGROUND**

(Note: The purpose of this section is to provide full and complete information on the conflict between the Plaintiff and the Defendants which led to this lawsuit as well as information on the litigation to date. This would include the undisputed facts as well as the positions of all litigants. While my conclusions and opinions are based on the information contained in this section, none will be provided in this section.)

Reason For Lawsuit

Plaintiff is a preacher who espouses traditional, biblical Christian values. Defendants published an article falsely labeling him as "woke," "anti-American" and "anti-family values" which purportedly severely damaged the Plaintiff's reputation and life's work by spreading demonstrably false claims that he has abandoned traditional values and now supports progressive social agendas. The Plaintiff contends this has led to individuals questioning the foundation of his ministry, sowing doubts among his followers and undermining his central mission.

Profile of Parties in This Case

Following is a brief profile of the litigants as well as other individuals and entities germane to the issues that resulted in this lawsuit:

Plaintiff

Pastor Steve Smothermon ("Smothermon") – A resident of New Mexico, he is a conservative "Bible-based" pastor and has been the leader of the Legacy Church in New Mexico since 2002.

Defendants

- Keith Hodge ("KeithH") – A resident of Las Vegas, Nevada, he is a stand-up comedian, entertainer and social media influencer.

- Kevin Hodge ("KevinH") – A resident of Las Vegas, Nevada, he is a stand-up comedian, entertainer and social media influencer.

- Hodgetwins, LLC ("Hodgetwins") – A Limited Liability Company headquartered in Las Vegas, Nevada, which is owned by KeithH and KevinH.

Others

- Steve Smotherman (“SSmotherman”) – A former management and training leader at Cracker Barrel, he left the company in 2020 and joined the Human Rights Campaign’s Business Advisory Council, one of the most powerful LGBT lobbying groups in America.

- Legacy Church (“Legacy”) – Headquartered in Albuquerque, New Mexico, it is a non-denomination, evangelical Christian mega church which operates multiple campuses across the state.

- Nathan Hughes (“Hughes”) – An independent contractor to the Defendants who operates and manages their website.

- Cracker Barrel – Founded in 1969 and headquartered in Lebanon, Tennessee, it is an American chain of Country-themed restaurant and gift shops which has 660 outlets in 45 states.

- Krisha Mason (“Mason”) – An employee of Legacy.

- Kylie Howerton (“Howerton”) – An employee of Hodgetwins.

- Nicole A. Westbrook (“Westbrook”) – An attorney for the law firm of Jones, Davis & Jackson, PC which represents the Plaintiff.

- Marc J. Randazza (“Randazza”) – An attorney with the law firm of Randazza Legal Group, PLLC which represents the Defendants.

Background on Litigants

This report focuses on the allegations of the Plaintiff against the Defendants related to their words, actions and inactions which were key contributors to the issues that led to this litigation. Following is additional information on the primary litigants which will provide pertinent background.

Plaintiff’s Background

Smothermon, who has 35 years of experience in Pastoral Care and Spirtual Leadership, has been the Senior Pastor at Legacy for nearly a quarter of a century. In addition to his preaching responsibilities through traditional church services (approximately 312 sermons annually) as well as its online campus and various social media platforms, he is responsible for overseeing the daily operations of the multi-location church to include supervision of a 260-member team (in Albuquerque alone) as well as staff recruitment, training and development in other locations.

An author of two books (“Big Problems, Bigger God” and “Large Large Living in a Small Small World”), Smothermon utilizes numerous communications outlets to preach and advance the church’s message, include a You Tube Channel (91,000 subscribers), Instagram (20,000 followers) and a podcast titled “Legacy Church with Pastor Steve.” He is also active as a speaker and conference presenter on faith-based subjects both in the United States and internationally.

In his position, Smothermon is an active participant in, member of and has leadership positions in many types of organizations, including religious, community, charitable, youth and cultural. His education and certifications include Bachelor of Theological Studies from Vision International University, Ministerial Training from the Rhema Bible Training Center and certification by The Institute of Motivational Living as a Certified Behavioral Consultant.

Church Background

Founded in 1980 as the Victory Love Fellowship, Legacy was rebranded to its current name in 2002 when Smothermon took over its leadership. It is located on nine campuses in New Mexico and a worldwide online campus. Church locations include: Albuquerque, Rio Rancho, Edgewood, Tucumcari, Clovis, Portales, Carlsbad and Grants. The church reports it is dedicated to advocating a life marked by generosity and service. The church is reported to have 10,000 weekly in-person attendees and a membership of 20,000 members.

Legacy has an active online presence to disseminate its messages and has reached over 28 million people through social media. It has over 440,000 followers across all platforms. Its 2024 Annual Report reports that, among its charitable endeavors, it has spent over $3.7 million on missions and outreach. Additionally, it has provided 270,000 meals to Kids Around the World, provided 2,000 children with bibles, backpacks and shoes, granted 29 wishes to children in New Mexico through the Make-A-Wish Foundation

Defendants' Background

Professionally known as the "Hodgetwins," KeithH and KevinH are twin brothers who gained recognition and popularity online through their YouTube channel and social media presence. Among their programs on YouTube are "The Hodgetwins" and "Conservative Time." They reportedly have nearly 3.5 million subscribers on YouTube. They have a podcast called the "Twins." They also have a Facebook page which has over 6.3 million regular followers.

Initially, they built a following with fitness advice and reaction videos before shifting their focus to stand-up comedy and conservative political commentary. The Hodgetwins frequently post provocative videos and written content offering their conservative perspectives on current events, social issues, and political matters. They don't avoid divisive topics and are known for delivering their message or opinion in a blunt, satirical style that is directed towards their base audience of conservative followers.

Since 2016, the Hodgetwins have performed live comedy shows across the country in addition to maintaining a strong online presence. They brand themselves as the "Conservative Twins" and are known for their outspoken views on politics, culture, and current events.

SSmotherman Background

This case revolves around the misidentification by the Defendants of the Plaintiff Steve Smother<u>mon</u> with a businessman named Steve Smother<u>man</u> who was the intended subject of their negative comments on their Facebook post. SSmotherman was a queer business executive who began working for Cracker Barrel in 2005 with a goal of making changes in the company relating to Diversity, Equity, and Inclusion. An advocate for LGBTQ+, he is credited during his 15 years with the company for developing Diversity, Equity and Inclusion (DEI) initiatives and providing queer employees with platforms for advocacy and visibility.

Cracker Barrel Rebranding

This litigation traces back to an effort by Cracker Barrel to rebrand itself in August of 2025. In an effort to remove its "old fashioned" image and Americana feel and replace it with a "woke" rebranding, it eliminated its character "Uncle Herschel" from its logo. This new marketing strategy and change in branding received a significant amount of criticism and backlash (including from President Trump) and resulted in an immediate stock drop of 10%. The new logo was subsequently eliminated.

Background to Hodgetwins Attack

KeithH and KevinH are strongly opposed to DEI and woke. They reportedly have been active, intense and vehement vocal critics of both through their various internet forums. When Cracker Barrel launched its rebranding, they labeled it as *"a violation of tradition, family values, and putting America first."*

Facebook Post

On August 22, 2025, the Hodgetwins published the following post on their Facebook page:

*"Cracker Barrel's WOKE Past Comes Back to Light.*

> *The backlash over Cracker Barrel's recent logo change and rebrand is exposing the chain's long march toward woke politics.*
>
> *Meet Steve Smotherman – former Cracker Barrel management and training leader. After leaving the company in 2020, he joined the Human Rights Campaign's (HRC) Business Advisory Council, one of the most powerful LGBT lobbying groups in America.*
>
> *During his time at Cracker Barrel (2005- 2020) Smotherman:*
>
> ** Founded an LGBT employee group that grew from just 6 members into a powerful force inside the company.*

- *Helped move Cracker Barrel's HRC Corporate Equality Index score from ZERO in 2002 to 80 by 2021.*
- *Pushed policy changes like adding "sexual orientation" to nondiscrimination rules.*
- *Championed corporate activism, including:*
    - *Pulling Duck Dynasty products in 2014.*
    - *Banning a pastor with traditional views in 2019.*
    - *Sponsoring Nashville Pride in 2024.*
    - *Launching rainbow-colored rocking chairs in 2023.*

> *Now, as Cracker Barrel scraps its "old-time" logo and faces accusations or erasing its heritage, many Americans see this as part of the same work transformation.*
>
> *Users on X are connecting the dots – accusing the chain of abandoning tradition, family, and Southern values in exchange for appeasing the woke mob.*

*Cracker Barrel used to be about heritage and heartland America. Today, critics say it's becoming just another corporation chasing trends instead of honoring tradition.*

*#AntiWoke #Protect Heritage #Tradition Matters*
*#Family Values # Cracker Barrel #AmericaFirst"*

Under the text above, they posted a photograph what they assumed was SSmotherman but instead was a photograph of the Plaintiff Smothermon. In doing so, they conveyed that a Christian Pastor was a "woke" supporter of LGBTQ+ causes and was responsible for the controversial DEI-driven rebranding at Cracker Barrel, which allegedly led to a $145 million loss in brand value in a single day.

The Defendants sought to explain how the misidentification occurred and defend its impact with the following explanations:

- Conducted searches of the name "Steve Smotherman" on YouTube, Google and Gemini, and the Plaintiff kept appearing.

- KevinH, who created the post and conducted the search, had no knowledge of what SSmotherman looked like.

- Defendants were not aware of Reverse Image Search technology.

- The Plaintiff's photograph was only posted for "an hour or two."

- (Note: The error was discovered shortly after the Facebook posting by Mason, an employee of Legacy, who sent an email to and talked by telephone with Howerton who works with the Defendants. Howerton notified Hughes, the website manager who removed the post.)

