# EXHIBIT 2

Rebuttal Expert Report of Eric Rose

(Aug. 14, 2026)

EKA
GOVERNMENT ADVOCACY
& PUBLIC AFFAIRS

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

PASTOR STEVE SMOTHERMON,
Plaintiff,
v.
KEITH HODGE, an individual; KEVIN HODGE, an individual; and HODGETWINS, LLC, a Nevada limited liability company,
Defendants.

Case No. 2:25-cv-01858

# REBUTTAL EXPERT REPORT OF ERIC ROSE

In Response to the Expert Report of Robert J. Fisher

2335 E. Colorado Blvd., Suite 115
Pasadena, CA 91107
www.ekapr.com

**Assignment and Scope of This Rebuttal**

Counsel for Defendants Keith Hodge, Kevin Hodge, and Hodgetwins, LLC retained me to review and respond to the expert report of Robert J. Fisher, dated July 16, 2026, submitted on behalf of Plaintiff Pastor Steve Smothermon. EKA is compensated at $700 per hour for my work on this engagement. I have reviewed Mr. Fisher's report in full, together with Plaintiff's operative First Amended Complaint and Demand for Jury Trial, and Plaintiff's Motion for Leave to File First Amended Complaint and to Modify Scheduling Order, both filed July 1, 2026[1], together with the redline comparing the original Complaint to the First Amended Complaint filed as Exhibit 2 to that Motion and the record materials referenced in his report. This rebuttal addresses the reliability of Mr. Fisher's methodology, the evidentiary support, or lack of it, for his conclusions, the repeated instances in which he strays outside the boundaries he sets for his own report, and the basis, or absence of a basis, for the dollar figures he presents to the jury.

As with my work generally, my opinions here are offered strictly from the standpoint of a communications and reputation management professional. I am not an attorney, and nothing in this report should be read as a legal opinion on liability, causation, or the elements of defamation. Where I use terms like harm, damage, or repair, I use them the way they are used in my profession, not as legal conclusions. Mr. Fisher claims the same limitation applies to him. As detailed below, he does not consistently honor it.

**My Qualifications**

I am a Partner at Englander Knabe and Allen, a public affairs and strategic communications firm. I have spent more than four decades in communications, with the last twenty-five years focused specifically on crisis communications, media relations, and reputational risk and repair. Since 2013, when I was first retained as an expert witness in the first case in the United States to proceed to trial involving an allegedly defamatory tweet, I have been retained as an expert witness in more than forty matters involving reputation repair, defamation, or reputational damages, on behalf of both plaintiffs and defendants. I have testified in eight trials and three arbitration hearings, and I have never been excluded from testifying as an expert in any proceeding, including proceedings in which my qualifications were challenged.

I co-authored Navigating Reputational Harm: A Deep Dive into Repairing, Measuring, Metrics, and Legal Implications of Reputational Harm in the Internet Age, and Reputation Repair in the Digital Age: Limits, Realities, and the Path to Recovery. I am a member of Reputation Advisors International, a global network of senior communications professionals specializing in reputation management, brand positioning, and crisis preparedness and response. I mention this background

[1]Plaintiff's First Amended Complaint and Demand for Jury Trial, Smothermon v. Hodge, et al., Case No. 2:25-cv-01858, ECF No. 52-1 (D. Nev., filed July 1, 2026); Plaintiff's Motion for Leave to File First Amended Complaint and to Modify Scheduling Order, ECF No. 52 (D. Nev., filed July 1, 2026). The claims and factual allegations added by the First Amended Complaint, the Nevada Right of Publicity claim, the False Light claim, and the Unjust Enrichment claim, and the discovery timeline recited in the accompanying Motion. I have also reviewed the redline comparing the original Complaint to the First Amended Complaint, filed as Exhibit 2 to the Motion for Leave, ECF No. 52-2 (D. Nev., filed July 1, 2026). The redline confirms that the amendment added new paragraphs 49 through 54 (the incognito-search admission, the metadata and reverse-image-search allegations, and the Mason-Howerton notice sequence) and the Third, Fourth, and Fifth Claims for Relief (Right of Publicity, False Light, and Unjust Enrichment). Mr. Fisher's noted these documents in his own recitation of the record.

not to inflate my own credentials, but because it is the same professional grounding against which I evaluated Mr. Fisher's report, and my opinions below reflect the standards routinely applied in this field, including standards Mr. Fisher's own report claims to follow but does not consistently meet.

**Summary of Opinions**

Based on my review, it is my opinion that Mr. Fisher's report falls well short of the standards ordinarily applied by reputation management professionals when forming and supporting their conclusions, and that, in several places, it is not reputation management analysis at all but advocacy dressed in the language of expertise. Specifically:

- Mr. Fisher does not apply any recognizable, testable methodology to the facts of this case. He describes a general process of gathering information, analyzing it, and forming conclusions. Still, he never shows his work, and his report contains no independent source citations, hyperlinks, studies, or data of any kind to support the general principles he relies on.[2]
- Mr. Fisher builds much of his opinion on generic communications adages rather than on case-specific evidence, and he says so directly, telling the reader that these adages are the basis of many of his conclusions and opinions.[3]
- Mr. Fisher's uncontrolled dissemination theory is asserted, not demonstrated. He never identifies a single third party who received, forwarded, discussed, or acted on the post, and he substitutes the Plaintiff's own stated belief for independent analysis.
- Mr. Fisher represents that his pre-litigation internet research found no negative information about the Plaintiff, personally or professionally. A media-monitoring report shows at least three negative-coded mentions from December 2024, eight months before the Facebook post, reporting a sexual-abuse lawsuit naming Smothermon as senior pastor of the church entity overseeing an affiliated treatment ministry, Steelbridge.
- The record Mr. Fisher reviewed, including facts recited in his own report, shows no lost book sales, no lost media interviews or speaking engagements, no negative comments from parishioners, and an increase in the church's income from 2024 to 2025. Mr. Fisher never reconciles these facts with his damages recommendation.
- Mr. Fisher repeatedly abandons the boundary he sets for himself at the start of his own report, that he will not offer opinions on causation or liability, and instead evaluates the reasonableness of the Defendants' verification process and labels their conduct extreme carelessness, a fault-based conclusion dressed up as reputation commentary.
- Mr. Fisher offers clinical-sounding conclusions about depression, anxiety, and mental trauma that fall outside his stated expertise in communications, and he pads his account of harm with an irrelevant back problem and generic speculation about family collateral damage that he expressly concedes is not tied to any fact in this case.

---

[2]Expert Report of Robert J. Fisher, Smothermon v. Hodge, et al., Case No. 2:25-cv-01858 (July 16, 2026) (hereafter "Fisher Report") at 22 to 25 (Methodology section).
[3]Fisher Report at 27 to 28.

