# EXHIBIT 3

Excerpt of Deposition of
Robert J. Fisher

ESQUIRE
DEPOSITION SOLUTIONS
800.211.DEPO (3376)
EsquireSolutions.com

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| PASTOR STEVE SMOTHERMON,<br>Plaintiff,<br>vs.<br>KEITH HODGE, an individual;<br>KEVIN HODGE, an individual;<br>HODGETWINS, LLC, a limited liability company,<br>Defendants. | Docket No.:<br>2:25-cv-01858-APG-BNW<br>Los Angeles, California<br>Thursday, August 6, 2026<br>10:06 a.m. |

VIDEOTAPED DEPOSITION OF

ROBERT FISHER

Taken by the Defendants

Breyan Sims, CER-2648

Proceedings recorded by electronic sound recording;
Transcript produced by transcription.

APPEARANCES OF COUNSEL

On behalf of PASTOR STEVE SMOTHERMON:

NICOLE A. WESTBROOK, ESQ.
JONES & KELLER, P.C.
1675 Broadway
28th Floor
Denver, Colorado 80202
720-809-7990
nwestbrook@jonesdavis.com
APPEARED IN PERSON

G. MICHAEL JACKSON
JONES DAVIS & JACKSON, P.C.
25350 Magic Mountain Parkway
Suite 300
Valencia, California 91355
661-836-7711
mjackson@jonesdavis.com
APPEARED VIA VIDEOCONFERENCE

On behalf of KEITH HODGE, AN INDIVIDUAL; KEVIN HODGE, AN INDIVIDUAL; HODGETWINS, LLC, A LIMITED LIABILITY COMPANY:

MARC J. RANDAZZA, ESQ.
RONALD D. GREEN, ESQ., VIA VIDEOCONFERENCE
RANDAZZA LEGAL GROUP, PLLC
8991 West Flamingo Road
Suite B
Las Vegas, Nevada 89147
702-420-2001
mjr@randazza.com
rdg@randazza.com
APPEARED IN PERSON

Also present:

Ryan Uno, Videographer
Amy Nguyen, Paralegal at Randazza Legal Group
Richard McLaren, Summer Associate at Randazza Legal Group

## INDEX TO EXAMINATION


| EXAMINATION | PAGE |
|---|---|
| Examination by Mr. Randazza | 6 |


## INDEX OF EXHIBITS


| DEFENDANTS' | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Expert Report | 49 |
| Exhibit 2 | Court Order | 149 |
| Exhibit 3 | Facebook Post | 150 |
| Exhibit 4 | Document | 153 |
| Exhibit 5 | Chart | 160 |
| Exhibit 6 | First Amendmened Complaint | 162 |
| Exhibit 7 | E. Jean Carroll v. Donald J. Trump Expert Report | 195 |
| Exhibit 8 | List of Pictures | 218 |
| Exhibit 9 | Picture | 225 |
| Exhibit 10 | Document | 232 |
| Exhibit 11 | Reddit Post | 335 |
| Exhibit 12 | Article | 336 |
| Exhibit 13 | Article | 342 |
| Exhibit 14 | Screenshot | 363 |


(Defendants' Exhibits 1 through 14 were attached to the original transcript.)

THE VIDEOGRAPHER: This is tape number 1 to the videotaped deposition of Robert Fisher in the matter of Pastor Steve Smothermon versus Hodgetwins, LLC, et al., being heard before the United States District Court, District of Nevada, case number 2:25-CV-01858-APG-BNW. This deposition is being held at 444 South Flower Street, Suite 2140, Los Angeles, California 90071, on August 6, 2026. The time is 10:06 a.m. My name is Ryan Uno, and I am the videographer.

Will counsel and all parties present please state your appearances and whom you represent?

MR. RANDAZZA: Marc John Randazza. I'm here for the defense, and with me is my summer associate, Richard McLaren, who is a student at Georgetown University Law Center. It's his --

Your first depo, right?

MR. MCLAREN: Yes, sir.

MR. RANDAZZA: All right. I probably won't do it right, but, you know, you can learn from my mistakes.

MS. WESTBROOK: Nicole Westbrook on behalf of the plaintiff and Bob Fisher today.

THE VIDEOGRAPHER: Will those appearing on Zoom please introduce yourself?

MR. RANDAZZA: I'm going to bet Ron Green.

MR. GREEN: This -- I'm Ron Green, Marc's

partner at Randazza Legal Group in Las Vegas, Nevada.

MS. NGUYEN: My name is Amy Nguyen. I'm the paralegal with Randazza Legal Group.

THE RECORDER: Mr. Jackson?

THE VIDEOGRAPHER: Jackson is not responding.

THE RECORDER: Mr. Jackson, are you present?

MS. WESTBROOK: The show must go on.

THE RECORDER: My name is Breyan Sims, notary public in the state of California. I will be capturing the verbatim record of today's proceeding using electronic audio equipment, a computer, and specialized recording software, which is not a form of stenography. The witness is located in Los Angeles, California, and has confirmed his identity with a driver's license issued by California Department of Motor Vehicles.

Absent any objections at this time, counsel and the witness agree to my administration of the oath to the witness and the final transcript may be used for all purposes allowed by the California Code of Civil Procedure.

Hearing no objections, this will constitute agreement and stipulation of such, and I will now swear in the witness.

Mr. Fisher, can you please raise your right hand to be sworn?

(Witness sworn.)

THE RECORDER: Counsel, you may begin.

ROBERT FISHER,

Having first been duly sworn, testified as follows:

EXAMINATION

BY MR. RANDAZZA:

Q. Okay. Mr. Fisher, or Bob -- we've -- we've established we'll be familiar.

A. All right.

Q. Okay. Bob, you've said you've done this like 40 times, right?

A. Yeah, 35 to 40.

Q. Okay. So I'm just going to ask you some questions that might seem pedantic, but I --

A. Yeah.

Q. -- I just got to start off with them. Probably everybody does, right?

A. It's your -- your program.

Q. Okay.

A. Yeah.

Q. So you understand your oath?

A. I do.

Q. Okay. You understand it's the same oath you take before a jury?

A. I do.

Q. Okay. And if you don't understand a question, will you tell me that?
A. I will.
Q. Thank you. And if you answer, is it -- can I assume you understood the question?
A. If the answer makes sense, yes.
Q. Okay. And is there any reason today you can't testify fully and accurately?
A. No.
Q. Not on any medication?
A. Got a full night's sleep.
Q. Got a full night's sleep? Okay.
A. Uh-huh.
Q. Didn't party too hard last night?
A. No.
Q. Okay.
A. Well, actually, I had a party for my granddaughter, but she was going back east to Cornell for school, so we had a going-away party for her.
Q. Okay.
A. But I didn't drink, so I'm -- I'm good.
Q. All right. Did you meet with Counsel to prepare for today?
A. By phone. We spent an hour by phone yesterday.
Q. Okay. And who was present?

A. Myself on my end. I'm not sure who was present on her end, but just -- it -- it was just a one-on-one conversation with her.
Q. By her, do you mean Ms. Westbrook?
A. Yes, I do.
Q. Okay. Did you review anything to prepare for today?
A. Yes.
Q. Can you tell me what?
A. My -- I mean, not my deposition, my expert report. It's the only -- only thing I reviewed.
Q. And did anybody tell you how to answer any questions today?
A. No. And I probably wouldn't have listened to them anyway, but.
Q. You said you reviewed your report. Is that complete and accurate as of today?
A. I believe so. I haven't -- now, that report was filed, what, three, four -- three week -- three or four weeks ago. I haven't seen any new discovery since then, so yeah, I would say that it's --
Q. Okay.
A. -- it's accurate.
Q. And are there any corrections you want to make to it before we start in earnest?
A. No. No, not that --

in -- instead of being, you know, a rifle on the line or being a mechanic, I weaseled my way into -- so I was -- during my whole two years in the Army, I worked in the Public Information Office. So I was essentially doing PR for two years. I was in West Germany. I didn't get sent to -- I spent a half a year in the United States and a year and a half in Germany, West Germany at the time.
Q. And so now, what is your -- what percentage of your current work is expert witness work versus PR clients?
A. Oh, 100 percent expert witness. I haven't done -- from 2018 to maybe '22, I'd have law firms -- my firm was the first firm in the country representing the legal profession. Back in '78, when the Bates versus Arizona decision came down, I was the first firm. In fact, I was acknowledged throughout the country with the legal profession as being the pioneer in -- in, you know, PR and marketing for law firms. I mean, I spoke to the ABA's national convention. I wrote the cover story for their national -- but anyway, yeah.
    So I -- I did -- I'd have law firms call me, you know, up until about '22 and say, you know, we just won a $50 million case. Will you put out a news release on it, or -- I stopped doing press conferences to announce -- you know, I used -- I've probably done 80, 90 press

And -- and I was watching a tape of Rather interviewing me. They said -- they interviewed me if he was found guilty and if he was found innocent with the thought is they would put whatever -- you know, whatever. And so I was watching a tape of his interview on his show with me when -- when the -- when they cut to Clinton walking down the aisle to give a State of the Union speech. So, you know, it's interesting. It's -- it's interesting.

But yeah, I -- to answer your question, yeah. I've -- I've probably done about 40 reputation damage repair programs around the country --

Q. For law firms?

A. Well, for their client -- or for -- you know, it got to a point where regular people would call me or companies or businesses and -- but yeah. I did some -- I did probably 40 repair -- I did one internationally, actually. I -- I did one program internationally as well, but I did a lot of programs to try to restore people's image.

Q. Could you identify the last one you did?

A. Oh, no. I wouldn't know. Probably around turn of the century. Probably around 2000, in that area.

Q. Who was that for?

A. Pardon?

Q. And can you tell me who that was for?

A. I don't remember. I mean, I did so many of them. The timeframes, I -- especially in the '80s and '90s, they were doing them, you know, almost every month, it seemed like. And I -- I can't remember the sequence off the top of my head. I mean, I -- as I -- as I said, it's -- it's -- it might have been the -- the brothels in Nevada. I saved the brothel industry in Nevada. There wouldn't be one -- there wouldn't be brothels in Nevada if it weren't for me.
Q. What do you mean?
A. Well --
Q. I mean, I hope that doesn't mean what it sounds like.
A. It's simple. When the AIDS -- when the AIDS thing came out, the -- the government never liked brothels and they wouldn't allow them in major cities like Reno and Vegas. So they only allowed them in these old cow town counties. And they said, well, we can't keep them -- legally we can't stop them, but we can keep them out in the farms -- you know, out in the farm areas. So they were looking for any excuse.
Well, when AIDS came along and the thought was that -- that, you know, men went into the brothels, had sex, and went back to the girlfriend and their wife, and spread AIDS all over, they decided to eliminate

regular four- year degree, I had a couple of psychology classes.
Q. Do you remember the title of those courses?
A. No.
Q. They were --
A. Interesting enough, I even had some cases on libel. I -- I had some legal -- legal cases in college on -- on libel and defamation and whatever that I took. I don't know why I took them. I think it was because they interested me and they were interesting.
Oh, I know, journalism. Because of my journalism background, they required -- the PR Department as part of the Department of Journalism and Advertising -- I was required to take a couple of cases on, you know, media libel, that kind of thing.
Q. Do you mean classes?
A. Classes, yeah.
Q. Okay.
A. Courses.
Q. Courses. Okay. So what year was that?
A. Well, I went to San Jose State from the fall of '64 to the spring of '66. I quit two years, and as I said, I went back to school in the -- in the fall of '64, and then I -- I was there a year and a half at San Jose.
Q. Okay. So those were undergraduate legal survey

classes?
A. Oh, yeah. Yeah. And as I said, I've never taken any graduate courses or anything, right? Back in those days, they didn't have graduate -- as I said, there was only five schools in the nation that even had a PR degree, and that was an undergraduate degree. So there was no one that had -- back in those days, there were no advanced, like, master degrees or anything like that. Didn't exist.
Q. So since 1966, have you taken any courses on law of any kind?
A. Well, I didn't have to. I mean, I --
Q. Well, I'm not saying you did.
A. Well, no. I mean, I was in the field. I -- I represented 138 law firms over -- over the years, and I was involved in litigation in cases. I mean, I handled the court of public opinion. While the court was -- while the lawyer was handling the court of law, I was handling the court of -- which was, frankly, more effective in most cases. The -- the court of public opinion is more effective in legal than the laws because defendants don't give a darn about going to a trial. If they lose the case, they lose a little money or they lose -- I used to represent Mattel for -- I handled Mattel's PR.

A. Yeah. I'm -- I'm -- you know, I -- I go to church every Sunday, but I -- I -- no, I'm not a member of the Baptist. Although I have a case against the Southern Baptist Convention right now, which is a --
Q. You're suing them?
A. Yeah. I'm -- I'm representing the plaintiff in the cases that you know -- and they're the largest religious organization in the United States, as you know. They --
Q. What do you mean "representing the plaintiff"?
A. Well, there's a lawsuit. A plaintiff is suing the Southern Baptist Convention. I'm representing the plaintiff in that case.
Q. As a -- not as a lawyer?
A. Yeah. I've done the deposition. The trial's going to be in November. Pardon? No. As an expert witness.
Q. Oh, okay.
A. Yeah.
THE RECORDER: And just to -- to remind you guys, try to speak one at a time. You guys are kind of stepping on each other's questions and answers.
MR. RANDAZZA: I'm sorry. It's -- it's too friendly.
THE WITNESS: It's a conversation.
MR. RANDAZZA: Yeah. I'll do better.
THE WITNESS: We just did it now. Yeah.

go up, that she was persona non grata to the point of physical violence. And she wound up moving to Mexico, changing her name, and working for half of what -- she was getting 300,000 a year or something like that -- wound up getting a job for 80,000 a year in Mexico under an assumed name because that's how much she was -- how scared she was and what was going on.

Yeah. I'll -- I'll send Ms. Westbrook the information on it and you can --

Q. Okay. Thank you.

A. Yeah. I think the case -- I never testified. They -- in fact, I never did a deposition either. I -- I -- the case settled.

Q. Did you do a report?

A. Yeah. I always do a report. So I believe I did a report. Yeah. I'm pretty sure I did a report. I do a report in 95 percent of the cases I do. It went long enough for me to do a report, but they -- the case settled eventually and --

Q. Was your report just on the damages caused by the alleged defamation?

A. Well, I'm not a -- I'm -- obviously, as an expert witness, I'm not allowed to get into liability. I mean, I -- I can't -- I mean, I can -- I can give the facts of what happened and let somebody else draw the

conclusion --
Q. Right.
A. -- mainly the jury. But I can't -- I can't do -- but yeah, I -- I don't know how an expert witness such as myself could -- could talk about damages without talking and tracing back to what caused the litigation in the first place. You know, I present -- my reports, I present both sides equally. The first -- the case background section is the first part of my report. I follow Rule 26. And in that, I'm scrupulously, like a reporter would be. I scrupulously give both sides. I give the facts as -- as I know them to be true. I give both sides' opinions or contentions of what one side is saying, the he said/she said thing. And then at the end of the report, I -- I do my conclusion. Well, you saw that in the thing.
Q. Right.
A. If you read my case background section of your report, you wouldn't be able to tell whether I was representing Pastor Smothermon or -- or the -- the Hodge Twins. You wouldn't -- you wouldn't be able to tell as it's scrupulously neutral.
But then -- you know, then I -- I save my -- I'm just -- you know, it's like Jack Webb. You're not -- are you old enough to know who Jack Webb was and

A. I've seen -- I've seen the -- the copy that was in the post and the picture -- the picture they used of -- of the pastor.
Q. Does that photograph resemble this, as you described it, demonic depiction?
A. No. No. As I -- I made it clear in here that this was a sidebar. I mean, if you -- if you read that -- that -- this section, it was basic. In other words, I didn't attribute it to your clients at all. And -- and -- and I -- I just said, I -- I think I'm right to make the assumption that your clients are aware that this exists on the internet. I mean, I think your office may have been the one that put -- put it up.
Q. Right.
A. It seems the attribution. But I -- I find it ludicrous to think that they're not aware of it. So the point is when the -- the salt in the wound comment is -- the point is -- is that they're -- you know, they did something for whatever reason, that whether they planned to or didn't plan to, without getting it and then realized their mistake. They took the thing down. They're in litigation for it. And as -- and then while the -- you know, while they're -- it's like the old saying, leave sleeping dogs lie. And -- and instead, you know, they -- they're obviously -- they -- I -- I

Q. Is the term "rage bait" yours? Did you write that?
A. No, I didn't make up that term. I must have saw it somewhere. It's not a term I would've made up. I probably saw it somewhere and just adapted -- adopted it.
Q. Oh, so you put that in there?
A. Well, I put it -- I wrote the thing, yes. I wrote the report, so I put it in. No one else did.
Q. Okay. So in public relations, is rage bait a term of art?
A. No, I've never -- to be honest with you, I've never heard that phrase before.
Q. How about demonic?
A. Oh, what? Demonic? I've heard that. I've seen movies, you know, The Omen or whatever, you know? I mean, demonic --
Q. Focus on public relations, not entertainment.
A. Oh. Well, rage bait, definitely. I've never -- anywhere in my life, I've never seen that phrase. So that -- that is that. Demonic, I've heard the expression demonic used throughout my lifetime. In PR, I don't know specifically in PR, but I mean, it's -- it generally means that someone is possessed by a demon or he has attributes or he has behavior that's -- that relates to how a demon would be.

Q. So if I looked at -- you've done reports for defendants?
A. Oh, yeah. I -- I've done a lot of defendants. I would say 70 percent of my cases are plaintiffs and 30 percent are defendants.
Q. So if I looked at in -- in defamation cases?
A. Yeah.
Q. So if I looked at any of your defense reports, would I find the terms rage bait or demonic in them?
A. No, I've never used that. As I said, I -- I did not make up that term because I never heard it before, and I didn't dream it up when I was writing this. But I obviously saw it somewhere in -- in -- related to this case in some way. And I don't -- if you're going to ask me where, I don't know at this point. But demonic, I don't think I've ever used in a report -- if you're asking me, have I ever used the word demonic in a report? No, I don't. But I -- I've never had occasion to. I mean, this -- this -- that was a word that I put in. I didn't pick it up from any -- anybody or whatever. I authored that word in this report. And it was basically from the -- from the -- the picture. I mean, it was -- I mean, that's that was my impression of the depiction in the graphic of the picture, that the -- the guy was some kind of evil demon coming with his

hands outstretched and his look on his face, is that he was a -- had everything but horns on.
Q. Have you ever given an expert opinion on the substantive elements of Nevada defamation law?
A. Well, I'm not allowed to.
Q. You're not qualified to?
A. Well, no. I certainly can qualify to, but --
Q. What qualifies you to?
A. Well, simply the understanding of the law. I mean, you know, there's a -- I mean, I've had cases in 33 states and the -- the -- each -- the definition of defamation in all states is -- is exactly the same, there's four elements of it. And -- and so, yes. I mean, I -- I'm not allowed by law as an expert witness to usurp the providence of the jury to -- to make a -- I -- I did early on. And I got my -- you know, my first ten, 15 cases, I used to make -- say, this is defamation or this isn't defamation. And, you know, I -- I quickly got my hands slapped either in motions or in depositions, you know, saying you can't do that. So I -- you learn from experience, as I say.
But -- but I -- I can look -- as a communicator, I can look at the four elements of the legal defamation -- definition of defamation and -- and give my assessment of whether I think it applies in this based on the

facts.
Q. And your assessment is --
A. Yeah. I just don't -- I just don't put a conclusion to it. In other words, I -- for instance, if -- if -- if the first one is a false statement. Okay, if somebody says that this woman murdered this man, which she didn't because he's living, he's standing there or sitting there, that -- that's obviously a false statement. I can say -- I can obviously say that my -- my -- my judgment is that that's false because he's still living, you know?
Q. So --
A. I mean, I can go that far. I just can't take all four elements and say that -- was it published -- the second one is always published to a third person. Well, I can say it was in the New York Times. So yeah, it was published for the third person. And the third is that is -- does it cause any harm? You know, does it cause any harm? Well, that's a judgment call and that's an expert. I can say whether it -- there are factual basis that it caused harm because the guy has a bullet wound in his shoulder. So I can say, yes, it caused -- caused harm. The last one is, was it done with negligence or --
Q. Wait, can we go back to that?

in the state of Hawaii. I had a case in the state in Hawaii, and I just assumed the definition was the same as everyone else. And in my deposition, the lawyer, you know, just cut me to pieces because Hawaii's definition is a little different. So whenever I get a defamation case, whether I'm representing the plaintiff or the defendant, I look up the state's definition of it.
Q. Did you do that in this case?
A. In fact, I put it in my reports. I -- I put the definition, I -- I cover my rear end so that I don't get blindsided like in that Hawaii deposition. I cover my rear end by stating in my report what the definition of defamation is in that particular state.
Q. All right. This may seem kind of a non -- well, it is a non-sequitur. You're not a psychologist?
A. My wife is a clinical psychologist.
Q. No, no. You sir, focus.
A. Yeah. She's taught me everything she knows.
Q. Okay. So you are a psychologist?
A. No, I'm not a trained psychologist. I -- I said I have a couple courses, but.
Q. You're not a psychiatrist?
A. No. I'm not a psychiatrist or a psychologist.
Q. Or a physician of any kind?
A. No. No. I have a lot of physicians, but I'm not a

-- I'm not a physician myself.
Q. Do you have any qualifications to diagnose any mental health condition?
A. No. And I don't purport to. In my report --
Q. Are you an economist?
A. No. In my reports, I'm very careful not to -- to -- to -- to say that the -- that the -- in -- in the case of a plaintiff, and the defendant's not going to claim mental health, I -- in my reports, I'm -- I'm careful to say that the -- the plaintiff has maintained that he had -- that -- that he, or she, or it -- well, it has to be a he or she, has had emotional trauma, or distress, or whatever.
Q. So you take their word for it?
A. Well, yeah. I mean, I -- I don't -- I don't interview their psychiatrist, no. I -- I take it as -- and -- and mainly because they do it under oath. I mean, very rare I do a report where -- that I don't see a deposition from the plaintiff or from who I'm representing or, you know, retained by. And if they swear under oath, I have to assume that they're -- they're telling the truth, barring contrary information.
Q. So Steve Smothermon swore to -- something to you under oath?
A. No, he didn't. And -- and, you know, I gathered --

and if I remember right, he didn't do a deposition in this case. But -- but I've -- I've seen, I can't remember in interrogatories, which is the same thing, whether he's put -- I've seen it in legal documents anyway, complaints, interrogatories. I know in the complaints, it was in there. I can't remember right offhand whether it was in -- in the interrogatories.

But I mean, you know, you -- you have to, as an expert, contrary to thing, you have to take certain things that -- that they're -- they're being referenced as being true. For one thing, he's the only person that could tell you whether he's had emotional stress or not, no one else. I mean, unless his wife would get up and testify she saw him falling apart one day or something. But, you know, the bottom line, you have to take his -- you have to go under the presumption that he's telling the truth.

Q. Do you harbor any skepticism?

A. Well, no. I mean, anybody would have emotional distress. We're talking about what types or what degree.

Q. Hold on. Anybody would have emotional distress; could you finish that thought?

A. Well, yeah. In -- in other words, I've, you know, for 42 years, I worked with people that were victims of

reputation harm. For 20 years, I worked with people that were victims of reputation harm. And -- and -- and it's -- and there's a commonality in every one of them, they had stress. And, you know, if their -- if their name is bandied about, or they're, you know, they've been cascaded in the press or on the internet or -- or people have said bad things about them, they -- it's going to cause some degree.

Now, we can debate what types of emotional trauma and distress they've had, anxiety, you know, the different fear, anxiety, the different kind of embarrassment, whatever different types they are. We can debate that. We can debate the degree that they've had. Some people, drives them to go to psychiatrists, to pop pills, they can't sleep at night. You know, whatever, they pace the floor all the time.

Q. Focus on this case. Let's not focus on 132 other cases.
A. Okay. All right.
Q. In this case, your sole evidence that you considered of his claims of psychological harm were his statements?
A. Yes. That's as clear as I can indicate.
Q. Okay. You have no training in economics, correct?
A. Professionally?
Q. Did you ever take an economics class?

