# Exhibit 5

Deposition Excerpt of Robert J. Fisher
Carroll v. Trump, No. 20-cv-7311 (S.D.N.Y.) (Dec. 2022)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

E. JEAN CARROLL,

Plaintiff,

-vs- 20 CIV. 7311

DONALD J. TRUMP, (LAK)(JLC)

in his personal capacity,

Defendant.

------------------------------x

DEPOSITION OF ROBERT FISHER

December 14, 2022

Reported by:
MARY F. BOWMAN, RPR, CRR
JOB NO. 220615

R. Fisher

Q. You were there from 1968 to 1969?
A. Yeah. Yeah. I started in mid -- probably mid '68, went into '69.
Q. Did you reach a full year at The Times?
A. No, I wasn't there a full year.
Q. What was your position?
A. I was a reporter. What they call -- I worked in the Los Angeles bureau, not in New York, and there are like ten people there.
And when you're in a bureau, if you're in New York, usually you have a specialty type of thing. But out there, we were all generalists. So I would do various type assignments. I could cover a Litton stockholder meeting. The next day I could cover a press conference for the Los Angeles Rams. I just did all sorts of articles.
Q. Roughly how many articles did you write while you worked there?
A. Oh, I could not give you a guess. I could not give you an estimate. I did a

R. Fisher

lot of what you call -- I did multiple articles a day. I was -- I covered the international beat for a while. I could explain that to you.

But I might write or three or four international stories a day and it was based on -- well, if you want me to get into it, it was based on pirating something from the LA Times. If you want me to get into it, I will. If not -- let's vague and ambiguous just say I wrote a lot of articles.

Q. Did you name appear on the byline for those articles?

A. No, I can't remember -- no, they couldn't. Those kind of articles, you couldn't put the byline because they were basically plagiarism. I mean -- not plagiarism, but I mean taking information from other sources.

So you couldn't put your name on it because if you put your name -- if anybody put their name on it, it would be more -- it was more -- it looked like a

Q. If we turn to page 116 in this same exhibit. You will see it says at the top, "Appendix A, Examples of negative comments and posts about Ms. Carroll," and then we see in brackets "Produced in native form"? Do you see that?

A. Yeah, what does that mean, produced in native format?

Q. We don't have to sort through that now, but sort of my previous question, did you review this appendix A that was produced in native form?

A. No, I never saw it.

Q. And if you turn just one more page, to page 117 of Professor Humphreys' report, and you see another appendix listed, it's appendix I, "Examples of direct messages and emails to Ms. Carroll," and under that it says, "Produced in native form," is it fair to say that you didn't review appendix I either?

A. No.

Q. Let's turn back to page 75.

A. Yes.

Q. At the top, do you see where it says "Appendix B, materials considered"?

A. Yes.

Q. And then the first section says "Bates stamped documents."

Did you review any of the documents listed in this section?

A. No.

Q. And then under that on the same page, we see a section entitled, "Legal filings and depositions."

You testified previously that you did review the complaint, is that correct?

A. Yes.

Q. Did you review the deposition of Robbie Myers?

A. No.

Q. Turn to the next page, page 76, header "Academic articles" and then there is a list of academic articles that continues on to page through page 78.

Do you see that?

A. Yes.

Q. And did you review any of the

academic articles listed here?

A. No, I wasn't provided.

Q. By -- I believe you said no, you weren't provided. Are you aware that these academic articles were made available to the defendant's counsel in conjunction with Professor Humphreys' expert report?

A. I don't know what the relevance of these academic -- I don't know what these academic articles are or what they're about or whether they are -- I mean, you're asking me about the things I'm not even aware of and whether they are germane to anything.

Q. Okay, if we turn to page 79, there is a section titled "Books." Did you review any of the books listed in this section?

A. No.

Q. And then lower on that same page, there is a section titled "Websites" and then there is a list of URLs that continues on to page 83.

Did you review any of the

websites at those URLs?
A. No.
Q. Then if we turn to page 83, there is a section entitled "Social media posts" that continues on to page 84.
Did you review any of those social media posts listed there?
A. No.
Q. And then on page 84, there is a section called, "TV rating references," that continues on to page 85.
Did you review any of those TV rating references that Professor Humphreys lists?
A. No.
Q. And then on page 85, we have a section entitled, "Damages model references," that lists as 5 bullets under there.
Did you review any of those damages model references that Professor Humphreys lists?
A. No.
Q. And also on page 85, we have a

section entitled, "Print publication data references."