- Defendants maintain that anyone who knew of the Plaintiff would know he was not an executive of Cracker Barrel and therefore, there would be no harm.

It is important to note that the Defendants, in legal filings, have made the following admissions:

- The photograph in the Facebook post was not the former Cracker Barrel executive.

- The last names of the Plaintiff and former Cracker Barrel executive are spelled differently.

- The Plaintiff has no affiliation with Cracker Barrel and is not responsible for DEI Initiatives.

- Defendants did not contact Plaintiff or Legacy to verify identity.

<u>Ramifications of Facebook Post</u>

The Complaint alleges that the confusion of the Defendants wrongfully labeled the Plaintiff, a clergyman, as "woke," "anti-American," and "anti-family values" and linked him to advocacy and support for LGBTQ+ issues and advocating DEI initiatives – all which violate the philosophy and teachings of his ministry. In the Complaint, the Plaintiff addresses the culpability of the

Defendants and the negative consequences that have and can result in the future from the misidentification and allegations in the Facebook post.

- *The term "woke" is widely understood as pejorative, often used to criticize performative activism and ideological overreach in institutions such as schools, corporations, and media. Associating Pastor Smothermon with such terminology has deeply negative implications for his public image and ministry.*

- *As a direct result of Keith and Kevin Hodge's knowing and malicious misidentification, Pastor Smothermon has been subjected to widespread backlash, criticism, and reputational damage stemming from an incident with which he had no involvement.*

- *Keith, Kevin, and Hodgetwins, LLC had no reasonable basis to believe that Pastor Steve Smothermon was "woke," anti-American, or anti–family values. They had no personal knowledge or credible evidence to support such claims, and, upon information and belief, made no attempt to verify the identity of the individual pictured or the truth of the allegations.*

- *Despite this, they chose to publish Pastor Smothermon's photograph alongside false and defamatory content with actual malice and reckless disregard for the truth.*

- *These statements were disseminated to their Facebook audience of more than 6.3 million viewers, with full awareness of the reputational harm such a misrepresentation would cause—and with the apparent intent to inflict that harm.*

<u>Notification of Error</u>

On August 22, 2025, the day of the posting, the Defendants were notified of the error and misidentification by two sources:

- As previously reported, Mason became aware of the error and notified Howerton. She notified Hughes of the wrong photograph through this email message:

  > *"The recent post about Steve Smotherman of Cracker Barrel uses an INCORRECT photo. The post features a photo of PASTOR Steve Smothermon of Legacy Church in New Mexico, a major CONSERVATIVE voice in New Mexico. This post needs to be taken down immediately because it s causing much confusion and damage. Many of our church members have commented and the official Legacy Church page has responded, requesting it be taken down."*

- Legal counsel for the Plaintiff sent a demand for retraction to the Defendants through Facebook Messenger. The text was:

  *"My name is Thomas C. Carroll, II of Jones, Davis & Jackson, PC. We represent the gentleman whose picture was wrongfully attached to this post. Our client has never had any connection with Cracker Barrel. You are hereby instructed to immediately remove his picture from this post and issue and post a full and unequivocal apology. The insinuation that our client is associated with Cracker Barrel is egregious and defamatory. Time is of the essence."*

As a result of these notifications, it was reported that the photo on the Facebook post was taken down that same day.

Plaintiff's Case of Defendants' Wrongdoing and Defendants' Response

The essence of the Plaintiff's allegations of wrongdoing against the Defendants which he alleged caused reputation harm and the Defendants' response is detailed in a series of letters exchanged between the respective attorneys, Westbrook and Randazza.

On February 10, 2026, Westbrook sent a letter to Randazza outlining the justification for the Plaintiff's Cause of Action of Defamation. The issues she raised, included:

- The Facebook post contained a specific, factually verifiable narrative alleging he was the architect of a corporate rebranding, strategy that caused a $145 million loss in brand value for the Cracker Barrel organization.

- Below the text, the Defendants published a photo of a man and reported that he joined the Human Rights Campaign's Business Advisory Council, founding an LGBT employee group, and implementing specific DEI policies.

  (Note: The inference was that these were actions that were attributed to a conservative Pastor whose reputation relies entirely on his adherence to traditional biblical values.)

- This was not an innocent mistake. Hodgetwins are a sophistical media entity who monetize their commentary with over 6.3 million followers.

- They do not lack knowledge and skill in publishing and posting on social media.

- The two men look nothing alike and the failure to identify the person they were publicly shaming is evidence of "reckless disregard" required to establish actual malice.

Randazza responded in a letter to Westbrook with a combination of a denial of harm to the Plaintiff and elements of a legal defense of the Defendants' actions. Following is a digest of some of his explanations and assertions:

- A Google search of "Steve Smotherman" show top results are the pastor.

- Pastor is a public figure (limited purpose public figure)

- Actual malice cannot be proved.

- Defendants are protected by the First Amendment and the Anti-Slapp law.

- But even if the inclusion of the Plaintiff's photograph led readers to somehow presume that he was "woke" or insufficiently "conversative," such statements would not be defamatory. They would be considered opinion.

- No specific allegations even suggest a failure to exercise reasonable care. Defendants would have little difficulty showing that their publishing activities fall well within industry standards.

- Anti-American and Anti-Family values are not clearly defined and are not defamatory.

- There are no discernible damages – the Plaintiff didn't work for Cracker Barrel and those who don't know who he is, there would be no harm to him.

- Even if the inclusion of the Plaintiff's photograph led readers to somehow presume that he was "woke," it does not have a clear meaning or definition and, to some, might have a positive reference.

On February 25, 2026, Westbrook responded to Randazza's assertions and defenses in a letter to him. Following are some excerpts from her letter.

> *"This is Fact-Based Defamation: We argued that the Hodgetwins did not just call you woke as an opinion. They explicitly published your photograph alongside verifiable, factual assertions—claiming you were the architect of a corporate rebranding strategy, founded an LGBT employee group, and caused a $145 million loss in brand value. Attributing these specific corporate actions to a conservative pastor is defamatory per se.*
>
> *They Acted with Actual Malice: The Hodgetwins are not casual internet users; they are a highly sophisticated media entity with 6.3 million followers. The visual difference between you and the corporate executive is obvious, as is the spelling of your last names. A simple verification would have revealed the incongruity of a conservative pastor running a corporate HR department. Their failure to check is the very definition of reckless disregard for the truth."*

## LAWSUIT INFORMATION

On October 1, a lawsuit was filed on behalf of Pastor Steve Smothermon in the United States District Court, District of Nevada against Keith Hodge, Kevin Hodge and Hodgetwins, LLC. On July 1, 2026, Plaintiff moved to amend his complaint, adding claims for relief based on Defendants' admissions in discovery.

### Claims For Relief

In his First Amended Complaint, the Plaintiff cited the following Claims of Relief:

- Defamation and Defamation Per Se

- Permanent Injunctive Relief

- Statutory Right of Publicity/Likeness Appropriation, NRS 597.770-810

- False Light Invasion of Privacy

- Unjust Enrichment (in the alternative)

### Plaintiff Seeking Through Lawsuit

In the lawsuit, the Plaintiff is seeking the following:

- Economic damages, plus additional damages as the Court and Jury may award, as proved at trial in an amount in excess of $75,000.

- Actual damages, but not less than the statutory minimum of $750 under NRS 597.810, for the unauthorized commercial use of Plaintiffs' likeness.

- Disgorgement of all profits from the unauthorized use (in the alternative).

- Non-economic damages at the maximum rate allowed by law.

- Pre-judgment and post-judgment interest on all such amounts at the maximum rate allowed by law.

- An Order mandating that Defendants immediately stop all defamatory statements described above, and if this is violated, a significant monetary sanction by Defendants.

- Costs, expenses, and reasonable attorney fees pursuant to NRS 597.810(1) and other applicable laws that Plaintiff has incurred and will continue to incur bringing and maintaining this action.

- Exemplary and punitive damages pursuant to NRS 42.005 and NRS 597.810, based on Defendants' knowing, oppressive, and malicious conduct.

- Any and all such other and further relief that the Court deems just and equitable under the circumstances.

<u>Affirmative Defenses</u>

In response to the Plaintiff's initial Complaint, the Defendants offered the following Affirmative Defenses:

- The Claims are Barred by New York Times v Sullivan and its Progeny, Which Require Clean and Convincing Evidence of Actual Malice for a Public Figure to Prevail in a Defamation Claim.

    - Plaintiff is a public figure.

    - The Claims are Brought Against Non-Actionable Speech Made in Good Faith Without Actual Malice

        -- Defendants wished to include a photograph of Steve Smotherman in the Facebook 19 Post and performed a Google image search for Mr. Smotherman.

        -- A Google image search for Steve Smotherman primarily returned, and still primarily returns to this day, images of Steve Smothermon.

        -- Defendants did not know that the images Google showed them were not of Cracker Barrel's Steve Smotherman.

-- Defendants did not know the photo they obtained by searching for Steve Smotherman in Google image search was actually a photograph of Plaintiff Smothermon.

-- Defendants used the photograph of Steve Smothermon in good faith, as that term is described in the Nevada Anti-SLAPP statute and without actual malice as that term is defined under New York Times Co. v. Sullivan, 376 U.S. 254 (1964) and its progeny.

- ■ The Facebook Post is Not Defamatory

-- The Facebook Post was about Steve Smotherman, and to the best of Defendants' knowledge, the post is true as to Steve Smotherman.