- In at least one passage, Mr. Fisher labels his own writing a personal opinion. He uses inflammatory, one-sided language, calling the Defendants' conduct malicious and describing a graphic as demonic, language that is very difficult to square with his claim that fairness has been my guiding principle and that his opinions are objective and not biased.
- Mr. Fisher's proposed reputation repair budget of $325,000 to $350,000 is a bare estimate that he expressly declines to itemize or explain, and the only independent validation he offers for his general approach is an unnamed, uncited case that no reader can check.
- Mr. Fisher's recommended compensation figure of $2.65 million to $5.589 million has no calculation behind it of any kind. It is not tied to any specific fact, comparable case, lost opportunity, or cost, and it strays outside the boundaries of a communications expert's role into territory that belongs to the jury.
- Mr. Fisher relies on a study produced by Plaintiff's own law firm to support his claim that Defendants failed to use accepted verification tools, without disclosing who conducted that study or independently testing its conclusions.
- Mr. Fisher's own rebuttal Google search, offered as proof that the Defendants' error was implausible, was conducted nearly a year after the post, is undocumented as to search conditions, and contains an internal counting error and an incomplete review of the very image results he relies on.
- Mr. Fisher's account of his own professional history does not hold up to the same scrutiny he asks the jury to apply to the Defendants. He states his career case count as both 133 and 126 in different sections of the same report. He claims to have served as an expert witness in 32 states while naming only 28, and he describes his tenure operating his own firm as 42 years even though his own report states the firm was founded in 1978, forty-eight years before the report's date.
- The only confirmation Mr. Fisher offers for his methodology is his own account of unrecorded conversations with unnamed colleagues. He identifies no published standard that ties a specific set of case facts to a specific dollar figure.
- Mr. Fisher asserts that his approach reflects the universal consensus of the reputation management field, but, as explained later in this report, one widely accepted approach among reputation management professionals for pricing a repair campaign is a market-based, itemized, checkable one, not a single blended dollar range with no components.
- Mr. Fisher's opinions here were generated for this litigation, and, as discussed below, the positions he takes in this report diverge from the positions he took as a defense expert in Carroll v. Trump on at least three points central to the analysis, which suggests his conclusions track the party who retained him rather than a fixed, litigation-independent methodology.

**Mr. Fisher's Report Does Not Apply a Reliable, Verifiable Methodology**

Mr. Fisher describes his methodology in broad strokes: gathering information, analyzing it, and formulating conclusions and opinions.[4] That description could apply to almost any exercise of judgment by almost anyone. It does not tell the reader, the parties, or the jury what he actually did, based on the specific facts of this case. There is no media monitoring data, no count of how many people the Facebook post actually reached, no calculation of audience or publicity value, and no attempt to check whether the post, or any commentary about it, persisted online after it was taken down.

This matters because those tools exist and are routinely used in the field of reputation repair. Commercial media monitoring platforms calculate audience and publicity values for individual mentions based on viewership, circulation, and follower counts, which lets a reputation professional turn a subjective impression of how far something spread into a quantifiable, checkable estimate. A market-based cost estimate for any proposed repair campaign is then built from current advertising and media rates for the specific channels needed to reach the relevant audience. Mr. Fisher's report contains none of this. He offers his conclusions as though they were self-evident, without showing the reader how he arrived at them.

Mr. Fisher's claim to a  fares no better on inspection.  that he has discussed and reviewed his methodology with other experts in his field by telephone, correspondence, and in meetings and received their confirmation and validation of it.[5] No names, no dates, no documents, and no way for anyone to check any of it. An expert cannot establish that a method is generally accepted by simply asserting that unnamed colleagues once agreed with him in conversations no one else was present for. That is not peer review. It is a claim about peer review, offered on faith. Notably, Mr. Fisher and I worked together as retained experts on the same matter, Jose I. Lopez, M.D. v. Healthcare Group and OptumRx, and have discussed methodology. I did not provide him with the methodology he applies in this case.

Mr. Fisher also never addresses a threshold question that any reliable methodology has to confront first: what did the record actually show happened after the post came down? He acknowledges elsewhere in his own report that the post was up for only hours, that Legacy Church itself flagged the error the same day, and that the photograph was removed that day. A methodology that measures reputational harm has to grapple with those facts before it prices a remedy. Mr. Fisher's does not.

**Mr. Fisher Also Adopts an Advocate's Work Product Without Independent Verification**

Among the items Mr. Fisher lists as forming the basis for his conclusions is a study conducted by Plaintiff's own law firm, which he says demonstrated that the Defendants did not use normal and accepted photograph verification tools.[6] Mr. Fisher does not link to the study, identify who conducted it, what methodology it used, whether it was reviewed by anyone outside the firm that retained him, or what he personally did to verify its conclusions. He adopts an advocate's own work product, produced by Plaintiff's counsel, and repeats its conclusion as though it were his

---

[4] Fisher Report at 22 to 25 (Methodology section).
[5] Fisher Report at 22 to 23 ("Peer Accepted Methodology").
[6] Fisher Report at 24 (Methodology Specific to This Case).

independent finding. Mr. Fisher incorporated another party's unvetted analysis without independently validating it; he did not demonstrate that he was exercising independent expert judgment; rather, he showed that he was merely functioning as a conduit for someone else's advocacy.

**Mr. Fisher Substitutes Adages for Analysis**

Mr. Fisher's report leans heavily on a short list of communications sayings: that it takes years to build a reputation and seconds to destroy it, that you cannot unring a bell, that you can never wipe a slate clean, and that perception is more important than reality.[7] Standing alone, none of these sayings is wrong. But Mr. Fisher states plainly that they are the basis of many of his conclusions and opinions in this report.[8] These are old sayings, familiar to anyone who has worked in public relations for any length of time. They are not evidence, and standing alone they are not a methodology.

As an expert witness on reputation matters for Plaintiffs, I know that expert reports are meant to connect the specific facts of a case to a conclusion through a reasoned, checkable process. Here, the reasoning runs the other direction. Mr. Fisher starts from the adage and works backward to the conclusion, rather than starting from the facts of what actually happened to Pastor Smothermon and asking whether those facts support the adage in this instance. Nowhere does he explain why a post that was live for one to three hours, corrected the same day by the very church it concerned, behaves as an uncontrolled, unrecoverable reputational event is supposed to. He assumes it does, because the adage says reputational harm cannot be undone.

**The Uncontrolled Dissemination Theory Is Asserted, Not Demonstrated**

Mr. Fisher devotes several pages to explaining the difference between controlled and uncontrolled dissemination of negative information, and ultimately opines that the uncontrolled method of communication clearly applies here because the post was made on the internet.[9] It is important to note the language he uses to get there. He writes that the exposure would have been widespread and would most assuredly have resulted in a word-of-mouth effect. Those are predictions about what a Facebook post could do in the abstract, not findings about what this Facebook post actually did. Mr. Fisher does not identify a single specific person, beyond the Plaintiff himself and those at his own church, who saw the post, discussed it, forwarded it, or changed their view of Pastor Smothermon because of it. He does not cite a single comment, share, screenshot, or news account documenting secondary spread. The closest he comes to a case-specific finding is his observation that the Plaintiff, meaning the Plaintiff himself, believes some people will discount the post while others will have a seed of doubt planted in them.[10] That is Mr. Fisher recording the Plaintiff's own subjective expectation and presenting it back to the jury as though it were his own independent expert finding. It is not.

---

[7]Fisher Report at 27.
[8]Fisher Report at 27 to 28.
[9]Fisher Report at 28 to 29 ("General Overview").
[10]Fisher Report at 34 (Impact and Damage to Reputation and Perception of Plaintiff, describing the "seed doubt" belief as something "he," meaning the Plaintiff, reports).

As AMEC's Barcelona Principles reflect, communication measurement is a multi-method discipline; audience research is one tool available to reputation professionals, among several others, not a mandatory one.[11] Reputation professionals who quantify how an audience has received a piece of content typically draw on a toolkit of objective, checkable data, including media monitoring, social media monitoring, audience analytics, publicity valuation, sentiment assessment, search visibility, content analysis, and stakeholder assessment, with survey research, focus groups, or opinion polling available as additional tools where the objective is to measure audience belief or lingering perception. No single tool in this toolkit is mandatory, but a credible assessment draws on a meaningful combination of them rather than relying on assumption or intuition alone. [12]Mr. Fisher used none of these tools.