Q. Have you ever, in those 50 years, seen anybody exaggerate their psychological harm, their claims thereof?
A. Oh, people do it all the time. You know, I -- I have friends that -- that, you know, will say I'm -- you know, that will emphasize, like, they may be a little tipsy and they say, I'm stoned, I'm falling down drunk, when they're not. You know, I mean, people tend to embellish, exaggerate, extrapolate, whatever.
Q. Ever seen a party in a case do that?
A. Pardon?
Q. Have you ever seen a party in a case do that?
A. Well, that I -- that I had documented knowledge that they -- they were exaggerating or wasn't true?
Q. Yeah.
A. Not specifically. I mean, you know, in most cases, I take -- I take them at -- at their word. I mean, I'm sure -- I'm sure it happens. I mean, I can say, I'm sure it happens. Can I cite something right now? No. But it probably happens. I mean, people tend to, you know, maybe in litigation, part of the way that -- that some people may -- may exaggerate or something like that. But the point is that's an individual basis that nine out of ten may not or one may do it. You know, it's -- it -- that again, that's in the jury's province

to decide.
Q. When you've been an expert for the defense, have you ever seen a plaintiff exaggerate their emotional harm? Just think about when you've been on the defense side.
A. Well, I'm sure they have. I'm -- I'm sure they have.
Q. Sure or certain, or how --
A. Well --
Q. What degree of certain?
A. -- I mean, everyone -- everyone tries to make their best case for whatever they're advocating or -- or claiming or whatever. I mean, some of them you could take with a -- a grain of salt or, you know. But I don't know that I can remember challenging anyone.
Let me put it this way: If I was representing a plaintiff in the case and I thought he was off the reservation, you know, in terms of what he was -- he, she, it, whatever, was claiming, I would -- I would not go down that path. In other words, if I didn't believe, as I say, I -- I try to be as objective as I can. You know, I may be retained by someone, but I try to be -- if I saw somebody saying something that I knew wasn't true or that couldn't have happened, you know, that -- that kind of thing, I would not reflect that in my report. I wouldn't agree to it or I wouldn't use that

in my report.
Q. In any of your --
A. I would just skip it or I would -- I would -- I would put my honest assessment of it. Because I'm not going to sell my soul for -- you know, my integrity and my reputation is more important than any isolated case.
Q. In your expert work, have you ever conducted any digital forensics examination?
A. Define that a little bit more, digital forensics. What do you mean? What -- give me an example.
Q. If you don't know what it means, you can just say, I don't know what it means.
A. Well, I have an idea of what it means, but I --
Q. What's it mean to you?
A. Well, it means doing assessments of -- of impressions or that kind of thing. You know, in other words, if something was aired on a -- on a TV show or something like that, or something, you -- you get that -- you get the ratings, you get the how many people saw it. And the -- I did that in a case once for Trump. I represent Trump -- the Trump campaign in a case in Denver, oddly enough. And I represent the Trump campaign. It's a case related to the 2020 election and where they're one of the defendants in the case.
And I did the -- the whole crux of the Trump the --

the case against the defendant, the Trump campaign, is a press conference that was held about two weeks after the election. There was a press conference held that Rudy Giuliani, Sidney Powell, different people were at. And their whole participation in the case, the reason they are there's, like, eight, or ten, 12 defendants. And the only reason they're in it was this one isolated press conference. So any harm that allegedly came from them related to this press conference. So I was able to get -- I did do a digital survey. I did. It's the only one I -- maybe I've ever done. But I -- I -- I looked up a cross section of the, like, CSPAN and, you know, different one, YouTube, but different ones that had run --
Q. Sorry. Different ones what?
A. That had aired the program.
Q. You're using a lot of words. I don't know what they mean, so --
A. Yeah. Had used a --
Q. Let's briefly -- I need to know some of -- some of these words.
A. Okay. Well, a lot of different outlets broadcasted, it was a 90-minute press conference. A lot of different outlets broadcasted it live.
Q. Right.

A. Or you could get it on YouTube later. I took -- there were, like, ten or 12. I took five or six of them. And I did an analysis of them that said, based on the comments that were written in, there were, like, 38,700 and some comments on those stations written in. I did an analysis of how many of them would have reflected negatively on the plaintiff in the case.
Q. So you looked at a cross section of negative and positive press?
A. Oh, I looked at -- I looked at -- you know, we did an analysis. But the easy way to do it was to do -- was to do -- to do a -- a check on the internet of how many times his name was mentioned.
Q. What tool did you use to do that?
THE RECORDER: Sorry to interrupt you, Counsel.
MR. RANDAZZA: Yeah.
THE RECORDER: You're cutting off his question at the end. If you can try to let him finish.
THE WITNESS: Okay. Yeah.
MR. RANDAZZA: Yeah. What -- what --
THE RECORDER: Sorry, Counsel. Continue.
MR. RANDAZZA: Sure.
THE WITNESS: No, it's my fault. It's my fault.

BY MR. RANDAZZA:
Q. What tool did you use for that search?
A. Well, actually, I had someone do it for -- do it initially for me.
Q. So you didn't do it?
A. Well, I did part of it. In other words, he got me the raw data, and then I went over the raw data and -- and --
Q. What does raw data mean?
A. Well, the raw data is the comments.
Q. Okay. So --
A. He gave me the 38,000 comments or whatever. And -- and then we -- we worked together on -- on -- on 38,000 comments. The only ones we cared about were the ones that related to the plaintiff in the case. We didn't care if they were talking about Giuliani or whatever. So we -- we -- we saw that out of 38,000 comments, only three out of 38,000 related to the plaintiff in the case. So there's zero harm. And -- and two of them weren't harmful to him. One was, who is this guy? Another was, somebody should talk to him or something. The third one was negative to him.
So the point is, yeah. So I -- I did -- that was, I would assume, is what you're referring to as a -- a digital analysis. I'm -- I'm assuming you're referring

to.
Q. All right. So tell me what metadata means?
A. Well, metadata, I think, is the way on the internet that it -- it's the -- what's behind the -- what you see on the -- on your computer. It's the -- it's the statistical or it's the identification, as far as I know.
I'm going to cut you off here, just tell you I'm a technological retard. I -- I know how to turn on a computer. I know how to send emails. I know how to do research, and that's it. So if you got questions coming up regarding -- technology is relating to the computer, that's not my thing. I get other --
Q. Your defense of no knowledge is fine. You -- I'm --
A. Yeah, well --
Q. -- just asking what you know, so.
A. Well, that's like what I did with the -- oh, I cut her -- sorry. That's what I did with the --
Q. No, no. Please --
A. I'm going to have to send her some flowers when this is over. But --
Q. Yeah, yeah.
A. And look --
Q. I would love to have a beer with you and talk about old war stories.

A. Yeah. Okay.
Q. Let's focus because I don't want to keep you here until the red eye.
A. No. I believe experts do what experts do.
Q. Right.
A. I am not an expert in computers.
Q. Okay.
A. Or in computer technology or any kind of technology.
Q. Okay.
A. So what I do is I have a head case and something like that's involved, I do -- I have a guy and he is an expert in these things. So I will hire him as a subcontractor.
Q. What's his name?
A. His name? I didn't use him in this case, so I don't know. But his name is Don Phillipson, P-H-I-L-L-I-P-S-O-N.
Q. Okay.
A. But what I do is I go to him and whenever there's something technical --
Q. Sir, he's not relevant if you didn't use him here. It's okay.
A. I didn't use him in this case. I used him in the Trump case, but --
Q. We can skip over him.

problem. In fact, got a case with the Real Housewives of Beverly Hills right now that involves a Facebook post.

But to answer your question specifically, yes. I've had many cases where Facebook posts were part of the problem in the litigation. And as I said, I've seen analytics from other experts on the other side. And have I ever done analytics myself; is that your question?

Q. Yes.

A. I think I used Don in a couple cases. I don't remember which ones they were, but I -- I think --

Q. Could you tell me what information you got from it?

A. Well -- well --

Q. Or better yet, what information would you expect to get from Facebook Analytics?

A. Well, I think that the -- the main thing you would be interested in is the -- is the exposure, the reach. The -- how many -- how many -- well, first of all, generally, you know, how many followers. For instance, in this case, I understand that the Hodgetwins has 6.3 million followers, but that's followers. You -- you'd have to -- what I would try to do is, what was the exposure? How many people saw the post? That would be -- seem to me to be the obvious. I don't need somebody

I -- I -- as I say, I don't do them myself. I get -- I -- I will go outside to somebody that -- I believe in experts doing experts and not some idiot trying to -- to weasel his way through doing something.
Q. I don't know what any of that meant. Can you explain that to me in a --
A. Well, I -- I --
Q. Explain it to me like I'm, you know --
A. Oh, okay.
Q. I didn't grow up super educated.
A. If something is in my area of expertise, I do it. If not, I hire somebody to do it.
Q. Okay.
A. That's --
Q. So let's see. The -- on Page 23, you are talking about your publications. And you do mention the ABA TYL Summer --
A. Yeah, I do --
Q. -- Summer 2020, right?
A. Yeah. I didn't finish my answer to your question.
You asked if any of those articles on my website had been published. And I -- I started with the -- the -- the ABA's national publication, published one of them.
Q. Is that a peer-reviewed journal?
A. Pardon?

Q. Is the ABA TYL Summer of 2020, was that a peer-reviewed journal?
A. I wouldn't think -- I wouldn't think so.
Q. Have you published anything in a peer-reviewed journal?
A. Yes. Some of my articles, I -- I didn't publish them myself, but some of my articles were picked up and they were -- yes. I'll answer that in two -- two questions.
One is that I put -- I have a LinkedIn page, and I put all -- all the articles in the LinkedIn page.
Q. Sir, no, I'm not referring -- what I'm referring to is you know what a peer -- can you tell me what a peer-reviewed journal is?
A. Okay. Let me -- okay. Let me answer your question specifically. Yeah. I didn't get the second part.
I -- I said that different places picked up my articles and ran them. One was the ABA publication. The other is, there are services that provide expert witnesses to lawyers. Are you familiar with them?
Q. Yes.
A. Are you aware of the concept?
Q. But what I'm asking --
A. What I'm answering --
Q. Peer review journals?

A. Yeah.
Q. Have you published in a peer-reviewed journal?
A. Yeah. They -- they, on their websites, two of the services picked up my articles. They happened to see them, picked them up, and asked my permission to publish them. Now, they -- when they publish them, they -- they go to -- since it's a service for expert witnesses and -- and attorneys as well, it does -- it -- it is seen by -- by expert witnesses.
Q. So you're interpreting a republication of a LinkedIn post as a peer-reviewed journal?
A. Not the LinkedIn post. Although people that did response and comments I received back from the articles were from -- from -- from lawyers and from -- from expert witnesses. But I -- you know, that's not definitive. But the point is, we're -- we're in a --
Q. Sir, there's no dishonor in --
A. I don't need --
Q. There's no dishonor in never doing so.
A. I don't -- no. No. This is a false thing in the methodology. This peer review stuff is BS, quite frankly. The -- the bottom line is, if I know for a fact that everyone is doing the same thing I am, and I'm doing the same methodology that they are. I don't need peer review through a magazine article, that's

ridiculous. Which -- which is more effective? But -- to put an article in a publication that somebody could read and not be able to talk to you about it or whatever, or sitting face-to-face with them and talking to them about it? That's a joke. This whole peer review thing by publishing, that might be fine in law, or architecture, or in accounting. But it -- it's -- it's useless in -- in expert witnessing.

I don't need to publish an article that people read to get my thoughts when I can talk to them personally, sit and listen to them, speak to them, and whatever. I mean, it -- it's ridiculous. It's -- it's -- I know you're you guys are obsessed with this. I get this. It's not my case. The bottom line is it is more effective to have personal interaction, either speaking to somebody in a conversation, listening to them, have them listening to you, seeing other people's reports, which is peer review, by the way, because they're writing how they -- their methodology. They follow Rule 26. They -- they show -- I've read a lot of other experts who have been on the other side from me, and their methodology is the same. I know other experts in my field. I talk to them.

I have a -- there's one guy that I've -- I've -- I've opposed in about five or six cases. He's based in

considered peer reviewed. There -- there are a lot of national -- there's the -- PR National's PR Journal is a national publication for the -- the PR profession. There are a lot of local national public relations publications, but none of them are for peer review purposes. I mean, yes. Then the answer to your question is, yes, I've written articles for public relations publications that PR people would have read.

Now, if you consider that peer review, I don't know.

BY MR. RANDAZZA:

Q. So did you ever publish in Public Relations Review?

A. I've never heard of that one.

Q. The Journal of Public Relations Research?

A. No. Those might not have been around when I was, as I said.

Q. What about Public Relations Inquiry?

A. No, I haven't heard of any of those. Those weren't correct.

Q. How about Journal of Communication Management?

A. No.

Q. Corporate Communications? International Journal of Strategic Communication?

A. I should be saying no.

THE RECORDER: Yeah.

THE WITNESS: I was shaking my head.
THE RECORDER: Was your last one a no?
THE WITNESS: No. None of those were ones that I was aware of. They may not have been in existence back when I was doing that.
BY MR. RANDAZZA:
Q. Journal of Public Interest Communications?
A. No. I've never heard of one of those. As I said, there were about four or five PR publications, some regional, some national at the time. I was -- remember, I was doing PR from '70 -- from '69 to '70 to about 2000 -- well, I stopped around 2006. I stopped reading publications, you know, whatever. But none of those were any that were -- were the leading publications at the time.
Q. So you said in your -- on Page 23, when you talk about your peer acceptance, you said you discussed your methodology with other experts by telephone. Was Gerald Rose (sic) one of them?
A. We worked on a case together and yeah, probably. I don't remember if we specifically talked about methodology, but we were hired to do a case. I was hired at the same case. I was hired to do one section. He is the other. It's a case in Miami. And he did one facet. I did another facet.

probably five or six cases, and I have seen his reports. And he, like I, in my report, in his report, outlines his methodology. And his methodology is exactly the same as mine. They all are.

This is -- this is a -- a red herring from opposing a counsels -- defense counsels, to bring up peer review and all this stuff. It -- it's --

Q. Like just dumb academic stuff, right?

A. They're grasping at straw. Let me finish. They're grasping at straws. They're looking for something that doesn't exist because I'm -- I'm just telling you that I know to a hundred degree certainty that -- that all legitimate -- I can't say if there's a hundred expert witnesses.

Two might do something different than I do. But I'm saying that the -- the vast majority of legitimate expert witnesses use the same methodology to form the conclusions, opinions, and cases, and to go about forming the same, to getting the information as I do. And I know that from seeing their reports and talking to them and spelling out. This is an opposing counsel's witch hunt to try to find a reason to exclude someone because a peer accepted to you. It's such a -- and anyway, go ahead.

Q. At your conferences, did anyone ever review your

methodology in writing?
A. No. No. We talked to each other. I mean, I went to a conference in Florida two years ago, '24. May of '24 --
Q. Sir.
A. No. I went to say -- you're asking me how we interacted.
Q. No. I didn't ask you that, sir.
A. Oh, okay.
Q. So let's stay focused.
A. No. Is anyone in writing? No. The answer is no.
Q. Okay. You mentioned Mr. Rose and that you -- so you've reviewed his methodology?
A. I've seen his reports. Yeah.
Q. And anybody else you'd say you --
A. Yeah.
Q. -- respect, that you know their methodology?
A. Yes. I -- there's been numerous cases where -- I had one case where they hired five experts to -- to rebut --
Q. I'm looking for a name of a living human being.
A. Oh, I don't know off the top of my head. I -- I don't remember those. The -- the names of --
Q. So Eric Rose is the only person you respect in this field that you can name?

minutes?

THE VIDEOGRAPHER: We are now off the record. The time is 11:51 a.m.

(A recess was taken.)

THE VIDEOGRAPHER: And we're now on the record. The time is 12:00 p.m.

BY MR. RANDAZZA:

Q. All right. So let's jump to Page 22 of your report, sir.

A. I'm on it.

Q. And there you talk about you did research into treatises and academic studies and publications from Harvard, Duke, and Cornell. You see that?

A. Yes.

Q. Can you name one?

A. Well, there -- there isn't any. The bottom line is -- is that after my last deposition, which was like two months ago --

Q. Sir, take a look at your drawing. Can you name one sitting here today?

A. No. No. They -- they -- what I was --

Q. Are any of them cited anywhere in your report?

A. No.

Q. Is there a bibliography to your report?

A. No.

Q. Single --
A. Bibliography? I'm sorry.
Q. Do you have a single footnote to your report?
A. No, I don't do footnotes, but there is a bibliography.
Q. Does your report -- okay. Thank you. Does your report cite to any scientific studies?
A. I don't know how you define scientific studies.
Q. Do --
A. It does report -- it does indicate a couple studies, but they're not -- I don't know if they consider it scientific or not.
Q. And we've already established you don't really like the whole peer-reviewed thing; is that fair?
A. Well, it's not that I don't like it. I -- I think it's -- it's --
Q. Don't agree with it?
A. It's a misnomer for -- for what's already being -- being done in a more effective way.
Q. Look at Page 7 of your report. Actually, 7 through 9.
A. Yes.
Q. Is the -- the Coomer versus Trump, is that the case you were talking about?
A. Yes.

three, four weeks ago, I have not done any --
Q. Okay.
A. -- trial or deposition since then.
Q. Has any court ever excluded your testimony in whole or in part?
A. Yes. Yes. I -- I've probably had about 30 or 40 exclusion motions at one point or another a day.
Q. That the Court ruled against you?
A. Oh, no -- no. I've only got --
Q. Okay. Let me ask the question again more clearly.
A. Okay.
Q. Has any court ever excluded your testimony in whole or in part?
A. Yes.
Q. Stricken any portion of a report?
A. I don't think they've stricken anything. They -- they haven't -- it -- it wasn't put in the terms of stricking (sic) a portion of my report. It was just -- just saying that on this particular subject area, that -- that -- that I wouldn't be allowed to testify on.
Q. What case was that in?
A. Oh, it's been a lot of cases. I mean, early on --
Q. How about recently, in the past three years? Four years?
A. Last three years, they -- the -- yeah. There was a

case in Massachusetts about a couple of months ago where -- it had nothing to do with me. The judge just ruled that he didn't think a reputation damage expert witness had anything to offer the jury.
Q. Happened in the Trump case, too, didn't it?
A. No, that was -- I -- we -- I was excluded. That was a technicality. I was excluded in that case because of -- yes, I was excluded from -- in the Trump/Carroll case. And it was because I was designated as the expert. They designated me as a rebuttal expert and I -- and I was a full expert.
Q. Sir, you understand when I ask you if you've been excluded and you don't like the reason it happened, the answer is still yes, right?
A. Okay. I'll -- I'll -- let me ask you because, I've been excluded --
Q. No, no. That was my question. The answer -- do you understand?
A. Yes. I -- I understand.
Q. Okay. Thank you. Has any court ever excluded your repair program cost opinion, specifically?
A. No. And I've been challenged probably six, eight times, and every judge has ruled that -- that's something the jury has a right to decide.
Q. Has any court criticized the support for your

damages figures?
A. No.
Q. Have you ever withdrawn or been de-designated by a party who retained you?
A. No. I've quit a couple cases, but for various reasons. But yes, one case just recently. One case I've been working on about three years.
Q. Can you give me the name of that case? Or any party to that case?
A. Yeah. It -- Herman v. -- Herman was the name of a woman's school teacher.
Q. So would it be in your record here?
A. No, because I haven't done a deposition in that case. So, obviously, a case I had worked on for about three years. After three years, they became aware of the Trump decision.
Q. Okay.
A. And they called me and said that they felt that they couldn't have me keep working because they were afraid that the -- the Trump decision happened in 2023. They called and they said that, since you were excluded there, we're afraid they'll exclude you from our trial. And I said, I've testified in eight trials since the Trump one. And I have -- yeah. You get the idea.
Q. Of your 133 cases.

A. Yeah.
Q. Which that was back -- that's the number of working with.
A. At the time.
Q. Yeah. Okay. Yeah. How many were for plaintiffs about --
A. I said earlier, I testified it -- it's about 70 percent, roughly.
Q. Okay.
A. Split of roughly 70 to 30.
Q. Have you ever issued a report when retained by a plaintiff concluding that the plaintiff suffered no harm?
A. No harm at all?
Q. No reputational harm, yes.
A. No. I mean, it's a matter of degrees on how much harm they suffered or didn't suffer, but I've -- I've never said that in no way, shape, or form, mental, physically, financially, or any other way did they not suffer some form of harm. No, I've never --
Q. Did you ever conclude that a reputation repair program was unnecessary?
A. Yes, in the Trump case. The Trump Carroll -- E. Jean Carroll versus Trump. In that case, the -- of course, I was represented defendant, but one wasn't

necessary, because that case was covered in the national media on a day-to-day basis. The bottom line is once she prevailed in the case, what's the need for an exit program? I mean, that --
Q. Have you ever been retained by a plaintiff and concluded that a repair program was unnecessary?
A. No. I think that my answer to that would be it's a matter of degrees. I think it -- well, I'm trying to think if I had another case where I had the -- most of the high profile cases I've had would have been defendants.
Q. So you've never told the plaintiff, you don't need a reputation repair program?
A. No. But then there's -- there's factors being how big of a program it should be. I mean, you know, it's, like, could be a small program or a large program, depending on the circumstances at the time.
Q. Have you ever concluded that a plaintiff who hired you had overstated their damages claim?
A. Well, I don't get involved with the damages claim. I'm not the court. I used to --
Q. Okay.
A. -- come up with the figures, and that's one of the things the Court struck me down on. They said, you're not a financial expert. You can't author the -- you

can't come up with the damages claim. So, I mean, I have my own opinions on -- sometimes on -- on the claims, whether they're too high.

Usually, I think they're too low, but that they're asking for less than they should. But -- but no, that I don't -- I -- I'm not allowed, as an expert witness, to -- to opine on a damage claim.

Q. But you did so in this case?

A. Pardon?

Q. You did so in this case?

A. No. I didn't come up with the figures in this case. I didn't come up with those.

Q. Who came up with them?

A. Well, the -- the lawyer or the client. I -- I always state that they -- the client or lawyer feels the -- you know, has come up with the figure that they feel is a representative. I don't -- I didn't author that number.

Q. So if we turn to Page 42 of your report.

A. Yeah. I -- I state it there. In the last sentence, "Factoring in this negative impact on the plaintiff, they have," meaning the plaintiff, "have determined" -- it should have he had. It probably --

Q. Oh, okay.

A. "They have determined that a damage award." I -- I

asked you --
Q. So that's not your number?
A. No. And I -- I clearly state that. They have determined. Not me. They have determined.
Q. Do you know how they came up with that number?
A. No. I have no idea.
Q. Did you ask them?
A. No. I acknowledged that they -- I was provided with the number not long before I finished the report and was the last thing I think I inserted in the report. And I didn't -- I didn't specifically ask them, no.
Q. What is your professional opinion of that number?
A. Well, my -- my professional opinion off the top of my head is that it's -- it's a wide range. I mean, most ranges I've seen -- I'm a -- I'm a big believer in ranges, rather coming up with a number.
Q. Sir, if I -- how about this? Let's hypothetically say, since you're giving an unbiased opinion and it wouldn't matter which side you're retained by --
A. Yeah.
Q. -- so I call you as a defense witness. Do you think that $2.65 million to $5.589 million is a reasonable, fair, and equitable amount of compensation for the plaintiff in this case?
A. Well, I -- you've got a -- you've got a $3 million

range there.
Q. Well, I'll tell you what.
A. And the jury --
Q. Why don't we go with the bottom number?
A. No. The jury -- the jury -- and that -- I think it's a broad range that the jury is able to determine themselves what -- what -- what they feel within a $3 million range.
Q. Sir, can we play a game?
A. Yeah.
Q. Let's play a game that I ask you a question and you answer the question I asked you.
A. Okay.
Q. All right. Here's the question again.
MR. RANDAZZA: Could you read the question back to the gentleman?
THE RECORDER: Give me one second.
(The requested question was read back.)
THE WITNESS: Yes. I mean, you can debate whether it should be the 2 million or the 5 million, but I -- I think that's a reasonable range for -- for someone to, once they've heard all the facts -- the jury heard the fact. I -- I think it's a -- it's a reasonable range to provide to the -- the trier of fact to -- after they've understood all the -- heard all the

evidence to -- to determine which they think is right within that range. Yes.
BY MR. RANDAZZA:
Q. So if you were on the jury, you'd support an award of $2.65 million, at least here?
A. Well, once I heard all the evidence and, you know -- I mean, I haven't heard -- what I'd be interested in is that Mr. -- or Pastor Smothermon's testimony. I mean, he's the only one that walked the walk.
Q. What you've seen in this -- you've reviewed the entire case file, right?
A. Well, I've -- I don't know if I've seen the whole case file, but I've seen what I was provided. Yeah.
Q. Well, you looked at all of his sworn statements, right?
A. Yeah. I've -- I've seen that requisite. But look, neither you or I have walked the walk. I mean, you know, he -- he's the only one that has experienced --
Q. Sir, look at your drawing.
A. Okay.
Q. So what I'm trying to get from you --
A. By the way, he's interrupting me. I hope you --
Q. Yes. I'm definitely interrupting you because I don't want to keep you here till 12:00 tonight, but I will.