Did you review any of those print publication data references?

A. No.

Q. And at the end of 85, we have a section entitled, "ProQuest articles," and that continues on to page 86.

Did you review any of those ProQuest articles?

A. No.

Q. And then finally, on page 86, we have a section entitled "Databases."

Did you review or consult any of those databases?

A. No.

Q. So if we look -- just I apologize for maybe doing some flipping back and forth between your rebuttal report and Professor Humphreys' report. If we open to page 9 of your rebuttal report in the paragraph with the header "preface."

Do you see that?

A. Yes.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| E. JEAN CARROLL, Plaintiff, | ) CASE NO.: 20-Civ-7311 (LAK) (JLC) |
| v. | ) |
| DONALD J. TRUMP, in his personal capacity, Defendant. | ) |

DEPOSITION OF ROBERT FISHER

VOLUME II

REMOTELY IN LOS ANGELES, CALIFORNIA

TUESDAY, DECEMBER 20, 2022

REPORTED BY: NATALIE PARVIZI-AZAD, CSR, RPR, RSR
CSR NO. 14125

JOB NO.: 220862

specific, the time to do so. I was given five days to -- from the time I was contacted, to the time I prepared a report. And I did not have the luxury of -- of delving particularly beyond what was reasonable for me to know to be able to offer my conclusions and opinions.

And plus, I may add that having been involved in these kind of things for 50 years, representing people that have been damaged by programs and the extent of the damage, how they were damaged, how it manifested itself, so on and so forth, I don't need to consult pie charts or to -- to have a -- have an educated feel of -- of what the potential damage was.

Q. And you would agree that in designing a reputational repair campaign someone should, sort of, focus on the forms of media that the target audience actually consumes?

A. That would be a reasonable -- a reasonable thing to do.

Q. And is part of your designing reputation with repair campaigns, what sort of data do you rely on to identify the types of media that your target audience consumes?

A. Well, I don't particularly get into data

things I might have been done if I had a couple months to do it, the luxury of time, but in this case I had to meet the need.

Q. Understood. So just again, you did not -- you did not have any idea how many people actually saw or read what Mr. Trump said about Ms. Carroll?

A. Not at the time I did this report, no.

Q. And sitting here today?

A. Well, I -- I glanced at Professor Humphreys' charts. I didn't add them up but I glanced at them.

Q. Okay. And you didn't perform any analysis to calculate the percentage of people who were likely to believe what Ms. Trump said about Ms. Carroll; correct?

A. No, I don't think I had to do a study to -- to -- to get that information. I mean, Mr. Trump is a very well-known person and has a -- is very polarizing. And to answer your question, I don't need to see surveys to have a good feel on how many people would believe what he said or not believe what he said.

Q. And so, any opinion you have about the -- the degree to which people were receptive to what he said is based on your good feel and your

positive reputations can be destroyed almost instantly by a negative statement; correct?

A. Yeah, you must have seen in one of my reports where I said reputations -- there's an old saying. It takes years to build a reputation and seconds to destroy it.

But, again, a lot of these questions that you're asking, I would answer differently if it was anyone but Mr. Trump. But given the nature of his controversial nature, I think everybody would look at those with a -- you know, seed of doubt.

Q. And have you consulted any -- any data about how people filter Mr. Trump's comments when it comes to statements he makes about other individuals?

A. Yes, yes, I've talked to -- all the time, last six years. I talked to people all the time. I mean, people I know, people -- friends, business -- family, business associates. We talk all the time. He's a public figure. He makes thousands of comments. His tweets were famous.

Yes, I've talked -- over the years, I've talked to hundreds, probably, of people about what did you think of this or did you see Mr. Trump said that and this, and did you hear his latest -- yeah,

100 percent but she had a highly positive -- yes.

Q. And you did not include the point that it could take a lifetime to build a reputation but only seconds to destroy in your report here; correct?

A. No. Because as I -- I represent -- first of all, I usually do that in -- in conjunction with the reputation damage repair programs I write. And since I didn't do it, I didn't put it in. I use that as a preface for the program, but in this case I'm representing the defendant, so I didn't put it in.

Q. And you agree that the more broadly negative information is disseminated, the greater the reputational harm; correct?

A. I'm sorry. Please repeat that question.

Q. You would agree that the more broadly negative information is disseminated, the greater the reputational harm?

A. Well, that's logical, yes.

Q. And you would also agree that the President of the Untied States has one of the most prominent platforms in the world?

A. I think that's a fair assumption.

Q. And are you a member of any political party?