- Plaintiff's Damages, if Any, Were Caused in Whole or in Part by Third Parties Over Whom Defendants Had No Control.
  - ■ Plaintiff's claims are barred by his failure to mitigate his damages, if any.
  - ■ Those damages could have been mitigated by Smothermon requiring corrections to YouTube or KOAT TV for the misspelling of his name, and the eventuality that others might secondarily make the same error.
  - ■ Plaintiff's damages and injuries, if any, are not attributable to any act, omission, or other conduct on the part of Defendants.
- The Complaint Fails to Allege Special Damages and/or Specific, Quantifiable Economic Loss.
- The Defendants Rely on the Wire Service Defense.
  - ■ Third party, reliable media outlets and search engines spelled the Plaintiffs name as "Steve Smotherman."
  - ■ Given that these sources were reliable, it was reasonable for the Defendants to rely upon them in their publication.
  - ■ The re-publication of the third-party information was not done with actual malice.
  - ■ Defendants were not negligent in making the Facebook post.
  - ■ Defendants had a duty to use reasonable care in finding and posting the correct photo. Defendants used reasonable care, did not breach that duty.
  - ■ Commonly used search engines, such as Google, return Plaintiff's photos when an Internet user searches for "Steve Smotherman."
  - ■ A person of ordinary intelligence and diligence would reasonably conclude that searching for "Steve Smotherman" in a search engine would primarily

result in images of "Steve Smotherman."

- Defendants had no motivation to use an incorrect photo.

- Even if Defendants had taken extra, and unnecessary, care, the photo that was returned, and that they are alleged to have used, looks nothing like what Plaintiff looks like today.

- Even if Defendants failed to use reasonable care, which they did not, this failure was not the cause of any harm to Plaintiff.

With their response to the Complaint, the Defendants filed two counterclaims seeking Declaratory Judgment under 28 U.S.C. § 2201. They sought judicial declarations that Defendants did not defame Pastor Smothermon by using his photo and did not defame him through the text of the Facebook post.

The Defendants further sought the following relief from the Court in their reply to the Complaint:

- That Plaintiff Smothermon takes nothing by way of the Complaint.

- That the Complaint be dismissed with prejudice.

- That the Court approve Keith Hodge, Kevin Hodge, and Hodgetwins, LLC affirmative defenses.

- That the Court specifically finds that Steve Smothermon is a public figure.

- That the Court award Keith Hodge, Kevin Hodge, and Hodgetwins, LLC their attorneys' fees and costs pursuant to its inherent power and the Nevada Anti-SLAPP law.

- That the Court award Keith Hodge, Kevin Hodge, and Hodgetwins, LLC such other relief as the Court deems proper.

(Note: The Defendants subsequently dropped their counterclaims.)

<u>General Defenses</u>

In various legal filings during the litigation, the Defendants offered a variety of legal claims and rebuttals to allegations of harm made by the Plaintiff, including:

- The Plaintiff is a Public Figure or at least, a Limited Public Figure.

- The Defendants are protected by the First Amendment.

- The Defendants are protected by Anti-SLAPP (Strategic Lawsuits Against Public Participation) law.

- The Plaintiff has not required or has not sought mental or physical treatment.

- The Plaintiff did not lose any book sales, media interviews, or speaking engagements.

- The Plaintiff has not received any negative comments from his parishioners.

- The church's income increased from 2024 to 2025.

**INFORMATION/INPUT REVIEWED TO FORM OPINIONS**

In connection with my preparation of this report, I have received and reviewed from Plaintiff's legal counsel the following documents and information relating to this case:

Complaint

- Pastor Steve Smothermon v Keith Hodge, Kevin Hodge and Hodgetwins, LLC (October 1, 2025)
- First Amended Complaint and Demand for Jury Trial (July 1, 2026)

Legal Documents

- Certificate of Interested Parties (October 1, 2025)
- Civil Coversheet (October 1, 2025)
- Order to Show Cause Why This Case Should Not Be Dismissed For Lack of Subject Matter Jurisdiction (October 3, 2025)
- Plaintiff's Response to Show Cause Regarding Subject Matter Jurisdiction (October 15, 2025)
- Motion to Enter Default with Memorandum of Points and Authorities, Affidavit of G. Michael Jackson (January 15, 2026)
- Offer of Judgment (February 17, 2026)
- Defendants' Answer and Counterclaim (March 3, 2026)
- Plaintiff's Motion to Dismiss Counterclaim and Strike Exhibits (March 3, 2026)
- Order (March 9, 2026)
- Certification of Interested Parties (March 10, 2026)
- Defendants' Amended Answer and Affirmative and Other Answers (March 17, 2026)
- Declaration of Leora Dimanlang (March 17, 2026)
- Plaintiff's Motion to Strike Lengthy, Speaking Affirmation, Defense and Exhibits to Recharacterize Defenses as Counterclaim's and to Dismiss Recharacterized Counterclaim's (March 18, 2026)
- Defendants' Opposition to Motion to Strike (March 19, 2026)
- Plaintiff's Response in Support of the Motion to Strike
- Defendants' Second Set of Requests for Production (March 28, 2026)
- Defendants' Third Set of Requests for Production (March 29, 2026)
- Plaintiff's Reply in Support of the Motion to Strike Lengthy, Speaking Affirmation, Defense and Exhibits to Recharacterize Defenses as Counterclaim's and to Dismiss Recharacterized Counterclaim's (March 23, 2026)
- Defendants' Initial Disclosures (April 9, 2026)
- Joint Discover Plan and Scheduling Order Submitted in Compliance with LR26-1(b) (April 9, 2026)
- Plaintiff's Rule 26(a)(1) Initial Disclosures (April 10, 2026)
- Plaintiff's First Supplemental Disclosures (April 21, 2026)

- Plaintiff's First Set of Interrogatories, Requests for Production and Requests for Admission to Defendants (April 22, 2026)
- Defendants' First Set of Requests for Admissions (May 13, 2026)
- Plaintiff's First Set of Requests for Production (May 13, 2026)
- Plaintiff's First Set of Requests for Interrogatories (May 13, 2026)
- Defendants' Responses to Plaintiff's First Set of Requests for Admission (May 21, 2026)
- Defendants' Responses to Plaintiff's First Set of Interrogatories (May 21, 2026)
- Defendants' Amended Responses to Plaintiff's First Set of Interrogatories (May 22, 2026)
- Defendants' Responses to Plaintiff's First Set of Requests for Production of Documents (May 22, 2026)
- Defendants' Second Set of Interrogatories (May 27, 2026)
- Defendants' First Supplemental Disclosures (May 29, 2026)
- Defendants' Second Supplemental Disclosures (June 5, 2026)
- Defendants' Second Amended Responses to Plaintiff's First Set of Interrogatories (June 10, 2026)
- Defendants' Amended Responses to Plaintiff's First Set of Interrogatories (June 11, 2026)
- Plaintiff's Responses to Defendants' First Set of Interrogatories, Requests for Production of Documents and Requests for Admissions (June 12, 2026)
- Defendants' Third Supplemental Disclosures (June 22, 2026)
- Plaintiff's Second Set of Interrogatories, Requests for Production, and Requests for Admission to Defendants (June 30, 2026)
- Defendants' Fourth Supplemental Disclosures (June 30, 2026)
- Plaintiff's Responses to Defendants' Second Set of Interrogatories, Second Requests for Production and Third Requests for Production (July 1, 2026)
- Plaintiff's Motion for Leave to File First Amended Complaint and Modify Scheduling Order (July 1, 2026)

<u>Miscellaneous Documents</u>

- Legacy Church, Who Are We Webpage (No date)
- Legacy Church 2024 Annual Report (No date)
- (Screenshot) Legacy Church YouTube Page (No date)
- (Screenshot) I'm a Right-Wing Extremist and Here's Why! (No date)
- (Screenshot) Pastor Steve Smothermon Instagram Page (No date)
- (Screenshot) Legacy Church Instagram Page (No date)

<u>Letters</u>

- Marc J. Randazza to Nicole Westbrook (No date)
- Marc J. Randazza to G. Michael Jackson and Nicole A. Westbrook (January 27, 2026)
- Nicole A. Westbrook to Marc J. Randazza (February 10, 2026)
- Marc J. Randazza to Nicole A. Westbrook (May 13, 2026)
- Ronald A. Green to Nicole Westbrook (May 29, 2026)
- Ronald D. Green to Nicole A. Westbrook (June 3, 2026)
- Nicole Westbrook to Marc Randazza (June 30, 2026)
- Ronald D. Green to Nicole Westbrook (July 1, 2026)

<u>Emails</u>

- Nicole A. Westbrook to Pastor Steve Smothermon (February 25, 2026)
- Nicole A. Westbrook to Marc J. Randazza (February 26, 2026)
- Nicole A. Westbrook to Marc J. Randazza (February 26, 2026)
- Nicole A. Westbrook to Marc J. Randazza (February 26, 2026)
- Nicole A. Westbrook to Marc J. Randazza (March 18, 2026)
- Nicole A. Westbrook to Marc J. Randazza (April 21, 2026)

Social Media

* Post from Thomas C. Carroll, II (August 22, 2025)
* Facebook post of "The Hodgetwins" (August 22, 2025)

Sources to Obtain Information

The aforementioned documents and informational materials listed along with internet research I conducted and information I received from Plaintiff's legal counsel provided me with the information related to this case which formed the basis for the findings, conclusions and opinions I offer in this report.

## METHODOLOGY

As an expert witness, the methodology I utilize to gather and analyze information and form my conclusions and opinions in cases is standard to both public relations professionals in addressing reputation damage on behalf of clients and to expert witnesses in my field of expertise in litigation. Further my methodology has been accepted and validated by both federal and state courts as I have testified in 18 legal proceedings including 15 trials (bench and jury trials and in state and federal courts) and three arbitration hearings.

In respect to the development of the methodology I utilize in cases, I conducted extensive research of treatises and academic studies related to expert witnesses as well as researched and reviewed reports and articles in publications written on behalf of academic (e.g. Harvard, Duke, Cornell) and legal entities (e.g. American Bar Association) to educate myself to accepted practices and procedures for forming conclusions and opinions that I would formulate. I also familiarized myself with the requirements of Rule 702 for expert witness testimony.