Mr. Fisher conducted no media monitoring, no audience or publicity value calculation, no sentiment assessment, no search-visibility review, no content analysis, and no stakeholder assessment, nor did he employ any survey, focus group, or opinion poll of the Plaintiff's audience, the Defendants' audience, or the general public. In short, Mr. Fisher made empirical claims about audience belief and perception without applying any recognized empirical methodology to test them.[13] Mr. Fisher did not record that he reviewed to fill that gap: he does not identify a single social media post, news article, letter, or email documenting that the post, live for several hours, caused any reputational harm to the Plaintiff. His only support for any claim about what portion of the exposed audience believed, doubted, or discounted the post is the Plaintiff's own stated belief that some people will discount it. In contrast, a seed of doubt will be planted in others, an unverified prediction that Mr. Fisher repeats rather than independently tests.

A damages opinion can't rest on what any negative post could theoretically do; it has to rest on what this one actually did. Reputation professionals know the difference between generic risk and documented harm. Mr. Fisher doesn't. He paints a worst-case scenario in the abstract, then slaps a price tag on it- a repair program, a compensation award- as if the abstract scenario were the real one. He never closes that gap with a single fact from this case.

**Mr. Fisher Never Separates Defendants' Own Conduct From What Unrelated Third Parties May Have Done**

Reputation professionals distinguish between the audience a publisher's own post actually reached and whatever further, independent spread other people may have chosen to give it on their own.

---

[11] See Int'l Ass'n for Measurement & Evaluation of Commc'n (AMEC), Barcelona Principles V4.0, at 3–4 (2025),(setting out the industry's seven consensus principles for communication measurement and evaluation, launched at AMEC's 2025 Global Summit in Vienna, and explaining that sound measurement and evaluation should be rooted in a rigorous, multi-method approach rather than any single mandatory tool

[12] *See* Mark Weiner et al., Institute for Public Relations Measurement Commission, The Communicator's Guide to Research, Analysis, and Evaluation 18–20, 25–33 (Mar. 2021), https://instituteforpr.org/wp-content/uploads/IPR-Guide-to-Measurement-v13-1.pdf (identifying the standard toolkit of communication research and evaluation methods, including traditional and social media monitoring and analysis, web analytics and search/SEO tracking, sentiment measurement, content analysis, media demographic and stakeholder audits, and publicity/reputation tracking tools, and separately describing surveys, focus groups, and polls as methods used specifically to gauge stakeholder "awareness, attitudes, and behavior" and audience "perceptions", i.e., audience belief and lingering perception as distinct from and additional to the broader monitoring/analytics toolkit).

[13] See Fisher Report at 34 (Impact and Damage to Reputation and Perception of Plaintiff). Mr. Fisher's report contains no reference anywhere to media monitoring data, audience or publicity value calculations, survey research, polling, or focus groups conducted for this engagement.

Mr. Fisher's uncontrolled dissemination theory blurs that line and he prices a repair program and a compensation figure as though Defendants were responsible for reaching every person who might, hypothetically, have seen, discussed, or passed along some version of the post during the one to three hours it was live, without separating what Defendants themselves published from what unrelated third parties independently may, or may not, have done with it. In this specific case, the damages analysis is not anchored to an audience that was potentially reached by the conduct at issue. Instead, Fisher discusses a hypothetical audience that could theoretically have encountered a secondhand account of it without offering any proof that this occurred.

Defendants' Facebook followers were likely online during the one- to three-hour window the post was live. He does not analyze the post's reach and engagement; extrapolation from follower counts is a standard, well-documented methodology in the social media analytics field: an expert can estimate likely impressions using a platform's average engagement rate for pages of comparable size, industry benchmarks for the relevant time window, or the page's own historical posting data. Mr. Fisher does none of this. He never estimates how many of Defendants' Facebook followers were likely online during the one-to three-hour window the post was live, and he does not analyze the post's own engagement, its views, shares, likes, or comments to gauge its actual or even potential reach.[14] Nor does he attempt any extrapolation from comparable posts or industry-standard engagement rates that might have supplied a defensible proxy in the absence of post-specific data. Having chosen not to undertake even that more modest exercise, he cannot now treat the resulting evidentiary void as license to price a repair program and compensation figure against a hypothetical audience of unlimited size. Without a baseline, estimated or otherwise, there is no way to test whether his proposed repair budget or compensation figure bears any relationship to the scope of exposure the record actually supports.

The record also contains public commentary critical of Pastor Smothermon that is entirely independent of, and unrelated to, the Cracker Barrel misidentification, further illustrating the danger of attributing all negative sentiment associated with Plaintiff's name to Defendants' conduct. For example, a post in the r/Albuquerque subreddit titled "Legacy Church, the unchristian church" criticizes Pastor Smothermon for a sermon the poster found objectionable concerning the Governor of New Mexico, a subject with no connection whatsoever to the Facebook post, the Cracker Barrel executive, or this litigation, and that post alone has drawn 546 upvotes and 212 comments. Whatever reputational association that commentary reflects is attributable to Plaintiff's own public statements from the pulpit, not to anything Defendants did or published. Mr. Fisher's report does not identify, consider, or account for this or any other source of negative sentiment about Plaintiff that exists independently of Defendants' Facebook post.

Notably, Plaintiff's own counsel has effectively conceded that unflattering information about Pastor Smothermon exists in the public record independent of Defendants' post. In moving to strike the exhibits attached to Defendants' Answer, Plaintiff argued that those very exhibits offered solely to establish that Pastor Smothermon is a public figure were "selectively curated to smear" him. *See* Mot. to Strike (ECF No. 45) at 2–3. But if there were nothing negative already in the public record about Plaintiff, there would have been nothing for Defendants to draw on to "smear" him in the first place. This is methodologically inconsistent with Mr. Fisher's own damages

---

[14] See Fisher Report at 9–10 (reciting that Defendants' Facebook page has more than 6.3 million followers); id. at 30–33 (My Own Research) (containing no engagement or reach data for the post itself).

analysis. The exhibits attached to Defendants' Answer, which Plaintiff's counsel has characterized as material enough to "smear" Plaintiff, demonstrate that unflattering, publicly available information about Plaintiff existed independently of Defendants' Facebook post. Yet Mr. Fisher's report does not account for this pre-existing negative sentiment as a possible contributor to reputational harm. A reliable damages methodology should isolate and control for alternative causes of reputational injury; instead, Mr. Fisher's report attributes the entirety of Plaintiff's claimed reputational harm to Defendants' post without ruling out, or even acknowledging, these other sources.

**Mr. Fisher's Claim That He Found No Pre-Existing Negative Information Is Not Accurate**

Before assessing any reputational harm, Mr. Fisher states that he searched the internet to determine whether there were any preexisting reports, personal or professional, that would reflect negatively on the Plaintiff, and that his search did not reveal any negative information about him, either personally or professionally.[15] That representation is not accurate. Plaintiff's own counsel has acknowledged the existence of negative, publicly available information about Plaintiff, moving to strike the very exhibits attached to Defendants' Answer because they were "selectively curated to smear" Plaintiff. See Motion to Strike (ECF No. 45) at 2–3. If, as Plaintiff's counsel represented to the Court, those exhibits contained material capable of "smearing" Plaintiff's reputation, then negative information about Plaintiff was both publicly available and known to Plaintiff's own counsel, directly contradicting Mr. Fisher's claim that his research uncovered no negative personal or professional information about him.