Okay. So you've got to look at, what is the situation at that given point in time because you're launching the program at that time. So what -- what is it then?
Q. What's damaged here?
A. Pardon?
Q. What is damaged here?
A. Well, it's spelled out. It's -- he's got these -- a lot of his -- his -- well, you know, it's -- there's a section on there what the reputation damage or harm to him was. That has to be -- the bottom line is --
Q. Tell me, in your words, how his reputation was harmed.
A. Oh, well, that's his -- his whole -- look --
Q. Wait. Wait. Let me back up. Do you know what happened in this case?
A. Pardon?
Q. What happened in this case?
A. What happened in this case?
Q. Yeah. What is the --
A. Very -- very simple. The -- you want me to go back to Crate & Barrel (sic)? How far back do you want me to go?
Q. I don't know what Crate & Barrel means. You mean the store?
A. No. This case is about Crate & Barrel. Part --

part of it is. The whole -- the whole thing is -- is that this -- this Smotherman, M-A-N, who wasn't the pastor, became an executive at Crate & Barrel. He got rid of their old-fashioned image, their motherhood and apple pie image, which was mainly encased in a logo. And he got rid of it and he changed the whole culture. He re- branded the whole organization or the whole company from being, you know, appealing to the motherhood and the farmers and whatever to --
Q. I'm sorry. What was that word?
A. Pardon?
Q. Parmers (sic)?
A. Well, I -- I mean, to average. In other words, again --
Q. I don't know what that word means. I've never heard it in the English language.
A. Farmer?
Q. Farmer. Okay. I'm sorry.
A. F-A-R-M-E-R.
Q. Yeah. Got it.
A. In other words, they were -- appealed to the Middle America. Let's call it this way. The thing was appealing to Middle America. We sell furniture, Crate & Barrel, and they -- you know, Middle America, whatever. They always -- they -- their whole existence had been

geared to that. He came in, according to them, and rebrand and -- and led a revolt to rebrand it from there into a more progressive type of business where they -- they were advocating for DEI, for LBGTQ (sic), and for this and that.

They were -- they're conservative by basis, the Hodge twins, as I understand it. And they -- they were upset that the -- you know, that what was nice motherhood and apple pie type of business, was now going to a woke -- you know -- you know, going the far left type of thing.

So they -- their intention was to put up a Facebook post in -- in order to decry the fact that -- that this organization, it was -- lived on, you know, a nice conservative of -- a family value type of organization was now being turned into a radical left type of thing.

So they determined to put up a Facebook post to their followers to say that they were upset that this guy was coming in and -- and, you know, transforming Crate & Barrel. And they -- at some point, somebody said, well, we should put a picture of -- a photograph of -- of the man, the post, so they could see. And they went ahead and they did their Google research. They came up mistaken. They identified the pastor. They put it on the -- the -- they put it on the -- attached it to

the Facebook post. And that's why -- why we're here today.

Now, you're asking me if -- you're asking me what's the harm to him, I -- I would say, if the -- if he was a plumber or an architect or electrician or an Indian chief, there wouldn't be too much harm to him. But the bottom line is that the harm to him is that his -- his occupation, his mission in life, is to be a spokesman for God. He's a visionary. He speaks God's word. And -- and the point is, that God's word is preaching biblical values. It's preaching family values, conservative of -- themes of -- of family and -- and religious and God's word and all this. And everything that was ascribed to -- to that post, is -- it diametrically opposed to, so it -- it basically makes him look like a charlatan. Basically, it makes --

Q. How does that post identify him?

A. Well, it doesn't identify him by name. The photo identifies him. The -- in other words, you have a post with a picture attached to it. The picture is -- is clearly not the Crate & Barrel executive. The picture is clearly the pastor. So the point is -- is, you know, there's an old saying about a picture is worth a thousand words. Pictures -- and I -- I won't bore you with it, but there are surveys to prove it. Pictures

are far more impactful in -- in forming opinions than the words are.
Q. If I put a picture of you on that post, would that harm you?
A. No. As I -- I already said, if -- if you were a plumber or electrician or a -- or somebody like that, it wouldn't, because no one cares. If you want me to fix your pipe, you don't give a damn what I think -- I think, you know.
But the point is, it -- it totally discredited this -- this man that's supposed to preach a certain biblical philosophy and -- and human values and all that. It diametrically makes him look like a wolf in sheep's clothing in -- in the sense that -- that he -- that he doesn't believe any of that stuff. So it totally --
Q. How does it do that?
A. It discredits him. As I said, it makes him look like a charlatan, and it -- it totally discredits him.
Q. I'm sorry. But what -- so is it -- I don't want to put words in your mouth, so tell me I'm putting words in your mouth if I am, but I'm going to try to clarify what you're saying, too. You're saying since he's a Christian pastor, this is diametrically opposed to what a Christian pastor would say?
A. Well, preachers, yes. Yes.

A. Well, it's not that I -- I don't know. In -- in biblical -- first of all, I'm not a -- I don't claim to be an expert on the Bible, but -- but I'm sure that the -- that the Lord and Jesus Christ and God and whoever else is up there is all for equality. That's -- that's the point.
Q. So if Pastor Smothermon wasn't for that, wouldn't he already be a charlatan?
MS. WESTBROOK: Object to form.
THE WITNESS: Would you repeat that question?
BY MR. RANDAZZA:
Q. Well, if I were to agree with you, and suffice to say I do, that God and Jesus believe in equality, this post is railing against somebody who is in favor of equality. And then the third person is Pastor Smothermon, that you say making him seem in favor of equality is making him out to be a charlatan. Well, who's at odds with God and Jesus now?
MS. WESTBROOK: Form.
THE WITNESS: Well, you're -- you're picking one thing, the DEI. You're picking one initial out of the DEI and going at, you know, the --
BY MR. RANDAZZA:
Q. Is God against diversity?
A. The post was also about -- about the LBGBQ (sic), if

those are the right initial, I don't remember them in order. But the post was about that, which is -- which is in -- is in favor of -- you know, I mean, they're supportive of -- of transvestites, transgesters (sic), homosexuals. And -- and that is -- that is totally opposed to biblical teachings.

Q. It is?

A. Yeah. Yeah. It's a -- it's, you know --

Q. Didn't Jesus hang out with prostitutes?

A. Well, it -- I don't think he hanged out with prostitutes, but he believed -- Jesus believed that all -- all people deserve respect, regardless of who they are.

Q. Including homosexuals?

A. Prostitute, you know, that -- pardon?

Q. Including homosexuals?

MS. WESTBROOK: Object to form.

THE WITNESS: Well, I -- I can't comment on that because I don't know that there were homosexuals back in those days. I'm sure there were.

BY MR. RANDAZZA:

Q. You don't know if they existed?

A. I'm not that educated enough in the -- in the biblical days of whether there were homosexuals there or not. I assume there may have been, but whatever. But

recklessness of --
Q. No. No. Is that what it says or not?
A. No. No. No. No. It doesn't -- it doesn't -- look, no one is -- I have no problem personally with -- with what they wrote in the post. I believe in the First Amendment. I believe in people having the right to express their views and whatever. I have no problem anything that they wrote in that post. That was their opinion. They -- they have a conservative view. Obviously, the real Smotherman, M-A-N, doesn't share those views. They're diametrically opposed. Every -- both sides have the right to their opinions. They have the right to express their opinions or whatever. We're not talking about the post. We're -- in that sense. We're talking about the identification. The post is opinion.
Q. Okay.
A. I mean, the post is a -- is their opinion. It's opinion. But the -- the photograph is fact. The photograph is fact. The post is opinion, and they choose to link the two together. So we're not debating it. We're not in here debating the -- what was written in the post.
Q. Yes, we are. No. What we're debating -- and we don't really -- I don't know what the --

MR. RANDAZZA: Why don't we get a copy of the post so that we're not working from a difficulty? Do you have another copy for me?

MR. MCLAREN: That's him. That's for him.

MR. RANDAZZA: Yeah. Okay. That's for him. Okay. Here you go, sir.

So why don't you give me one and give our -- our buddy over here one.

BY MR. RANDAZZA:

Q. And sir, just a few questions about your report before we get back to that.

A. Okay.

Q. Did you type the whole report yourself?

A. Yeah. I wrote it. I typed it.

Q. I get it. We'll get to that.

A. I wrote it. I typed it. I printed it out. And I sent it by email to the -- to the law firm, Ms. Westbrook --

Q. So no one else provided any language that appears in the report?

A. I sent -- well, I -- let me see if I can do this better. I send -- I send --

Q. Sir, N equals 1 or N equals 0. Did anyone else provide any of the language that appears --

A. Well, I mean, they -- they provided thoughts. I

wrote my own comment. There was some --
Q. Can you say who they is?
A. Well, they would be Ms. Westbrook.
Q. Okay. So Ms. Westbrook helped you write the report?
MS. WESTBROOK: Objection. Misstates testimony.
THE WITNESS: That -- that's a stretch to say she helped me write the report. No.
BY MR. RANDAZZA:
Q. She provided language for the report?
A. She provided -- she provided comments on -- to me.
Q. Like, this would be better phrased that way?
A. Well, she said, you might bring up this issue or you might not bring up this. I mean, you know, she gave me her input or she --
Q. Sure.
A. -- she might have thought -- she might have said, you know, you forgot to put this in -- or, I mean, not forgot to put this in, but, you know, she just gave me suggestions, but she didn't write the words. I wrote the words.
Q. Do you still have every draft?
A. I don't keep drafts. I -- in other words, I work off a master. Somebody -- if I send something that somebody suggests some changes, I make it. Then I do it

on the master. Then -- then I don't keep drafts.
Q. Then you delete the original or the --
A. Yeah. I mean -- well, no. I type over them. I don't delete them. I just -- I just work over the --
Q. Sure.
A. -- the -- I have one report and I make revisions to it. I don't have drafts. I just work on one report.
Q. In Page 36 of your report, you refer to the plaintiffs, multiple. There's only one plaintiff here, correct?
A. Page 36?
Q. Yes, sir.
A. If -- I don't know where it is, but if I refer to plaintiffs, yes. It -- there's only one plaintiff.
Q. Okay.
A. That I know of.
Q. And on Page 36, you also say --
A. No. No. There are -- there are multiple plaintiffs. What am I talking about?
Q. Oh, there are?
A. Oh, no. No. He said there are multiple defendants, right? There -- there's only a single Hodge. I was looking at a picture. I -- I think there's -- yes. There's one plaintiff and there's three defendants.
Q. Can you explain why you used the plural then on Page

36, 41, and 42?
MS. WESTBROOK: Object to form.
BY MR. RANDAZZA:
Q. So if you look at Page 36 --
A. Some of -- some of that is -- is boilerplate from a previous case.
Q. Okay.
A. And then with other ones, what I do, instead of -- if -- if you're -- you're -- you -- if you have an apple and you want to have another apple, I don't believe in -- in taking my client's time and money to reinvent the wheel. What I do is go through it as carefully as I can and I edit -- I edit out what it is to -- sometimes it's to -- it's to change the names. Sometimes I put names in it. Sometimes I --
Q. Right.
A. -- refer to plaintiffs or plaintiff. So that -- it -- it's -- it was an error in sloppiness.
Q. Okay. So Page 26 to 28, those are boilerplate?
A. About 20 percent of the -- of this report is, for the most part, boilerplate -- 20. Oh, yeah. That part is -- that part is. I mean, that -- that's important to give a perspective and context to --
Q. Sure.
A. -- how negative communications can -- can harm and

bill?
A. Actual. That's one of the reasons I used some boilerplates, to save the client's money.
Let me put it this way: If every word in this report was original, I probably would've had to charge 25 percent more hours than I did for doing -- let's say I did 20 -- it took 20 hours to write the report. I probably would've had -- I probably would've had charged 25, 26 because I would've been writing the whole thing.
Q. Turn to Page 17, please. You say, "Defendants wish to include a photograph of Steve Smothermon in the Facebook 19 post."
A. Wait a minute. I'm not on 17 yet, sir. When I get there, I'll let you know. Okay. I'm there now.
Q. It says, "A photograph of Steve Smothermon in the Facebook 19 post." What is the significance of 19 there?
A. I don't see what you're talking about. I'm on Page 17. Where -- where are you?
Q. Well, do you --
A. Describe what you're -- where it's located on the page.
Q. Do you see the two black squares?
A. Yeah.
Q. Put your finger on the bottom black square.

A. The one that says "if claims are brought"?
Q. Yes.
A. Okay.
Q. Now bring your finger down slowly until you see two dashes. And then where you see those two dashes --
A. I see three --
Q. -- look at the second line under that.
A. Well, I see three dashes, not two. So you must have a different --
Q. Really? Let me see that.
A. It's three. One, two, three. I count.
Q. Okay.
A. I went to school.
Q. I'm going to circle it for you.
MR. RANDAZZA: Let the record reflect that I circled the word Facebook.
THE WITNESS: Oh, I thought you were talking about three different items here. Okay. Okay. One -- dashes, I -- I meant -- all right. I see that, yes, you should --
BY MR. RANDAZZA:
Q. What's the 19 mean?
A. The 19 is a -- the 19 is the number of the document I took it off of.
Q. 19 what?

A. The line. Some -- sometimes I copy and paste in information. Again, there's no reason for me to type a sentence in from a document when I can copy and paste it in. The 19 was obviously one of the lines in the document I did. And in -- and might have been 20 of them and then deleting 19 of them, I missed that one.
Q. If you look at Page 20 to 22 --
A. Uh-huh.
Q. -- and then 23. So I want you to start at Page 20 where it says, "Information input reviewed."
A. Right.
Q. You see that?
A. Yes.
Q. And then if you skip forward to Page 22.
A. Yes.
Q. And we stop at the word "methodology"?
A. Yes.
Q. Is that a complete list of everything you considered writing this report?
A. Yes. I'm meticulous in writing -- in -- I'm meticulous in -- in listing everything that I looked at.
Q. So you reviewed nothing else that is not on that list?
A. Right. There's nothing -- the only thing I would possibly think is I do -- if you look at -- on Page 22,

if you look at the -- I do do some occasionally. I go on the internet and look at stuff to see if there's anything I missed. For instance --
Q. I -- I'm asking you what you did in this report because this is about your report?
A. Oh. Okay.
Q. And not about the blog list.
A. Okay. The answer is that is everything.
Q. Okay.
A. That is everything that I reviewed, all the information -- types of information, materials, and legal documents that I reviewed in order to form my conclusions.
Q. So you've never spoken with Steve Smothermon?
A. No.
Q. Never spoke with anyone at Legacy Church?
A. No.
Q. No congregant?
A. No.
Q. Did you talk about anyone -- did you talk to anyone in what you described as the faith-based community on Page 35?
A. No.
Q. Did you talk to a single person who saw the post?
A. No.

Q. Did you talk to any member of the news media?
A. No.
Q. Did you interview anyone at all in this case?
A. No.
Q. Okay. Let's skip to Page 34.
THE WITNESS: By the way, are we taking a break for lunch here at some point, or are you planning to just go through? We're going on four hours here.
MR. RANDAZZA: I thought you said before that you could just go right through, but --
THE WITNESS: Well, I could, but --
MR. RANDAZZA: -- if we need to modify --
THE WITNESS: -- that's a little -- I mean, I'm thinking of the other people here. You got other people that are -- I know you're trying to save time and money, but I'm -- I'm thinking that -- of the other people here as well. They're -- I mean, if -- if it's all right with them, it's all right with me. Let's put it that way. I brought a -- I got a little bar from --
MR. RANDAZZA: How long do you need to take another change?
THE VIDEOGRAPHER: Probably 45 minutes.
MR. RANDAZZA: Everybody good with breaking in 45?
MS. WESTBROOK: We can go the whole way here.

MR. RANDAZZA: All right.
BY MR. RANDAZZA:
Q. So you say on Page 34 through 36, "The plaintiff reports." So for a number of your -- your conclusions here. But you've never reviewed any declaration by Mr. Smothermon or a transcript of any deposition, correct?
A. Well, I don't believe he did a deposition or I would've seen that. I'll have to look back at my -- no. No. I've -- I've seen -- you know, I've seen the complaints, the interrogatories, all that -- that which provides information that comes from the plaintiff or the defendants, for that matter.
Q. And on 36, you said, "He's reported significant forms of mental trauma"?
A. Yes. That's --
Q. To whom did he report that?
A. Well, that's what I was -- that's what I was informed.
Q. By whom? Who told you that?
A. Well, I don't know if I -- I don't know as I sit here today that the -- that that --
Q. Read your report until you figure it out.
A. Well, I don't know if I -- whether I saw that in writing or someone -- I -- I believe I saw that in writing that -- that he had -- he -- that -- that he

testified to that.
Q. Let's look on the list of materials you considered. It's a -- it's a short list. Can you show me on that list which writing you're referring to?
A. Well, it might have been in its -- I can't. It could have been in his interrogatories. I didn't make it up. I mean, he had -- you know, I read a lot of different types of documents, as you see, two and a half pages --
Q. Yeah.
A. -- of listing of documents. I'm not sure which exactly one I saw. It's not something I -- I made up. I just -- I just reported what I had read.
Q. Oh, I'm not accusing you of making it up.
A. No. No. I understand.
Q. And to any extent you might interpret what I'm saying in saying that --
A. I understand.
Q. -- I apologize.
A. Yeah. No, but what I --
Q. Sincerely.
A. Yeah. No.
Q. So I --
A. Hey, I have thick skin. What I'm trying to --
Q. No, but I am in no way accusing --

A. What I'm trying --
Q. Please, sir, focus. Focus. What I'm trying to get to is the factual foundation you relied upon. And, you know --
A. Yeah.
Q. -- if it's garbage in, garbage out or gems in, gems out. If so --
A. Well, what I'm -- what I'm --
Q. If I look at the materials you considered, I don't see anything about that. But you did testify you never talked to Smothermon. You never talked to anyone at the church. You never talked to anyone except Ms. Westbrook; is that accurate?
A. For the most part, yeah.
Q. No. No. N equals 1 or N equals 0. So is there anyone else other than Ms. Westbrook?
A. Okay. The only person I remember talking to, I believe it was Ms. Westbrook. She has a partner, but I don't think I ever talked to him. I think I -- you know, that might have corresponded with him, but I didn't talk to him.
Q. So the singular person you've interviewed was Ms. Westbrook?
MS. WESTBROOK: Object to form.
THE WITNESS: Well, that I've talked to.

BY MR. RANDAZZA:
Q. Okay. This is the only person --
A. Yeah. We're talking about verbal talking. The only person I believe I remember talking to at the law firm --
Q. No. No. Not at the law firm. Okay. Let's -- let's --
A. Well, you're splitting -- you're --
Q. Let's methodically say this.
A. Yeah. You -- you're --
Q. To create this report, you spoke with Ms. Westbrook. We've addressed that, right?
A. Right.
Q. Okay. Check. Now I'm going to put a square here and I'm going to put other people. Should I check that box as yes or no?
A. No.
Q. Okay. So you spoke with no one else?
A. No.
Q. No, you didn't speak with anyone else?
A. N-O.
Q. Okay.
A. You want me to write it for you so you can see it? N-O. I answered your question twice. No.
Q. Nobody else?

A. No is no.
THE RECORDER: And gentlemen, I just want to remind you guys to speak one at a time, please.
THE WITNESS: Yeah. Yeah.
BY MR. RANDAZZA:
Q. Let's see. Do you know how many people saw the -- we'll call it the erroneous post?
A. No. I haven't seen any figures of that.
Q. Do you know how many shares it had?
A. No.
Q. Comments?
A. No.
Q. Likes?
A. No.
Q. Are you aware of a single person who recognized the photograph as Steve Smothermon, the plaintiff?
MS. WESTBROOK: Object to form.
THE WITNESS: No. Not personally.
BY MR. RANDAZZA:
Q. Are you aware of any -- have you looked at any Legacy Church attendance records? It's not on your list, so.
A. Well, yes. I -- I have in my report that -- that what -- as I understand it, they have 10,000. Among their nine churches, they have 10,000 regular

parishioners or congregants that attend each Sunday.
Q. Okay. So did you look at actual attendance records?
A. On a specific church?
Q. On Legacy Church?
A. No.
Q. Any membership records?
MS. WESTBROOK: Object to form.
THE WITNESS: No.
BY MR. RANDAZZA:
Q. What about financials other than -- because you do list the 2024 annual report. So did you look at any other financial documents?
A. No.
Q. What about book sales?
A. Yes. Or not book sales. No. I -- I saw a list. No, it wasn't book sales. It was something else. But no, I don't think I saw any statistics on book sales.
Q. How about Pastor Steve Smothermon's YouTube subscriber accounts?
A. Yeah. I think that I saw -- oh, YouTube. No. I saw one figure that related to all of his social media.
Q. What about his Instagram account?
A. No. They weren't broken out. I -- I saw --
Q. What about his podcast downloads?
A. I'm going to finish your last question.

Q. Well, it was just about Instagram.
A. And you're going to allow me to answer or --
Q. Is there more to Instagram than no?
A. No. I was starting to say that I saw a figure of 28 million as it relates to the Facebook, Instagram, YouTube. I mean, all his social media combined that supposedly he has a reach of -- of -- he or the church, I'm not sure which was which, has a reach of 28 million.
Q. Wow.
A. That was a figure I saw. Have I --
Q. No, I --
A. -- I -- no.
Q. I didn't know that until now. Thank you.
A. Well, it's in the report if you read the report.
Q. Right.
A. You might read the report. It would be helpful.
Q. Is -- huh? 28 million? Would you call that a lot?
A. Yeah. I'd call that significant.
Q. Did you look at any medical or mental health records?
A. No.
Q. Tax returns?
A. No.
Q. Income records?
A. No.

Q. Any correspondence from any congregant?
A. No. I didn't see congregant.
Q. Any document created by anyone who saw the post other than Ms. Westbrook?
MS. WESTBROOK: Object to form.
THE WITNESS: I'm sorry. You'll have to repeat that question.
BY MR. RANDAZZA:
Q. Did you look at any document created by anyone that you believe saw the post?
A. Oh, you mean like a declaration, affidavit, something like that?
Q. Anything.
A. Email?
Q. Anything.
A. No.
Q. You said on Page 24 you reviewed a study conducted by Plaintiff's law firm. What study did you review?
A. Well, it's -- it's spelled out in the copy if you read the report. I mean, I didn't just throw that out there without attributing what it was about.
Q. Can you tell me about the study?
A. Well, as I -- as I understand, I didn't need to see the study. They -- they supplied the results of the -- of the study to me. And it was a referencing on -- on

-- and how they went about -- how the defendants went about selecting a picture from Google.
Q. Okay. So their study says "Defendants didn't utilize normal and accepted photo verification tools to verify the identity of a person in a photograph"?
A. Yeah.
Q. That's their words, not yours?
A. Well, that was the -- no, they were my words, but that was the information that was provided.
Q. Right. I'm saying -- okay.
A. Yeah.
Q. That's their conclusion, not your conclusion?
A. Yes, that was. Yeah.
Q. Do you know who conducted that study? The person?
A. I think I did hear at one point. I'm trying to remember at one point if I did, but it was alluded to who at the firm did it, and I can't remember. I wouldn't remember the name, but I --
Q. Do you have it?
A. I -- I don't know. I don't know. As I say, I'm not -- I'm not completely sure whether I saw it or not. I think it was somebody at the firm that did it.
Q. Wait. You're not sure if you saw it or not?
A. I'm not sure I saw what?
Q. Well, we were talking about the study.

A. Yeah.
Q. I asked you if you had seen it. And then you said, I'm not sure I saw it or not. So I'm confused.
A. No. I didn't say that. I said I -- I said I didn't see the study. I said they gave me the results.
Q. So you didn't review the study itself?
A. No. And I said that. I -- I testified that about two minutes ago. Yeah. I didn't see the study itself.
Q. Well, you can see how I'd be confused when your report says you reviewed this study.
A. Well, no. If you were listening to what I said, you would -- you would have heard it.
Q. Well, I'd like to turn your attention to the last bullet point on your report where you say you reviewed a study conducted by Plaintiff's law firm.
A. I reviewed the results of a study, not the study itself.
Q. Okay. So we should insert the word --
A. My bad -- yeah.
Q. -- the results of?
A. Right. Reviewed the results.
Q. Okay.
A. Or they gave me the information of what was determined in the study. I didn't see the formal paper that outlined the study or a report or anything like

that, no.
Q. So theoretically, they could have just made it up?
A. Sure. That's -- I'm -- I have to take representation. I mean, any expert would have to take representation that the law firm provided you with a study. I mean, that's -- that's -- I mean, I -- I don't turn around every law firm and give me information saying, are you lying or did you make that up? That's reasonable. It's not reasonable.
Q. Do you ask, do you have anything to back that up?
A. No. But, I mean, you know, that's -- you know, I've been doing this a long time and you -- certain things you're allowed to take as representation, particularly when they come from the law firm, that they're not making it up.
Q. So you don't know what methodology that study used?
A. No. I don't know the methodology.
Q. You didn't verify any of its conclusions independently?
A. No.
Q. So you adopted a study designed by the lawyers who hired you, whose author you can't name, using a method you can't describe; is that fair?
MS. WESTBROOK: Objet to form.
THE WITNESS: Yeah, that's fair.