Peer Accepted Methodology

The role of expert witnesses is to assist the trier of fact (judge or jury) to understand complex information on technical, scientific, or professional issues by providing information and independent insight, clarity, perspective, context and/or objective and expert opinions on evidence and/or facts. The methodology I utilize in cases is guided by and consistently followed by peer reviewed and accepted methods, standards, processes, procedures, and formulas normally and routinely used by both public relations and communications professionals for clients as well as expert witnesses for litigants who were performing reputation damage determinations, analyses, and investigations.

The methodology I utilize as an expert witness in assessing and offering my conclusions and opinions is peer-accepted. It was formulated during my four decades as a public relations professional and two decades as an expert witness. In both careers, I have diligently taken

numerous actions to educate myself in standard methodology and validate my ongoing use of it. As an expert witness, they include:

- I have attended expert witness conferences, attended sessions, and interacted with other experts and obtained information on and discussed their methodologies as to obtaining, reviewing, and interpreting information in order to formulate their conclusions and opinions – to include reviewing them my methodology.

- Over the years in my profession, I have discussed and reviewed my methodology with other experts in my field by telephone, correspondence and in meetings and received their confirmation and validation of it.

- I have reviewed the methodology in the reports of other experts which I was privy to because they were on opposing sides of cases I have had and found that their methods of analysis and processes to form opinions were the same as mine.

- I have authored numerous articles about defamation and reputation harm (the last of which appeared in the 2020 edition of American Bar Association's national magazine).

This methodology is consistent with that used by public relations practitioners when addressing reputation harm. During my communications career – in addition to my direct experience - as an officer of both national and local public relations associations, I had unique opportunities to interact with other professionals to gain insight into accepted methodology and often spoke and wrote on related subjects.

My methodology as an expert witness in cases is as follows:

- <u>Gathering Information</u> – This involves educating myself to who the litigants are, the nature of the disputes that led to the lawsuit and what has transpired in the litigation to date. In my assignments as an expert witness, I fully endeavor to obtain information reflecting positions taken from both sides of the litigation so that I can understand their respective positions and the scope and consequences of the crisis for which harm was suffered. My input in this report will be based on the information I obtained and reviewed in this case which was detailed in the "Information/Input Received to Form Opinions" section of the report. The information which emanated from both sides in this litigation reflects both of their understandings of the facts as well as their interpretations and views of them. In some instances, they may agree on information and facts and in others they may not. It is not my task or responsibility to determine who is right or wrong; that will be determined in court.

- <u>Analysis</u> – Analyze the information and insight they have obtained and conduct any additional research and investigations as needed.

- <u>Formulate Conclusions and Opinions</u> – These will eventually be presented in various means or forums (e.g., expert report, deposition, trials/arbitration hearings). The conclusions and opinions I offer in cases are within the scope of my expertise, are reasoned, dependable and relevant. They are objective and not biased on behalf of the litigant who retained me. They are based both on the information and evidence I have been provided or obtained which I believe to be accurate, dependable and authentic, merged with the insight and perspective accumulated from my professional background, experience, and expertise in reputation management and

repair.

In doing so, I apply my experience, knowledge and expertise amassed during half a century as a communications professional as well as in 126 cases as an expert witness with the facts and evidence to make the determinations that I offer in this report. In all cases, once I have received all relevant information, I will take the following actions to form my conclusions and opinions:

- When applicable, apply the principles of negative communications to the case as appropriate, germane, and applicable to this litigation.

- Follow peer accepted methods, procedures and forms of analyses in both the public relations and expert witness professions relating to how to analyze and assess situations which negatively impact reputations as well as devise strategies, plans and actions to restore them.

- Apply the facts of the case in consideration of, creation and development of my conclusions and opinions.

- I consider and analyze my many decades of having managed and repaired past situations of reputation harm that I addressed as a public relations professional and expert witness. I analyze both the nature and extent of the reputational harm and determine its source. This information and insight are then factored in when developing my conclusions and opinions in this case.

Therefore, the methodology I utilize as an expert witness in assessing and offering my conclusions and opinions is peer-accepted and reviewed because it represents the universal consensus of how professionals in the field of reputation management operate when addressing reputation damage and repair as well as expert witnesses in formulating their conclusions and opinions in cases.

<u>Methodology Specific to This Case</u>

In addition to the normal actions, I take to formulate my conclusions and opinions as described above, in this case, I undertook the following:

- Researched, reviewed, and analyzed Plaintiff Smothermon’s reputation, both personally and professionally prior to August 22, 2025, when the Facebook post was published by the Defendants.

- Following the research method the Defendants purportedly claimed they did, I conducted a Google search of “Steve Smotherman” to ascertain what identification would appear as well as photographs.

- Reviewed and analyzed the words and actions of the Defendants in the case that allegedly caused the Plaintiff reputation harm.

- Reviewed a study conducted by Plaintiff’s law firm which demonstrated and concluded that the Defendants did not utilize normal and accepted photograph verification tools to verify the identity of a person in a photograph.

- Reviewed and analyzed all the forms of negative exposure that emanated from the communications directed towards the Plaintiff (e.g., internet, social media).

- Examined the allegations in the Complaint against the Defendants and compared them with the facts and evidence in this litigation.

- Assessed whether the photograph misidentification and words and representations published by the Defendants in the post would have resulted in any reputation harm to the Plaintiff.

## PREFACE TO FINDINGS

The comments, conclusions and opinions I offer in this report pertain to the issues I was asked to address as outlined in the "Assignment" section of this report. My input in this report is based on the information I obtained and reviewed in this case which was detailed in the "Information/Input Received to Form Opinions" section of the report.

I have reviewed the legal documents and other types of information listed in this section of the report and have conducted internet research to obtain some general background on the litigants in the lawsuit filed by the Plaintiff. As a result, I am versed in the facts related to this litigation emanating from the information and evidence that is available.

The analysis of the information and evidence related to this case which I have seen is germane and at the core of this litigation for both the Plaintiff and Defendants. Also included is my assessment of what reputation harm, if any, the Plaintiff has incurred resulting from the words and/or actions of the Defendants.

Definitions Applied

The Claim of Relief in this case which I will opine on as cited in the Complaint is Defamation, Although my opinion might be relevant to other claims filed in the First Amended Complaint as well. Following is the definition of Defamation under Nevada law.

Defamation – A false statement that would "tend to lower the subject in the estimation of the community and to excite derogatory opinions against him and to hold him up to contempt." Elements for Defamation are:

- False Statement of Fact: The defendant must have made a statement claiming to be fact that is verifiably false. *Mere opinions cannot be the basis of a defamation lawsuit*.

- Unprivileged Publication: The statement was communicated either verbally or in writing to at least one third party (someone other than the person the statement is about).

- Fault: The defendant must have acted at least negligently, or in some cases with actual malice (knowing the statement was false or acting with reckless disregard for the truth).

- Damages: The false statement must have caused actual harm to the plaintiff's reputation, resulting in financial or personal loss.

Importance of Reputation

One's reputation – regardless of whether it is a person, business, organization, or any other type of entity is critical because that is most often the "prism" through which the subject is view and/or judged. According to an amalgamation of definitions offered by the Cambridge, Oxford and Merriam-Webster dictionaries, reputation is defined as:

> *"The beliefs or opinions that are generally held about someone or something. The overall quality or character as seen or judged by people in general; the opinion that people in general have about someone or something or how much respect; the estimation in which a person or thing is held."*

Additionally, as applies to an individual (as is the Plaintiff in this litigation) who, the vital interest in a person's own good name (and reputation) surpasses its relation to or impact on his or her occupation, finances, business, and personal relationships, etc. It is a fundamental part of his identification, of his or her self-image, standing, and sense of worth.

In the public relations profession, there are two old "tried and true" axioms that are sacrosanct and they are *"It takes years to build a reputation but only seconds to destroy it"* and "*perception is more important than reality*" (in most cases, reputation and perception are basically interchangeable in this context).

"Bond of Trust"

There are people in many types of businesses and professions that can experience, survive and shake off negative information about them that might stain their image, reputation, brand and/or the goodwill with those they service. There are some that cannot because of the nature of what they do and the impact on those they serve. They are held to a higher standard and forgiveness is rare. This includes educators (who mold our children), law enforcement (which safeguards us), the legal profession (which protects our legal rights), and financial professionals such as accountants, financial planners, investment advisors (who protect our finances and ensure we have economic viability). It particularly applies to the clergy who is responsible for our spiritual needs and influences our value systems. Therefore, the reputation harm emanating from the Defendants would be particularly and significantly more damaging to the Plaintiff in this case.

Impact/Effects of Reputational Damage and Harm

Prior to addressing the type and extent of reputational harm, which was incurred by Plaintiff in this case, there is one critical factor that needs to be understood and considered when analyzing the real and potential reputational harm as a result of alleged false statements, misrepresentations and/or actions of the Defendants which the Plaintiff maintains have already had a profound negative impact. When assessing a situation involving reputational harm and damage, it is important to understand how any negative communications emanating from Defendants serve to stain the reputation of the Plaintiff, which in turn translates into negative consequences that have a detrimental impact on him. There are numerous means through which negative communications can be transmitted and spread, including: oral and written messages, internet/social media formats, media exposure, print publications, etc. A particularly damaging means is through "word of mouth" which further perpetuates the reputational harm through widespread distribution of its

disparaging content, often resulting in the original message being altered or enhanced through individual interpretation of the negative comments and alterations in what is passed on to others. Also, it is nearly impossible to counteract or negate the harmful effects of this negative reputational spread either in the short or long term.