There is also a more recent record development bearing on this same question that Mr. Fisher's own report neither mentions nor lists among the materials he reviewed. On May 5, 2026, more than two months before Mr. Fisher signed his report, the Magistrate Judge denied Plaintiff's motion to strike the very exhibits Plaintiff's counsel had characterized as curated to smear the Plaintiff, and ruled directly on their content. The Court found that none of the exhibits appear curated to smear Plaintiff and that they do not unnecessarily reflect on his moral character or state anything repulsive.[16] Those exhibits include articles and podcasts in which the Plaintiff has publicly commented on New Mexico politics and on COVID-19 policies, material the Court held bears directly on the disputed question of whether Plaintiff is a public figure. (I take no position on the public figure dispute) Whichever characterization one accepts, the underlying point is the same. A judicial ruling now reinforces it: Mr. Fisher never cites the record as containing a body of pre-existing, publicly available commentary by the Plaintiff on politically contested subjects that predates the August 22, 2025 Facebook post, and that a properly conducted pre-event reputation baseline would have had to identify and account for. Mr. Fisher's own list of materials reviewed does not include this Order at all, even though it was issued well before his report was signed and speaks directly to the reputational baseline his own stated methodology required him to establish first.

---

[15]Fisher Report at 29 (Analysis of Plaintiff's Reputation Pre-Public Exposure).

[16]Order Denying Plaintiff's Motion to Strike Defendants' Amended Answer, Smothermon v. Hodge, et al., Case No. 2:25-cv-01858-APG-BNW, ECF No. 51 at 5–6 (D. Nev. May 5, 2026). Compare Fisher Report at 20–22 (Information/Input Reviewed to Form Opinions), which lists numerous filings dated through July 1, 2026, but does not include this Order.

Using the commercial software Critical Mention, which many public relations professionals use, I created a coverage-tracking report for Pastor Steve Smothermon over the last two years. The software only allows searches to go back two years. The report, which can be reviewed here, shows otherwise. On December 4 and 5, 2024, more than eight months before the August 22, 2025, Facebook post at issue in this case, outlets including City Desk and KUNM reported that Legacy Church and its affiliated residential-treatment ministry, Steelbridge, had been named in a lawsuit alleging sexual abuse, and both articles identify Smothermon as the lead pastor of the church entity that oversees Steelbridge; both mentions are coded by Critical Mentions AI system as negative in the monitoring report. A third article, published December 26, 2024, and likewise coded Negative, reports that an alleged victim sued the New Mexico drug rehabilitation program and its supporting church, again describing Smothermon as the senior pastor of the church that controls Steelbridge.[17] Mr. Fisher's search was not limited to any particular time period, and even a cursory search turns up other coverage he does not address, including a 2012 report describing protests outside Legacy Church after Pastor Smothermon publicly opposed a gubernatorial appointment because the appointee was gay.

This omission matters because assessing the reputational harm attributable to Defendants first requires establishing what Plaintiff's reputation looked like before the events at issue in this case. Coverage linking Plaintiff to allegations involving Steelbridge is plainly relevant to establishing that baseline, and a properly conducted reputation audit would ordinarily be expected to identify it.

Either Mr. Fisher's search failed to identify readily available reporting, or the report does not disclose why those articles were excluded from his analysis. This is not an isolated point: Mr. Fisher's uncontrolled dissemination theory and his conclusion that the harm is irreparable both rest on the premise that Plaintiff's reputation was unblemished before the events at issue. The record does not support that premise. This substantially undermines the assumptions underlying his dissemination and damages opinions.

Plaintiff's own counsel has taken the opposite position in this same litigation. Twice, first in a Motion to Dismiss Counterclaims and Strike Exhibits filed March 9, 2026, and again in a Motion to Strike filed March 18, 2026, after Defendants amended their pleading, Plaintiff's counsel asked the Court to strike the exhibits attached to Defendants' Answer and Counterclaim on the ground that they were impertinent and scandalous, and had been selectively curated to smear Pastor Smothermon. Those exhibits consist substantially of the same category of pre-existing, publicly available coverage of political disputes and public controversies involving the Plaintiff that Mr. Fisher's report claims does not exist. Plaintiff's own counsel repeated characterization of that coverage as scandalous and reputation-damaging is itself an acknowledgment that pre-existing negative material about the Plaintiff was available and substantial, further undermining the premise on which Mr. Fisher's damages opinion rests.[18]

---

[17]Critical Mention media-monitoring report, "Pastor Steve Smothermon," entries dated Dec. 4, 2024 ("Legacy Church, Steelbridge Ministries named in lawsuit alleging sexual abuse"), Dec. 5, 2024 ("THURS: NM Supreme Court decides lawmakers should settle dispute with executive branch…"), and Dec. 26, 2024 ("Alleged Victim Sues New Mexico Drug Rehab and Supporting Church…"), all coded Negative.

[18]Plaintiff's Motion to Dismiss Counterclaims and Strike Exhibits (ECF No. 40, filed Mar. 9, 2026) at 4–5 (arguing the exhibits attached to Defendants' Answer and Counterclaim were "impertinent" and "scandalous," and were

**The Record Mr. Fisher Reviewed Undercuts, Rather Than Supports, His Damages Narrative**

Mr. Fisher's own report recites a set of facts, drawn from the litigation record he reviewed, that cut against significant reputational harm, not toward it.[19]

- The photograph was posted for only about one to three hours before it was removed.
- Legacy Church's own staff identified the error and had it taken down the same day it was posted. Defendants' sworn interrogatory responses supply additional, more precise detail: Nathan Hughes, who maintains Defendants' website, removed the post after a Legacy Church employee flagged it by email to Defendants' customer-service account, and Keith and Kevin Hodge did not personally learn of the misidentification until after this lawsuit was filed (Declaration of Ronald D. Green, Ex. 1 (Defendants' Second Amended Responses to Interrogatory Nos. 3 and 6), ECF No. 53-1 (July 15, 2026)).
- The Plaintiff did not lose any book sales, media interviews, or speaking engagements.
- The Plaintiff did not receive any negative comments from his own parishioners.
- The church's income increased from 2024 to 2025.

Mr. Fisher records all of this in his case background summary, and then never returns to it. His damages analysis, his repair budget, and his compensation recommendation do not mention any of these facts again, let alone explain why a reputation that produced rising church income and no lost professional opportunities warrants a repair program in the hundreds of thousands of dollars and a compensation award reaching into the millions. An expert who is genuinely weighing the evidence has to account for the facts that run counter to his own conclusion. Mr. Fisher sets them aside.

**Mr. Fisher Does Not Address the Streisand Effect Created by the Litigation Itself**

There is a further gap in Mr. Fisher's dissemination analysis, and it cuts against his damages theory rather than for it. The photograph was live on Defendants' Facebook page for only a few hours before Legacy Church's own staff removed it. The filing of this lawsuit, by contrast, generated its own, far more long-lasting media coverage of the underlying mix-up, coverage that remains indexed and publicly accessible today. One example is a Headline USA article published on October 6, 2025, describing the lawsuit under the headline "Hodgetwins Sued for Confusing Conservative Pastor with Woke Cracker Barrel Executive."[20]

---

"selectively curated to smear" the Plaintiff); Plaintiff's Motion to Strike Lengthy, Speaking Affirmative Defenses and Exhibits, to Recharacterize Defenses as Counterclaims, and to Dismiss Recharacterized Counterclaims (ECF No. 45, filed Mar. 18, 2026) at 3 (renewing the same argument as to the 23 exhibits attached to Defendants' Amended Answer).

[19] Fisher Report at 19 to 20 (Lawsuit Information, General Defenses, summarizing the record, including that the Plaintiff did not lose any book sales, media interviews, or speaking engagements, that he received no negative comments from his parishioners, and that the church's income increased from 2024 to 2025).

[20] Ken Silva, Hodgetwins Sued for Confusing Conservative Pastor with Woke Cracker Barrel Executive, Headline USA (Oct. 6, 2025).

That article, which recounts the misidentification and quotes from the Complaint, has now been publicly available and searchable for the better part of a year, far longer than the original post was ever online. This is a familiar pattern in reputation management, sometimes called the Streisand effect: an effort to correct or contest an unwanted piece of content can itself generate broader and more lasting attention than the original content would have received on its own.