A. Yeah. I don't understand how that would do -- would've happened.
Q. Okay. So -- well, it looks like you mislabeled an attorney-client communication as correspondence between counsel and published it to us. Would that be accurate?
A. What do you mean by mislabeled?
Q. So you're telling me that -- that those two block quoted paragraphs --
A. Uh-huh.
Q. -- are not attorney-client privileged communications. You're telling me that those were actually written to me?
A. Well --
Q. The "you" in those is me?
A. There's no attorney-client in it. It's a letter from one attorney to another attorney. There's no client involved in it.
Q. Okay. I would like you to role play that you're Ms. Westbrook and I'm me.
A. Okay.
Q. Read that block quote to me.
MS. WESTBROOK: Object to form.
THE WITNESS: "This is a fact-based" -- that's the one you're talking about?
BY MR. RANDAZZA:

Q. Yes, sir.
A. Yes. "This is a fact-based defamation. We argued that the Hodgetwins did not just call you woke as" --
Q. Point to "you" in that sentence. Point to the person that that pronoun addresses.
MS. WESTBROOK: Object to form.
BY MR. RANDAZZA:
Q. Are they in the room right now?
MS. WESTBROOK: Object to form.
THE WITNESS: No.
BY MR. RANDAZZA:
Q. They are not in the room right now?
A. No. And it -- it was not -- obviously, it's not a reference to you.
Q. Okay. So --
A. And --
Q. To whom was this communication actually written?
A. Are you saying that you don't believe it came from the letter to -- from Westbrook to -- to Randazza?
Q. Well, I'm "you," if that's to Randazza. So I'm not sure that the Hodgetwins called me woke.
A. Yeah.
Q. Or said I was part of a corporate rebranding strategy. So I'm drawing the conclusion here and asking you your opinion. Is this mislabeled?

A. Well, it obviously -- whether it's mislabeled or not, it obviously doesn't make sense that the -- that the Hodgetwins would've called you woke, obviously. There's --
Q. Yeah. They might.
A. Yeah. Well, there's -- whether they did or not, obviously there's an error there of some sort. And --
Q. Okay. That's all I'm getting at.
A. No. No. I mean, it -- it mystifies me as much as anything else. I mean, the bottom line, even if I got the date -- there were six letters that she wrote to you. Even if I had the date wrong, like it wasn't the February 25th letter, which is February 26th letter, it still wouldn't have changed the fact that it was -- that it was her writing and -- and claiming that they called you woke. That doesn't make any sense at all.
Q. Okay.
A. Yeah.
Q. Thank you.
A. Good point. I -- but I -- just I -- I'm going to go look at that one when I get back.
Q. Strike. Strike. Yeah.
A. I got to go back to that letter and see when I -- where I made that error.
THE WITNESS: Are we doing any better?

A. I don't remember. If it's not on the list, I didn't, no. Do you know the date, what the order would've been?
Q. Yes. It would've been May 5th.
A. Okay. Let me look. May 5th of '25 or '26?
Q. '26, sir.
A. May 13th. No, I didn't see it because I go from May -- I go from April 22nd to May 13th. So no, I never -- I never saw that document.
MR. RANDAZZA: All right. I'm going to mark this as Exhibit 2.
(Defendants' Exhibit 2 was marked for identification.)
THE RECORDER: You never marked the other one.
MR. RANDAZZA: Yeah. We're not at that yet.
THE WITNESS: Yeah. He marked it 1 on that one. It's -- yeah. He's got it Number 1 on there.
MR. RANDAZZA: 2. All right. Wish we -- do we have a stapler here?
MR. MCLAREN: I got a clips.
MR. RANDAZZA: Great. Hook me up, would you, brother? Give me two.
BY MR. RANDAZZA:
Q. Let me see. Why don't we clip your report there, sir, so it doesn't fall apart since it's an exhibit?

A. Okay. Oh, you're handing me something?
Q. Yes, sir.
A. I'm sorry. My eyes were --
Q. Quite all right.
A. -- diverted to something else. Okay. Now we've got order.
Q. Does that look familiar?
A. No. If it's not on my list, I never saw it. Believe me, I don't miss anything on my list. And I, obviously, never saw this.
MR. RANDAZZA: You have no idea how many -- oh, let's actually label that exhibit now, the -- the photograph.
THE WITNESS: You have it labeled 2.
MR. RANDAZZA: No, no. Number 3 now.
(Defendants' Exhibit 3 was marked for identification.)
THE WITNESS: On this one? It's already labeled 2.
BY MR. RANDAZZA:
Q. All right. Let me have a -- right there with that, sir.
A. Oh, this one?
Q. Okay. Here it goes. You have no idea how many people saw Exhibit 3, do you?

A. Those two paragraphs -- I mean, there's no purpose of me typing -- taking time to type a large -- a couple large paragraphs when I -- when I can just cut and paste them, and they're generally foolproof, but obviously --
Q. If you look at Page 13 of your -- of your report, you see the first full paragraph that begins with the word under?
A. Yeah. You mean the one that said "under the text"?
Q. Yes, sir.
A. Yeah. Okay.
Q. Can you see at the last full line of that paragraph says, "Which allegedly led to $145 million loss in brand value?"
A. Right.
Q. Where'd you get that figure?
A. I got it from a document. I'm not sure -- sure which -- which one, to be honest with you. But, I mean, obviously, I didn't make up a figure, 145 million. It -- it came from one of the documents I read.
Q. Right above that, you copied the whole post, correct, on Page 12?
A. Yeah. Sometimes things are on documents I can't cut and paste and --
Q. Okay. Well, why don't we take a look at Exhibit 3, which is actually a post then, instead?

A. Oh, yeah.
Q. Probably the best evidence.
A. Yeah. That's fine.
Q. Can you -- is $145 million mentioned there?
A. No. I see no figure like -- of that kind in there.
Q. Where'd you get that?
A. On, specifically, one of the documents I looked at. I mean, obviously, as I said, I didn't -- I did not make that figure up. I mean, it -- it was in one of the -- one of the legal documents I got that I looked at.
Q. Okay. Did you get that figure from Ms. Westbrook?
A. No, no, no. I didn't -- I -- you know, most of the time I talked to Ms. Westbrook, it was -- we were just talking about deadlines or meetings and stuff like that. I -- there -- there was very little -- first of all, I didn't talk that often to Ms. Westbrook. And the second thing is it wasn't that much verbal exchange of information. We didn't exchange information from her. 99 percent of this is from written documents, not from somebody telling me on a telephone call.
MR. RANDAZZA: Can you -- I'm going to hand you Exhibit 4 now.
(Defendants' Exhibit 4 was marked for identification.)
BY MR. RANDAZZA:

Q. And I'm going to ask you to look at -- oops, Lines 31 -- Paragraphs 31 and Paragraphs 44, which I've highlighted for you.
A. Oh, okay. Well, that'll make it easy. What is this document?
Q. Yeah. Read 44 first.
A. Yeah.
Q. Read it aloud, if you wouldn't mind.
A. Well, this one, 31, is "Cracker Barrel shares plummeted approximately 10 percent."
Q. No, no. Look -- look at Paragraph 44. I'm sorry.
A. Oh, okay. Oh, yeah. Yeah. That --
Q. Could you -- could you read that aloud for me?
A. The whole paragraph? Sure.
Q. Yes, sir.
A. "None of -- nonetheless, the Hodgetwins' Facebook post falsely, and with reckless disregard for the truth, told their vast audience that Pastor Steve" --
Q. Sir, let me see the document. I think I've highlighted the wrong thing.
A. Oh.
Q. Let me take a look.
A. It has the 145 figure in it.
Q. Okay.
A. That's obviously where it came from.

Q. Yeah. Yep. I'm sorry. My mistake.
A. Okay.
Q. Beg your pardon.
A. I'll go back to reading it.
Q. Go ahead, sir.
A. "Nonetheless, the Hodgetwins' Facebook posts falsely, and with reckless disregard for the truth, told their vast audience that Pastor Steve Smothermon was a woke supporter of LGBTQ+ causes and responsible for the controversial DEI-driven rebranding at Cracker Barrel, which allegedly led to a 145 million loss in brand value in a single day."
Q. Now, will you look at Page 13 --
A. That's a --
Q. -- of your report?
A. Yeah. That's a different number.
Q. No, no. It's the same number.
A. No. It has 143 million.
Q. Well, not if you look at Page 13 of your report.
A. Oh, 13 in my report?
Q. Yeah.
A. I thought you meant 13 -- okay. Page 12.
Q. But if you read the last three lines, start with, "was a woke supporter." Can you see that?
A. No, I don't.

Q. Okay.
A. Page 13?
Q. Page 13 of your report.
A. Yeah.
Q. Place your finger on the paragraph that begins with the word under.
A. Oh, okay. I was looking at the bottom. Okay. Under.
Q. Now -- now go down to the word was. "Was a woke." Can you see that?
A. Yeah. "Was a woke supporter."
Q. Keep reading.
A. Okay. "Christian pastor was a woke supporter of LGBTQ+ causes and was responsible for the controversial DEI-driven rebranding at Cracker Barrel, which allegedly led to a 145 million loss -- dollar loss in brand value in a single day."
Q. So you took your description of the post from the complaint, not from the post?
A. Let me read the whole paragraph. Well, that doesn't say it was from the post. Not at all.
Q. Well, I didn't --
A. You're reading --
Q. I didn't say it did.
A. Oh, okay.

Q. I just asked you, did you take --
A. Yeah. Because once you get to "which allegedly led to," that's a --
Q. Right.
A. -- that separates it out from --
Q. So you copied that from the complaint?
A. That must have been where I got it. Yeah.
Q. Okay.
A. I knew it was somewhere.
Q. Sure. So now if you go to Paragraph 44 of the complaint -- I mean, I'm -- yes, of the complaint. So at 31, it says --
A. Okay. Wait a minute. I'm on the complaint. Sure. This is the complaint? We're on number 4?
Q. Yes, sir.
A. Okay. There is no Page 44.
Q. Paragraph.
A. Oh, paragraph?
Q. There's numbers of each paragraph.
A. Paragraph 44. Okay.
Q. What does that say for loss in value?
A. It said it allegedly had led to a 145 million loss in brand -- brand value in a single day.
Q. Okay.
A. They're both 145 million.

Q. Right.
A. Yeah.
Q. I'm aware of that.
A. Yeah.
Q. Yeah. It doesn't matter. Let's go to Page 34 of your report.
A. Of the report? Okay. All right.
Q. Let's go with the -- can you see the indented block quote there?
A. Yeah. "As a pastor"?
Q. Yeah. What are you quoting there?
A. You mean where did I get the source of the quote?
Q. Yes, sir. Or are those your words?
A. No, they're not my word. I wouldn't put them in -- I wouldn't put them in italics and -- and with quotes around them. That means they were -- they came from somewhere. Let me read it.
Q. Do you notice that a couple times in your report you spell Smothermon with two S's, S.Smothermon?
A. Yeah. On purpose.
Q. Oh, how come?
A. Oh, simple. Look at the case background section. In the case background section, what I do is I always identify people. I put S.S. Smotherman as being M-A-N, not the other. So I -- I say, "Steve Smotherman, a

former management training leader at Cracker Barrel. He left the company," blah, blah, blah. And after Steve Smotherman, I put in parentheses, "S. Smotherman." That's to differentiate him from the Pastor Smothermon.
Q. Oh, okay.
A. In other words, you -- you know, it's an abbreviation. You don't need to say -- you don't spell out his name every time.
Q. I didn't pick up on that. Thank you.
A. Okay.
Q. Okay. So this --
A. You must have though I had hiccup -- hiccups or something.
Q. No. I thought it was a typo, you know. The things I've filed with glaring typos in it, I --
A. Yeah. No.
Q. -- I certainly wouldn't have been using that to make you look bad.
A. Well, believe me. I'm the last person trying to be perfect.
Q. Okay. So when I look at that quote, isn't that -- if you look at the complaint again, isn't that Paragraphs 50 to 52?
A. Order? Let me put this out here. So in the Paragraph 52 in the -- in the complaint, Paragraph 52

talks about "moral feature."
Q. 50 to 52.
A. Oh, 50 to 52? Okay. What page was I on my report?
Q. 34, sir.
A. 34. Okay. The page -- the page -- lost the page. 34. Yeah. It -- it appears to be.
Q. Okay. So the passage you offered as background, context, and perspective --
A. Yeah.
Q. -- is a quotation of the complaint?
A. Yeah. In other words, trying to say what his -- what he's -- what he preaches, what his general -- his general message is when he -- when he preaches.
THE RECORDER: Mr. Fisher, try to remember to let him finish the question before you answer.
BY MR. RANDAZZA:
Q. All right. Take a look at -- so look at Page 9 of your report.
MR. RANDAZZA: Actually, do you have a couple copies there? Give me, like, a -- I'd like another exhibit sticker. And we have one for Ms. Westbrook and then one for me.
(Defendants' Exhibit 5 was marked for identification.)
MR. RANDAZZA: There you go.

MS. WESTBROOK: Thank you.
MR. RANDAZZA: Sure.
BY MR. RANDAZZA:
Q. I'd like to give you this.
A. Oh.
Q. There you go.
A. Five? That's my favorite number.
Q. So I've made a -- a little chart here of language that came from your report that appears to be lifted directly from the complaint. Would you like to look through your report and the complaint to confirm that?
A. No. I'll take your word for it.
Q. Okay. So perhaps to save a little time, you adopted their -- their conclusions as part of your report?
MS. WESTBROOK: Object to foundation. Form.
THE WITNESS: Well, I would say no to two things on that. One is that I -- I may have -- have taken their -- I might have used their -- some of their terminology. Obviously, you've seen where I do -- I use some of their terminology in their report. I, you know, again, don't reinvent the wheel. But the other thing is, I -- I wouldn't put it in unless I felt that it was -- I didn't -- it was not contrary to what my own assessment would've been.
In other words, just because I said something,

if I didn't agree with it, I wouldn't have put it in. And as I -- I can see at the bottom on Page 43, that's where the "rage bait" came from. I knew it wasn't -- I knew it wasn't something I made up.

BY MR. RANDAZZA:

Q. So you copied it from that?

A. Yeah.

Q. Okay.

A. I mean, you asked that -- about that earlier, and I said I had never heard that term before, and I didn't make it up myself. Well, obviously, that's where I got it from.

Q. Okay.

A. But in reading it, I obviously thought that was a good --

MR. RANDAZZA: Could I have an exhibit sticker, please?

THE WITNESS: -- I thought that was a good interpretation of what it was conveying.

MR. RANDAZZA: I think we're on 6?

THE RECORDER: Correct.

MR. RANDAZZA: Okay. So I'm going to give you Exhibit 6, which is the first amended complaint, which has not yet been accepted.

(Defendants' Exhibit 6 was marked for

identification.)
BY MR. RANDAZZA:
Q. And I'm going to just open it to Page 8 for you.
A. Which I haven't seen.
Q. Oh, you haven't seen their amended complaint?
A. Well, it's not on my list, I don't believe.
Q. Okay. So --
A. If you said it hasn't been accepted, then I wouldn't have seen it anywhere.
Q. Okay. Can you see where it talks about using incognito mode as highly irregular and reckless?
A. Right.
MS. WESTBROOK: Object to foundation.
BY MR. RANDAZZA:
Q. Read that -- those words, if they're on that page.
A. It says -- well, the sentence -- the complete sentence says, "Doing so was highly irregular and reckless."
Q. Referring to what, sir?
A. The online search. It's referring to their search in Google to find a picture of Pastor Smothermon.
Q. Okay. So --
A. So there's --
Q. On your report, on Page 30, you said --
A. It's the second paragraph down.

Q. Yeah. If you look at --
A. I said "negligence and recklessness." I didn't say --
Q. Okay. I want you to look at failures of search standards and verification.
A. Yes.
Q. Okay. So here you wrote what? Kevin H. You -- read it to me. Kevin H.
A. You want me to read that?
Q. Yes, sir.
A. The whole paragraph?
Q. If you would not mind, sir.
A. Not at all. "Kevin H. admitted that he performed his Google image search in its incognito mode. Plaintiff maintains that doing so is considered highly irregular and reckless as it bypasses standard internet browsers, which deliberately leaves no record of the search and destroys a verification history."
Q. So --
A. So I attributed it to the plaintiff.
Q. Right. But that's in the proposed amended complaint, which you never saw before?
MS. WESTBROOK: Object to form.
BY MR. RANDAZZA:
Q. Did you say you didn't see it before?

Q. Right.
A. -- mode means. No. The answer is no.
Q. Okay. So did your description of the post come from the complaint or the post?
MS. WESTBROOK: Object to form.
THE WITNESS: How do you mean description?
BY MR. RANDAZZA:
Q. Let's turn to Page --
A. Oh.
Q. Let's -- no.
A. In other words --
Q. I don't want to confuse you. Let's get -- let's go to Page 12 of your report, and we're going to look at where you say Facebook post. Do you see that?
A. Yes.
Q. Okay. Did that come -- did you copy that from the complaint?
A. It must be because the post wasn't up on the -- the post was taken down, so I didn't see it on the internet, obviously. And the only place -- the only place I would've seen it is some -- in -- in one of the documents that was presented to me, whether it was the complaint or otherwise. I -- I don't remember exactly where I lifted it from, but it -- the bottom line is I didn't see it online. So it came from one of the -- the

pieces of discovery I was provided.
Q. So your report really is about a photograph, correct?
A. Well, yes. The photograph attached to the post. That -- that's a -- as I said, there was nothing in the post that directly addressed the pastor. And -- and I -- I will represent that I don't think that the defendants were going after the pastor in the post. Obviously, they -- they're very clear they were going after Smotherman, M-A-N, who was a Cracker Barrel -- ex-Cracker Barrel executive. I mean, they're clear about that. There's no -- it's the photo attached to the post that's a problem, not the post, but the photo attached to the post.
Q. Right.
A. If they just -- if they just did his photo -- put his photo online by itself and put his name under it, there'd have been no problem of any kind. You know, it was the -- it was the joining of the post with the picture that -- that -- where the damage emanated from.
Q. Do you think it's likely they did it on purpose?
A. No. I don't believe they did it on purpose at all. No. I -- why should they? They were after -- they were after one guy. Why would they take a picture of another guy? No. I'm sure they didn't -- they didn't know what

they were doing, and they didn't -- you know, no one is claiming them doing a hatchet job on -- on the pastor, I mean, you know, deliberately or wantonly or purposely. That's not -- not the point at all.
Q. Now, on Page 31 of your report, when you did your Google search for "Steve Smotherman" --
A. Yeah.
Q. -- with an A --
A. Yeah.
Q. -- the first picture that came up is the one that shows on Page 31, correct?
A. Yeah. When I did the post, as I explained in -- I mean, when I pulled up the post, I just -- like, I can Google. I Googled, and I put Steve -- just what they did. I put Steve Smother, M-A-N, into the post.
Q. Right.
A. I -- I mean, into the search box.
Q. Yeah.
A. And what came up, as I said, came two -- two blocks of five pictures that went horizontally. There was -- there was one block of five pictures from side to side underneath of it. There was another block of five pictures. Ten pictures in two rows.
Q. Did you provide that ten pictures in two rows to anyone?

A. Provide it to anyone? No. I put it --
Q. Does it exist?
A. I put it in my report. I -- I just took the top five pictures because they -- the -- first of all, anybody looks from top to bottom, not bottom to top, and the -- and the -- the second row was not really relevant. I mean, there was other pictures of -- of both of them and this, that. In other words, I went to where the person would've looked at. He looked at the -- if he went on Google, he looked -- the first thing he would've done was -- was -- well, he might have looked at the text -- I mean, the different listings, but also he would've looked -- they were looking for pictures.
    They weren't looking for listings. So he went -- he Googled "Steve Smotherman" or he -- whoever did it, Googled "Steve Smotherman" and he -- specifically to find a photo of Steve Smotherman, and he found ten photos. And obviously, he would've looked at the first five and first -- and -- and three were of the pastor and two were of the -- of the Crate & Barrel executive.
Q. Are you sure about that?
A. Yeah. I've got the pictures in the -- so, you know, something even to -- even to emphasize more. A month after I did that initial search --
Q. Yeah.

five photographs, but you didn't do a screenshot of the whole results?
A. Pardon?
Q. Do you know how to do a --
A. The first five -- the five across the top.
Q. Do you know how to do a screenshot?
A. Five across the top, two rows. Top row, five; bottom row, five.
Q. Yeah.
A. I only did the top five because, obviously, he would've looked at the thing, and he would've looked at -- you look top to bottom. You don't look at bottom to top. You look at the -- but the bottom was --
Q. "Obviously, he"? Who's he in that sentence?
A. Well, whoever looked. It might have been a she. I don't know who did the search.
Q. So you're saying "obviously" --
A. I assumed Kevin. I assumed that Kevin -- I think it was -- Kevin said it was -- said that Kevin did the search, not Keith.
Q. Okay.
A. I can't remember. One of them was -- I read had done the search.
Q. All right. So your testimony is that -- do you know how to do a screen capture?

A. A screen what?
Q. Capture. Do you know how to take a screenshot of your whole screen on a computer?
A. I didn't up until about a week ago and someone showed me how to do it, but I -- I didn't do it for this. I --
Q. You just copied the first five horizontally that came up for you?
A. Yeah. The first five. But I wouldn't have had -- I don't think I would've had room on the page to put five.
Q. Did you do the search in incognito mode?
A. No. No. I just did Google. I took them in -- I mean, I assume he just went on and did it, the -- the Google, which is what I did. No, I didn't do it in any mode. I just went on -- I pulled up Google on my computer. I typed in the name Steve Smotherman, M-A-N, and a page came up and that's it.
Q. And the first result was the plaintiff?
A. The -- the -- yeah. It's a side by side. The plaintiff was first.
Q. Yeah.
A. And the next --
Q. And the plaintiff was second?
A. This was first. The plaintiff was second. And the -- the Cracker Barrel guy was third and fourth, and the

one was an earlier picture of the -- a younger picture of the guy. He didn't have a beard. I mean, you know, he had the beard and his hair, you see. But as far as I can see, they were -- the other -- the other thing you should -- that should be pointed out on -- on this is every one of the pictures -- I mean, I can see whoever did -- did the research, they went on. They see some pictures and whatever. They don't know who's who. Even though the spelling should have told them they was correct. Let's say --
Q. Oops. Sorry.
A. Let's say that the spelling -- the -- I mean, it's easy not to see an, A-N, instead of an, O-N. I'll give that. But every one of the --
Q. Could -- wait.
A. No. No, wait. Let me finish.
Q. No. No. I want you to finish what you just said there.
A. Every -- every one of the pictures, every one of the three pictures here, as you will see, of the -- of the pastor identified him as a minister. I mean, there's no other -- they're looking for a -- a business executor, every one. Under the first one, it says Tony Cooke Ministries, meaning that --
Q. What's Tony Cooke Ministries?

four next to it. But if I saw a picture that showed a man, and under it, he talked about ministries, I would -- I -- a red light would go off. I would say, I need to look further.

Then the very next picture I would've saw would've identified the exact same person as being a -- a pastor. I mean, this isn't rocket. He's either a blithering idiot or -- or whoever it was. Or it's a pastor. The bottom line is, any reasonable person looking at five pictures, of which three of them was of one person and two were the other, and the three had some sort of a religious -- a picture or a -- a reference to them, would say, hey, wait a minute. This guy is tied into religion. He's not a Cracker Barrel executive.

Q. So tell me about the reverse image search you did for the first image.

A. I never did a reverse image search. I didn't --

Q. Why not?

A. I didn't do it, was I --

Q. Don't you think you need to do that to do a complete report for a case?

A. There was no need for -- I was duplicating what that -- what that guy did, or whoever it was. I don't know. Who was it? I mean, tell me who -- who did the search. I thought it was one of the Hodges.

picture that they used in the post.