There are several principles accepted in various communications professions that are apropos in relation to the dissemination of negative information about some person and/or entity - regardless of whether it is true or not, to wit:

- It takes years to establish a reputation and seconds to destroy it.
- You can't un-ring a bell.
- You can never wipe a slate clean.
- Perception is more important than reality.

Succinctly, this means that once a reputation is damaged, it cannot be fully restored. These principles are the basis of many of my conclusions and opinions in this report.

There are two methods of disseminating negative information (or, in this instance, a negative reputational view of the Plaintiff) – controlled and uncontrolled. "Controlled" means that one can pinpoint everyone who actually was exposed to the negative communications passed on (e.g., person-to-person remark, written communication to only certain people, a speech to a group of people) in a contained environment. The theory here is that only these people have the information, and they have hopefully not yet passed it on in any way to others. When the negative content is limited to only those exposed, there is a chance to be somewhat effective in refuting it by reaching those people and providing an opposing view to the input they received.

"Uncontrolled" means that either the negative communications (which could result in reputation harm) have already been passed on in various ways to others that cannot be identified or contacted – or it was disseminated in such a way (e.g. in the media or on internet) that there is no way of knowing exactly who received it or what they may have done with that information (e.g. disseminate it to others). In this instance, it is impossible to ensure that everyone exposed to the negative communications has access to the opposing viewpoint – and thus, without any counter information, the original (negative) view or opinion formed as a result of it could be considered to be accurate making it extremely damaging.

Negative impressions or perceptions once implanted can often never be completely erased or overcome – for some people completely and for others, to a certain degree. In reputation management and the communications field in general, there are accepted principles that apply to the transmission, absorption, and impact of negative communications on a subject, which include:

- Changing their thinking is never as effective because the person may have already given credence to the initial opinion or they will filter the second outlook through the original information received (not a clean slate).

- Even if people receive a contrary view, there could always be an element of doubt (e.g., where there is smoke, there is fire).

- If someone receives contrary views of a reputation, and doesn't know which is right, it would be human nature to take a conservative approach to steer clear of the subject of the information (e.g., "why take the chance") and go with another choice.

- People will believe in a negative impression or perception of a reputation if it seems plausible and there is no counterbalancing input that refutes or challenges that information.

- As a negative reputation is communicated to others, when there is no way to identify who has received the information, there is no chance to provide them with the correct negative impression or perception.

- When a damaged reputation is communicated and isn't countered, it can be passed on by "word of mouth." This is particularly dangerous and harmful because when passing this view from one person to the other, the original view can be misinterpreted, exaggerated, embellished, and/or distorted which could make it even more negative in nature.

- Finally, and most importantly, if the negative impression or perception cannot be stopped with the original people who heard it, it can go on forever and the spreading of it can be limitless.

In short, reputational damage through negative communications can be devastating and lasting.

## ANALYSIS & OPINIONS

### Preface

Following is an analysis of the information and evidence emanating from the words and/or actions of Defendants that are germane and at the core of this litigation as well as my assessment of their contributions to what, if any, harm they contributed to damaging the Plaintiff's reputation. These conclusions and opinions will be objective and not based on any biases I have or motivated by serving the interests of the Plaintiff who retained me for this assignment.

My five-decade background in all major professional areas of communications along with my 42 years of experience in litigation support, my specialization in reputation management and repair counseling and programs as well as my 20 years as an expert witness, along with my education and training, provide me the particularized knowledge necessary to form comments, conclusions, and opinions I offer relating to this case. All of my opinions are offered to a reasonable degree of certainty.

### General Overview

In the previous section on the Impact/Effects of Reputation Damage and Harm, I outlined the two methods of disseminating negative information. In this case, it is my opinion – in relation to any reputation damage that the Plaintiff has incurred from the words and actions of Defendants - that the "uncontrolled" method of communication would clearly apply because of the means by which the negative exposure was disseminated (e.g. Facebook post on the internet) that would have been widespread in its reach and would have most assuredly resulted in the "word of mouth" factor that would additionally spread this negative information. This type of negative exposure incurred by the Plaintiff will undoubtedly continue over this period of time and into the future.

(Note: As evidence of the fact that the communications are "uncontrolled" and will continue in the future, while the litigation is still ongoing, the Defendants' law firm is continuing to potentially cause reputation damage through a website. Information on this is in the following section.)

**ANATOMY OF REPUTATION HARM**

My professional background, experience and expertise qualify me to assess the reputational damage and/or negative consequences emanating from the misidentified photograph, the content and assertions in the Facebook post and resulting misrepresentations negatively impacting the Plaintiff which led to this litigation. In this section I will analyze what factors led or contributed to the reputation damage and how it occurred as well as words, actions and inactions of the Defendants that the Plaintiff maintains have led directly to the reputation harm. This assessment and any conclusions and opinions I may offer are based on the information and insight I have received, reviewed and evaluated.

(As a preface to this section, it must be stated that as an expert, I am not allowed to offer judgments and/or opinions on causation or liability as they relate to the issues in this litigation. That is for the trier of fact (jury in this litigation) to determine. However, I can review the evidence of what transpired that led to the dispute in this litigation as well as discuss the factors that led to or impacted the allegations made by the Plaintiff against the Defendants and offer any insight, context and perspective to aid the jury in arriving at a decision.)

Analysis of Plaintiff's Reputation Pre-Public Exposure

Prior to assessing what damage to Plaintiff's reputation may have been caused by the alleged false statements, misrepresentations, and actions of Defendants, it is important to assess what his reputation was prior to the initial dissemination of the negative communications on August 22, 2025. I researched the internet seeking to discover if there were any reports, personally or professionally, that would be negative to him or discover any incidences of reputation harm that occurred prior to the publication of the Facebook post. As detailed in the Case Background section of this report, evidence shows that the Plaintiff Smothermon has had a distinguished and successful career as a clergyman and was accomplished and well respected. I did not see any information of a negative nature about him either personally or professionally.

Intent of the Facebook Post

As reported in the Case Background section of this report, the Defendants are highly critical of DEI and woke and have been vocal about both through their communications on the internet. When Cracker Barrel decided to change its "old fashioned" image, one of the actions it took was to remove its "Uncle Herschel" logo which was symbolic of it. The "Hodgetwins" apparently seized upon this action to make their points against DEI and woke. The target in doing so was SSmotherman, who led the movement within Cracker Barrel towards such diversification. Assumingly, under the First Amendment and other protections, they had every right to do so.

Photo Misidentification

The text was written for the Facebook post and a determination was made to include a photograph of their "target" – SSmotherman" - with it. The Defendants claim they did a standard Google search of "Steve Smotherman" and all the photographs that appeared were of the same person. They extracted one of the photographs and placed it under the text of the Facebook post. The problem was the photograph was of the Plaintiff, a Pastor named "Steve Smothermon" whose

name ended in "on" and not "an." Regarding the error, the Defendants ascribe it to be an "innocent mistake" based on the similar spellings of the two names, as well as the fact they didn't know what SSmotherman looked like and that, in their search, the photograph of the same person (Plaintiff) kept appearing.

Errors, Problems and Disputes of Defendants' Photograph Claims

The Plaintiff maintains that the Defendants' use of the wrong photograph was a result of a faulty search process and lack of verification combined with negligence and recklessness. Following are their assertions and examples of these.

- Failures of search standards and verification

  - KevinH admitted that he performed his Google image search in its "incognito mode." Plaintiff maintains that doing so is considered highly irregular and reckless as it bypasses standard internet browsers which deliberately leaves no record of the search and destroys the verification history.

    (Related to this issue, in a Plaintiff interrogatory response, it was stated: *"For sophisticated commercial media influencers publishing controversial content to over 6.3 million followers, deliberately hiding and erasing their research trail constitutes a conscious avoidance of truth and a flagrant disregard for basic verification practices.*)

  - The Defendants admitted (in response to Request for Admission No. 9) that they did not review the metadata for the photograph prior to publication. According to the Plaintiff, had they performed the most basic, industry-standard check of the photograph's System Metadata, they would have seen that the embedded metadata and the Source URL identified the image's origin as a website affiliated with Legacy Church.

  - The Plaintiff contends there was a complete omission of standard verification as the Defendants admitted they performed no reverse image search, were completely unaware of standard visual search tools, and never contacted the Plaintiff or Legacy, or any representative of theirs, to verify the image before publishing it to a monetized, revenue-generating platform.

My Own Research

As an average person, I sought to replicate the process used to do a search on the internet of "Steve Smotherman." I typed his name in the Google search bar. In their legal filings, the Defendants maintain that their search for that name produced only listings and photographs of the Plaintiff, not the former Cracker Barrel executive, which is what led to the use of the incorrect photograph. That was not my experience.

First the listings. Of the first 10 listings under the name "Steve Smotherman," beginning at the top of the first page, following are the titles of those listings as well as an indication of who the article was about.

- What's at your Core? Steve Smothermon (Plaintiff)
- Steve Smotherman – Director of Advisory Services (CB Executive)

- Former Cracker Barrel employee Steve Smotherman led… (CB Executive)
- Legacy Church, the unchristian church.:r/Albuquerque (Plaintiff)
- Staff Directory * Steve Smotherman (Other person)
- Search Seven Smotherman Obituaries and Funeral Services (Other person)
- The hireling spirit in today's church… (Plaintiff)
- How to Hear God's Voice with Pastor Steve Smothermon (Plaintiff)
- Steve Smothermon (@stevesmotherman) (Unknown)
- Steve Smotherman at Motlow State Community College (Other person)

What this reveals is that four of the six listings were about the Plaintiff, two of the listings were about the Cracker Barrel executive (who was the target of the search) and four were about neither of the two individuals. My personal conclusions from this search are as follows:

- It is clear from just viewing the first page of Google that there were multiple people that exist with the name that begins with "Smother…" whether it ends with "man" or "mon." Even a cursory view of the page would reveal that. Therefore, it would be difficult to assume that there is only one person that would be the one that would be the subject of their search.