A reliable damages analysis has to ask which source, the several-hour post or the coverage the lawsuit itself generated, is actually responsible for whatever online association currently exists between Pastor Smothermon's name and this controversy, and it has to account for the fact that litigation-driven press coverage is not conduct attributable to the Defendants. Mr. Fisher's report does neither. He does not mention the Headline USA article or any other coverage of the lawsuit anywhere in his dissemination analysis, and he does not consider whether continued publicity about the lawsuit may be adding to, rather than repairing, whatever reputational exposure exists.

Plaintiff's own filings corroborate this point. In his Reply in support of the Motion for Leave, Plaintiff represents to the Court that any present-day online search for his name may be shaped by "the litigation's own public footprint," including case-related material published online since the post came down (Plaintiff's Reply in Support of Motion for Leave, ECF No. 56 at 11 (July 22, 2026)). That is consistent with and supports the Streisand-effect analysis above: continuing publicity generated by this litigation, rather than the one- to two-hour post itself, is a more likely source of any current online association between Pastor Smothermon's name and this controversy. Mr. Fisher's report does not engage with that possibility at all.

**Mr. Fisher Repeatedly Crosses Into the Legal and Factual Conclusions He Says He Will Not Offer**

Mr. Fisher tells the reader early in his report that he is not allowed to offer judgments or opinions on causation or liability, and that those questions are for the trier of fact to determine.[21] He does not honor that limitation.

Immediately after stating that disclaimer, Mr. Fisher spends several pages evaluating whether the Defendants' internet search process was reasonable. He walks through their use of incognito mode, their failure to check photograph metadata, their failure to perform a reverse image search, and he conducts his own Google search of the same name to compare results.[22] He then concludes that it is not plausible that anyone could have conducted a basic search and confused the two men, and states in his own words that it is my opinion that, at the very least, the Defendants' actions and inactions exhibited extreme carelessness.[23]

That is not reputation management commentary. It is a finding about whether the Defendants exercised reasonable care, which is the fault standard at the heart of a defamation claim. Mr. Fisher cannot tell the jury he takes no position on causation or liability and then, in the same report, tell the jury that the Defendants were extremely careless in the very conduct the jury will be asked to judge. The same problem appears at the close of his report, where he concludes that the Plaintiff suffered irreparable harm to reputation, without ever demonstrating that this event produced the

[21] Fisher Report at 29 (parenthetical preface to the Anatomy of Reputation Harm section).
[22] Fisher Report at 30 to 33 (Errors, Problems and Disputes of Defendants' Photograph Claims; My Own Research).
[23] Fisher Report at 43 (Conclusions and Opinions).

type or magnitude of persistent harm that the reputation-management literature associates with that term.[24] Irreparable harm is not a communications metric. It is the legal standard for injunctive relief. Mr. Fisher is not entitled to hand the jury legal conclusions dressed in the vocabulary of his profession while telling the court he is doing no such thing.

**Mr. Fisher's Own Verification Research Suffers From the Same Defects He Attributes to the Defendants**

In faulting Defendants for conducting their search in incognito mode, which Mr. Fisher describes as destroying the verification history, Mr. Fisher holds Defendants to a documentation standard he does not apply to himself.[25] His own "My Own Research" section does not disclose the date of his search, whether he was logged into a Google account, his location, or whether personalization or search history affected the results he obtained. All of these factors influence search and image results. Without that information, no one, including the Defendants or the jury, can verify or replicate what Mr. Fisher found.

More probative on the plausibility question is Defendants' contemporaneous, sworn account of the search Kevin Hodge actually ran on August 22, 2025, which represents that nearly every result for that search term returned Plaintiff's photograph rather than the Cracker Barrel executive's (Defendants' Response to Interrogatory No. 2). Unlike Mr. Fisher's own search, run without documentation and, as discussed below, nearly a year after the post, Mr. Hodge's sworn account is a first-hand record of the actual conditions he encountered at the time. It goes directly to the plausibility question Mr. Fisher purports to answer. A reliable methodology accounts for evidence that runs counter to its own conclusion, wherever that evidence originates and however long after the fact it surfaces. Mr. Fisher's report does not address it at all.

Mr. Fisher's underlying premise, that browsing in incognito mode is itself a mark of carelessness or concealment, also does not hold up. Incognito mode is a routine, everyday privacy feature. [26]

Plaintiff's characterization of incognito mode as something that bypasses standard internet browsers and destroys the verification history misdescribes the technology on both counts. Incognito mode is not separate from or evasive of a standard browser; it is a native, built-in setting within standard browsers such as Chrome, Safari, and Firefox, accessible from the same menu used to open a new tab or window.[27] It does not bypass the browser in any sense. Nor does it

---

[24]Fisher Report at 44 (Report Summary).

[25]Fisher Report at 30 (Errors, Problems and Disputes of Defendants' Photograph Claims, describing Defendants' use of incognito mode as destroying the verification history).

[26] See Hana Habib, Jessica Colnago, Vidya Gopalakrishnan, Sarah Pearman, Jeremy Thomas, Alessandro Acquisti, Nicolas Christin & Lorrie Faith Cranor, *Away From Prying Eyes: Analyzing Usage and Understanding of Private Browsing*, Proceedings of the Fourteenth USENIX Symposium on Usable Privacy and Security (SOUPS 2018) 159, https://www.usenix.org/conference/soups2018/presentation/habib-prying, finding, based on monitored browsing data from over 450 participants, that private browsing is commonly used for practical, everyday, and security-related purposes rather than primarily for concealment.

[27] See Google, Browse in Incognito Mode, https://support.google.com/chrome/answer/95464, explaining that Incognito is a built-in browsing mode and that, while it limits what is retained locally on the device, it does not make browsing activity invisible, as websites visited, including Google itself, and network administrators may still observe activity during an Incognito session

destroy anything, as Fisher says in his report.[28] No verification history is deleted or erased, because none is created in the first place. The feature declines to save new local browsing data, including history, cookies, and cache, for that session. That is a materially different claim than the one Plaintiff makes, which implies the deliberate erasure of evidence that otherwise would have existed. Incognito mode also does not prevent Google's own servers from logging the query, nor does it prevent a screenshot from being taken during the session; it affects only what is retained locally on the device afterward. A characterization of this basic, everyday feature as something irregular, evasive, or destructive of evidence misstates how it works and undermines the premise that Defendants' use of it reflects an intent to operate outside normal browsing conduct.

There are common, non-culpable reasons a person selects it, including eliminating the influence of the user's own prior searches and personalization on the results returned, avoiding cross-contamination on a shared or public computer, and limiting ad tracking. None of those ordinary motivations has anything to do with an intent to deceive or a disregard for accuracy. If anything, removing the influence of one's own search history is a more neutral way to generate results, not a less reliable one. Mr. Fisher's report treats Defendants' choice to browse in incognito mode as inherently suspicious without acknowledging any of these ordinary explanations or explaining why they do not apply here, which is the same one-sided treatment of the evidence that runs through the rest of his report.

That gap matters here in particular because Mr. Fisher ran his search around the time he prepared his report, dated July 16, 2026, nearly eleven months after the August 22, 2025, post. After this lawsuit, its filings, and the underlying controversy had already generated their own online footprint. A methodologically sound comparison would have made some effort to reconstruct what search results looked like at or near the time of the post, rather than running the same query almost a year later and treating the results as equivalent to what Defendants would have seen.