Q. You wrote this report without seeing the picture they used in the post?

A. Yeah. I've never seen the picture. I -- I saw the text somewhere in -- whether it was the complaint or somewhere else, I saw the text of the post, but not the picture. But that -- that's not the issue -- the issue in this case. It's not what picture they used. The issue is that they misidentified the -- the pastor.

Q. How did they do that?

A. Your guess is as good as mine.

Q. No. No. How did they misidentify him?

A. They put the wrong -- they didn't -- they didn't misidentify him by wording or text. They misidentified him by the picture that they used, that they associated that he was the person that they were referring to in the text.

Q. The picture you just said wasn't relevant?

A. What? No, they -- it -- what picture they used of him is not relevant in terms of the fact they used the picture of the wrong person. That's what's relevant. Doesn't matter if they had him in a cowboy suit on a horse. The bottom line is they misidentified him. The -- what picture was used doesn't -- doesn't matter. It's just that they used the wrong person. The harm

Q. -- for all you know, could be a gay-only church, correct?
A. Who cares?
Q. Okay. It could also be a church devoted to gay orgies, couldn't it?
A. Who cares? The bottom line is -- in the context of this, is that underneath the picture, there was a reference to a religious church or organization or whatever ministries in this case, which should have been a red flag to any halfways-intelligent person, that why is it -- why are they putting the name of a religious person underneath the -- or a religious entity underneath it -- this guy's picture?
Q. The photograph that you say isn't relevant that the case is all about?
A. No. No. It's not -- the actual visual image of the photograph is not relevant.
Q. Okay. Here's my question for you about that not-relevant photograph.
A. Right.
Q. Where did they get it?
A. I don't know. And it's not -- it's not important. The important is they didn't do their due diligence. They were negligent. They were reckless. And they -- when they clearly would've pulled up Google and seen

A. I can't -- I can't tie that in terms of malice or anything else. I'm not allowed to get into that area. I mean, in the sense I --

Q. Sir, you can tell me that you shot John F. Kennedy if it's true. So why don't you tell me the truth? Do you -- is it your opinion that that was reckless?

MS. WESTBROOK: Object to form. Calls for a legal conclusion.

MR. RANDAZZA: Yes, it does. That's my point.

BY MR. RANDAZZA:

Q. You don't know what you're talking about when it comes to law, do you?

MS. WESTBROOK: Object to form.

THE WITNESS: No. And I'm not talking about law. I'm talking about their -- their process to identify -- to find a photograph to identify -- to identify an -- a certain individual, their process to do it. I have no problem with them going on Google, typing in the name. But there were so many red flags, a misspelling of the name. The fact that there was multiple people with the same name. The fact that the -- the one that they choose to use, whichever photograph they choose of them, the one that they choose to use in all identifications, other than his name being spelled differently than the man they were looking for, had --

Q. You were deposed three times in that case?
A. Well, two, but one was split into two.
Q. Okay. And you submitted this written report?
A. Yeah. I'm not sure which case this was for, the first or the second, but we'll -- we'll find out.
Q. Did you -- you applied the same methodology there that you did here, correct?
A. No, not necessarily. I mean, this case was -- you know, your methodology -- I would say the core of it, yes. But I'd say methodology evolves as you -- as you go. I would say it's -- it's somewhat different than it was then. And in other words, I -- I've -- in recent years, I've started doing more, like -- like, little studies. Or not studies, but looking into things, like I mentioned with the --
Q. What's the date on that report?
A. This is January 30, 2023.
Q. Okay.
A. So --
Q. So in that report, did you offer the opinion that a person with an established positive reputation and a developed reservoir of goodwill is more resilient to a single negative statement?
A. It depends on how -- you mean --
Q. In that report, sir?

it -- that's on me.
THE WITNESS: Oh, okay.
BY MR. RANDAZZA:
Q. Okay. So you're saying that that reservoir of goodwill theory was kind of unique to that case?
A. Well, I said it's not a cookie cutter thing. It -- in many cases, yes. It -- it helps if somebody already has a good opinion of you before they hear anything about you. In other words, the -- there's the blank slate thing, where the first thing they hear anything about you is negative. Then there's one where somebody already has a reputation. Then they hear -- theoretically, if they have a -- a good reputation, it'll buttress it somewhat. Yeah.
Q. What was Steve Smothermon's reputation prior to the publication of the -- we'll call it the photo you call irrelevant, the irrelevant photo?
A. I don't recall being irrelevant, but from what I gather as a professional, he had a -- he had a good reputation. I mean, he had nine churches. He's -- he had been a -- a preacher for 35 years, 25 with Legacy. And he had a -- a reasonably positive -- there were -- I did do some research on him as I always do when I first got the case. And -- and, you know, he had been involved in some little controversies here or there, I

think a dispute over some civic thing and that -- there was a political thing.

Q. Why did you say in your report that he had absolutely no negative press at all?

A. Well, I didn't -- I was talking about him professionally, that there's a difference between personally and professionally. I mean, he's -- professionally, as a preacher, he -- you know, he didn't have any blemishes. But -- but, you know, as a community -- person acting in the community, he had a -- you know, a couple things. But it wasn't anything super negative. It was just that he had some disagreements with some -- some people.

So it's a matter of whether he was right or wrong or, you know, I mean, anyone. I just addressed it from the point of -- as a -- as a -- professionally as a preacher. And I didn't see anything. I mean, he'd never been chastised or -- or suspended or anything like that. I mean, he had a -- he had a growing church and he had a good following, so it was generally positive.

Q. So you educated me that he reached 28 million people in his social media audience?

A. Well, I think it's in my report if you find that, but 26, 28. Yeah. I -- I think so. I saw that. Again, I didn't do a count on it and I --

A. Not really any.
Q. How many negative opinions, period, did you find?
MS. WESTBROOK: Object to form.
THE WITNESS: On social media?
BY MR. RANDAZZA:
Q. Anywhere.
A. Well, I didn't really see anything in there. All I did was look at the -- I looked -- I looked for -- generally, I -- you know, I researched online. I researched him and whatever. And generally, you don't see positive things. It's like if a -- if you help an old lady cross the street, it's not news. But if you throw her down, then it's news, you know? I didn't -- in other words, the absence of negativity generally means the person has a fairly clean slate.
Q. And would you say there was an absence of negativity here?
A. Well, I didn't see anything that stuck out in -- in what I looked at or what I was exposed to. And, you know, I usually look at least ten pages of Google, and I go on and see another thing or something like that, look at another one, too. But I -- I didn't see anything glaring that -- where he was accused of anything negative, of anything. I mean, he was involved in one or two controversies, but -- but that was a he said, she

that -- that would -- shows up on your desktop. I pressed on Google. It wasn't a specific account of mine. It was just a Google search icon.
Q. Don't you think that was reckless?
MS. WESTBROOK: Object to form.
THE WITNESS: No, not for the purpose I was looking at. It was to just get general information to see what was out there.
BY MR. RANDAZZA:
Q. Did you clear your cookies or your cache before searching?
A. No.
Q. Disable personalization?
A. No.
Q. And we've already covered you didn't use incognito mode?
A. No.
Q. Did you preserve a timestamped screenshot?
A. No.
Q. Did anyone witness or verify your search?
A. No.
Q. So there's no record of that search that anyone could audit, correct?
A. No. Other than my truth, by saying it was true. I mean, I'll swear under oath if you want.

Q. Tell me the record you left. Describe it in detail.
A. Well, describe what you mean by record.
Q. Well, could we -- is there a dictionary here? Do you need a dictionary?
A. You mean written down?
Q. I'd like you to consult a dictionary if you don't know what the word record means. Would you like to do that?
A. Do you mean a written record?
Q. Any record. Is there anything in existence showing --
A. No. No. No. If I --
Q. I have to take your word for it that you did that?
A. No. Yes. No. If I had -- if I had found something substantial, I would've -- if I had found something that would've resulted in any of my conclusions and opinions in my report, I would've made a record of it, that I did it, and I would've put it in my -- I would've put it in my -- that listing of the information I have on Pages 26, 28.
THE RECORDER: Sorry to interrupt you, Counsel. Just be mindful to let him finish the question before you start answering.
BY MR. RANDAZZA:
Q. Before your search --

looked at my computer, and -- and pulled up Google and did it that way.
Q. Okay. And are you aware that Google personalizes your searches based on prior search behavior? Did you know that?
A. No, I didn't.
Q. So you didn't know that your own search history influences your results?
MS. WESTBROOK: Object to foundation.
THE WITNESS: No. I'm not aware of that.
BY MR. RANDAZZA:
Q. You did your search in 2026, correct?
A. Yes. I -- I got the case in 2026, yes.
Q. And the post was from August 22, 2025?
A. That's correct.
Q. About 11 months earlier?
A. Whatever. Yeah.
Q. Okay. In between, a lawsuit was filed and received some publicity, right?
A. Yes. I believe there -- I saw some articles on the lawsuit.
Q. In fact, I published a page about the case, correct?
A. Yeah. I'll take your word for it.
Q. Do you need to take my word for it, or should we look at your report again?

A. Well, if you're talking about that thing with the demonic thing, yes, you did. You had a web -- you had a website up there about the case.
Q. So all of that generated new indexed content about the plaintiff?
MS. WESTBROOK: Object to foundation.
THE WITNESS: Well, I didn't see that. I didn't -- your -- that website with the graphic and all that, I didn't see that until just at -- towards the end of doing my report, so I didn't see it at the beginning. I didn't -- I wasn't aware of it until almost the -- when the report was complete.
BY MR. RANDAZZA:
Q. Do you believe that you -- Google's rankings of pages stays static?
MS. WESTBROOK: Object to foundation.
THE WITNESS: Well, I imagine they're adjusted. I'm not -- I'm not sure for sure, but I -- I would assume they -- I know they -- that content, you know, on pages, if you Google somebody, the listings change from time to time. They go up and down or in between, whatever. So there are adjustments there.
BY MR. RANDAZZA:
Q. Do you know what Google returned for Steve Smothermon on August 22, 2025?

A. No.
MS. WESTBROOK: Object to foundation.
THE WITNESS: Oh, sorry. No, I did not do the search deal until I was retained in '26.
BY MR. RANDAZZA:
Q. I'm going to say it with the foundation here. I'm going to ask you: In your personal knowledge, do you know what Google returned for Steve Smothermon on August 22, 2025?
A. No.
Q. Did you check any archived result?
A. No.
MS. WESTBROOK: Objection. Foundation.
BY MR. RANDAZZA:
Q. Do you know what that means?
A. Well, I know what archives mean. You know, I mean, things are stored in --
Q. Can you tell me the names of one -- the name of one internet archive?
MS. WESTBROOK: Objection.
THE WITNESS: No.
MS. WESTBROOK: Foundation. Outside the scope.
MR. RANDAZZA: You can keep your speaking objections to a minimum, and you can just say form. And

I'm asking the deponent what he knows, so that's within the scope.

BY MR. RANDAZZA:

Q. Did you -- so you can't name a single internet archive?

MS. WESTBROOK: Objection. Outside the scope. Foundation.

THE WITNESS: No.

BY MR. RANDAZZA:

Q. Okay.

THE RECORDER: Your answer one more time.

THE WITNESS: No.

BY MR. RANDAZZA:

Q. Have you ever seen the Wayback Machine?

MS. WESTBROOK: Objection. Outside the scope.

MR. RANDAZZA: All right. We're going to call the judge if you keep this up.

MS. WESTBROOK: Foundation.

MR. RANDAZZA: So keep quiet.

BY MR. RANDAZZA:

Q. Do you -- have you ever heard --

MS. WESTBROOK: Wait, wait, wait. Wait, Counsel.

THE WITNESS: You know, you're so belligerent.

MS. WESTBROOK: Wait, wait, wait, wait, wait,

wait, wait.

MR. RANDAZZA: No.

MS. WESTBROOK: No, no, no.

MR. RANDAZZA: You say, "Objection. Form."

MS. WESTBROOK: Okay. I don't think that's right.

MR. RANDAZZA: If you don't like it, you can leave.

MS. WESTBROOK: I don't think that in California --

MR. RANDAZZA: You can end it and walk out if you want.

MS. WESTBROOK: I don't think --

THE RECORDER: Counsel, one at a time, please.

MR. RANDAZZA: Okay.

MS. WESTBROOK: I don't think that's the rule in California.

MR. RANDAZZA: I'm going to ask him what he knows, okay? I -- we were expecting this. We do have the judge ready.

MS. WESTBROOK: Okay.

MR. RANDAZZA: Okay. I was expecting you to act like this.

MS. WESTBROOK: Okay.

MR. RANDAZZA: So chill, please.

MS. WESTBROOK: I will continue to make my objections.
MR. RANDAZZA: All right.
MS. WESTBROOK: But let's get through this.
BY MR. RANDAZZA:
Q. Have you ever heard of the Wayback Machine?
A. No.
Q. Have you ever heard of archive.is?
A. No.
Q. Ever heard of archive.org?
A. No.
Q. So in doing reputational research, you've never once looked at an internet archive?
A. No.
Q. So your 2026 search, what could that tell the jury about what the defendant saw in 2025?
MS. WESTBROOK: Objection. Form.
THE WITNESS: Well, it would be a representation of what I saw in '26. It wouldn't say anything about '25.
BY MR. RANDAZZA:
Q. Your top result for "Steve Smotherman", with an A, was the plaintiff, correct?
A. Define top result.
Q. Let's go to Page 31 of your report.

Q. Okay. Let's see. The first caption -- let's see. Did you do any -- well, I mean, I guess I -- I already asked you this earlier, but I'll -- you didn't do any focus groups or test whether -- what an ordinary reader would do in that situation, did you?
A. No.
Q. What is your expertise in reading comprehension or visual attention?
MS. WESTBROOK: Objection. Foundation. Form.
THE WITNESS: Well, I don't know that I have any expertise in visual, but reading comprehension -- I mean, I have a college education. I've spent 50 years writing and reading. I would say it's pretty advanced.
BY MR. RANDAZZA:
Q. Did you review the amended answer in this case?
A. I'll have to look it up. Let's see. The first amended complaint came in on July 1 of 2026, so let me -- no. I did not -- I did not see the response to the amended complaint.
Q. No. The amended answer.
A. Uh-huh. Amended answer.
Q. Document 43, you didn't see that?
A. No, I didn't see it.
Q. Any reason you didn't review that?
A. No. I was supplied -- I was supplied with the

amended complaint, but I wasn't supplied with the amended answer to the amended complaint.
Q. So I'm going to give you this.
MR. RANDAZZA: I think we're at 8?
THE RECORDER: Yes.
(Defendants' Exhibit 8 was marked for identification.)
BY MR. RANDAZZA:
Q. So you've never seen that?
A. Oh, no. I haven't seen none of those pictures, no. I mean, a couple of pictures I recognize from the original search I did, but -- the ones towards the top, but no, I never saw this sheet. I never saw --
Q. You can keep that as Exhibit 8.
A. Oh, yeah. I never saw these -- all these pictures.
Q. All right. So your search has no date, no documentation, and can't be replicated; is that right?
MS. WESTBROOK: Object to compound. Misstates prior testimony.
THE WITNESS: I -- I would say that's true. I did it in the course of my -- my work, and there was no -- there's no formal records of it. No.
BY MR. RANDAZZA:
Q. Well, let's help overcome that objection. Tell me the date of your search.

A. The exact date?
Q. Tell me the date.
A. I don't know it. Fair. Okay.
Q. And you were telling the truth when you said you made no documentation of it, correct?
A. That's correct.
Q. So could we replicate it today?
A. Yeah. I -- I think I mentioned that I did the search -- I did the search early on after I was retained. And then I said -- I think I testified that about a week ago, I redid it. And --
Q. With the exact search terms?
A. Oh, yeah. I mean, there -- it's not rocket science. The search term was "Steve Smotherman," spelled A -- A-N. That was the search. It was not a bunch of words. It was one person's name at the same time, both -- both times.
Q. And you didn't use incognito mode?
A. No.
Q. Were your results different the second search from the first?
A. No. I -- I told you they were -- they -- the photographs were the same.
Q. The exact same?
A. The exact same. They -- the -- the text --

photograph of someone to attach to a -- to attach to a text that was basically castigating the person, would use reasonable caution and certainty to make sure the right picture is with the right -- with the damning text. Yes. I -- I think it's -- it's impossible for anyone --
Q. What would that be? What more would you have suggested they do?
A. They wouldn't have to do more if they did just the basic opened their eyes and saw what was on there. Anybody that went on there would've seen that there were multiple people with the name Steve Smothermon. So it was -- it wasn't just one person. They would've seen pictures of at least two different people that had the same name. They would've identified that the person that they were looking for had a -- a name ending in A-N instead of O-N, which was clearly spelled out.
In other words, they were blathering idiots, or they were -- they were so careless and reckless that -- that they just grabbed a picture that they saw and -- and thought was him and -- and slapped it on a -- a post that was -- was very detrimental to the person they were trying to identify.
MR. RANDAZZA: Can I have an exhibit sticker?
BY MR. RANDAZZA:

22?
A. What is the list? There we go.
Q. Okay. But you list the amended answer of March 17, 2026, on your list of information reviewed to form opinions?
A. Yeah. Of the -- of the first.
Q. Do you see the date on that, March 17, 2026?
A. The original complaint was filed on October 1, 2025.
Q. Sir, put your finger on the word "legal documents" on that page.
A. Yeah.
Q. One, two, three, four, five, six, seven, eight, nine, ten. The 11th bullet point below that, I read "Defendant's Amended Answer and Affirmative and Other Answers, March 17, 2026." Do you see that? I can highlight it for you if you want.
A. No, I can see it. I am -- what I'm -- I'm thinking of is the -- the amended complaint came on July 1, 2026.
Q. Yeah. That's not relevant to my question right now.
A. Oh. Well, I -- I --
Q. My question right now is: Did you tell the truth when you said you reviewed this amended answer or not?
A. Well, I -- I assumed that -- that the amended answer came after the amended complaint. So then when I said that, it wasn't a matter of telling the truth. It was a

putting in there. But I didn't -- it wasn't something that I was opining or concluding. So it was just saying, this is what they're saying, and this is what they're saying.
Q. So it -- you didn't have any curiosity as to what KOA TV meant here?
A. Not in that respect, no, particularly.
Q. Do you know what KOA TV is?
A. It's obviously a -- it's probably a -- an internet station of some sort.
Q. So you didn't investigate that or what we were talking about when we said YouTube?
A. No. No. In -- in that case, all I'm doing is presenting the own word -- the -- the own words of both sides. I'm not interpreting them. I'm not evaluating them. I -- I'm just putting them there to show what each side is claiming.
Q. Okay.
A. I have no investment in it.
Q. So Document 43 is the exhibits to this amended answer that you reviewed, but you didn't find important. Am I mischaracterizing your testimony?
MR. RANDAZZA: This is 10, right?
THE RECORDER: Correct.
(Defendants' Exhibit 10 was marked for

identification.)

BY MR. RANDAZZA:

Q. I'd like to just hand you Exhibits 9 through 20 from that amended answer. Do any of these look familiar to you? You can flip through that whole document as -- for as much time as you like. Any of that look familiar?

A. No, not really. What is this purported to be?

Q. You can read the title, sir. Those are all the exhibits --

A. It says Exhibit 9.

Q. -- to the amended complaint that you said that you reviewed. It's beginning with --

A. No. I didn't say I reviewed the exhibits at all. I don't say reviewed the exhibits. I -- I might have read the amended thing, but I didn't necessarily look up the exhibits. No, I didn't see -- I don't -- I didn't see any of this stuff.

Q. So when you read the amended answer and it referenced all these exhibits, that didn't pique your curiosity? Articles about your client, photos of your client, all that just looked like, I don't know what, superfluous information?

A. I'd have to go back. I can't comment on that. I'd have to go back and see if the exhibits were part of it or not, but I don't remember seeing any of this. That's

report -- but the point is the only thing that's germane to the jury are what my conclusions and opinions are, not what the defense and the plaintiffs are saying about what is right or wrong.

Q. So you weren't aware that YouTube made the same spelling mistake?

MS. WESTBROOK: Object to foundation.

THE WITNESS: No.

BY MR. RANDAZZA:

Q. And you weren't aware that a news station -- news station misspelled his name the same way, correct?

MS. WESTBROOK: Object to foundation.

THE WITNESS: No. But two wrongs don't make a right. You know, I mean, if they made a mistake --

BY MR. RANDAZZA:

Q. Sir, I'm just asking if you were aware.

A. No, I wasn't aware.

Q. Okay. I'm not looking for --

A. Yeah. Okay. Yeah.

Q. -- the story about the --

A. I mean, I can see how somebody might like to make a mistake and they are common names, you know? I mean, how many Steve Smothermons are there? I mean, I'm human. I -- I can see that it's a possibility something might oversee something like that.

BY MR. RANDAZZA:
Q. So Page 9 of your report, I'd like you to sort of compare these two. So you remember what this is, right? What is --
A. Well, this is the post.
Q. -- Exhibit 3? It's the post.
A. That's his issue in this case.
Q. Right. Which was never attached to your report, correct?
A. No. I don't -- no, it wasn't attached.
Q. On Page 9, you say, "Defendants published an article falsely labeling him as woke, anti-American, and anti-family values," right?
A. Yes. I don't see it, but I'm --
Q. Those are your --
A. Yeah. I see it now. Yeah.
Q. Are those your words or are they Ms. Westbrook's words?
MS. WESTBROOK: Object to compound.
THE WITNESS: I guess they're my words. I don't -- I don't frankly know at this point in time whether that was something I -- I saw and -- and decided to pick up on it or whether it was my -- my words or not. But I --
BY MR. RANDAZZA:

Q. All right.
A. Probably it was a -- it might be something that I saw in the complaint or something that I put in there.
Q. So you don't know what you based that on?
A. I think it's just a -- I based it on a -- you know, a conglomeration of -- of the different input that I read. Just the --
Q. But not the post itself?
A. No. I don't see in the post itself anything that says -- I don't see the words "anti-American" or "anti-family values." I -- it's probably what I picked up from the -- the plaintiff's allegation.
Q. On Page 13, you say that the post said he was responsible for the rebranding; is that right?
A. Yes. I mean, the general -- maybe not using his words, but the general -- the general thought of the post was that he was -- he was changing the -- that he was influencing and changing the direction of the -- the image of the -- of the Crate & Barrel.
Q. Okay. But the post doesn't say that, right?
A. Well, the post says it's -- Cracker Barrel scraps its old-time logo and -- and accusation using his heritage, and then it segues into him, you know? So yeah, I mean, is it in a specific one sentence thing? No. But, I mean, that's the general inference.

Q. So you're basing your opinion on inferences given to you by the plaintiff?
A. Well, yeah, in the context of what they're saying. I mean, what they're -- the points they're trying to make. Yeah, that they had a -- they had an old-timer logo and image, and now they're erasing their heritage and turning into a -- a woke formation. And they're obviously making -- whether it was intended to be the pastor or not, they're -- they're obviously attributing it to a man named Steve Smothermon.
Q. So on Page 34 of your report, you say, "The defendants' mistaken portrayal of him, meant for S. Smothermon --
A. Uh-huh.
Q. -- "through the misidentification in the Facebook post. It charged that he was opposed to old-fashioned values, anti-family, and anti-American." Does it say that in the post?
A. No.
Q. So --
A. It doesn't specifically --
Q. -- is your report accurate or is your report wrong?
A. Well, the misidentification obviously is a reference to the -- to the photograph and not to -- to text.
Q. No, no, no. But focus on the question, sir. I'm --

is -- is not the -- the issue is they used the picture of the pastor instead of a picture of the Crate & Barrel. So what I meant was not relevant is which picture of the -- I want to be real clear on this. But I --

Q. Because you're not doing a good job of that, sir.

MS. WESTBROOK: Objection.

THE WITNESS: I don't deny saying what you were saying. I don't deny that.

BY MR. RANDAZZA:

Q. Okay.

A. But what -- but the context of it was I wasn't saying that -- that it was not the picture -- the picture used with the post was not relevant. I'm not saying that. I'm saying the particular pose, for lack of a better word. Didn't matter if they used him on a horse or they used him behind a pulpit or they used them sitting listening to a lecture. I'm saying that the -- the -- the picture itself wasn't -- is not relevant. It's the picture -- the fact that the picture was of him is that -- that is relevant. So yeah. So it's -- I don't doubt using those words, but it wasn't in the context of -- of how you interpreted it. It was the -- the whole -- this whole case is not about the text of the post.