- All names were spelled correctly relating to the subjects of each of the listings so there would be no confusion as to who was who.

- While the top listing in the search for "Steve Smotherman" was of the Plaintiff (whose name in the listing was spelled "mon"), the next two listings were of the Cracker Barrel executive (the subject of the search) and one of them even identified him as being with Cracker Barrel. Therefore, the proximity of the top listing and the one immediately below it would immediately indicate that there were two people of the same name with slightly different spellings.

As to the photograph, the Defendants maintain that when Googling "Steve Smotherman," the photographs of the Plaintiff were the ones that came up. That was not my experience. When I did my Google search, at the top of the page were two rows of five photos each, one row under the other. The top row had these photographs (in this order, left to right)

Images



What's at Your Core? by Steve Smothermon

Tony Cooke Ministries

Instagram




Able and Willing | Pastor Steve Smothermon

YouTube



Steve Smotherman - Director of Advisory Services | LinkedIn

LinkedIn



Stephen Smotherman - Owner | LinkedIn

LinkedIn



Patria Church Pomona
Instagram

- Three of the photographs were of the Plaintiff (which clearly linked him to the ministry) and two were of the former Cracker Barrel executive (one taken at an earlier age).

- Four of the five contained the name of the person in the photograph and all had the correct spelling of the names.

- It would be clear all three photographs of the Plaintiff that he was a Pastor or affiliated with a church.

- There is no facial resemblance between the Plaintiff and the former Cracker Barrel executive.

Based on my individual research, it is not plausible that anyone could have conducted a basic research on Google of a businessman named "Steve Smotherman" who was affiliated with Cracker Barrel and was exposed to the information and photographs above, to have confused the two of them – one a Pastor and one a businessman – not through the spelling of their names, the photographic images and/or the identification of their professions.

Continuing Reputation Harm

Despite the fact that the Defendants are now aware of their misidentification of the Plaintiff in their Facebook post and despite the fact that they are aware that this error is believed to caused him reputation damage as a result, and despite the fact that there is litigation in progress because of it; potential additional reputation damage is still being generated through a website that their lawyer Randazza is currently hosting on the case (https://randazza.com/lawsuits/pastor-steve-smothermon-v-the-hodge-twins). At the top of the home page is a large graphic with multiple images on it.




Among the images are (top to bottom)

- An American flag which is being held by the Hodge twins.
- Under them (on left) is a depiction of Randazza, as a conquering hero.
- To the right of that is assumingly a photo of him and his clients in this case.
- Special attention needs to be called to the upper right-hand corner and a depiction of the Plaintiff – who is a pastor – as a scowling, demonized, threatening "force" with his hands extended as if he were either going to attack the flag or the Hodge twins, or both.

Personal Opinion – Given that the Defendants were the ones who made the careless mistake in their Facebook post that allegedly caused an "innocent" individual considerable reputation harm, they (assumingly they were aware of their attorney's website on their case and approved its content) maliciously double-downed on their original error by "throwing more salt into the wound" through this "demonic" graphic depiction of the pastor. Instead of being contrite for their original

error and any harm it might have caused - they compounded it by continuing to sully the Plaintiff's reputation, who is a pastor.

**ANALYSIS OF NEGATIVE IMPACT RESULTING FROM REPUTATION HARM**

Preface

To provide context and perspective to this section, it is important to understand the Plaintiff's religious philosophy and his approach to his ministry.

> *"As a pastor, Smothermon is dedicated to connecting individuals with God, fostering healthy relationships, and encouraging a life marked by generosity and service. His sermons are firmly rooted in Biblical scripture, addressing a wide range of topics including marriage, family, gender identity, and sexual ethics. The moral teachings, traditional values, and social principles emphasized in his messages reflect beliefs commonly associated with political conservatism."*

Contrast this with the Defendants' mistaken portrayal of him (meant for SSmotherman) through the misidentification in the Facebook post. It charged that he was opposed to "old fashioned" values, anti-family and anti-American, that he was a strong advocate of woke and LGBTQ+ issues and championed DEI initiatives. Also, that he was an active supporter of promoting and fostering opportunities for queers in the workplace. All are highly liberal views.

(Note: The LGBTQ+ support system is for anyone whose sexual orientation, gender identity, or biological sex differs from traditional, cisgender, and heterosexual norms (e.g. homosexuals, transgender, transvestites.)

As the Plaintiff is a respected teacher, speaker and spiritual leader relating to Biblical subjects – including those involving homosexual lifestyle choices and related issues, the description of the Plaintiff's spiritual philosophy and ministerial practices as well as political philosophy could not be more diametrically opposite to how he was mistakenly portrayed in the Facebook post and thus the adverse impact to him would be most likely be potentially very harmful.

It is also important to note that the Hodgetwins are conservative in their lives, philosophical and assumingly political leanings and therefore their core audience would be conservative, which includes many who are religious. Therefore, it is reasonable to project that of their millions of followers, a large percentage would potentially include those who could be future congregants of the Plaintiff, buyers of his books, YouTube subscribers or Instagram followers. Thus, the negative consequences of the misidentification would be particularly impactful and harmful to him.

Reputation Harm to Plaintiff

Based on information and evidence I have reviewed, the Plaintiff has already suffered significant reputation damage from the Defendants' words, misrepresentations, actions and inactions which have translated into a wide array of harmful and negative consequences to him. The damage to the Plaintiff has been significant and consequential by any objective analysis. This section will detail the negative impact on the Plaintiff, both to him personally and professionally and, by extension to the church, based on what has been declared in reports and testimony.

- Impact and Damage to Reputation and Perception of Plaintiff – The Plaintiff reports that the issues brought in the Defendants' Facebook post and the beliefs and actions attributed to him struck directly at the heart of his life's calling and career mission. The post represented a confluence of life and career altering circumstances due to the misappropriation of his name and likeness on a public social media platform that had a large audience. Some of the negative consequences he cited include:

  - His association with a controversial social issue (practice of a homosexual lifestyle in today's culture) directly clashes with Biblical teachings as well as his consistent and very public stance in opposition to the practice of a homosexual lifestyle given that it is in direct contravention of both the Old and New testaments of the Bible.

  - Following the publication of the Facebook post, the misrepresentations became a topic of conversation to many in the faith-based community – from his followers to his peers. It caused significant harm to the perception of him as an individual and his reputation as a Pastor. Further, he believes while some people, especially those who know him, will discount or give no credence to the misrepresentations, others will believe it and a "seed doubt" will be planted in them.

  - There is evidence that the news media (particularly in City of Albuquerque and Bernalillo County) have monitored him more carefully and its coverage and reporting on him have become more suspect and critical in nature.

- Impact on Church Operation – As the Plaintiff is the not only the spiritual but operational leader of Legacy, negative consequences to him, emanating from the Defendants, also adversely impacts the church as well. Following are some examples:

  - The Plaintiff reports that the stress and emotional trauma he has experienced relating to the Defendants has impacted his ability to function fully on behalf of the church.

  - The time, energy and resources required to cope and deal with both responding/defending the false portrayal of the Plaintiff to others as well as to provide information and logistical support to the litigation has caused a significant disruption to Plaintiff's ability to operate the church.

  - Following the Facebook post, the church leaders, staff and congregants became aware of the misrepresentations, and it led to some negative consequences within the church, including some moving on to other churches and others ceasing to attend church altogether.

- Impact on Relationships – The Plaintiff reported that, in the aftermath of the Facebook post and the resulting negative public exposure, he has great concerns about the impact in the short and long term on his family, including his wife, son and grandchildren. His fears were not unfounded as it has taken an emotional toll on his family – and even those in his inner circle of friendships. He further fears that "with a click of a computer key," this situation and ongoing turmoil will continue to have similar long-term negative repercussions well into the future. The Plaintiff is also concerned with the potential

impact and spillover of harm to his brother, who is a pastor at another church in New Mexico.

(Note: Having had over 50 years, representing and interacting with individuals who suffered reputation harm, I can attest to the fact that family members are often "collateral damage" when one member has severe reputation damage. It particularly effects spouses – potentially leading to marriage strain, discord and divorce – and children – often harassed, bullied or even physically attacked.)

- Impact on Mental and Physical Well Being – Mentally, the Plaintiff has reported that the Facebook post and the resulting negative ramifications and consequences have been the source of significant forms of mental trauma, including anguish, fear, depression, anxiety, apprehension as well as concern for the future well-being of himself, his career, his family, the church and its parishioners. With the realization that the issues that have arisen since the Facebook post and the resulting problems they spawned could be prevalent well into the future, it is a constant source of fear and anxiety for him.

  Physically, following the Facebook post and the uproar emanating from it, the Plaintiff has experienced the normal negative side effects which are associated with extreme mental and emotional trauma. Additionally, he has been coping with an ongoing back problem and while not attributable to the Facebook post, it has complicated his recovery.

- Negative Economic Impact – While my assignment in this case does not involve an analysis of any form of economic loss the Plaintiff has suffered attributable to the Defendants' Facebook post, obviously the costs relating to the litigation he was forced to undertake to clear his name and reputation would be a byproduct of the Facebook post and the misidentification which led to the reputation harm.

## REPUTATION DAMAGE REPAIR PROGRAM

Preface

In the communications business, there are several axioms pertaining to reputational damage and harm – e.g., when a person or entity has been the recipient of negative input or communications – which I outlined earlier in this report, which include:

- It takes a lifetime to build a reputation and seconds to destroy it.
- Perception is more important than reality.
- You can never un-ring a bell.
- Where there is smoke, there's fire.
- You can never wipe a slate clean.