Tools exist to make this kind of comparison rigorous rather than assumed. The Internet Archive's Wayback Machine preserves historical snapshots of individual web pages, and its Crawl Data Index Application Programming Interface can be queried to retrieve the earliest capture date for almost all Uniform Resource Locators (URLs). Applying that tool to the pages Mr. Fisher's search surfaced would show, for each one, whether it existed and was indexable as of August 22, 2025, or whether it entered the public record only afterward. Published and last-modified date metadata embedded in news articles and blog posts provides a second, independent check on the same question. Search-interest tools such as Google Trends can further show whether search volume for the name in question changed materially after the Facebook post and the subsequent litigation, which would itself indicate that the search landscape Mr. Fisher was examining in July 2026 was not the same landscape that existed in August 2025. None of this requires exotic technology; it is standard due diligence for reconstructing a historical online footprint, and it is the kind of

[28] Fisher Report stating that Defendants' use of incognito mode "bypasses standard internet browsers" and "destroys the verification history". Neither characterization is accurate. Incognito mode is a native, built-in setting within standard browsers such as Chrome, Safari, and Firefox, not a tool separate from or evasive of them. It does not destroy any verification history, since none is created in the first place; the feature declines to save new local browsing data such as history, cookies, and cache once the session ends.

verification a reliable methodology would undertake before treating a search run eleven months after the fact as a stand-in for what existed at the time. Mr. Fisher did none of it.[29]

Mr. Fisher's presentation of his own search results is also internally inconsistent. He states that he reviewed "the first 10 listings" returned for the search, but then summarizes his findings by stating that "four of the six listings were about the Plaintiff, two of the listings were about the Cracker Barrel executive...and four were about neither of the two individuals."[30] Four plus two plus four is ten, not six. An expert asking a jury to treat his own manual review as more reliable than Defendants' search should be able to describe his own results accurately.

The same is true of his review of the image search results. Mr. Fisher states that his search returned two rows of five photographs each, ten images in total, but his substantive analysis addresses only the five images in the top row; he offers no discussion of what appeared in the second row.[31] Yet he builds his conclusion that it is "not plausible that anyone could have conducted basic research on Google...and confused the two of them" on a review of only half of the images he says his own search returned.

**Mr. Fisher's Own Case Count, Jurisdictional Claims, and Years of Experience Do Not Add Up**

Mr. Fisher's description of his own professional history shows the same imprecision found in his review of his own search results. In three places, he states he has served as an expert witness in 133 cases over the past twenty years; in his Methodology section, he instead states 126 cases.[32] Mr. Fisher does not explain the seven-case discrepancy, and the report does not indicate which figure is correct.

The same problem recurs with the states in which Mr. Fisher claims to have testified. He states in different passages that he has served as an expert witness in 32 states, or in 32 states plus the District of Columbia, but the state-by-state list in his Expert Witness section names only 28.[33] Four states he claims cannot be identified anywhere in the report. Because Mr. Fisher's stated experience is the foundation for the opinions he asks the jury to accept, these unexplained discrepancies in facts entirely within his own knowledge bear on the reliability of his analysis of the more contested facts in this case.

---

[29] Article structured data (the date published and date modified fields) is the standard mechanism publishers use to tell search engines when content was created or last changed. See Google Search Central, Article Structured Data, https://developers.google.com/search/docs/appearance/structured-data/article. Google Trends' Explore tool measures relative search interest for a given term over a selected time period and can show whether interest in a name or topic changed materially after a given date. See Google Search Central, Get Started with Google Trends, https://developers.google.com/search/docs/monitor-debug/trends-start

[30] Fisher Report at 30-31 (My Own Research).

[31] Fisher Report at 31 (My Own Research).

[32] Compare Fisher Report at 3 (Assignment, "involved in 133 cases in 32 states"), and id. at 4 (General Summary, "133 cases in 32 states and the District of Columbia"), and id. at 5 (Expert Witness, "133 cases…in 32 states…plus the District of Columbia"), with id. at 22 to 24 (Methodology, "126 cases as an expert witness").

[33] Fisher Report at 5 (Expert Witness section). The named list reads: California, New York, Florida, West Virginia, Georgia, North Carolina, Mississippi, Virginia, Utah, Tennessee, New Mexico, Nevada, Hawaii, Washington, Colorado, Minnesota, Maryland, Indiana, Delaware, Massachusetts, Michigan, Wisconsin, Ohio, Louisiana, Kentucky, Arizona, Texas, and Alabama, twenty eight states, plus the District of Columbia.

Mr. Fisher's claimed years of experience suffer from the same defect. His Assignment section states that he spent "42 years operating my own communications firm, Fisher & Associates, Inc.," and, separately, that he has "a 42-year background in representing law firms."[34] But his own Professional Experience listing states the firm was founded in 1978, forty-eight years before his report's July 16, 2026 date, not forty-two. Elsewhere in the same report, he describes his career as a "half-century career," a "five-decade background," and, in his closing summary, "45 years" as a public relations professional.[35] None of these figures reconcile with one another or with the founding date he himself supplies, a fact that requires no judgment call to verify.

**Mr. Fisher Offers Clinical Opinions He Is Not Qualified to Give**

Mr. Fisher is a communications professional. He is not a psychologist, psychiatrist, or physician, and his report does not claim any such credential. That does not stop him from describing the Plaintiff's reaction to the post in clinical terms, stating that the Plaintiff experienced significant forms of mental trauma, including anguish, fear, depression, anxiety, and apprehension.[36] Naming specific psychological conditions and calling the reaction trauma is a diagnostic-sounding conclusion. It belongs, if anywhere, in the report of a mental health professional who actually evaluated the Plaintiff, not in a reputation management report.

Mr. Fisher then adds that the Plaintiff has been coping with an ongoing back problem and, in the same sentence, states that it is not attributable to the Facebook post.[37] If it is not attributable to the post, it has no place in a report assessing harm caused by the post. Including it anyway suggests an effort to thicken the damages narrative with detail that Mr. Fisher himself admits does not belong there.

Mr. Fisher's discussion of the Plaintiff's family follows the same pattern. He writes generally that family members are often collateral damage when one member has severe reputation damage, and that this can lead to marriage strain, divorce, and children being harassed, bullied, or physically attacked.[38] He offers this as a general observation from his career, not as something the record shows happened to Pastor Smothermon's family in this case. A general observation about what sometimes happens to other people's families in other cases is not evidence of what happened to this family, and Mr. Fisher does not claim otherwise.

---

[34] Compare Fisher Report at 3 (Assignment, "42 years operating my own communications firm, Fisher & Associates, Inc."), and id. at 4 (Litigation Experience, "a 42-year background in representing law firms"), with id, at 5 (Professional Experience, listing "Fisher & Associates, Inc. PR Firm (Founded 1978) President"). The Report is dated July 16, 2026, forty-eight years after the firm's stated 1978 founding.
[35] See Fisher Report at 3 (Assignment, "half-century career"); id. at 28 (General Overview, "My five-decade background…along with my 42 years of experience in litigation support"); id. at 44 (Context and Perspective, Report Summary, "as a public relations professional for 45 years").
[36] Fisher Report at 36 (Impact on Mental and Physical Well Being).
[37] Fisher Report at 36 (Impact on Mental and Physical Well Being).
[38] Fisher Report at 35 (Impact on Relationships).

**Mr. Fisher Abandons Professional Objectivity When It Suits Him**

Mr. Fisher's report states that fairness has been my guiding principle, and that his assessments are objective and not biased on behalf of the litigant who retained him.[39] His discussion of a website maintained by defense counsel does not read that way.