Q. It's not?
A. Not -- no, no.
Q. So it's about the picture now?
A. It's about the picture being attached to the text. If they -- as I said earlier and I testified earlier, if they hadn't used the picture of him, we wouldn't be here today. If they had just talked about Steve Smothermon or Crate & Barrel or alluded to him or whatever, we wouldn't be here today. The only -- the only problem that resulted in us being here today is them showing the picture of the wrong person. That's what it -- that's what this whole thing is about. Not the -- not the -- yeah. No. I meant the particular pose that -- that -- of the picture they used is not relevant. I mean, it could have been a picture of him in diapers for all I care.
Q. Okay. So it's not about the text. It's about the picture?
A. It's about the text linked -- it's about the picture linked to the text.
Q. Right.
A. If either one -- if they did a separate post with this picture, just a post on Facebook with this picture --
Q. Yeah. I know what you're saying.

Q. "Also contrast this with defendants' mistaken portrayal of him... That he was an active supporter of promoting and fostering opportunities for queers in the workplace," end quote.
A. Yeah. Well, the active portrayal of him is obviously placing the wrong person's picture with posts. That's -- that's the -- you know, as I've -- I've made clear to you in the past, that --
Q. Have you talked to Pastor Smothermon about whether he has ever given homosexuals opportunities in the workplace?
A. No. As I said, I've never talked to him, so.
Q. So far as you know, he --
A. It's a moot question, but --
Q. It's a moot question?
A. Well, it's moot because I haven't -- you know, I haven't talked to him. So I don't know if you're asking me if I talked to him about this or not.
Q. I'm asking if you have any idea whether he discriminates against gay people or not?
A. No. Specifically, no. I've never heard a speech where he -- where he specifically -- no. I haven't heard any of his speeches where he -- or his sermons or whatever.
Q. Have you heard any of his sermons?

A. No.
Q. So as far as you know, they could actually preach homosexuality as the word of God?
MS. WESTBROOK: Object to foundation.
BY MR. RANDAZZA:
Q. As far as you know?
A. Now, let me put it this way. I've been going to church for 70-some years, and I've never heard a preacher on a pulpit -- and I -- I can honestly say that I'm sure -- I've never heard a preacher on the pulpit address homosexuality. And -- and I go every Sunday, 50 Sundays a year times 70.
Q. You ever --
A. And I've never heard a preacher -- and I've heard maybe 40, 50 different preachers in my life. I've never heard one address they -- the subject of homosexuality in a sermon.
Q. Ever been to Massachusetts?
A. Well, I'm not saying it hasn't been done. I just haven't -- it's not --
Q. Ever been to Vermont?
A. It's not in my frame of reference. Let's put it that way.
Q. Okay. But you've never been to his church?
A. No, that's -- I haven't. I would like to think that

all preachers believe in all God's children being, you know, worthwhile and all that. And, you know, and not that they're consigned to hell if they're -- they're homosexuals or not. I'd like to think that's the case with him or any other preacher.

Q. So the post named Steve Smotherman ending in M-A-N, right? Or you didn't look at the post?

A. Let me pull out the post. Well, yes. The Hodgetwins, that was their -- their target, was the -- the former --

Q. That's -- that's who it names, right?

A. Yeah.

Q. That's not the --

A. With an M-A-N. Yeah. That was the guy that they were upset with.

Q. And that's not the plaintiff's name?

A. Close, but his is -- ends in M-O-N.

Q. And every factual assertion in the post is about the M-A-N guy?

A. Yeah. Although they -- they actually don't use his name in the post.

Q. The post never names him, huh?

A. Oh, wait a minute. I'm sorry. I'm looking at the second page.

Q. No. Never names the plaintiff?

A. No.
Q. Never mentions Legacy Church?
A. No. They -- they don't mention a preacher. They don't mention the -- that their spelling is M-A-N.
Q. New Mexico?
A. No.
Q. Albuquerque?
A. No.
Q. A pastor?
A. No. Not to anything I see. There you go. Their post is totally on target. I mean --
Q. So you say at Page 33 of your report, "There is no facial resemblance between the plaintiff and the former Cracker Barrel executive." Are those your words or are they Ms. Westbrook's?
A. Oh, no. I don't see any resemblance. No. They're my words probably. I -- I mean, I've seen the pictures of the two of them. I don't see any -- any resemblance, except that they're both men. I mean, you know, one wears glasses, the other doesn't. And one is -- looks to be small and more on that heavy side, whereas the other is tall and thin. I -- I don't see any real physical resemblance between the two. I mean, you could see it here in the pictures. I mean, he -- he looks like -- at least when he was younger, the preacher looks

like a generally -- a reasonably thin man. Or, I mean, not thin, but average build. Whereas the -- the Crate & Barrel has a rounded face, and he looks like he's more shorter and probably a little more stockier. So I -- I don't think you could say there were twin -- twin images. Plus one wears glasses and the other doesn't. That's another factor.
Q. So your testimony is they don't look anything alike. So if anyone -- if you knew this guy -- let's pretend you went to his church. Let's pretend you had met him.
A. Yeah.
Q. And we had a picture of this guy and it said my name under it. Would you know they have the wrong guy?
A. Well, I -- assuming yes, although they're twin. I've seen my own twin before. I mean, there are people that look a lot alike, you know?
Q. Do I look like him?
A. No, you don't.
Q. Okay.
A. Yeah.
Q. So --
A. I'm not -- not --
Q. I'm going to ask you, from a reasonable person's perspective, as a -- as a public relations professional, someone who is saying that they would charge 325 to

$350,000 to mitigate the damage --
A. Uh-huh.
Q. -- what person would look at that --
A. By the way, I wouldn't be the one charging it, but go ahead.
Q. What person would look at that and think that that was the guy from Albuquerque?
A. Well, that is the guy from Albuquerque.
Q. Okay. What guy would think that that's the guy from Cracker Barrel?
A. You mean in the context of comparing it to the -- the copy?
Q. Sure.
A. Oh, it could look like anybody.
Q. Wouldn't you have to know that guy to recognize the picture?
A. I'm not -- I'm not sure. You're saying a total stranger --
Q. See that picture?
A. You're --
Q. If I walk up to a total stranger with that picture.
A. Yeah.
Q. Okay. If I hold that up to the court reporter and I say, who is this?
A. Yeah.

Q. She's not going to know, is she?
A. No, probably not.
Q. She would only know if she knew Pastor Smothermon, right?
A. Or knew of him. Similar.
Q. Had met him, had seen him?
A. Yeah. I mean, they could have seen his picture in the paper or something. Yeah. In other words, they -- they were aware of what Pastor Smothermon looked like. Yeah. They would -- would only know.
Q. So you're not aware of anybody who looked at this and thought that guy is secretly moonlighting as a Cracker Barrel executive?
A. No. I haven't talked to anyone. No. I haven't had access to anyone. No.
Q. Can you imagine that person existing?
A. Can I imagine that a person would look at that picture and think that he was a woke --
Q. Well, they'd have to know the guy to recognize the picture, wouldn't they?
A. Well, yeah. Either --
Q. Otherwise, that could be a picture of Cookie Monster, couldn't it?
A. -- either know -- know them or know of them, yeah, to recognize the picture. Yeah.

Q. Okay.
A. That they -- certainly. Yes.
Q. So you'd have to look at that and go, that's Pastor Smothermon, not the guy who works for Cracker Barrel, right?
A. Yeah. Yeah. Unless they were -- but you're talking about -- yeah, that's true. But, I mean, the bottom line is if they had -- if they were aware of Pastor Smothermon, who he was, and then they went -- were made aware that there was a post out there with -- you know, didn't see the picture, was made aware that his picture was tied to a post, then that would -- that would harm him -- his reputation. I mean, they didn't have to see the picture themselves.
Q. You're just making that up, aren't you?
A. No. No. I'm just saying that for --
Q. You're basing -- what are you basing that on?
A. Oh, word of mouth.
Q. Word of mouth with who?
A. Yeah. Word of mouth. I mean, if somebody -- somebody saw that that did know him and talked to someone else and said, I saw Smothermon, not the person that was impacted, but the person that -- another person saw it in -- in word of mouth --
Q. Oh, I see.

A. -- and it got spread around that Pastor Smothermon's picture is on a post on Facebook that the -- that says he's an advocate of woke and LBGTQ or whatever it is, that -- that they wouldn't see the picture, but they would get the -- they would be exposed to the negative transference between the two.
Q. I see. So you're saying someone who recognized him would have to see it, then talk to another person and tell them what they saw, but they would not -- but they would not also --
A. Well, that person wouldn't have to see it himself because --
Q. But they wouldn't also -- but they couldn't also then communicate, hey, I saw his picture on the wrong post. They'd have to say, I saw it.
A. They would -- it -- yeah. Their --
Q. And then transfer the truth of the matter as presented to that person. That's where you're finding $325,000 in repair damage?
A. Well, the damage -- the damage emanated from the picture plus the post. But the bottom line is, once it's out there, it doesn't matter whether they saw the picture or the post. All they're doing is getting information that -- that he's been linked to. You know what I mean? They don't -- at a certain point, you

don't have to have firsthand inspection. You get the -- you get the word of mouth or you get the buzz or you get the -- the gossip going around --
Q. Great. Give me every --
A. -- that he's been connected.
Q. -- give me every bit of evidence that you reviewed that shows that that ever happened.
A. Well, I don't have any evidence. It was very -- very logical. Once the -- once things happen --
Q. You have absolutely nothing. Say that.
A. I have nothing in the terms --
Q. Thank you.
A. -- of talking to one person that actually saw the post in the picture and made their own conclusion from it.
THE RECORDER: And gentlemen, I just want to remind you guys, please try to speak one at a time just to ensure that the record is clear.
BY MR. RANDAZZA:
Q. Okay. So English is your first language, yes?
A. Yeah. I speak a little French, but English, yeah.
Q. Okay. You reviewed the amended complaint, correct?
A. Well, yeah. It's in there. I -- I did. I don't remember --
Q. I did give it to you, right, here as an exhibit?

Q. Okay.
A. I didn't know that he was himself. I thought he was just an advocate for -- I hadn't seen any --
Q. So in ordinary American English.
A. Did you want me to read this?
Q. You're a communications professional, right?
A. Yeah.
Q. So in ordinary American English, do we stress the final vowel in a word or do we reduce it to a schwa?
A. Oh, I -- I think that in -- in general terms, that it can be washed together. Yeah. I don't -- I don't doubt that. That's not an easy name to pronounce, whether there's an M-O-N or an M-A-N on the end of it. Smotherman, Smothermon. You know, it's a -- it's a difficult name to --
Q. How do you refer to your client?
A. Well, I almost never refer to him by name, you know, but say the plaintiff. But, I mean, in talking to Ms. Westbrook here or on phones or when we have a conversation, I don't use his name really.
Q. So you believe there's a phonetic difference between the two?
A. Well, it depends on your diction. Somebody with good diction, yeah, it's clear. Mon or man is -- is different. Mon or man is different. And the only thing

Q. Does the post say $145 million anywhere on it?
A. No. The closest --
Q. Does the post name the plaintiff?
A. No. The closest they said, kind of --
Q. Does the post name the plaintiff?
A. No. The plaintiff's name is not on the 145 million, but go back to your -- your previous question. The closest it comes is this sentence: Users on X are connecting dot accusing the chain of abandoning traditional family and Southern values exchanging the woke model.
Q. So all of the characterizations in your report about this post came from the counsel, not the post, correct?
A. Not from the post. It came from the -- I wouldn't say it came from the counsel. It came -- I mean, I wrote a lot of different documents, a lot of viewpoints, a lot of whatever. And it -- I would say it came from an accumulation of -- of all the written information that I read, not specifically from one firm or one person.
Q. Let's take a look at Page 30. Here, on Page 30, you say -- you called checking metadata the most basic industry standard check of the photograph's system metadata. You see that? Had they performed the most basic industry standard check of the photograph system

metadata, they would've seen that the embedded metadata and the source URL identified the image's origin as a website affiliate of the Legacy Church. You see that?
A. Uh-huh. Uh-huh.
Q. Which industry are you talking about there?
A. Well, this was -- this was information that was supplied to me in context with the -- in -- along with the -- the results of the study that the law firm did.
Q. Okay. So --
A. So I'm --
Q. -- this is the law firm's position, not your position?
A. Yeah. Yeah. They -- they gave me -- they did a study. They gave me their results, conclusions from the study. And I -- I basically, you know, referenced that -- that I -- that they did the study, that I got the information from them. And that's basically giving their conclusions on the study.
Q. So you just rubber-stamped their conclusions?
A. Well, I didn't do the study, so I had to report that -- I had to accept that -- that their conclusions from doing the study, that was -- I mean, obviously that -- that is their conclusions and opinions. And I have to base my -- you know, basically, I was reporting what their study found.

Q. So is this your report or the plaintiff's attorney's report?
A. Well, it's -- it's my report, but I -- as I said, I attributed that one section out of a, what? 53-page report or something, or 48 report, there's a half a page that related to a study, 45-page report. There's a half a page that -- where I provided feedback from a study that was conducted by an outside source. And I just reflected their views. That's -- there's nothing wrong with that. It was attributed. And I didn't say it was my opinion. I'd say this is what the study found. It's perfectly fine.
Q. Do you know what EXIF stands for?
A. I'm sorry? XIF?
Q. Yeah, EXIF. Do you know what it stands for?
A. No. I don't even know what you're talking about. Where -- where do you see --
Q. What software do you use to read image metadata?
A. I told you I don't read image --
Q. So you've never personally examined an image's metadata?
A. No. No, I told you I'm not a technological person, so I don't. It -- it's all Greek to me. I rely on other experts and -- to get into that area, and they provide me with feedback. Much like Don Phillipson,

much like their report. I -- I take professional assessments from other people or other businesses and --
Q. So this statement that says "metadata identified the image's origin as a website affiliated with Legacy Church," you're just writing what they told you to write?
A. You're right.
Q. Not what you found?
A. Yeah. They --
Q. Okay.
A. No.
Q. You ever done a reverse image search in your life?
A. No. No.
Q. Have you ever seen a published professional standard requiring a reverse image search before publishing a photo?
A. No.
Q. When you were a journalist, did you ever hear of a policy doing that?
A. When I was a journalist, they -- they were still using regular typewriters. It was long before metadata and the -- and internets and reverse searches and all that.
Q. You ever heard of a newsroom having a policy requiring that?

A. Well, they may. I don't know.
Q. No. Have you ever heard -- answer the question I asked you.
Have you ever heard of a newsroom with that requirement?
A. No. That doesn't mean that -- that there aren't and that they do have -- I'm just not privy to that. I don't know what newsrooms do these days.
Q. Okay. So again, at Page 30, where it says that "incognito mode bypasses standard internet browsers," that's just you --
A. That -- that's --
Q. -- rubber-stamping what they said?
A. -- that's -- well, I wouldn't say rubber --
Q. I'm sorry. You repeating what they said without --
A. Reporting.
Q. Okay.
A. Reporting is the word. That's me reporting what I --
Q. You quoting them?
A. Yeah. What they were told. I'm not rubber-stamping. I'm just reporting they did a survey. This is what they're saying the survey found. This is their opinions on it and --
Q. So where you say it destroys the verification

history, you don't know that that's true yourself?
A. No, I don't. Nothing. All of that is wrapped in the same bow. It's -- it's that someone did a study, and they reported the results, and I'm reporting what they -- what information or findings that they -- they found.
Q. You have no training in digital forensics, correct?
A. No. No.
Q. So in your own words, what is your methodology in a report like this?
A. What is my methodology?
Q. Yeah.
A. Well, my methodology, it's very simple. I can say -- I can sum it up in -- in one sentence. My methodology is to thoroughly educate myself to all aspects of a -- a case, including the dispute, and the disputes that led to the litigation of whichever kind, whatever the dispute is, educate to where -- what was -- what led the plaintiff to file the lawsuit. Second of all is to look at both sides equally as to what one is claiming, the he said/she said thing. And I -- I need to take in both -- input from both sides as to their positions and stance on -- on what the dispute is to educate myself on where the litigation is to that point. By -- then it is to -- to review all the discovery and

all the information that I'm provided that relates to either one of them.

In other words, a set -- you know, gather all the information and evidence I can possibly gather. Then -- then get the viewpoints of both sides related to that information. Try to ferret out -- you know, then try to separate, you know, what is real and what is claimed by one side or the other. In other words, separate the facts they both agree on to what their -- their -- either -- where their sides differ. And once I have that kind of information, then I -- then my -- is to do some research and to find out.

I -- I look at the facts and apply the facts of the case to the -- to what the -- the claims are. I mean, in terms of -- depends on whether I'm representing the plaintiff or the defendant. But I mean, I look at -- look at that. Then I apply the principles. Defamation is a form of negative communications. And I have 32 points that relate to negative communications. And I apply that to -- to that. If I'm representing the plaintiff, I apply them to see what -- what is appropriate to them. Then I look at -- then I do whatever research to get other information that I -- as much as I can.

For instance, I might have a plaintiff send me three

A. Well, most of them relate to Legacy Church, it looks like. Some are -- relate to Smothermon.
Q. Would you like to take a break and read them all?
A. No, not particularly. I don't think it would change -- change my opinions on it.
Q. Well, I'd like you to pick out the one article in there that isn't about Pastor Smothermon. Find me one. I'm prepared to tell you they're all about him, but I want you to --
A. Yeah. I mean, no, I --
Q. -- I want you to --
A. -- I -- I see -- yeah. I see -- whether he's the focus or not, I see most of the articles do include him in it.
Q. Right. I -- yeah.
A. Yeah.
Q. But I don't want you to take my word for it. I want you to be convinced.
A. Well, no.
Q. Are you convinced --
A. I -- I pared it to -- if they -- if they talk about Legacy Church, they're obviously talking about him. And I see his name in -- in a good -- good part of that.
Q. Do any of these articles look familiar to you?
A. I think one or two of them I might have seen when I

do to -- to find a picture.
Q. Thank you. That's what I'm getting at.
A. Yeah.
Q. How was your methodology different from the receptionist out front? What would they have done differently? Would they have not done a Google search?
A. Well, they may have. They didn't have to do. They weren't retained for this person.
Q. But your specialized knowledge and your 50 years of experience said, do a Google search?
A. No. No. Specialized knowledge has nothing to do with doing a Google search. You're right. The gal out there could have done the same thing as I do. That's part of the process. It's not the whole process.
Q. How would anyone test whether your conclusion is right or wrong? How could you replicate your conclusion? If I -- do you understand -- if we were doing the scientific method here, how would I replicate this report? Could I replicate this report?
A. Which report are you talking about?
Q. Your report. The report that you charged all this money to do.
A. Yeah.
Q. Where you just -- how would I replicate it? Would I get someone to get -- what would I do?

A. You'd get another expert like me to do it. I mean --
Q. And get them to the --
A. -- the bottom line is you're -- what you're trying to advance here is that you could take any idiot off the street and -- and provide them all the information, tell them they should do a Google search, and they could do the same thing I did. That's BS.
Q. Yes. That's basically what I'm saying.
A. No. The point is I'm bringing all -- what is --
Q. Tell me how that's wrong.
A. Expert means you're bringing all your experience and your expertise in a -- in a specific area into -- into the thing. A guy off the street doesn't have that.
In other words, I'm making judgements based on having done, like -- like, my reputation damage repair program. I'm not some student or professor that just thinks, well, these make -- make good things to do. I've done 40 of those programs in the past in person. So the point is that --
Q. Done what? What program?
A. You can't replicate that. That is --
Q. That's what I'm saying. That's what I'm asking you.
A. That's my -- no. No. That's my expertise. No one else would have that expertise. No one else would know

what it takes to do to restore reputation. I have 50 years of doing it. I can do that. Nobody else can do it. She can't do it. She can't do it. And you can't do it. Because I have been out there. I've -- I've seen what works and doesn't work. I've seen how reputations go -- flipping away from that to how it's hurt people. I've seen things that -- that are -- you asked me, how do you know if he had trauma or -- or emotional distress and all that? Well, duh. I mean, everybody else I've ever come across that was in a similar position did. Is he the weird duck that didn't have any when everyone else has?

Q. But you never talked to him? You diagnosed him without talking to him.

A. I didn't have to talk to him. I mean, I -- I'll take him at his word on the surface. But the point is, the kind of things he were saying were common to every other person or every other situation I've ever been in as a PR person or as an expert witness that had the same thing, you know?

Q. So no one that you've ever met in your -- what are you -- I don't want to guess your age, but your 50 years of --

A. Yeah. Yeah.

Q. -- 50 years since you graduated from the last

Q. Do you have a master's degree in public relations?
MS. WESTBROOK: Object to foundation.
THE WITNESS: No, I don't.
BY MR. RANDAZZA:
Q. All right. I do.
A. Okay. Have you ever done a reputation damage repair program?
Q. No.
A. No. So don't --
Q. I hire somebody who has replicable results.
THE RECORDER: Gentlemen -- gentlemen, please speak one at a time.
THE WITNESS: I -- this has -- this has reached a point of --
BY MR. RANDAZZA:
Q. Well, I'm sorry you've reached the end of your creativity, sir.
A. Ask your questions. Ask your questions. You're total -- you're so totally off base --
Q. So are there any written standards governing a reputation harm assessment, in your views?
A. Well, that's what you've done. Talk about the methodology. Yes, there is. Not written standard. Well, there's -- yes. There's -- I don't know if they're written down. I don't know if anyone has

written them down. But there -- there are tried and true principles, procedures, processes, and practices that are used by -- in dealing with people that have suffered reputation harm.
Q. Who's that other guy you said? The -- Rose. Would he have written standards?
A. Who?
Q. The name you gave me earlier.
A. Oh. Oh, the other guy? I don't know. He might. He might. I don't know if he's got them written down or something like that.
Q. Have you ever met --
A. But I've got them up here from -- from 50 years of doing them. I don't know that --
Q. Have you ever met another expert who had a published protocol for doing repetition repair?
A. No. The only -- the only published protocols I've ever seen are in expert witness reports, like in mine. I have, what? Three pages of methodology.
Q. Okay. But not a protocol?
A. I've seen -- I've seen Rose's things. He has -- he talks about -- well, the protocol is your process -- your process you go about forming your -- your conclusions and opinions. And as I'm saying, I -- I don't know you have to put it in writing. I've never --

Q. -- it's obviously bothered my above position here.
Is your method reproducible?
A. I would say -- just as I was starting to answer, I would say that that person you're talking about, probably 80 percent of the report, they could replicate on their own. But the bottom line is -- the key thing is the -- the opinion and conclusion section could not be done by someone that didn't have the frame of reference of spending half a lifetime actually experiencing -- trying things like reputation damage repair program.
Anybody could sit there and say, well, it'd be a good thing if you sent out a news release or you had a speaking engagement or something like that. But actually, if you haven't trial tested it, if you hadn't done those in the field, you don't know what works and doesn't work. You don't know what is -- what is effective and what isn't effective, you know? So I don't think anyone -- just taking that one segment of the report, I don't think anyone could put together a reputation damage repair program that had never done one, because they don't -- they don't have any basis to judge whether it'll be effective or not, let alone the cost factors on them, you know, that kind of thing. But, you know, if they can look at the facts and all the

separate firms that do different things like that. Those people -- so while you may have had a master's degree in PR, and whether this -- that guy may have been in PR, which I think I remember right, was mainly political, that -- that this is a -- a separate subsection. Just because you've done PR by --
Q. What is this subsection called?
A. Reputation harm, damage, or -- you know, handling your crisis communications, dealing with people that have had to have reputation damage.
Q. Well, let's look at your report. Maybe this will help filter this, okay? 26 to 28, 36, and 44 of your report have these things on them that I'd like to dig into. You say it takes years to build a reputation and seconds to destroy it?
A. That's true.
Q. That's a -- that's a study or that's a saying?
A. It's not a study. It's a -- it's a judgment made from years of analysis. And it's -- it's widely considered within -- in the PR profession, we all agree it's true. I mean, people spend years to build up their reputation and one negative thing comes along and it's like a house of cards. It all goes down.
Q. Okay. But that's a saying, not a study.
A. Well, it is a study. Yeah. It's a study from the

-- a study from practical experience of -- of seeing it happen through countless decades, and not only me, but anyone else.
Q. You don't know what I mean by study, do you?
A. Yeah. A study is a formal study. No, it's not a formal study.
Q. Okay. That's what I'm asking you, sir.
A. No, it's not a formal study. It's experience, which is more valuable than a --
Q. You can't un-ring a bell. Is that the result of a study or is that a saying?
A. Yeah. Well, that's -- that means if somebody -- if somebody comes out and implants a thought out there or something like that, you can't --
Q. No, I know what it means, sir.
A. You can't pretend you didn't hear it. You know, you can't pretend that it's --
Q. Yeah. No. We've -- we've heard these sayings since we were children. You don't need to go be a PR professional to know them, right?
THE VIDEOGRAPHER: Counsel?
THE WITNESS: Right.
THE VIDEOGRAPHER: We're going to have to --
THE WITNESS: Yeah. And -- and it's because it's a --

Q. How did you measure it before August 22, 2025, I asked.
A. Oh, I didn't hear that.
Q. How did you do that? How did you measure the basis --
A. I didn't because I wasn't on the case before then and there's no way of postdating. I mean, I looked on -- I looked on the internet and when I look and see an item that could be positive or negative, I can -- if it's negative, I can look at what the -- if it's, like, an article saying so-and-so is in trouble or so-and-so -- I can -- you know, I can look and see what the date of the article was, which would tell me the time frame.
Q. Do you know what survey-based reputation measurement means? Have you ever heard those words before?
A. I've heard the -- I've heard the term survey-based, yeah. It's -- in other words, doing -- doing a formal survey to -- to ascertain the reputation at a given -- of a person at a given point in time.
Q. What about sentiment analysis? Does that sound familiar?
A. No. I've never heard of sentiment analysis.
Q. Media content analysis? Share of voice analysis?
A. Well, media content analysis, yeah, that would be a -- you know, that would be a survey of -- or, you know,

analyzing -- analyzing the reports or articles to --
Q. Did you do any of that?
A. In this case, no.
Q. Do you -- are you familiar with social listening platforms, like Brandwatch, Meltwater, Sprout, Talkwalker? Any of those?
A. No.
Q. Why didn't you use any of them here?
A. Why didn't I use any of them?
Q. You never heard of them?
A. Well, I never heard of them, yes, but --
Q. Okay. Well, that would be why.
A. That would be why. Yeah.
Q. So your methodology has never been tested, correct? It's just unique to you?
A. No. Have you -- where you been the last seven hours? It's not unique to me. It's methodology that's used by everyone. Can't you remember that?
Q. Your methodology?
A. No. Yes. My methodology is the same as -- God, we've gone through this all day.
Q. Is it the same as Matt Shoup's?
A. I don't think you're listening. The -- the point is my methodology is the same as everyone else's methodology.