For more than four decades, as a professional, I counseled clients on issues relating to reputation, image, or brand damage. I have also created, planned, and implemented dozens of reputation damage repair programs to aid in repairing and recovering their reputations and to mitigate the damage that was caused. As an expert witness, I have created, outlined, and budgeted reputation

damage repair programs for Plaintiff(s) in over 80 cases and have testified on some of these programs in depositions, trials, and arbitration hearings.

It is my strong belief that a Reputation Management/Repair Program is vitally needed for the Plaintiffs as their reputations have been stained both within their industry and with entities and audiences which they interact with that have been exposed to the Defendants' alleged false statements and misrepresentations. Regardless of whether the Plaintiff prevails in this lawsuit or not, the fact is his reputation has been harmed and damaged and that won't change unless some proactive action is taken to counter the negative information disseminated about them as well as to restore their goodwill and reputation.

The best-case scenario is that such a program can mitigate the damage to some extent by combatting or minimizing the negative exposure they received from the negative communications as well as offsetting it with positive exposure. This can be accomplished to a degree through a public relations and communications program utilizing both online and offline communications channels. It is my opinion as a public relations and communications professional who has extensive experience and expertise in reputation management and damage repair and has implemented many such programs for clients with tarnished reputations, that there are reasonably prudent and effective actions that can and should be taken to improve their reputations regardless of the outcome of the litigation.

Program Validity

Federal and state courts have ruled in the past that when reputation damage has occurred, the plaintiff(s) has the right to recover damages from the defendant(s) to fund such a program to mitigate the reputation harm and restore the reputation. In one recent case, the judge opined:

> *"In his report, Mr. Fisher opines that, where a Plaintiff's reputation and image have been so damaged, a repair program of certain duration and with itemized components would be needed to make that image and reputation as near whole as possible. Mr. Fisher assigns a value or cost to that remedial program and lists the steps such a program would entail. The Court concludes that addressing and repairing the harm a person's reputation and image could suffer as a result of defamation is specialized knowledge not within the ken of the lay juror, and which would assist jurors in determining issues of fact surrounding that aspect of damages. While the report lays out the bare minimum in terms of support for Mr. Fisher's damages figure and components of the remedial program he opines is necessary, it is sufficient to allow a jury to understand and evaluate the basis for his opinion.*

It is important to add; I have subsequently testified to such a program in federal and state courts as well as arbitration hearings.

Program

The following is an outline for such a program. This is based on my professional background of having created and implemented over 35 reputation damage repair programs as a public relations professional over four decades on behalf of clients who suffered reputation harm and damage. I have also created another 80 such programs in cases as an expert witness.

Program Overview

- Objectives: The primary purposes of this program are as follows:

- Through this program, to eliminate as much as possible and counter the reputational harm to the Plaintiff that has incurred and ensure that the program reaches and impacts the target audiences in the most timely, expeditious and effective way.

- To restore the reputation of the Plaintiff as needed and required by eliminating or minimizing the negative communications emanating from the Defendants while generating positive exposure for the Plaintiff to portray him as a virtuous clergyman with good character.

- Target Audiences: The "publics" that this program is intended to impact, include:

  - The general public in the geographical area in which he resides and works as well as any other areas in which his reputation has been negatively impacted.

  - The community in general, including all entities which the Plaintiff or the church interacts with, rely on for moral, logistical or financial support, and/or offer goods or services to them.

  - The religious community locally and those in his profession.

Program Activities

The following is an outline of a prudent and suitable reputation management/damage repair program which would seek to achieve the objectives for such a program as stated above. I believe that such a program is necessary and a realistic approach to correct reputational damage as much as possible based on my half century of experience in handling crisis communications and reputational damage programs and on what information and insight I have at this point on this situation. As such, this proposed program is subject to adjustments if and when more information is available and obtained.

- Audit/Assessment – In order to fully assess the degree of the reputational harm that the Plaintiff has suffered, some research and analysis would need to be conducted to determine the nature and extent of the damage emanating from the Defendants' actions and negative communications. The result of the litigation will have an influence on the perspective and perception of how key target audiences were impacted and the harm that has occurred and could happen in the future. The program would then be based on and factor in the litigation result as to how best to counter the negativity and restore the Plaintiffs' positive reputation to include determining what the strategy is, the message to be projected and what actions need to be taken and to what extent. The Audit would include a detailed analysis of relevant online keyword search volume post-litigation, which will be the foundation to determine the appropriate plan for creating content for its online presence.

- Program Plan – A strategy for the program would be formulated, a detailed plan would be created for the program which would then be utilized when it is implemented.

- Online Communications - There are two aspects to a person's or entity's online presence: the precise online platforms in existence (e.g., a website, a YouTube channel, a Facebook page, etc.) and the content found on those platforms. The platforms are inextricably linked

to the content they contain. As illustration, a website is merely a container to which content is added; social media platforms such as a Linked-In page or Facebook page are simply blank pages to which copy, images and videos are added. This is where the role of the keyword research from the Audit/Assessment becomes paramount. It is crucial to create content that people are searching for in order to establish a high level of visibility online. In addition, it must be emphasized that for reputation repair or enhancement, all content relating to the Plaintiffs - Press Releases, Blog articles, videos, interviews with news organizations, mentions in the general press - must be distributed through all online channels, including social media. Following are some of the actions relating to online communications and exposure which would be utilized for this program.

- Website - A website is an extremely critical outlet for the dissemination of information and to impact reputations and public perception. The program would evaluate if it was prudent to make what, if any, adjustment to Legacy's website to address any damage to the Plaintiff or church's reputation and take appropriate remedial action.

- Integrated Website Blog – Consideration would be given to creating a blog with new content continually added is a crucial element in creating and enhancing an online presence. Individual blog pages each have their own unique URL, which creates the opportunity for focusing on sub-categories of search terms and increases the ability of the Plaintiff to speak out on various subjects related to his background and expertise and help project a positive image for him.

- Social Media Communications – The program would review what social media platforms the Plaintiff and the church currently have and decide how they can be addressed in respect to this program. It also could require establishing their presence on platforms they are not currently on. Social media platforms provide an ideal way to leverage content originally published in a website blog. Content can be summarized (instead of copied) and edited to reach a particular target audience. Also, links can be added to social media posts which lead people to the original content and enhance the blog page's ranking in the various search engines' results. However, choosing specific social media that allows civil discourse is an increasingly difficult challenge. Determining which platforms to establish is dependent on controls that will be in place at the time chosen to begin reputation repair and ongoing program management. Platforms including LinkedIn, YouTube, Facebook personal and professional pages, Instagram, and X (formerly Twitter) accounts will all be evaluated in regard to their security setting capabilities at the point a reputation repair and management campaign is ready to begin, specifically to eliminate any opportunity for negative or disparaging content. Creating content and monitoring interaction with the content require a full-time professional for reputation repair of this magnitude.

- Miscellaneous – Working with independent contractors, including contracting for IT Support, Website Hosting, content managers, internet monitoring (for counter or alt group trolling, and purchasing technical components (i.e., software, sufficient internet connectivity, adequate devices, etc.) required for the Plaintiff's Online Presence.

- Search Engine Optimization (SEO) - The internet would need to be reviewed for information relating to the Plaintiff and actions taken to mitigate the damage as well as generate more positive links with high domain authority to effectively push down negative search results as much as possible. Positive content will have to be added to the internet as well. Optimizing content to positively affect a search engine's determination of a website page's value in relation to a key word or phrase is the essence of SEO. It consists of creating content of interest and value to someone searching for a particular term, as noted above. Although content is the essence, there are many technical aspects of SEO that also require constant attention. Readability of a page on a mobile device, website accessibility according to the terms of the Americans with Disabilities Act (ADA) and page download speed are three examples of the numerous factors that affect a website page's ranking in a search engine result. An effective SEO campaign must include constant monitoring and attention to all these factors. However, because any negative articles about the Plaintiff on the Internet are hosted by in many cases by large media companies with strong search-engine rankings, it is unlikely that he would be able to replace those articles at the top of the search engines with any content on lower-ranked websites.

- Videos – Videos would be produced for reputation restoration and enhancement purposes and exposure for the Plaintiff which would be generated on many places on the internet (e.g., website(s) and its social media forums, YouTube, Instagram) and could also be used for communications purposes offline as well. The importance of creating videos to enhance a person's reputation cannot be overstated. YouTube is the world's second largest search engine behind Google (See: open.library.okstate.edu/), although many people do not think of it as such. The process for creating videos that rank high in a search on YouTube, consequently, requires a process like SEO for traditional website pages. Videos, therefore, are not only extremely effective at creating and enhancing a reputation because of the powerful impact of visual images, but they are also a key component of a larger integrated SEO campaign. It is important to publish all videos on YouTube, which allows the owner to disallow the public from commenting on videos. This also gives the owner the ability to use links to the original YouTube video post in social media posts, and to use "embed coding" when publishing on a website.

- Public Relations Program – As image, reputation and brand are the purview of the public relations profession, such a program would be a critical element of this effort. There is a myriad of activities that need to be undertaken to reinforce and/or establish the reputation and goodwill of the Plaintiff. They include:

  - Strategic planning/counseling/oversight.

  - Generating positive media exposure to reach key target audiences – especially in targeted industries - through a variety of communications means as appropriate for the purpose (e.g., news releases, general and trade media interviews, various types of authored pieces, etc.)

  - Set up interaction between the Plaintiff with key target audiences as needed through means to include personal contact (e.g., in person or electronic meetings, written outreaches such as letters, emails, newsletters).

  - Counsel on social media outreach.

- Speakers Forums – Seek speaking engagements and participation in various forums (e.g. conferences, symposiums, seminars, miscellaneous types of meetings) for the Plaintiff to speak on subjects that would achieve the goals of this program.