Describing a graphic on that website, Mr. Fisher labels his own paragraph Personal Opinion. Then he writes that the Defendants maliciously doubled down on their original error by throwing more salt into the wound through what he calls this demonic graphic depiction of the pastor.[40]

Setting aside whether that graphic is fair comment by defense counsel, which is not a question for a reputation expert to resolve, the language Mr. Fisher chooses. Fisher writes, "Given that the Defendants were the ones who made the careless mistake in their Facebook post that allegedly caused an "innocent" individual considerable reputation harm, they (assumingly they were aware of their attorney's website on their case and approved its content) maliciously double-downed on their original error by "throwing more salt into the wound" through this "demonic" graphic depiction of the pastor. Instead of being contrite for their original error and any harm it might have caused, they compounded it by continuing to sully the Plaintiff's"

Mr. Fisher's own report tells the reader that he flagged this passage as personal opinion because, evidently, he recognized it was different in kind from the rest of his report. That recognition is telling. If an expert has to label part of his own report as personal opinion to distinguish it from his professional analysis, the more important question is why the rest of the report, which is not so labeled, is not held to the same standard.

**Mr. Fisher's Own Prior Sworn Opinions Point the Other Way**

Mr. Fisher has served as a reputation expert on behalf of both plaintiffs and defendants, including as the defense expert in E. Jean Carroll v. Donald J. Trump, where he addressed many of the same questions of reputational harm at issue here. Comparing that report to the one he has submitted in this case is instructive, because on at least three points, the positions Mr. Fisher took on behalf of a defendant in Carroll cut directly against the opinions he offers on behalf of the Plaintiff here.

An established, positive reputation is more resilient to a single negative statement, not less. In Carroll, Mr. Fisher opined that a person with an established positive brand and a developed reservoir of goodwill can withstand attacks, especially from a controversial source, and that it is the person with no such reservoir, a clean slate with no counterbalance, who is hurt the most.[41]

By Mr. Fisher's own account in this report, Pastor Smothermon has led a single church for nearly a quarter century, built a congregation of roughly 20,000 members across nine campuses, reached an estimated 28 million people through social media, amassed roughly 91,000 YouTube subscribers, and authored two books. Under the very principle Mr. Fisher articulated in Carroll, that kind of long-established, well-documented reputation should be relatively resilient to a single

---

[39]Fisher Report at 4 (Assignment section, describing Fisher's stated commitment to fairness and objectivity).
[40]Fisher Report at 33 to 34 (Continuing Reputation Harm).
[41] Rebuttal Expert Report of Robert J. Fisher, E. Jean Carroll v. Donald J. Trump, No. 20-cv-7311 (LAK)(JLC) (S.D.N.Y., dated Nov. 14, 2022) (hereafter "Fisher Carroll Report"), at 8 (Reputation and Reputation Damage).

post that was corrected within several hours. Mr. Fisher does not mention, apply, or even acknowledge that principle anywhere in this report.[42]

A polarizing figure with a partisan following generates discounted belief rather than full-value exposure. Mr. Fisher's Carroll report reasoned that, because the defendant there was controversial and often bombastic, people were less likely to believe him. It went on to calculate that even if the opposing expert's own numbers were credited, a majority of the audience would not believe anything he said. Mr. Fisher's own description of the Hodgetwins in this report, provocative, blunt, and satirical in style, and directed at a base audience of conservative followers, fits the same profile of a polarizing communicator whose statements a significant portion of the audience discounts at first glance. Mr. Fisher does not apply that same discount here. Instead, he treats Defendants' full 6.3 million follower count as though it represents at-risk exposure, without the audience-receptivity adjustment his own prior report insisted was necessary.[43]

Mr. Fisher's Carroll report states that, as a reporter trained in the fair and balanced tradition, he believes the Case Background section of any expert report should present both sides equally, and he criticized the opposing expert there for what he read as one-sided language. Measured against that same standard, Mr. Fisher's own choice of words in this report, describing Defendants' conduct as malicious and a graphic on defense counsel's website as demonic, is difficult to reconcile with the standard of balance he himself set out as a mark of a reliable expert report.[44]

An expert's methodology should not change based on the identity of the party signing the retention letter. Mr. Fisher applied one set of principles when a well-known public figure's reputation withstood attacks in Carroll v. Trump, and a different, unstated set of principles when a well-known public figure's reputation is said to have been irreparably harmed here. That inconsistency itself is evidence that Mr. Fisher's conclusions track the position of whichever party retained him, rather than a fixed, reliable methodology.

**The Reputation Repair Budget of $325,000 to $350,000 Is Not Tied to Anything.**

Mr. Fisher recommends a two-year reputation repair program and estimates its cost, based on his prior experience, in the range of $325,000 to $350,000.[45] He then tells the reader, in his own words, that although he has projected costs for each activity and program element, he will not delineate them in this report at this time.[46]

This is the opposite of how a market-based cost estimate is supposed to work. One commonly accepted approach in this field is to price a proposed program the way a media buyer prices a campaign: channel by channel, using current advertising and media rates, tied to the specific audience the campaign needs to reach. That produces a number the other side, and the jury, can actually test and question. Mr. Fisher instead offers a single blended range with no components,

---

[42] Fisher Report at 10 to 11 (Church Background; Plaintiff's Background).Robert Fisher - Trump Case.pdf
[43] Fisher Carroll Report at 10 to 11 (Target Audiences); Fisher Report at 9 (Defendants' Background), describing Defendants as delivering their commentary "in a blunt, satirical style that is directed towards their base audience of conservative followers."
[44] Fisher Carroll Report at 3 (General Overview).
[45] Fisher Report at 42.
[46] Fisher Report at 41 to 42.

no rate card, no audience size, and no channel plan, and then tells the reader directly that he is choosing not to break it down.

The only outside validation Mr. Fisher offers for this kind of unitemized figure is a quotation from what he describes as a recent case, in which, in his telling, a judge opined that his report there laid out the bare minimum of support for his damages figure.[47] Mr. Fisher does not name the case, the court, or the date, and offers no citation anyone could use to verify the quotation. An expert asking a jury to trust an unverifiable, uncited quotation as proof that his approach has been judicially blessed is asking the jury to take his word for it twice over, once for the number. Once for the authority he says supports it. And even accepting his account of that ruling at face value, a court describing prior supporting work as the bare minimum is not a description any expert should want to repeat, let alone rely on, in a report that offers even less detail than the one the court was describing.

Independent, data-driven work by another defense-side reputation consultant in this same case illustrates just how far short Mr. Fisher's report falls. Matthew Shupe, a reputation-management consultant separately retained by Defendants, reviewed this matter and issued his own report on July 16, 2026. Using commercial monitoring services, including Meltwater and Grabien, together with direct searches of major search engines and social platforms, Mr. Shupe tracked mentions of Pastor Smothermon's name across social media, news, broadcast, and search results, both before and after the Facebook post. This is precisely the kind of media monitoring, audience tracking, and persistence analysis that I identify as missing from Mr. Fisher's report: a count of actual mentions, a check of what currently surfaces in search results, and an inquiry into whether pre-existing coverage explains any negative association, all done with tools built for that purpose rather than assumed from a communications adage.

Mr. Shupe found no lasting connection between the Plaintiff and the post. The only search results tying Pastor Smothermon to Cracker Barrel are articles and case listings about this lawsuit itself, and the pre-existing negative coverage of Pastor Smothermon that does exist, including reporting on the Steelbridge litigation and his political statements from the pulpit, predates the post and has nothing to do with it. On that record, Mr. Shupe concluded that Pastor Smothermon suffered no reputational or brand harm from the post and recommended no further repair action of any kind (Expert Report of Matthew Shupe, July 16, 2026).

I have reviewed Mr. Shupe's report. I reached my own opinions about Mr. Fisher's report independently. I do not adopt Mr. Shupe's findings as my own. What his report demonstrates is that the analysis Mr. Fisher's report is missing was not somehow unavailable to him. Another expert working from the same set of facts had no difficulty gathering current, checkable data on dissemination, search visibility, and pre-existing coverage, using tools any reputation professional could have used. Mr. Fisher's failure to do the same is not a limitation of the field; it is a gap in his report.