Q. It's the same as Matt Shoup's?
A. I don't know who Matt Shoup is.
Q. Did you read our expert report?
A. Yes, I did. It -- it was --
Q. Okay. The guy who wrote that, it may come to a surprise to you that his name is Matthew Shoup.
A. Now I see.
Q. Does he use the same methodology as you?
A. I don't remember him spelling his methodology in. I remember him talking about, you know, making assessments based on certain things, but I don't remember him spelling out like I did in the succession in a coherent way everything he did in one thing.
Q. So your methodology has no known error rate, correct?
A. No. I don't know how you -- well, going --
Q. There's no written standards governing your methodology?
A. No. We've talked about that. I've never, ever seen -- in 20 years, I've never seen -- even when I went to the national convention, you think they'd pass out standards, you know, or -- or allude to standards. I've never seen -- ever seen -- either seen standards or even heard anyone allude to standards.
Q. So another expert could not replicate your result?

A. Well, it depends --
Q. We need you for this, right?
A. It depends. If he -- if he -- he could -- he could replicate my result on two bases: If he did the things the same way I did and whether he had the same kind of background I did. You know, it's not enough, as we said, with pulling a college boy off the street. It's not enough having somebody telling somebody what to do and have them do it. If they don't have the frame of reference or the experience or the background to -- to -- to take what they've learned or read and -- and apply it and -- and formulate their conclusions and opinions, then --
Q. In every case you've ever been retained by a plaintiff, your methodology has never produced a finding of no harm, correct?
A. Of zero harm? No.
Q. Never?
A. No. I mean, degrees of harm, but never --
Q. Okay. So you measured nothing in this case, correct?
A. You mean measured, like, through surveys and stuff?
Q. Yeah. Any scientific method at all?
A. No, not through surveys.
Q. I mean, it's -- would you say it's more of an art

than a science to you?
A. Well, I think -- I think, in my type of expert witness, that's true. I mean, if I was an -- an engineering expert witness or a medical expert witness, you could take tests. You can have -- you know, you -- there's -- or even a forensic accountant expert. There's a -- you know, you can do bar charts. You can do tests that -- you can do X-rays and stuff.
Q. Yeah. I know.
A. You know, you --
Q. I -- I know how experts work.
A. Right. But in -- in --
Q. That's why I'm confused.
A. In my field, that's why they have Rule 702 and 703, is -- basically, in my -- there's no measurements and tests that we can do to certify like an engineer can take the tread on a -- on a tire that -- you know, and measure whether it was --
Q. Go to Page 43 of your report.
THE RECORDER: Just want to remind you guys, speak one at a time, please.
BY MR. RANDAZZA:
Q. So you say here that the misidentification unquestionably resulted in reputation harm, right?
A. Yeah. I mean, you can talk about --

Q. Okay. Is that a causation opinion?
A. It's both.
Q. Well, it's -- no, that's -- so that's one term, sir.
A. Well, the --
Q. Sir, wait. Do you know what the word -- the phrase causation --
A. Yeah. I know what causation -- I'm questioning --
Q. Okay. Is that a causation opinion or is it your testimony here right now that that's not a causation opinion? And I don't want to hear about the time you were in Burma.
A. Okay. Which -- which one?
Q. I want to hear this answer.
A. Which one was it? Let me read the whole thing.
Q. "The misidentification unquestionably resulted in reputation harm." Is that causation opinion or not?
A. I wouldn't frame it that way because I -- I --
Q. Well, I know you wouldn't because --
A. Yeah. I'm not allowed to -- to get into causation and make a definitive --
Q. Great. Let's go to the next thing on that page.
A. -- statement. It's an opinion based on --
Q. I want your attorney to make her flight, okay? If you want to talk about drinking gin on the Burma campaign, you can do that.

A. Well, you asked me -- I'm questioning --
Q. We'll go do that after.
A. I'm questioning -- the word I'm questioning --
Q. No. You're filibustering and I'm going to move for extra time at your expense if you don't cut it out. Putting that on the record, okay?
You know I can do that and I'll do it, so cut it out. Now, on Page 43, you also say, "The defendants exhibited extreme carelessness." Is that a legal standard?
A. No. It's a personal opinion. It's not expert opinion.
Q. You said on Page 33, "They maliciously double downed." Is malice a legal concept in a defamation case?
A. Yes. Actual malice is, not malice by itself, but actual malice and --
Q. Do you know what that means, actual malice?
A. Yeah.
Q. Define it, please.
A. Actual malice means this is done with negligence or reckless disregard for truth, or that they know the -- and -- and/or if they knew that the statement was false when they issued it.
Q. So negligence is actual malice, in your opinion?

tell me what paragraph it's in or what the heading is. Come on. Page 30.

MS. WESTBROOK: It's in italics.

THE WITNESS: Can't even find it.

BY MR. RANDAZZA:

Q. Yeah. It's in italics, sir. So --

A. Well, if it's in italics, it's not me.

Q. Okay. So this is again --

A. I don't put anything in italics that is my opinion. Italics is -- is other -- another opinion. I don't put it in italics. It's somebody else.

Q. Okay. On Page 25 and 26, you set out the Nevada definition of defamation and its elements. Is it your intent to give the jury the law?

A. No. No. I got -- I got --

Q. Where did that definition come from?

A. I went on the internet and -- and, you know, pulled up that, in -- in the state -- state of Nevada, what is the definition of defamation and legal definition of defamation in -- in Nevada. I go on. I put that in there. It's just a -- it's a preface of -- I put it in there just to state what the -- what the charge that's being -- the cause of action is under legal standards. That's on -- it's just pointing out what -- what the legal standard is. I'm not making any conclusions on

it.
Q. On Page 18, you lay out the -- that actual malice requires knowledge of falsity or reckless disregard. Yeah?
A. When I get to Page 18, I'll tell you.
Q. Well, you just testified that that's the standard as far as you know, right?
A. On 18?
Q. Tell me what actual malice means again.
A. Well, actual malice means that -- as I understand it, actual malice means it's a combination either/or, of -- of someone that acts with negligence or reckless disregard for truth or -- and/or they knew they -- they knew the falsity of the statement before they issued it. That's my understanding of actual malice. That could be right or wrong, but that's what I gather.
Q. Are you offering an opinion that either defendant subjectively doubted that the photograph was of the wrong man?
A. No, not at all. I mean, I don't see why they would -- they would post a photograph of someone they knew wasn't him. They'd keep looking until they found -- no. I believe they thought that that was the -- the Crate & Barrel executive. Yeah. I believe they thought that.
Q. Page 33 is headed your personal opinion.

A. Page 33; is that right? Do I have it right? I'm on 33. Oh, personal opinion at the bottom?
Q. Yeah.
A. What do you want me to look at?
Q. Well, I -- and then on 44, you say the same thing. Is this your personal opinion or is it your client's or Ms. Westbrook's personal opinion?
A. No, it's my opinion because they -- they were careless. I mean, I -- I --
Q. What's the difference between your personal opinion and your expert opinion?
A. I labeled it personal opinion for a reason. And that -- it was to separate it from being a legal opinion. I'm allowed to do that.
Q. So which opinions in the report are personal and not expert?
A. If I labeled it personal, it's personal.
Q. Okay. So we can just maybe cross those out completely as --
A. Well, if you want to, feel free to.
Q. Are your personal opinions offered as professional certainty?
A. They're what it says, personal opinion. No one says anything about professional certainty. It's personal opinion. It's my personal opinion. Do you understand

what personal opinion mean? That's what a personal opinion -- that's my personal opinion. I labeled it as such.
Q. Now, you say in your report you're not permitted to opine on causation, right?
A. Again, I -- I can't opine on -- yeah. I can't make a declarative judgments on -- I don't opine. Can't make a judgment on -- on causation. That ultimately is a jury to decide once they hear the --
Q. But then you write that the post unquestionably resulted in harm, right?
A. Well, that's a -- a personal opinion.
Q. Okay. So you said you're not a lawyer, but then you give the elements of defamation, right?
A. Yeah. That -- that -- I don't make any -- when I gave -- in that section, when I gave opinion --
Q. I -- just right or wrong.
A. I didn't make any comments on it. I just said, here is the definition of --
Q. Focus. Focus. You offer no opinion that either defendant knew the photo was wrong, right?
A. Right.
Q. And --
A. I don't think they did.
Q. Some of what's in this report is your personal

the plaintiff suffered?
A. Only the plaintiff's representations, plus the fact that some of the things -- things he claimed are -- are consistent with it with --
Q. No, no. What is your evidence?
A. Evidence. Okay.
Q. Your evidence?
A. Oh, my evidence. I don't have any direct evidence other than what -- the representations were made in -- in testimony, sworn and otherwise.
Q. So just what the plaintiff said?
A. Yeah. The plaintiff -- what the plaintiff has represented. Yeah.
Q. What's your evidence that any congregant stopped attending the church?
A. I have no evidence.
Q. What's your evidence the news media became more critical of the plaintiff?
A. I have no evidence.
Q. What's your evidence that his ability to operate the church was disrupted?
A. No direct evidence.
Q. How about -- what's your evidence that his wife, son, or grandchildren were affected?
A. No direct evidence.

Q. What's your evidence his brother was affected?
A. About what?
Q. His brother?
A. No direct evidence.
Q. What's your evidence that he has suffered from depression or anxiety or physical side effects?
A. That one is -- that -- that would be -- I have no direct evidence, but that's consistent with what I -- my -- I have.
Q. You have no direct evidence?
A. No. The history of -- of other people --
Q. Yeah. I'm not interested in other people. I'm interested in this report. So if you want to talk about other stuff, we can go for cocktails after, and we can talk about your whole life. I'm very interested in it. But in this deposition, I'm interested in this guy. So none of that is in either complaint, right, the brother, the physical manifestations, nothing?
A. Is in -- not in what?
Q. In the complaint. You reviewed the complaint?
A. Yeah.
Q. Okay. So who told you about all of that?
A. Well, in the complaint, if I remember right, there was stuff about emotional distress and -- and trauma and whatever in the complaint, I think. I -- obviously,

that -- that was in materials that I read. I mean, I didn't dream that stuff up. So it was obviously in some -- some information, legal documents or information I saw.
Q. Okay. So you say on Page 35, "This was a topic of conversation to many in the faith-based community."
A. That's what I was -- that was -- that is what was represented to me.
Q. Okay. So you can't name a single person who discussed it?
A. No, I can't.
Q. Document, email, text, letter, post, graffiti, anything?
A. No.
Q. Nothing. All right. Name one person in whom a seed of doubt was planted about Pastor Smothermon?
A. I can't name one person.
Q. But you say on Page 35, "There's evidence that the news media became more suspect and critical." What evidence? Name one outlet.
A. No, that was -- that -- that was represented to me that -- that -- that was the case, just to say --
Q. By the plaintiff?
A. Yeah. Just like the brother.
Q. Well, not by the plaintiff because you never talked

to the plaintiff?
A. No.
Q. Not once?
A. No. I -- I didn't get it directly from him. No.
Q. So you got it from Ms. Westbrook?
A. Well, or I've got it -- not from her. I've got it from things I read. I mean, I don't make up anything. I mean, I read -- I read what's presented to me. And if there's -- if it's presented with a reasonable degree of -- of certainty or reality, I -- then I -- you know, I accept it.
Q. Did you compare coverage of him before and after August 22, 2025?
A. No, I didn't compare it. I -- I saw coverage from both cases, but I didn't -- I didn't compare it.
Q. Is there a single news article in any of your materials list?
A. No.
Q. Your note -- your family note here, Page 35, 36, you say that, "Family harm potentially leads to marriage strain, discord, and divorce. Children are harassed, bullied, or even physically attacked."
A. Yeah. That's my experience.
Q. Great. Tell me your evidence that that happened here.

A. Well, I don't have evidence it happened here. I -- I --
Q. Then why is it in your report if you have zero evidence of it ever happening?
A. I didn't say it happened here. I said that -- that was -- that is the type of experiences that -- that have happened to other people in similar situations. I didn't say it happened to him.
Q. Let's see. So Page 19 and 20, there's contrary evidence here you reprint, but don't answer. The plaintiff has not required or sought mental or physical treatment. Any evidence to the contrary?
A. I don't see where you're -- what -- are you referring to on Page 19? I don't see anything.
Q. Did you review your report before your deposition today?
A. Oh, not today, no.
Q. When's the last time you looked at it?
A. Earlier in the week. Maybe Tuesday. What is today? Thursday. Probably Tuesday.
Q. So see where it says 19 at the bottom of the page?
A. Okay. I'm on Page 19.
Q. Do you see the two lines at the bottom of the page? If you don't see them, tell me you don't see them and I'll --

A. I see them.
Q. Okay. Great. Does the first one say, "The plaintiff has not required or has sought mental or physical treatment"?
A. That's not coming from me. This was the --
Q. Do you have any evidence to the contrary of that statement?
A. No.
Q. All right. The next one --
A. I'm not making -- I'm not --
Q. The -- no, that -- that's it. That's all I care about.
A. Okay.
Q. All I care about, pal. "The plaintiff did not lose any book sales, media interviews, or speaking engagements." Do you see that?
A. That's what -- that's what your side is claiming.
Q. Yes. I -- I understand. I'm --
A. Yeah. Yeah.
Q. I'm not attributing this to you.
A. Yeah. No. No. Okay. I see it.
Q. I think we figured out that.
A. Yeah. Yeah.
Q. Okay. Do you have any contrary evidence?
A. No, I don't have --

Q. Next page. "The plaintiff has not received any negative comments from his parishioners." See that?
A. Yeah, I see that.
Q. Any contrary evidence?
A. Not that I know of.
Q. The church's income has increased from 2024 to 2025. Do you dispute that?
A. No. I mean, I don't dispute it. I don't --
Q. Where in your report do you address any of these four points?
A. Well, it's not -- well, I don't -- I don't -- as I said, that's in a section where I just make -- I post the claims of both sides in a --
Q. The question --
A. I didn't --
Q. The question was -- the question was --
A. Yeah, I did -- I did --
Q. Where do you address it?
A. I don't think I addressed them.
Q. Okay. So is it your methodology to consider contentions cutting against your conclusions?
A. Well, that -- that's a -- it's a mixed bag here in the sense that --
Q. No, that's not.
A. I don't get involved with income. I don't have any

brother and -- and all the --
Q. Right.
A. -- I clearly identify that that is what the plaintiff is representing. I don't draw any conclusions myself because I'm not representing it. I'm just reporting that they represent it just as much as I'm reporting on these two pages that those four items are being reported by the -- by the --
Q. Okay. Here's where I'm going to think you're making a mistake, because I'm not going to say that you're lying. Report summary, okay? Based on all available evidence -- but that's not true because you didn't even look at the exhibits to the amended complaint, but --
A. I didn't see them.
Q. So that's -- no, it's okay.
A. Yeah. I didn't -- I wrote -- I did --
Q. It's available, right?
A. Obviously, I looked at the thing, and, I mean --
Q. You looked at my website where it's there, right?
A. No. I just looked at the graphic on your website.
Q. You just looked at the picture? You put the link to the case page and you didn't look at the case documents?
THE RECORDER: Gentlemen, sorry to interrupt. I want to remind you guys, please, please, please try to speak one at a time.

Q. Did you ever read a single comment about him?
A. You asked me that before. No.
Q. Okay.
A. I didn't see any comments. I wasn't exposed to --
Q. So you didn't address any of the defendant's points about the absence of harm, right? You --
A. No, no, no.
Q. You copied and pasted them, but you didn't engage --
A. No, I -- I saw what they were. It's not my job -- it -- it's my job to factor in what they're saying, but not to -- to investigate that they're saying what they're saying. I mean, that's -- that's -- I do that by providing -- providing their claims in the report. I'm showing that they're, in a sense, their own defense.
Q. So on Page 13 of your report and 15 of your report, you state that the photo was online for an hour or two, or taken down that same day?
A. My understanding was -- I don't know how long the time frame, but my understanding was that it was taken down the same day it was put up. I don't know how long the period was in between.
Q. Is that -- should that be relevant to your methodology, how long it was up?
A. Yeah. I made that -- you know, I made my report that the -- that the woman, I can't remember her name,

at the -- at the Legacy Church called this Kylie Howerton and told her. And she turned around and told Nathan somebody, and he took it down. I don't know what the time frame was. I never saw an exact -- but I -- but I did report in there that -- it is in my report that it was taken down the same day. I didn't say it was up there for two years.

Q. How much damage do you think it would cause if it was up for two years? Give me an estimate what you think the damage would be.

A. Well, he has -- I don't know. He has 6.3 million viewers, supposedly, or followers. I don't know how often they go on. I would -- I think they would go on more than -- you know, a two-year period, they would go on multiple times, I would think, to see that. That's a supposition, obviously.

But, you know, I don't know that it matters whether it was up two years or two months. I mean, his followers are going to -- their followers, I'm sorry, are going to go -- go on, if they're followers, and -- and periodically look at his things. So if it's up for a period of time, a certain percentage are going to see them and see it often.

Q. On Page 14, you quote Ms. Mason. It says -- you want to take a look at that or you want to -- where it

says, "Many of our church members have commented, and the official Legacy Church page has responded, requesting it be taken down." You see that?
A. On Page 14?
Q. Yeah.
A. Oh, yeah. Mason became aware of the error and notified Howerton. Yeah, that's what I said.
Q. So according to that, Legacy Church publicized the post to its own audience?
A. Well, I'm reading a thing where she said -- or sent an email, obviously, saying that they -- to Howerton saying it needs to be taken down.
Q. Did you analyze whether the plaintiff's own side amplified the exposure?
A. No. I saw no evidence.
Q. Can you identify a single instance of word-of-mouth transmission in this case? One person who told another?
A. No.
Q. So you can't say how long the photo was up? Or can you estimate?
A. It was within -- I would assume within hours. It was within a day, I mean --
Q. But you can't say how many people saw it?
A. No.
Q. And you have no evidence of any republication ever,

correct?
A.  No, not that I know of.
Q.  So you say at Page --
A.  Not to say there wasn't, but I have no evidence that there was.
Q.  So you say at Page 29 that you researched the internet seeking to discover if there were any reports that would be negative to him.
A.  Yeah.  Well, that's -- we've already discussed that.
Q.  You think you did a good job at that?
A.  I -- I think reasonably, yeah.  I mean, I think that -- I mean, you know, Google is like the Bible of the -- of the internet.  I mean, it's by far the -- the most popular and used research/search tool.
Q.  Well, let's go to Page 31, then.  Let's see.  Was it 31?  All right.  So you never saw Reddit posts about him?
A.  No.  I never saw any social media posts about -- about him.  I never saw any social posts about anybody, including the defendants.  There was no information provided to me or evidence.
Q.  Well, I want you to look at the second bullet point on Page 31.  Do you see that?
A.  Yes.
Q.  Read it out loud, please.

A. Oh, wait a minute. There's more bullet points.
Q. Page 31. Go put your finger at the top, at the first bullet point. Move your finger down to the second one. That's the one I'm talking about.
A. Legacy Church, the unchristian Church.
Q. The unchristian Church.
A. Uh-huh.
Q. Did you click on that link?
A. No, I didn't.
Q. So you didn't read that thread at all?
A. No. I just --
Q. You got no idea what it says, do you?
A. No. My -- my purpose in that was to -- to get the subject matter of the ten listings that were on the first page of Google, as to who they were about.
Q. And that's the second one, right?
A. No. It's the fourth one.
Q. Oh, that's the fourth result?
A. Yeah. Fourth result.
Q. Oh. You're -- yeah, you're right. I'm sorry.
A. Yeah.
Q. You have two on the other page.
A. Every once in a while, I'm right.
Q. Okay. So the second -- so the fourth Google result was that, and you didn't think it was important to look

THE RECORDER: I'm not sure if it's the one to strike.
THE WITNESS: Wait a minute. Yeah, the order is Number 2.
BY MR. RANDAZZA:
Q. Okay. So do you recall looking at this? It's on your list.
A. If it's on my list, I looked at it.
Q. Do you recall looking at it?
A. Let me see. Not specifically, but I -- I know I did.
Q. You know you did because you listed it or you know you did because you remember it?
A. Because I listed -- because I listed it. I wouldn't have listed it if I didn't look at it.
Q. So look at Page 6. And it's got a handy little number line on the left. Go to Line 6 of Page 6, where the Court says, "Plaintiff claims that Defendants curated the exhibits to smear him." You see that?
A. Uh-huh.
Q. Do you have any reason to believe that the Court lied?
A. I don't know what exhibits they're referring to.
Q. Well --
A. I mean, there are a lot of different types of

document, did you come across that and think maybe that would be some negative material you should look at? Or were you uncurious about that?
A. In other words, they trumped up the -- they cherry-picked all this negative stuff to -- in an effort to smear him, and you're thinking that I should have analyzed all these exhibits to see it were so, but I didn't see the exhibits, so.
Q. Well, you said you couldn't -- you said you couldn't find anything negative about him, either on Google, either on the exhibit you found, nor even on the motion to strike, nor even on the amended answer, nor even was your curiosity peaked when a court order explained that we curated exhibits to smear him.
A. Okay. Well, first of all, I never said I didn't find anything negative about him. I found -- I said when I did that --
Q. That's exactly what your report says.
A. No, no. I said when I got that initial search, I went through and I saw him involved in some disputes, which you could say negative, but it had nothing to do with him as a pastor or related to his profession, which is the issues in this case. I saw him getting in a debate over some -- I think it was a zoning thing. I got a political thing. But it was nothing that related

to the -- to his profession.
Q. Let's go to Page 29, and let's remind you of what you say you did. I -- okay. I want you to go to Page 29. Go to where it says, "Analysis of Plaintiff's reputation pre-public exposure."
A. I see it.
Q. And I want you to go to the sentence that begins with "I researched." And I'd like you to read that out loud.
A. Okay. "I researched the internet seeking to discover if there were any reports personally or professionally that would be negative to him or discover any incidents of reputation harm that occurred prior to the publication of the Facebook post."
Q. How about the last sentence?
A. "I did not see any information of a negative nature about him either personally or professionally." Yes, I didn't --
Q. But you saw a court order that said that we had found a bunch of things to smear him with, right?
A. Well --
Q. I mean, you didn't lie about reviewing it, so you must have --
A. No. I didn't review it. I don't -- I didn't -- I don't -- that particular sentence in that report, you

something. Yes, I'll give you -- it's a negative connotation. I would agree with that.
Q. Okay. Do you think if you were looking for pre-existing negative information, that would have been something you wanted to have?
A. Okay. You're taking your eye off the ball here. This case not is -- is not involved with that. This case is involved with a man's credibility as a preacher, as a pastor, preacher, minister, whatever you want to call him, to be able to function as a preacher in front of his church, because he's been accused that his whole philosophy or his whole sermons or whatever he -- he offers out is bogus because he's affiliated with something that goes against his teachings, his sermons. That's it.
Q. Okay. So --
A. It's not about whether he was a chairman of a board, of a corporation that may or may not have something to do with the -- the allegations against your defendants is -- is they caused reputation harm to him in the area of -- of his ability to function as a preacher in that he was two-faced and he was a hypocrite by espousing something in the God's Word about -- you know, about biblical philosophy, when in -- in turn he was advocating something that was diametrically opposed.