- Outreach To and Through Entities – A critical component of the Public Relations portion of this program would be to reach out to various groups, community, nonprofit, youth and charitable organizations, institutions, and other established entities, which provide opportunities for outreach to disseminate messages and achieve the program's goals that are vital to its interest and well-being. Every appropriate form of communication that exists would be analyzed to reach key target audiences directly or through them.

- Paid Exposure – There will be times when broad public or specialized exposure will be important to deliver the specific messages and if it can't be obtained through free channels of communications, options will be explored that would require payment for the exposure.

- Miscellaneous Communications – Throughout the program, continual efforts would be made to seek out opportunities to generate exposure and deliver information through existing channels whether online or offline.

- Additional Program Activities – To be determined as needed to achieve goals and with the benefit of technical analysis/audit.

The proposed actions outlined for this program have been utilized by myself and other communications professionals to restore reputations in the past and constitute a sound and effective means to do so. As a professional, I have successfully created and implemented dozens of these programs for clients, and they have proven to be successful.

(Note: Should the Plaintiff prevail in this litigation and a reputation damage repair program be implemented, I would not be a participant in the physical operation of the program.)

Program Overview and Budget

This program is based on my extensive background conducting similar campaigns, and my analysis of the nature of the communications program that would be needed to counteract the damage to the Plaintiffs' reputation that is attributed to the Defendants' alleged false statements, misrepresentations, and actions. Having created, planned and implemented such programs on behalf of clients with damaged reputations as a public relations professional I believe a proactive reputation management/damage repair program – implemented with sufficient time, effort, resources and budget – would be effective in restoring the Plaintiff's reputation to whatever degree possible. I would recommend a two-year program with the bulk of the work concentrated in the first year (necessity to restore the reputation as quickly as possible) with the second year devoted to follow-up, maintenance of first year and taking advantage of opportunities that may arise.) The scope of the program and the budget amount is based on my assessment of what I believe would be needed to repair the damage to the Plaintiff's reputation based on the information I have at this point in time. Further, while I have projected costs for each of the activities and program elements, I will not delineate them at this time in this report because of the following factors:

- The result of the litigation. Should the Plaintiff prevail, it would validate that he is a virtuous and reputable clergyman. This would greatly enhance the message and what would be required to seek to overcome the reputational harm. However, if the Plaintiff were to not prevail in this lawsuit, such a program would require a totally different approach and adjustment of strategy and message to achieve its objectives.

- The result of the litigation would also dictate which of the program elements listed would become more essential and need more emphasis, thus it is not possible at this point to determine the emphasis or exact budget for each individually. However, most of them would most likely be used regardless of who prevails in the litigation, it is a matter of to what extent. (Note: The projected budget though is based on an estimate for each element in the program as determined at this time.)

- It's not prudent to plan the specifics of a program before receiving the approval of the Plaintiff as to what specifically will be done and the degree of his participation. I would not expect the Plaintiffs in this case to make these decisions until they know the results of the litigation and can assess the situation at the time the program will be launched.

From past experience conducting similar reputation repair programs for individuals, businesses, and other entities throughout the United States, I believe a very conservative estimate of the cost of such a program for the Plaintiffs would be in the range of $325,000 to $350,000.

(Note: This budget for reputation repair is distinct and separate from any monetary award that may be received in this litigation for compensation for his reputation damages.)

To reiterate, this program and budget is a realistic assessment of the scope and cost of a program that would be required to meet the needs and goals of this reputation management repair program based on my current knowledge.

**REPUTATIONAL DAMAGE COMPENSATION**

Factoring in this negative impact on the Plaintiff from the Defendants' words, misrepresentations actions and inactions as well as the resulting negative consequences he experienced from them, it would be my recommendation that the Plaintiff should be justly compensated for the "pain and suffering" that he has incurred based on the extent of the reputational damage as reflected in the observations, comments and opinions I have expressed in this report. It is important to consider that even if the Plaintiff prevails in this litigation, the negative exposure he has suffered attributable to the Defendants will always be present to some degree and will continue to cause reputational harm and damage to him in the future. A fair and just damage award to compensate these Plaintiff for the negative consequences he has experienced, and undoubtedly will continue to suffer in the future, and for the costs to restore his damaged reputation, would be proper. Factoring in this negative impact on the Plaintiff, they have determined that a damage award in the range of $2.65 million to $5.589 million would be reasonable, fair and equitable.

**CONCLUSIONS AND OPINIONS**

As previously stated, as an expert witness, I am not allowed to offer an opinion on whether the Cause of Action of Defamation against the Defendants is legally correct or actionable in this litigation. It is up to the jury to make that determination. It is my task, based on my background, experience and expertise in the field of communications - and particularly in reputation

management, damage and repair – to provide pertinent information and insight, and offer appropriate conclusions and opinions that will provide worthwhile insight, context and perspective on the facts and information the jury has received to help facilitate the decision that they will render in this litigation.

Following is a summary of my conclusions and opinions that have been offered in this report to date based on the information and evidence I have reviewed and insight I have obtained:

- In a concerted effort to express their opposition to the "woke" philosophy and movement for DEI initiatives, the Defendants seized on a rebranding of the image of Cracker Barrel to express their displeasure of both of these and sought to target one of its executives (SSmotherman) for his role of fostering change within that business.

  (For context and perspective relating to their "mission" in this regard, one must factor in that their Facebook page is a revenue generator for them in which they seek to sell merchandise and obtain other income producing opportunities through their "rage bait" posts. Evidence of this is they retained a marketing company, Bigly (https://gobigly.com) which has a motto *"Bigly – We Build Revenue Engines, Not Just Brands."* As an example of this marketing effort, through Bigly, they are giving away trucks and directing people to buy T-Shirts (https://hodgetwins.goingbigly.com/order-form.)

- On August 22, 2025, the Defendants expressed their position of disapproval and condemnation of SSmotherman on a post on their Facebook page – which purportedly has 6.3 million followers. To accompany the text in the Facebook post, the Defendants decided to include a photograph of SSmotherman when they carelessly published one of the Plaintiff.

- To obtain a photograph, the Defendants allegedly initiated an internet search for "Steve Smotherman" which resulted in them incorrectly selecting a photograph of a Pastor named "Steve Smothermon" (whose name ended in "mon" and not "man"). The photograph was published under the text of the Facebook post.

- It is clear that the selection of the photograph of the wrong person could easily have been avoided and was a result of poor and improper search methods, lack of using proper identification tools on the internet, and lack of verification. The Plaintiff maintains that it reeks of recklessness. It is my opinion that, at the very least, the Defendants actions and inactions exhibited extreme carelessness.

- To their credit, when notified of the error, the Defendants removed the photograph from the Facebook post. To their discredit, to this date - nearly a year later - they have never published a retraction nor even offered the Plaintiff an apology, either privately or publicly.

- Regardless of whether the Defendants are found to be liable in this litigation or not, their misidentification of the Plaintiff with the former Cracker Barrel executive unquestionably resulted in reputation harm - the extent and longevity of which is still to be determined.

- The only remedy (albeit partial) to mitigate the reputation damage is to implement a Reputation Damage Repair Program. Such a program is vital to restore the Plaintiff's reputation as much as possible. A sound, effective program can mitigate the damage but once a reputation has been damaged, it cannot never be fully restored.

Context and Perspective

During nearly half century as a public relations professional, I represented dozens of clients who suffered reputation damage (inflicted on themselves or by others). My assignment was to restore their reputations which I attempted to do through repair programs. From that "in the field" experience, I can verify that once a reputation has been damaged, it can never be fully restored or made whole again (e.g., "Humpty Dumpty"). A "successful" program might restore 60-70% of a reputation. The reasons for this are detailed on pages 27-28 of this report and critical to an understanding of the negative impact of reputation damage.

In this report, on a few occasions, I have cited the old adages that are the "bible" of the public relations profession: "Perception is more important than reality" and "It takes years to build a reputation and seconds to destroy it." Thoughts on both.

- Perception/Reality

  Reputation is basically the same in meaning as perception. If one doesn't "perceive" someone or something positively, it impacts and often determines the actions that drive the "reality." In this instance, if one was seeking spiritual guidance from a clergyman who preaches biblical teachings as well as espouses traditional, moral and social values only to learn that he is an advocate of woke, anti-family and anti-American values would be devastating to his credibility and undermine what people look for in a spiritual leader.

- Loss of Reputation

  Both as a public relations professional for 45 years and as an expert witness who has had 133 cases involving reputation harm over a 20-year period, I have been privy to the destruction of reputations that had been highly positive for countless years, only to be destroyed in a moment due to words, actions and/or inactions of others. It's tragic but it happens. In this litigation, the Plaintiff has been a highly respected clergyman who has established multiple churches and has a large congregation based on his teachings, inspiration and leadership. Potentially, the allegations made by the Defendants, which were ascribed to him, could damage his reputation and hinder the growth of Legacy.

Report Summary

In summary then, it is my professional and expert opinion - based on all available evidence and the information I reviewed as well as the insight I have amassed from my experience and expertise in both the communications field and as an expert witness – that the Plaintiff, Pastor Steve Smothermon, suffered irreparable reputation harm from the words, misrepresentations, actions and/or inactions of the Defendants Keith Hodge, Kevin Hodge and Hodgetwins, LLC. Further, based on my direct experience and observations of similar reputation damage situations both as a public relations professional and expert witness, I can reasonably project the reputation harm will undoubtedly be long lasting and will continue well into the future to some degree if not indefinitely. This is my personal opinion based on my experience and expertise as a communication expert and derived from my review, evaluation and analysis of the evidence.

**REPORT DISCLAIMER**

This report provides my findings, views, conclusions, and opinions based on information and input related to this case that I have received to date. If there are further developments in this case and/or if I receive additional documents or information related to it in the future, I reserve the right to supplement, change and/or expand on the conclusions and opinions which I have offered in this report.

Robert J. Fisher

July 16, 2026

Date