**The Compensation Recommendation of $2.65 Million to $5.589 Million Has No Basis Whatsoever**

---

[47] Fisher Report at 37 (Program Validity).

Mr. Fisher's report concludes with a recommendation that Pastor Smothermon be compensated for pain and suffering in a range of $2.65 million to $5.589 million.[48] There is no calculation anywhere in the report that leads to those numbers. There is no comparison to any other case, no formula, no multiplier applied to any quantified loss, no reference to lost income, lost opportunities, or any other measurable economic harm. The paragraph that announces the range is the same one that first raises a dollar figure. The number simply appears.

This matters for two reasons. First, as a matter of reliability, an expert opinion that produces a specific number twice, without showing any arithmetic or comparative analysis behind it, cannot be tested or verified by anyone, including the jury asked to rely on it. Second, as a matter of scope, Mr. Fisher defines his own assignment at the outset of his report as assessing reputation damage and recommending measures to restore reputation.[49] He does not define his assignment as calculating a pain-and-suffering award. A dollar figure for pain and suffering is a determination for the jury to make based on the evidence as a whole, not a number for a communications consultant to hand down as though it were the output of a professional calculation. Having told the reader that questions of liability and causation are not his to answer, Mr. Fisher does not explain why a dollar figure for pain and suffering is any more within his expertise. It is not. In my opinion, this opinion falls outside the expertise of a communications professional and is unsupported by any disclosed methodology.

**A Reliable Approach Looks Different**

The approach I have described above is not something I invented for this case. It is the approach commonly used by experienced reputation-management professionals, including my own practice and those of colleagues with whom I work, such as Reputation Advisors International. I use it in my work whether we are advising a client directly on repairing a damaged reputation or, as here, serving as an expert witness reviewing someone else's work. The method does not change depending on which side of a case I am on. Nothing goes into a report or a dollar figure that the other side, and the jury, cannot see and check for themselves.

When I take on an assignment, I apply the same three-step process no matter which side has retained me. First, I ask whether the underlying facts are of the kind that would lead an ordinary person to think less of someone, because not every unflattering association constitutes reputational harm. Second, and only after that threshold is met, I determine the actual extent of online dissemination: what was said about the matter on social media, how many publications carried the story, whether the story remains accessible today, how prominently it surfaces in search engine results, and where it spread. I supplement the commercial monitoring tools described below with direct searches of platforms such as X, Facebook, Reddit, and YouTube. Only once that investigation is complete do I develop a reputation repair recommendation grounded in what the record actually shows, rather than in what a communications adage predicts it should show. Mr. Fisher's report skips directly from the first step to a dollar figure without ever completing the second.

That starts with counting what actually happened, instead of guessing at it. A reliable analysis identifies and counts the actual mentions of the event across traditional and social media, using

---

[48]Fisher Report at 42.
[49]Fisher Report at 3 (Assignment section).

commercial monitoring tools where they are available. Where those tools have gaps, a careful expert notes them and explains how the gaps were filled, rather than skipping the count altogether.

From there, a reliable analysis turns that count into an audience or publicity value using objective figures, things like viewership, circulation, or social media follower counts, the same figures advertisers themselves rely on to price a media buy. That is different from simply telling a jury that something felt widespread. A number built this way can be checked. A feeling cannot.

That three-step process can be summarized as a short checklist: (1) determine whether the underlying facts are of a kind that would lead an ordinary person to think less of someone; (2) determine the actual extent of dissemination, including how many publications carried the story, whether it remains accessible today, and how prominently it surfaces in search results; and (3) develop a repair recommendation grounded in what the record shows, priced using current market rates for the specific channels and audience involved. Measured against that checklist, Mr. Fisher completes only the first step, and even that only partially, since he does not first establish Plaintiff's pre-event reputational baseline. He does not complete the second step: he identifies no publications, no persistent online presence, and no search-result data. He does not complete the third: his proposed repair budget is not itemized, priced to any channel, or tied to any defined audience.

A reliable analysis also checks persistence rather than assuming it. That means looking at whether the content is still visible in a search for the person's name, whether it is still referenced in anything new, and whether it has actually remained in public view over time. Some negative content fades within days. Some does not. The only way to know which one you are dealing with is to look, not to reach for a general saying about reputations and bells that cannot be unrung.

A reliable analysis also respects the boundaries between professions. A communications expert can describe how information spreads and how audiences form impressions. A communications expert should not diagnose depression or anxiety; that is a question for a licensed clinician who has actually evaluated the person. A communications expert should not decide whether someone acted carelessly or with reckless disregard for the truth; that is a question of fault for the jury. And a communications expert should not slip personal opinion into an expert report at all. Keeping those lines in place is not a technicality. It is what allows a jury to trust that the rest of the report was written with the same discipline.

Finally, when a repair program is proposed, a reliable analysis prices it as an actual advertising or public relations campaign would be bought, channel by channel, at current market rates, sized to the audience the record shows was actually reached. That produces a budget built out of line items, digital spend, search and social spend, each one tied to a rate card and an audience number, so that anyone reviewing it can see exactly where every dollar goes and why. A single blended number with no components behind it is not a budget. It is a guess dressed up as one. None of that is present in Mr. Fisher's report.

**Conclusion**

Taken as a whole, Mr. Fisher's report does not reflect the reliable, checkable application of accepted methodology that the reputation repair field requires and that I know, from experience, courts expect of expert testimony. It relies on generic adages instead of case-specific facts. It

asserts a theory of uncontrolled spread without identifying a single instance of actual spread. It makes empirical claims about audience belief and perception without applying any of the empirical tools- media monitoring, audience analytics, publicity valuation, sentiment assessment, search visibility, content analysis, stakeholder assessment, or survey research- that reputation professionals have available to test such claims. It recites facts, including rising church income and no lost professional opportunities, that undercut its own conclusion, and then never engages with them again. It crosses, more than once, into the very legal and factual territory Mr. Fisher tells the reader he will not enter, labeling the Defendants extremely careless and their conduct malicious. It offers clinical-sounding conclusions no communications professional is qualified to give. Even the one piece of original research Mr. Fisher did perform, his own search of the Plaintiff's name, was undocumented as to date, location, and search conditions, was run nearly a year after the fact without any attempt to reconstruct what the search landscape looked like at the relevant time, and contains an internal counting error that no one, including Mr. Fisher, appears to have caught. And it arrives at two dollar figures, $325,000 to $350,000 for repair and $2.65 million to $5.589 million for compensation, that are supported by nothing more than Mr. Fisher's own say-so.

The central difficulty with Mr. Fisher's opinions is not merely that I disagree with them. It is that the methodology he discloses does not permit another qualified reputation-management professional to reproduce, test, or independently evaluate his conclusions. In my field, reproducibility is a hallmark of reliable professional analysis. Because Mr. Fisher does not disclose the analytical steps connecting the facts of this case to either his repair budget or his damages opinions, those opinions cannot be independently verified.

It is my opinion, to a reasonable degree of professional certainty in the field of reputation management, that Mr. Fisher's report does not meet the standards this field applies to its own conclusions, that it is not merely incomplete but irreproducible at every point that matters to his conclusions, and that the dollar figures in his report are not tied to any specific fact, calculation, or comparable analysis in the record of this case.

**Reservation of Rights**

This report reflects my opinions based on the materials reviewed to date. If I receive additional documents or information relevant to this case, I reserve the right to supplement, refine, or expand upon the opinions offered here.

Respectfully submitted,

Eric Rose



August 14, 2026