That's what the case is about, not whether he was chairman of a board or some -- yes --

Q. How familiar are you with his teachings at the church?

A. Well, I'm -- I'm not familiar specifically with him, but I'm familiar with --

Q. You don't know anything about him?

A. Well, I'm -- excuse me, I'm familiar with -- with pastors and their teachings and preachings and their -- their whatever. And they -- they generally --

Q. So sex abuse wouldn't generally go against his sermons and teachings?

A. He wasn't accused of sex abuse.

Q. He was accused of --

A. If they read the thing -- if they read the thing, the guy -- the guy said he's chair -- he's on the board of directors of an institute that someone was involved, so therefore I think he knew about it. You know, they -- he wasn't accused of doing anything.

MR. RANDAZZA: That's Exhibit 13.

(Defendants' Exhibit 13 was marked for identification.)

THE WITNESS: And there wasn't even specifically anything that said he was aware of it. He said that --

BY MR. RANDAZZA:
Q. Are you aware of that news report describing protests outside Legacy Church after he publicly opposed --
A. Yeah. This one, I remember.
Q. Oh, you saw that?
A. Well, no. I mean from my original research. I remember seeing something that -- that there was a comment that sparked some -- some protests.
Q. Right. Now, again, we don't judge whether that's okay or not, but that was about public protests at his own church, right?
A. Uh-huh.
Q. Did that appear anywhere in your assessment of his baseline reputation?
A. A gay man to office. One thing, if nothing else, it demonstrates that he's opposed to gay -- the gay men in -- in office, which is -- which is directly related to the leakage of his picture to a --
Q. Sure. But is that a positive press coverage or negative?
A. Well, the fact that --
Q. We can disagree with it, but --
A. Oddly enough, this is one of the pictures that was on that -- on that page on Google. That picture there

knew I had it some --
Q. What did you do to verify?
A. I didn't do anything to verify. It was --
Q. Come on.
A. I -- I think I got --
Q. You did nothing to verify?
A. Well, I think I got -- I'm not sure if I got that off of Wikipedia or that was -- I don't think that was information that was provided to me. I -- I found that from researching him on the internet, so I had no reason to dispute it.
Q. Why isn't Wikipedia in your list of documents you've looked at? It's not there.
A. No, it isn't. Those are mainly documents I -- I reviewed. Yeah, I did some research on him. I don't think that -- I'm not sure if that information was provided, but I think I found that on the internet. Yeah, I'm pretty sure I did.
Q. What did you do to verify it?
A. I didn't do anything to verify. I mean, it was -- it was posted --
Q. Take a look at Page 21 here where it says -- you have a screenshot, at least described, that says, "I'm a right-wing extremist and here's why." What was that?
A. I was provided -- that's not something -- I mean, I

was provided -- in the discovery that I was provided to review, I was provided three screenshots. And --

Q. Was that by him? Did he publish that about himself?

A. I don't remember. I remember it was in the information that -- that was sent to me and I looked at, and so I just --

Q. That's not the question, okay? Here's the question. Focus on the question. The question is this: Who is the "I" in that "I'm a right-wing extremist and here's why"? Do you have any idea?

A. Well, I'm sure it was -- I don't remember right now who -- who it was in reference to. I'm sure it was in the screenshot I saw. I'm sure it was --

Q. Sir, this is your expert report.

A. Yeah. I understand that.

Q. Okay. So should this get to a jury, I'm going to put this in front of them and have the expert who says, I don't know what this thing is I reviewed. Is that really how you're going to bolster your credibility?

You just say, I have no idea what it is, I just put it there. Is that what you want to say?

A. No. I was just listing -- I was just listing all the things I looked at. And obviously, since I didn't pick up on it anywhere in the text of my report, it was something that I didn't -- I just -- I just listed it --

Q. Do you know who "I" is in that sentence?
A. No, I don't, as I sit here now.
Q. Okay. So you have -- you have listed documents that you say you reviewed but you don't remember. You've looked at documents --
A. But I didn't -- I didn't think --
Q. -- that you don't know what they are.
A. I didn't think it was substantive enough to -- to use in the body of -- in the body of my report.
Q. So someone claiming to be a right-wing extremist, you were like, I'm not curious about that. Is that -- was that your methodology?
A. No.
Q. Is your methodology, like, specifically uncurious?
A. No. My methodology is I looked at -- I looked -- I looked at that individual document and I didn't think there was anything in the document that -- that was germane to put in my report, either in terms of the background to the -- to the case or in my conclusions, opinions. I don't put everything. I list everything I read. I don't -- I don't -- if it -- I read documents. You've got a page and a half of documents here or more.
Q. Yes.
A. Some of them I didn't get anything out of. I mean, I read them. There was nothing in it that -- that, to

350,000 in reputation repair costs.
A. Okay. You mean break it down cost-wise?
Q. Yeah. What are the components of that?
A. Otherwise, the budget, break it down. Yes. Okay. I'd be happy to.
Q. How come that's not in your report?
A. I didn't choose to put it in there.
Q. You don't actually have it, do you?
A. Yes, I do.
Q. Where?
A. Get your pen out. I'll break -- I'll break every one of them down.
Q. I'm ready. Go for it.
A. Okay. The audit assessment is $5,000.
Q. I'm sorry. What's an audit assessment?
A. We talked about that earlier. That's where you take a baseline for what the -- the situation is at the given point in time, where the problem areas are, what -- what needs to be addressed. It's basically looking at what the reputation damage is at the time, and what needs to be addressed.
Q. What time? At August 22, 2025?
A. No. God, no. No. You're doing the -- you're not doing the program starting on August 22, 2000 -- it doesn't matter what it is then. You're doing whatever

the date you're starting the program. Assumingly, it would be shortly after the trial.

Q. Do you have this written down anywhere? Are you pulling this out of your head right now?

A. No. I have it written down.

Q. Where?

A. We submitted it to them. Yeah. We broke it down. If you -- you're not competent enough to have your -- she submitted to you a breakdown in writing on it. So look --

Q. Okay. So I'm looking at Page 41 where you say, I've projected the cost, but I will not delineate them at this time.

A. No, that's true. I didn't delineate them at that time, but I have them, and that's what depositions are for. You can ask me where they are.

Q. Well, I'm sorry. I'm too incompetent to find them here, as you said. Where are they?

A. Well, she -- they're not in my report, but we submitted a separate page to you with a complete breakdown.

Q. Did you?

A. Yeah.

Q. You sure about that?

A. Well, ask -- ask Ms. Westbrook.

Q. She's not being deposed right now.
A. Well, I was -- I gave a complete breakdown of one of your things in with the subpoena. One of your things was related to that. So I -- I did a complete one-page breakdown of all the various items, what the costs were, what they were for, how many hours, whatever, and -- and gave it to Ms. Westbrook. And she told me before the deposition that she had submitted it to you. But I can give it to you verbally if you want it. I mean, but she gave you a page. If not, I'm sure she'll send it to you when this is over.
MR. RANDAZZA: Is that accurate? Is he lying?
MS. WESTBROOK: (No audible response.)
MR. RANDAZZA: He's not lying?
THE WITNESS: No.
MR. RANDAZZA: Okay.
MS. WESTBROOK: Did you really not get it?
MR. RANDAZZA: No.
MS. WESTBROOK: You didn't get the --
THE WITNESS: She sent you a couple things.
MS. WESTBROOK: -- response to the subpoena and everything else?
MR. RANDAZZA: Nope.
THE WITNESS: Well, regardless, I'm willing to give it to you now, so if you want it.

BY MR. RANDAZZA:
Q. Sure. Great. Yeah. Let's hear it.
A. Okay. All right. Let's go down item by item. Okay. Okay. Pardon? The audit -- the audit assessment --
Q. Yep.
A. -- was $5,000.
Q. Okay.
A. That was based on 20 hours by someone charging $250 an hour. Okay. The program plan was $10,500. That was --
Q. What goes into that?
A. Well, the -- well, the audit assessment is when you identify what you -- what -- what your goals are, what your needs are, where the problems are, what you have to address.
Q. Have you not done that yet?
A. I'm not going to do it. I'm not the person to do it. And you don't do it until the -- until the case is over. I mean, you know, the bottom line is that you start the program when the trial is over, assuming that the plaintiff prevails in it. That -- that's the -- that's the -- if he doesn't prevail, then he should still have a program, but the defendants aren't responsible for it.

Q. Why wouldn't you do it now?
A. You'll have to ask him that. The point -- the point is --
Q. Well, in your opinion --
A. Well, in my opinion --
Q. -- if his -- if his -- his reputation has been cratered by this couple hours, right?
A. Okay. All right. All right. I'm not trying to --
Q. When should he fix it?
A. I'm not going to say. I -- I can make a -- I could -- I can make a case that he should have done something on August 22. I mean, you know, back -- back then.
Q. Yeah.
A. But the bottom line is one of the reasons to wait is that a litigation and a trial, if he should prevail, gives him hell of a launching board of validity to say that, you know, I was right all along, and these -- these guys did me wrong, and therefore he has a positive message to sell.
Q. So we want to --
A. If he -- if he doesn't prevail in the case, he should still do one, but the message would be different. The message is, you know, here's my side of the story. But the bottom line is, if he comes off with a -- with a -- a jury decree that -- that he was wronged by -- by

the defendants, then that's something that -- that he can -- a positive message he can go forward with.
Q. So your methodology says, wait until after the trial is over to mitigate the damage?
A. Well, I -- I am always -- I'm always an advocate of doing it sooner, better than later. But the bottom line is, in this context, it is worth -- let me put it this way: If he -- if he went forward now or before the trial or a verdict or whatever, a settlement, of course, changes the whole picture. But if he went forward now, he -- he really doesn't have anything to sell, but that -- but that -- his word for it or his -- you know, it's a he said/she said thing. This is what I'm claiming. But if he waits till trial and he prevails, and the jury hears all the evidence and they come and -- and find in his favor, then he's got a validation that -- that he was correct and that is a hell of a launch for a communications program.
Q. Oh, okay. I'm sorry. We did get this today, so I don't need to ask about it.
A. Okay. So I don't have to go over it. So that's if you have any questions on that.
Q. Do you have any vendor quotes for this?
A. Pardon?
Q. Vendor quotes, or are you just making these numbers

up?
A. No. No. It's based -- as I said, I've done 35, 40 of them. I know what people charge out in the field.
Q. Who's going to do the audit assessment?
A. I don't know. He -- I'm not that -- I -- let me declare very clearly. I will have nothing to do with this program. I will not do --
Q. Who's the last person you hired to do an audit assessment?
A. The last person I hired to do an audit?
Q. Yeah. I mean, there must be vendors to all these, right?
A. Well, I generally -- no. I generally -- in the past, we're talking about the '80s and '90s for the most part. I -- I would do them myself or somebody on my staff would do it. I didn't need to -- you know, I had ten people working for me. I would've assigned a couple people to do some research and go out there.
Q. But you haven't done one since Reagan was president?
A. No. Reagan ended the presidency in '88. I've --
Q. Oh.
A. Yeah.
Q. George Herbert Walker Bush then.
A. Yeah. January '89. No.
Q. Okay.

A. I said I've done them in the '90s, too. No. I mean, I'd have my staff do the assessment.
Q. Who would do the program plan?
A. Oh, that would be pretty much me and --
Q. How about the online --
A. In other words, once -- once the -- we identified who the target --
Q. Okay.
A. -- what the objectives were, the target audiences, whatever, then I would -- then I would --
Q. I'm trying to help her get on a plane here, okay?
A. Pardon?
Q. Trying to help her get on a plane.
A. Yeah. Okay. Well, you asked these questions.
MR. RANDAZZA: 6:45, right?
THE WITNESS: All right. Then the answer is me. I mean, I --
BY MR. RANDAZZA:
Q. Who would do --
A. I would do the program plan for the most part.
Q. All right. So if the answer is me, you can just say me.
A. Okay. Okay.
Q. Online communications, a website, a blog, and a social media. Who would do that?

A.  Well, that would -- part of it would be interoffice, you know, and part of it would -- we obviously have to hire people who do -- to put together websites.
Q.  To do what?
A.  To do what?
Q.  Yeah.
A.  Well, to put up a website.  I don't -- I don't have the skills to put up a website to do the graphics and put up the -- technically, the -- the keywords and all that other stuff.  We would hire somebody that does -- a subcontractor that -- that would put up websites.  And -- and the other thing is the design or put up a -- a Facebook page or whatever we decide to -- to do, that kind of thing.  And so -- so we had that -- the budget there.  I think there was 25,000 --
Q.  Yep.
A.  -- for that.
Q.  What about search engine optimization?  What do you mean by that?
A.  Well, search engine optimization is scrubbing off all the negative.  But what -- what that is -- is to do a search of the -- do a search -- a continual ongoing search and monitoring of the internet to identify, find negative stuff on the internet, and try to, if you can, remove it.  If not remove it, replace it with positive

content, you know?
Q. That's your definition of search engine optimization?
A. Yeah. It's -- it's seeking out, monitoring, and searching out negative information on the internet and replacing it. That's in this context that -- yes, that's -- I mean, searching engine optimization is a much more broad character -- category, obviously. But in this context of a reputation-damaged program, it's to find the dirt and try to get rid of it. And if you can't get rid of it somehow, then to replace it or put other positive content up there to offset it.
Q. All right. So you have no vendor quotes here, right?
A. Yes. I did talk to -- I did have a vendor quote, the guy I talked to earlier, Don Phillipson --
Q. Is that in here?
A. -- does that kind of thing. He -- I asked him to -- no.
Q. It's not in here.
A. No. I -- I asked him in general what he thought. I told him what the problem was, thought what would -- would be a level for this kind of a thing. And he said that about 2,000 a month would be what should do it over a period of like two years. 2,000 a month would be

fine.

On the videos thing, I talked to a video guy that does videos. I tell him what -- what we would want. We'd want videos that -- that he can, you know, put on his -- put on his website. He can put it on YouTube. He can use it if he has speaking engagements or any -- I mean, you know, Jen and Eric can -- they recommended that he do one long video and then, you know, maybe a -- a ten to 15-minute video or something like that. A ten-minute, I think, video.

MR. RANDAZZA: Can I have an exhibit number?

THE RECORDER: This is 14, too.

MR. RANDAZZA: 14. All right.

(Defendants' Exhibit 14 was marked for identification.)

BY MR. RANDAZZA:

Q. So this was provided to us this morning. I guess it's a -- what is this, Exhibit 14?

A. I have no idea. I mean, it's a -- it's a --

Q. Did you make that?

A. Oh, I know. I know what it was. That was a -- a screenshot that I did. I think the second time I went on -- you know, I told you I went on twice and -- and -- and this was the second time. And I took a -- a screenshot. I -- I hadn't done one the first time. And

so I -- I went on a second time, and I thought that other than putting them in my report, that I should have a -- a picture of what they looked like altogether.
Q. So you didn't do a Google Image search, you just did a Google search?
A. Yeah. Google search. Yeah.
Q. Not a Google -- do you know what --
A. Yeah. And this -- this is --
Q. Do you know how to do a Google Image search?
A. Not particularly.
Q. What does the particularly in that answer mean?
A. I -- I --
Q. Is it yes or no?
A. An image search. I've never done one. I'm not sure what --
Q. In your life as a public relations professional, since Google was invented, you've never done an -- a Google Image search?
A. No. I don't believe so. Remember, I was doing mostly legal PR for the latter part. After computers came in around the mid '90s, I was doing mostly law and there was not -- not law, but for what -- the kind of work I was doing for law firms, there wasn't a need for -- for Google Image searches. I wasn't -- that wasn't what I was tasked to do.

Q. So we established earlier that the 2.65 million to $5.589 million number, that just came from the plaintiff?
A. Yeah.
Q. That's not your number?
A. No, it's not my number. I'm very clear about that. So I'm not testifying to it. I don't have any input into it. I don't know how they came up with it, and it's not my number.
Q. Okay.
A. You'll have to ask them.
Q. Back to the Carroll case. In Carroll, you said a strong reputation makes a person more resilient. Here, you didn't apply that, correct?
A. No. No, not -- not necessarily. As I said, it's not the same in every case.
Q. It's not part of your methodology here, correct?
A. No. No, not -- I mean, I was much more familiar with Carroll and all than -- than in the -- than I was Mr. Smothermon -- Pastor Smothermon. But no, I didn't specifically. As I say, sometimes -- and it's generally can be considered true, but there are cases I've had that it -- like with the Central Park Five case where that gal's whole life was destroyed.
Q. Focus. Focus.

A. Yeah. Okay.
Q. Okay.
A. So I --
Q. In Carroll, okay?
A. Yeah.
Q. We are talking about one of your other cases.
A. Yeah.
Q. I'm not talking about --
A. Yeah.
Q. -- you know, the Spanish Armada or anything. Talking about Carroll.
A. Right.
Q. You said, in that case, a polarizing speaker's audience discounts him. Here, did you apply that to your methodology?
A. I'm sorry. I didn't get -- you said a polarized?
Q. A polarizing speaker's audience discounts him. That's from your report in Carroll. Have you applied that to your methodology here?
A. I'm not sure in the context I said a polarized -- speaking. I'm not sure what I was referring to in that. Polarized -- I don't -- I don't understand. What -- what's the context?
Q. In Carroll -- no, it's okay. You can just say, I don't know what I was talking about.

A. Well, yeah.
Q. It's all right.
A. The term polarized.
Q. In Carroll, you criticized an opposing expert for one-sided language. You remember doing that?
A. Well, her -- her language was -- I mean, their expert was -- was pathetic. I mean, horrible.
Q. Did she use terms like malicious and demonic?
A. No. No. No. No. No. I was going to say something, but I want to hear either one.
Q. Look, the real difference between these case is which side is paying you, right?
A. Which side?
Q. Whether it's a plaintiff or defendant paying, you apply a different methodology?
A. No. I will -- I will attest to the fact that in -- in -- in general, in most cases, if somebody has a very positive reputation for a long time, it will buttress a lot of the negative criticism. But there are times when it won't help. I've seen that, like, if I mentioned that one case --
Q. Sir, the question was not that.
A. Okay.
Q. The question is: Do you apply a different methodology depending on if a plaintiff or a defendant

is paying you?
A. No. No, not necessarily. No.
Q. No or not necessarily?
A. No. Not -- no. I -- I try -- you know, I mean, there are certain core things that apply in other cases, but there are -- as I said, there are -- there are times that things are -- there's exceptions to the rule. Let's put it that way. And it's not a cookie cutter kind of thing where everything is exactly the same. Some people can withstand --
Q. Because it's not -- you can't replicate it.
A. Well, yeah. Some people can -- some people can withstand criticism and some people, it -- it hurts them. I've seen it both ways. In Mr. -- Pastor Smothermon's case, I -- we -- I don't think anyone knows what the total net effect is going to be -- play out. This only happened a year ago. It's August -- what is it? August 4th, 5th, 6th now? And that was August 25th. It's been a year.
Q. You don't have any clue, right?
A. I don't think anyone has an actual clue.
Q. No, but you don't have any clue, correct?
A. No. I think you have to go on what is -- correct? No, I wouldn't say I have any clue, but I -- I would say that -- that this -- this will still play out. Let's

put it --
Q. You based everything on what he or Ms. Westbrook told you?
A. Well, let's get -- you mentioned Ms. Westbrook. Ms. Westbrook has never told me anything.
Q. Nothing?
A. I mean, no. When we --
Q. That's not what you said earlier.
A. No. We talk on the phone, but it's about setting up meetings or doing this or whatever. All the information I've got is not from her or speaking to anybody. It was all from the written word that I -- in documents I saw or things I saw on the internet, whatever. I haven't had any -- I haven't had discussions with any lawyer, her or anyone else, that was basically feeding me opinions and conclusions. No. She just -- when we talk, it's just a general. It's -- it's more procedural or -- or, you know, are you going to have the report done on time or, you know, is there anything else you need that -- you know, that kind of thing. It's just general -- general things.
Q. Have you told me every opinion you hold in this case?
A. I think every opinion I have is in the report. I mean, I always get that asked of me.

BY MR. RANDAZZA:
Q. Did you look at them today?
A. Pardon?
Q. Did you look at them today?
A. Well, I thumbed through them. Yeah. While we were sitting here, yeah, I thumbed through them. And as I said, the one you had me shown, it was one on third page with two lines that -- that some guy -- but, I mean, I'd have to look at the whole context of what each article was about, how it related to him and whatever. But I will look at them before -- between now and -- and -- and I guarantee you that I -- when the -- when the trial comes, if it does, and I get up on the stand, if I see anything that all this -- look, I'm not going to sell my soul over one case. I've had 138 cases. I'm not going to kill my reputation on one case.
The bottom line is, if I see something that -- that demonstrably, it may shade my opinion somewhat. It may say things aren't as bad as I thought they were, or I could do a 180 flip. But, I mean, the bottom line is I will look at those. I'll look at those between now and whenever the -- the trial is held. And if I -- if I see any of that, it might -- might shade my opinion or alter something.
Q. Are you done filibustering?

A. Pardon?
Q. Are you done filibustering?
A. Yeah.
Q. Okay. Have you told me every basis for every opinion that you have in this case?
A. I think so. I try to be as thorough as I can in my reports.
Q. You done filibustering? Any document that you relied on that we haven't discussed?
A. No. I don't believe so.
Q. Any fact that you relied on that we haven't discussed?
A. No. I think you have been thorough. I think we've covered everything.
Q. Do you intend to do further work in this case and review additional materials?
A. I will look at those, yes. I -- I would be disingenuous not to. I mean, the bottom line, if somebody went and gives -- well, filibuster. Yes.
Q. So your opinions today are not final?
A. They're final unless I see something that changes them.
Q. Okay. But connecting those --
A. And that would be the only thing you brought up was this stack here. And I will -- I will look at them.

Q. Anything I should have asked you?
A. No. I think you've been very thorough. I mean, I -- I appreciate you going -- most people don't go over my report -- report that thoroughly. You know, you're very detailed in going over the different pages of the report. I'm getting dizzy going back and forth, but I won't filibuster.
So, no, I think, you know, as I said, after 35, 40 reports, I -- you know, I've had attorneys that were good, bad, or indifferent questioning me. I don't take it personally.
MR. RANDAZZA: You're going to make your flight. No?
MS. WESTBROOK: I don't see it.
THE WITNESS: No. There's no way.
MR. RANDAZZA: Okay.
THE WITNESS: She had a 7:30 flight. She will barely get to the airport by that time.
MR. RANDAZZA: All right. Well, I'm done.
THE WITNESS: Okay. Now, are you going to send --
THE VIDEOGRAPHER: Hold on.
THE WITNESS: I can't -- these are exhibits.
THE VIDEOGRAPHER: Hold on.
THE WITNESS: I can't take them.

CERTIFICATE

I, Breyan Sims, a Notary Public in and for the State of California do hereby certify:

That the foregoing witness was duly sworn; that the proceeding took place before me at the time and place herein set forth; that the testimony and proceedings were accurately captured by me with annotations using electronic recording means not related to stenography.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am not interested in the outcome of this matter, financial or otherwise.

IN WITNESS THEREOF, I have hereunto set my hand this 11th of August 2026.

Breyan Sims

Breyan Sims, CER-2648
Notary Commission CA No. 2476818
Commission Expires: December 19, 2027

CERTIFICATE OF TRANSCRIPTIONIST

I, Alessandra Rote, Certified Verbatim Reporter, do hereby certify:

That the foregoing is a complete and true transcription of the original digital audio recording of the testimony and proceedings captured in the above-entitled matter. As the transcriptionist, I have reviewed and transcribed the entirety of the original digital audio recording of the proceeding to ensure a verbatim record to the best of my ability.

I further certify that I am neither attorney for nor a relative or employee of any of the parties to the action; further, that I am not a relative or employee of any attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this matter.

IN WITNESS THEREOF, I have hereunto set my hand this 11th day of August 2026.

Alessandra Rote

Alessandra Rote, CVR.
Certification No. 8570
Expires: April 1, 2027